UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                          :
                                                :
AMPAL-AMERICAN ISRAEL CORP.,                    :          Chapter 7
                                                :          Case No. 12-13689 (SMB)
                          Debtor.               :
------------------------------------------------------------X
ALEX SPIZZ, as Chapter 7 Trustee for            :
Ampal-American Israel Corp.,                     :
                                                :
                          Plaintiff,            :
                                                :
          —against—                             :          Adv. Proc. No. 14-02110 (SMB)
                                                :
IRIT ELUZ, YEHUDA KARNI,                        :
MENAHEM MORAG, DANIEL VAKNIN                     :
and REVITAL DEGANI,                             :
                                                :
                          Defendants.           :
------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART
## AND DENYING IN PART MOTIONS TO DISMISS


**A P P E A R A N C E S :**

TROUTMAN SANDERS LLP
*Special Litigation Counsel to the Chapter 7 Trustee*
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

>       John P. Campo, Esq.
>       J. David Dantzler, Jr., Esq.
>               Of Counsel

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
*Attorneys for Defendant Irit Eluz*
900 Third Avenue, 16th Floor
New York, NY 10022

>       Michael D. Sirota, Esq.
>       Steven L. Klepper, Esq.
>               Of Counsel

CLARICK GUERON REISBAUM LLP
*Attorneys for Defendants Revital Degani, Yehuda Karni,*
  *Menahem Morag and Daniel Vaknin*
220 Fifth Avenue, 14th Floor
New York, NY 10001

      Nicole Gueron, Esq.
      Isaac B. Zaur, Esq.
      Sarah Louise Bishop, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The chapter 7 trustee (the "Trustee") of the debtor, Ampal-American Israel Corporation ("Ampal"), commenced this adversary proceeding against Irit Eluz, Ampal's former Chief Financial Officer, and Revital Degani, Yehuda Karni, Menahem Morag and Daniel Vaknin, Ampal's former independent directors (the "Independent Directors," and collectively with Eluz, the "Defendants"), alleging breach of fiduciary duty.  Eluz and the Independent Directors filed separate motions to dismiss.  For the following reasons, the Court grants the Independent Directors' motion to dismiss and grants Eluz's motion in part.

## BACKGROUND

The facts are derived from the well-pleaded allegations in the *Complaint*, dated August 27, 2014 ("*Complaint*") (ECF Doc. # 1), and other information that the Court may consider on a motion to dismiss for failure to state a claim.  In addition, at oral argument, the Trustee agreed that the Court could also consider the minutes of the meetings of Ampal's Board of Directors (the "Board") or of the Special Committee of independent directors (the "Committee") referred to in the *Complaint*.  (Transcript of hearing held on Mar. 3, 2015 ("Tr."), at 47:2-14 (ECF Doc. # 19).)

2

Ampal is a corporation organized under the laws of the State of New York with its principal place of business in Herzliya, Israel.  (¶ 4.)[1]  From its inception, Ampal acted as a holding company that invested in various businesses in the State of Israel.  (¶ 12.)  In or around 2002, Yosef Maiman acquired a majority interest in Ampal.  (¶ 13.)  At the time, Maiman was also conducting business through another Israeli corporation, Merhav (M.N.F.) Ltd. ("MNF").  (¶ 14.)  Following his acquisition of a majority stake in Ampal, Maiman became a director of Ampal and the Chairman of the Board.  (¶ 15.)  Maiman also "installed" former employees of MNF in management positions at Ampal, including Irit Eluz, who had been a junior executive at MNF.  (¶ 16.)  At all relevant times, Eluz was the Chief Financial Officer, Senior Vice President, and Treasurer of Ampal.[2]  (¶ 7.)  In 2006, Maiman became the President and Chief Executive Officer of Ampal and maintained that position up through the commencement of Ampal's bankruptcy case.  (¶ 17.)

In or about 2005, Maiman proposed that Ampal purchase a portion of MNF's interest in East Mediterranean Gas Company, S.A.E. ("EMG"), an Egyptian company that was constructing a natural gas pipeline across the Sinai Peninsula to Israel.  (¶ 20.)  Because it was a "related party transaction" under the New York Business Corporation Law, the deal had to be approved by the "disinterested" members of the Board.  (¶ 21.)  Consequently, the Board formed the Committee, which initially consisted of Karni, Morag, and Eitan Haber.[3]  (¶ 22.)  The Committee was

---

[1]    The citation "(¶ __)" refers to the paragraph in the *Complaint*.

[2]    Eluz also became a director of Ampal on May 5, 2010.  However, the Trustee subsequently clarified that the claims asserted against Eluz were solely in her capacity as an officer.  (*Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Eluz*, dated Dec. 8, 2014 ("*Opposition to Eluz Motion*"), at 2 (ECF Doc. # 10).)

[3]    Haber subsequently resigned from the Committee and is not a defendant in this adversary proceeding.  (¶ 22.)

3

assisted by Bryan Cave LLP ("Bryan Cave"), its legal counsel, and Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey"), its financial advisor.  (¶¶ 23-24.)  Based on the advice of Bryan Cave and Houlihan Lokey, the Committee recommended, and the Board approved, the purchase of MNF's interest in EMG.  (¶ 25.)  Subsequent to the transaction, the Committee continued as a standing committee of the Board.  (¶ 26.)

### A.  The Management Agreements

In February 2009, the Committee reviewed and considered a proposed Management Service Agreement (the "2009 Agreement") with MNF.  (¶ 28.)  The Committee was composed of Karni, Morag, and Vaknin at this time.[4]  (¶ 29.)  Eluz informed the Committee at a meeting held on February 15, 2009, that the purpose of the agreement was to compensate MNF for managing several of Ampal's projects.  (*Id.*; *Minutes of a Meeting of the Special Committee of Ampal-American Israel Corporation Held on February 15, 2009* ("*Feb. 2009 Minutes*"), at 1.)[5] Eluz further explained that there was no prior agreement providing compensation for MNF's services, although the parties had discussed entering into a long term management agreement in 2008.  (¶¶ 30-31; *Feb. 2009 Minutes* at 1.)  MNF had originally asked for 20 million NIS as compensation, but Eluz explained that the parties had negotiated an annual management fee of 10 million NIS payable in quarterly installments, which the parties deemed to be fair.  (¶¶ 32-33; *Feb. 2009 Minutes* at 2.)  Eluz also stated that Ampal's management would "monitor" the

---

[4]      Vaknin became a director and a member of the Committee in November 2008.  (¶ 10.)

[5]      A copy of the *Feb. 2009 Minutes* is attached as Exhibit C to the *Declaration of Nicole Gueron in Support of the Motion to Dismiss of Defendants Yehuda Karni, Menahem Morag, Daniel Vaknin, and Revital Degani*, dated October 27, 2014 ("*Gueron Declaration*").  (ECF Doc. # 9-2.)  A copy of the *Feb. 2009 Minutes* is also attached as Exhibit C to the *Declaration of Steven L. Klepper in Support of Defendant Irit Eluz's Motion to Dismiss the Chapter 7 Trustee's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)*, dated October 27, 2014 ("*Klepper Declaration*").  (ECF Doc. # 8-1.)

compensation paid to MNF in accordance with "detailed reports" submitted quarterly by MNF. If necessary, the compensation might be altered.  (¶ 34; *Feb. 2009 Minutes* at 2.)

Following the briefing from Eluz, the Committee approved the 2009 Agreement in principle.  It specified in its resolutions that the agreement should require MNF to cover its own expenses and permit Ampal to terminate the contract on 30 days' notice without cause.  (¶ 36.) The Committee also resolved to re-convene to "discuss and approve" the 2009 Agreement once the parties reached an understanding on its final terms.  (*Feb. 2009 Minutes* at 3.)  The Committee did not consult with its advisors prior to approving the 2009 Agreement.  (¶ 37.) Neither Eluz nor the other members of Ampal's management monitored the services provided by MNF or advised the Committee on any changes to the scope, nature or extent of the services during 2009 and the first eleven months of 2010.  (¶ 38.)

At a meeting of the Committee on December 19, 2010, Eluz informed the Committee that she had reviewed MNF's activities over 2010 and concluded that the compensation provided by the 2009 Agreement was "inadequate."  (¶ 39; *Minutes of a Meeting of the Special Committee of Ampal-American Israel Corporation Held on December 19, 2010* ("*Dec. 2010 Minutes*"), at 3.)[6] The Committee, then composed of Karni, Vaknin and Morag, (¶ 40), approved in principle a new Cooperation and Management Agreement (the "Superseding  Agreement") to replace the 2009 Agreement, effective retroactively to January 1, 2010.  (¶ 40; *Dec. 2010 Minutes* at 4.)

---

[6]        A copy of the *Dec. 2010 Minutes* is attached as Exhibit B to the *Gueron Declaration* and the *Klepper Declaration.*

The Superseding Agreement was executed on December 30, 2010.[7]  The Superseding

Agreement recounted MNF's "extensive expertise and experience in project development,

management and financing, particularly infrastructure and energy projects." (Superseding

Agreement at 1.)  Unlike the 2009 Agreement, which provided for the payment of a flat fee and

required MNF to cover its own expenses, the Superseding Agreement provided that Ampal

would pay MNF's fee[8] based on a percentage of its Ampal-related expenses as determined by the

Committee at or near the end of the year.  MNF was required to present its expenses, and the

parties agreed to review the fee in good faith and "make such adjustments as they agree may be

reasonably appropriate in light of the work performed or to be performed by [MNF]." (*Id.* at 2.)

Finally, the Committee determined, and MNF agreed, that the fee for 2010 would be 24,157,000

NIS. (*Id.*)  The Committee did not consult with its advisors before approving the 2010

Agreement. (¶ 44.)

During 2011, Ampal continued to pay MNF at the same rate, (¶ 46), despite the

Committee's failure to review, evaluate, negotiate or *approve* the 2011 compensation as required

under the Superseding Agreement. (*See* ¶¶ 46, 87.)  In addition to management fees, Ampal also

paid "consulting" fees to MNF in the amounts of 4,500,000 million NIS and 5,539,500 NIS in

2010 and 2011, respectively.  The Committee did not consider or approve the payment of the

"consulting" fees. (¶ 47.)

---

[7]      A copy of the Superseding Agreement is attached as Exhibit G to the *Gueron Declaration* and the *Klepper Declaration*.

[8]      The Preamble to the Superseding Agreement stated that Merhav-Ampal Energy Ltd., a wholly-owned subsidiary of Ampal, would pay MNF's management fees. (Superseding Agreement at 1.)

**B.  The Colombia Ethanol Project and the MNF Loan**

At a meeting of the Board on August 9, 2007, Eluz advised the Board that MNF was

developing an ethanol production project in Colombia (the "Project").  (¶ 48.)  At a subsequent

meeting on November 15, 2007, the Board, relying on the recommendation of the Committee,

approved a $20 million loan to MNF (the "Loan"), maturing on December 31, 2008.  The deal

also included an option (the "Option") for Ampal to purchase a 35% interest in the Project from

MNF once MNF obtained the necessary bank financing for the Project.  (¶ 49.)  The Loan was

secured by a pledge of MNF's stock in Ampal.  (¶ 50.)  The Committee received a "fairness

opinion" from Houlihan Lokey for the purposes of its review of the transaction.  (¶ 51.)

At a meeting on November 5, 2008, Maiman informed the Board that MNF was unlikely

to obtain bank financing for the Project in the first half of 2009 due to the "world financial

situation."  (¶ 53.)  The Committee considered an extension of the maturity date of the Loan at a

meeting on December 4, 2008.  Eluz informed the Committee that MNF was working toward

closing on bank financing in May 2009 but that a delay of six months was also possible.  (¶ 54.)

Relying on advice from Houlihan Lokey, the Committee approved a one year extension of the

maturity date to December 31, 2009.  In return, Ampal received a personal guaranty from

Maiman and the right to negotiate for the Option to provide a greater share of the equity in the

Project.  (¶ 55.)

As the maturity date neared, the Committee considered a second extension at a meeting

on December 15, 2009.  The Committee received a valuation from Houlihan Lokey, which

indicated that discussions regarding financing were in their "final stages" with Banco do Brasil.

(¶ 57.)  The Committee approved the extension of the maturity date to December 31, 2010 and

exercised the Option, converting the Loan to 25% of the equity in the Project.  However, the

conversion would not take effect until bank financing closed.  (¶ 56.)  The Committee did not

consider requesting additional collateral in exchange for the extension.  (¶ 58.)

By year-end 2010, MNF had not obtained bank financing, and Maiman again asked the

Committee for another extension of the maturity date and the termination date of the Option.  (¶

59.)  Houlihan Lokey provided the Committee with an updated valuation that disclosed that the

Project would require additional funding of $60 million.  (¶ 60; *Dec. 2010 Minutes* at 2.)  At the

December 19, 2010 meeting, Maiman explained to the Committee that he anticipated closing on

bank financing in March or April 2011 and that MNF also anticipated additional equity

investments.  (¶ 61; *Dec. 2010 Minutes* at 2.)  The Committee approved a third extension of the

maturity date to December 31, 2011.  (¶ 62; *Dec. 2010 Minutes* at 2.)  The Committee did not

request additional collateral from Maiman.  (¶ 62.)

Bank financing did not close in 2011, and MNF sought a fourth extension of the maturity

date.  By then, a series of terrorist attacks had been made on the EMG pipeline in the Sinai

Peninsula.  This threatened the flow of cash dividends from EMG to Ampal, which, in turn,

threatened Ampal's ability to meet its obligations to its bondholders.  (¶ 64.)  At a November 12,

2011 meeting of the Committee, which was now composed of Morag, Vaknin and Degani,[9]

Vaknin recounted the details of the Committee's trip to Colombia.  Vaknin stated that the

Committee had visited the Project site, met with Project management, the Colombian Minister of

Energy and the Project's contractors, and toured a commercial ethanol production plant.

(*Minutes of a Meeting of the Special Committee of Ampal-American Israel Corporation Held on*

---

[9]      Degani replaced Karni as a director and a member of the Committee in May 2011.  (¶ 11.)

*November 12, 2011* ("*Nov. 2011 Minutes*"), at 1.)[10]  Eluz also accompanied the Committee on

this trip and spoke positively about the Project.  (*Id.*)  The Committee approved a fourth

extension of the maturity date to December 31, 2012 at the meeting without considering the

impact of the attacks and without receiving any information regarding the status of bank

financing for the Project.  (¶ 66; *see Nov. 2011 Minutes* at 2.)

### C. This Adversary Proceeding

The Trustee commenced this adversary proceeding on August 27, 2014.  The *Complaint*

asserted three claims for relief.  The First Claim asserted that Karni, Vaknin, Morag and Eluz

breached their fiduciary duties in connection with the payment of excessive management and

other fees by Ampal to MNF for 2010.  The Second Claim alleged that the Defendants breached

their fiduciary duties by allowing Ampal to pay excessive management and consulting fees to

MNF for 2011.  The Third Claim asserted that Vaknin, Morag and Degani breached their

fiduciary duties by authorizing Ampal to extend the maturity date of the Loan to December 31,

2012.

Eluz and the Independent Directors each moved to dismiss the adversary proceeding

under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*Defendant Irit Eluz's*

*Memorandum of Law in Support of Her Motion to Dismiss the Chapter 7 Trustee's Complaint*

*Pursuant to Federal Rule of Civil Procedure 12(b)(6)*, dated Oct. 27, 2014 ("*Eluz Motion*") (ECF

Doc. # 8-3); *Memorandum of Law in Support of Motion to Dismiss the Complaint of the*

*Defendants Revital Degani, Yehuda Karni, Menahem Morag, and Daniel Vaknin*, dated Oct. 27,

---

[10]      A copy of the *Nov. 2011 Minutes* is attached as Exhibit J to the *Gueron Declaration* and the *Klepper Declaration.*

2014 ("*Director Motion*") (ECF Doc. # 9-1).)  Eluz contended that she did not actually make the decision to approve the management fees paid to MNF.  (*Eluz Motion* at 20-21.)  She also asserted that the *Complaint* failed to state a breach of the duty of loyalty because it did not adequately allege her interest in the transaction.  (*Id.* at 18-19.)   In addition, Eluz asserted that the breach of duty of care claims should be dismissed because the Committee's decisions were protected by New York's business judgment rule.  (*Id.* at 23-24.)  Finally, she argued that the "consulting" fees were likely special bonuses paid to Maiman at his request and that it was, again, the Committee's decision to pay.[11]  (*Id.* at 28.)

The Independent Directors contended that the Trustee's duty of loyalty claims should be dismissed because the *Complaint* failed to allege that the Independent Directors derived a personal benefit from the transactions or had lost their independence.  (*Director Motion* at 18.) They also contended that the Trustee's duty of care claims must be dismissed either because of an exculpation provision (the "Exculpation Provision") in Ampal's Certificate of Incorporation limiting the personal liability of directors to the fullest extent permitted under the Business Corporation Law, (*id.* at 20), or because they were protected by the business judgment rule.  (*Id.* at 24.)

In his response to the *Eluz Motion,* the Trustee argued, in the main, that Eluz was not protected by the business judgment rule because she lacked independence, (*Opposition to Eluz Motion* at 12-14, 22-23 ), but in any event, the business judgment rule was an affirmative defense that could not be asserted on a motion to dismiss for failure to state a claim.  (*Id.* at 21 n.9.)  In

---

[11]      Eluz also argued that she was shielded, in her capacity as a director, by an exculpation provision in Ampal's Certificate of Incorporation.  (*Eluz Motion* at 16.)  As noted in an earlier footnote, the Trustee clarified that he was only asserting claims against Eluz in her capacity as an officer, and as discussed in greater detail in the succeeding text, the exculpation provision only protects directors.

his response to the *Director Motion*, the Trustee contended that the business judgment rule did

not apply because the *Complaint* adequately pleaded a breach of the duty of loyalty,

(*Memorandum of Law in Opposition to the Motion to Dismiss of Defendants Karni, Morag,

Vaknin, and Degani*, dated Dec. 8, 2014 ("*Opposition to Director Motion*") at 16-17 (ECF Doc.

# 11)), and the duty of care.  (*Id.* at 21-22.)  The Trustee also argued that the Exculpation

Provision was extrinsic to the *Complaint* and the Court could not consider it without converting

the *Director Motion* into a motion for summary judgment, but in any case, the *Complaint*

sufficiently pleaded non-exculpated claims.  (*Id.* at 25-26.)  Finally, the Trustee requested leave

to amend the *Complaint* if the motions are granted.  (*Id.* at 30; *Opposition to Eluz Motion* at 26.)

## DISCUSSION

### A.  Standards Governing Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,

570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Iqbal,* 556 U.S. at 678; *accord Twombly,* 550 U.S. at 570.  Courts do not decide

plausibility in a vacuum.  Determining whether a claim is plausible is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal,*

556 U.S. at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal,* 556 U.S. at 678;

*Twombly,* 550 U.S. at 570.  "Where a complaint pleads facts that are 'merely consistent with' a

11

defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, the court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678. Second, the court should give all "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992); *McKevitt v. Mueller,* 689 F.Supp.2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko,* 897 F.Supp. 1507, 1532 n.23 (S.D.N.Y. 1995).

Here, the *Complaint* referred to what transpired at several Committee meetings and the allegations could only be based on information found in the minutes of those meetings. The

Defendants supplied the Court with copies of minutes of the Committee meetings and other

Ampal committee meetings, but the only meetings discussed in the *Complaint* that are relevant to

the motions were the Committee meetings held on February 15, 2009, (*see* ¶¶ 32-36), December

19, 2010, (*see* ¶¶ 39-43 and 61-62), and November 12, 2011. (*See* ¶ 66). The Trustee agreed at

oral argument that the Court could consider these minutes in deciding the motions. (Tr. at 47:2-

14.) The Court will also consider the terms of the Superseding Agreement, dated December 30,

2010, which is attached as Exhibit G to the *Gueron Declaration* and the *Klepper Declaration* and

is integral to the First and Second Claims.

In addition, the Independent Directors contend that I should take judicial notice of the

Exculpation Provision[12] and dismiss the *Complaint* based on its effect. The Exculpation

Provision, discussed in more detail below, limits the liability of Ampal's directors to the "fullest

extent permitted by law," including section 402(b) of the Business Corporation Law. N.Y. BUS.

CORP. LAW § 402(b) (McKinney 2003). Under Rule 201(b) of the Federal Rules of Evidence, a

court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute

because it can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned. Furthermore, the Court "must take judicial notice if a party requests it

and the court is supplied with the necessary information." FED. R. EVID. 201(c).

---

[12]    The Exculpation Provision provides:

   EIGHTH: The personal liability of the directors of the Corporation is hereby limited to the fullest extent
   permitted by law, including limitations contained in the provision of paragraph (b) of Section 402 of the
   Business Corporation Law of the State of New York, as the same may be amended or supplemented.

(*Restated Certificate of Incorporation of Ampal-American Israel Corporation* at 11.) The Certificate of
Incorporation is attached as Exhibit R to the *Gueron Declaration* and the *Klepper Declaration.*

In New York, certificates of incorporation are filed with the New York Department of

State and are public records.  N.Y. BUS. CORP. LAW § 402(a); *Int'l Painters and Allied Trades*

*Indus. Pension Fund v. Cantor Fitzgerald, L.P.*, 972 N.Y.S.2d 469, 474 n.3 (N.Y. Sup. Ct.

2013); *95 Lorimer, LLC v. Ins. Co. of State of Pa.*, 789 N.Y.S.2d 833, 838 (N.Y. Sup. Ct. 2004);

*Komow v. Simplex Cloth-Cutting Mach. Co.*, 179 N.Y.S. 682, 684 (N.Y. Sup. Ct. 1919).  Hence,

their contents are readily ascertainable.  It is not surprising, therefore, that New York federal

courts routinely take judicial notice of exculpation provisions in certificates of incorporation on

motions to dismiss.  *See, e.g., John Swann Holding Corp. v. Simmons*, 62 F. Supp. 3d 304, 309

(S.D.N.Y. 2014); *Steinberg v. Dimon*, No. 14 Civ. 688, 2014 WL 3512848, at *3 (S.D.N.Y. July

16, 2014); *Staehr v. Mack*, No. 07 Civ. 10368, 2011 WL 1330856, at *6-8 (S.D.N.Y. Mar. 31,

2011); *La. Mun. Police Emps. Ret. Sys. v. Blankfein*, 08 Civ. 7605, 2009 WL 1422868, at *7-8

(S.D.N.Y. May 19, 2009); *Ferre v. McGrath*, No. 06 Civ. 1684, 2007 WL 1180650, at *8

(S.D.N.Y. Feb. 16, 2007); *O'Toole v. McTaggart (In re Trinsum Grp.)*, 466 B.R. 596, 618, 620-

21 (Bankr. S.D.N.Y. 2012).

The Trustee's contrary authority is distinguishable.  With one exception, he relies on

Delaware federal and state court decisions.  (*See Opposition to Director Motion* at 25-26.)   His

lone Southern District case, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F.

Supp. 2d 376 (S.D.N.Y. 2013), applied Delaware federal and state case law in declining to take

judicial notice of an exculpation provision.  *Id.* at 399.  Nevertheless, the Trustee candidly

acknowledged that "it does appear some courts in this District will tolerate consideration at this

stage.  *See, e.g., Steinberg v. Dimon*, No. 14 Civ. 688, 2014 U.S. Dist. LEXIS 96838, at *11-12

(S.D.N.Y. July 16, 2014); *John Swann Holding Corp. v. Simmons*, No. 13 Civ. 8619, 2014 U.S.

Dist. LEXIS 154567, at *12 (S.D.N.Y. Oct. 16, 2014) (taking judicial notice where plaintiff did

not contest validity of the certificate)." (*Opposition to Director Motion* at 25 n.15.)

I agree with the latter approach. The contents of Ampal's Certificate of Incorporation,

specifically, the Exculpation Provision, are readily ascertainable and not subject to reasonable

dispute. Moreover, the Trustee does not dispute the contents of the Certificate of Incorporation

or the Exculpation Provision. It makes no sense to ignore the Exculpation Provision, which

raises a legal issue that the parties have addressed, and instead, insist on a second motion for

summary judgment that raises the same issue. In other words, if the *Complaint* does not plead

around the Exculpation Provision, it should be dismissed. Accordingly, the Court will take

judicial notice of the Exculpation Provision and consider it in connection with the Independent

Directors' motion to dismiss.

## B.  Sufficiency of the *Complaint*

### a.  Claims Against the Independent Directors[13]

#### i.  Introduction

The Exculpation Provision limits the liability of Ampal's directors to the fullest extent

permitted by Business Corporation Law § 402(b), which provides in pertinent part:

> (b) The certificate of incorporation may set forth a provision eliminating or limiting
> the personal liability of directors to the corporation or its shareholders for damages
> for any breach of duty in such capacity, provided that no such provision shall
> eliminate or limit:
>
> (1) the liability of any director if a judgment or other final adjudication adverse to
> him establishes that his acts or omissions were in bad faith or involved intentional
> misconduct or a knowing violation of law or that he personally gained in fact a
> financial profit or other advantage to which he was not legally entitled or that his

---

[13]    Although the cast of Independent Directors changed over time, and hence, the defendants in each count
may be a subset of the defined group, this opinion refers to the Independent Directors without regard to any changes
in the identities of those directors.

15

acts violated section 719 . . . .

N.Y. Bus. Corp. Law § 402(b).  Generally, section 402(b) shields a corporation's directors from liability for negligent acts or omissions occurring in their capacity as directors.  It also identifies five species of conduct that cannot be exculpated: (1) bad faith, (2) intentional misconduct, (3) knowing violation of law, (4) financial profit or other advantage to which the director was not legally entitled, and (5) violations of section 719 of the Business Corporation Law.[14]  *See In re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 293 (S.D.N.Y. 1996); *Teachers' Retirement Sys. of Louisiana v. Welch.*, 664 N.Y.S.2d 38, 39 (N.Y. App. Div. 1997); *Bildstein v. Atwater*, 635 N.Y.S.2d 88, 89 (N.Y. App. Div. 1995).  The provision protects directors against claims for breach of the duty of care but not breach of the duty of loyalty.  *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1211 (Del Ch. 2010) (interpreting New York law); *see generally* Gary Lockwood, Law of Corporate Officers & Directors: Indemnification & Insurance § 2:26 (2015) ("Lockwood").[15]  To plead around section 402(b), the *Complaint* must contain factual, nonconclusory allegations that implicate one of these exceptions.  *See Welch*, 664 N.Y.S.2d at 39 (conclusory allegations of complaint not sufficient to invoke exceptions to section 402(b)); *Bildstein*, 635 N.Y.S.2d at 89 ("[T]he complaint contains conclusory allegations that do not support the contention that the alleged conduct of GE's directors rose to the level of intentional misconduct, bad faith, or a knowing violation of the

---

[14]      Section 719 imposes liability against directors who vote or concur in the vote (1) to declare a dividend or other distribution in violation of Business Corporation Law § 510; (2) to purchase or redeem the corporation's shares in violation of § 513; (3) to distribute assets of the corporation to shareholders after dissolution without paying or providing for known creditors and creditors; and (4) making a loan to a director contrary to § 714.  N.Y. Bus. Corp. Law § 719(a).

[15]      All states and the District of Columbia have adopted similar statutes.  Lockwood § 2:26 & n.1 (collecting statutes).  The corresponding Delaware statute is Del. Code Ann. tit. 8 § 102(b)(7) (West 2015).

law."); *cf. Trinsum Grp.*, 466 B.R. at 618 ("Where an exculpatory provision applies, a director's

decision in that regard is only subject to challenge if there are allegations to support [non-

exculpated claims].") (interpreting Delaware law); *In re Cornerstone Therapeutics Inc.,*

*Stockholder Litig.*, 115 A.3d 1173, 1175-76 (Del. 2015) ("A plaintiff seeking only monetary

damages must plead non-exculpated claims against a director who is protected by an Exculpation

charter provision to survive a motion to dismiss, regardless of the underlying standard of review

for the board's conduct—be it *Revlon, Unocal,* the entire fairness standard, or the business

judgment rule.") (footnotes omitted) (interpreting Delaware law).

The Trustee relies on the "bad faith" exception.[16]  (*See Opposition to Director Motion* at

27-29.)  The difference between lack of due care, which is exculpable, and lack of good faith,

which is not, is a distinction not always easy to draw.  Recognizing the difficulty and confusing

case law, the Delaware Supreme Court in *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27

(Del. 2006), which the Trustee relied on for his definition of bad faith, (*Opposition to Director*

*Memo* at 27), explained the difference.  Lack of due care involves "fiduciary action taken solely

by reason of gross negligence and without any malevolent intent."  *Id.* at 64.  Gross negligence

---

[16]    The *Complaint* refers to the Independent Directors' duty of loyalty, (*see* ¶¶ 70, 72, 78, 94), but alleges no
breach.  The fiduciary duty of loyalty dictates that an officer or director "may not assume and engage in the
promotion of personal interests which are incompatible with the  superior interests of their corporation."  *Foley v.
D'Agostino*, 248 N.Y.S.2d 121, 128 (N.Y. App. Div. 1964); *accord Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425,
454 (S.D.N.Y. 2012).  "Director interest may either be self-interest in the transaction at issue (*see, Barr v. Wackman,
supra,* at 376, 368 N.Y.S.2d 497, 329 N.E.2d 180 [receipt of 'personal benefits']), or a loss of independence because
a director with no direct interest in a transaction is 'controlled' by a self-interested director."  *Marx v. Akers*, 666
N.E.2d 1034, 1041 (N.Y. 1966).  "The test for self-interestedness is not whether a director or someone who controls
him has engaged in or is liable for some sort of misconduct, but whether he will 'receive a direct financial benefit
from the transaction which is different from the benefit to shareholders generally.'"  *Stein v. Immelt*, 472 F. App'x
64, 66 (2d Cir. 2012) (quoting *Marx*, 666 N.E.2d at 1042).

The *Complaint* does not allege that the Independent Directors received any personal benefit from any of the
transactions at issue or that they were controlled by MNF or Maiman, who did.

includes "a failure to inform one's self of available material facts," and without more, cannot

constitute bad faith. *Id.* at 64-65. Instead, bad faith involves either subjective bad faith where

the fiduciary is motivated by an actual intent to do harm, *id.* at 64, or a conscious disregard of

one's fiduciary duties involving "misconduct that is more culpable than simple inattention or

failure to be informed of all facts material to the decision." *Id.* at 66. The Court quoted with

approval the lower court's examples of bad faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary
> intentionally acts with a purpose other than that of advancing the best interests of
> the corporation, where the fiduciary acts with the intent to violate applicable
> positive law, or where the fiduciary intentionally fails to act in the face of a
> known duty to act, demonstrating a conscious disregard for his duties.

*Id.* at 67; *accord Geltzer v. Bay Harbour Mgmt. LC* (*In re BH S & B Holdings LLC*), 807 F.

Supp. 2d 199, 200 n.4 (S.D.N.Y. 2011).

The law of New York, which governs the Trustee's claims, may impose even stricter

requirements for pleading and proving bad faith. In *Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d

Cir. 1991), the plaintiff brought a derivative action alleging, *inter alia*, that the defendant

directors had breached their fiduciary duties and wasted corporate assets by allowing GE to fund

a political support committee. The District Court dismissed these counts on preemption grounds.

The Court of Appeals reversed and remanded, concluding that the claims were not pre-empted,

*id.* at 476, and clarified the pleading requirements the plaintiff would have to meet. Discussing

New York's business judgment rule, the Court explained that "the actions of corporate directors

are subject to judicial review only upon a showing of fraud or bad faith." *Id.* (citing *Auerbach v.

Bennett,* 393 N.E.2d 994, 1000 (N.Y. 1979)). To survive a motion to dismiss, the complaint

must allege that the directors acted fraudulently or in bad faith, and allegations of waste, standing

alone, are not enough. *Id.* Although allegations of bad faith need not be supported by particular

factual statements, *id*. at 477, the pleader must do more than add the words "bad faith" to the

complaint:

> We note, however, that to survive a future motion to dismiss, Stern will have to do
> more than add the words "bad faith" to the complaint. Rather, if he intends to
> amend the complaint to allege that the Directors' actions were motivated by an
> improper purpose, he must state what that purpose was, and why it was improper,
> in terms clear enough to provide notice to appellees of the nature of the claim and
> the grounds on which relief is sought. *See* Fed.R.Civ.P. 8(a). Likewise, he must
> make clear why the Directors' actions constituted waste, and why their
> expenditures were "unreasonable and excessive."

*Id*. at 478 n.8; *accord Stoner v. Walsh*, 772 F. Supp. 790, 806-07 (S.D.N.Y. 1991) ("*Stern* makes

clear that conclusory allegations of 'bad faith' are insufficient to survive a motion to dismiss.

Rather, the complaint must state some set of facts from which it may be inferred that the

directors' actions might have been motivated by an improper purpose.").[17]

By analogy, the same rules for pleading bad faith should apply to exculpation provisions

in certificates of incorporation. The Trustee must, therefore, allege that the "Directors' actions

were motivated by an improper purpose, he must state what that purpose was, and why it was

improper, in terms clear enough to provide notice to [the Independent Directors] of the nature of

the claim and the grounds on which relief is sought."

---

[17] This standard also finds support in analogous situations under New York law. In *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413 (N.Y. 1983), the Court of Appeals was called upon to construe an exculpatory provision in a construction contract that precluded the plaintiff from recovering damages due to delays caused by the defendant, the City of New York. *Id*. at 414. The Court stated that even an unqualified exculpatory provision will not shield a party from liability for fraudulent, malicious or recklessly indifferent conduct or conduct "prompted by the sinister intention of one acting in bad faith." *Id*. at 416-17. The Court noted that bad faith "connotes a dishonest purpose." *Id*. at 417 n.5.

ii.     **First Claim – 2010 Fees**

The First Claim alleges that the Independent Directors breached their fiduciary duties by

approving the Superseding Agreement

> (a) without any consideration or finding of why it was fair to Ampal, or why it
> served Ampal's legitimate business purposes, to more than double, retroactively,
> the 10 million NIS consideration to Merhav that Merhav and Ampal had agreed
> was "fair" less than two years before; (b) without receiving any explanation from
> Eluz of why the Special Committee had not received quarterly reports on the
> purported increase in Merhav's activities on Ampal's behalf; (c) without
> considering what contractual justification Merhav had under the Management
> Agreement for requesting this additional compensation, or what contractual
> obligation Ampal had to make such an increase; and (d) without considering why
> it served a legitimate business purpose of Ampal, or was fair to Ampal, to base
> the annual management fee on a percentage of Merhav's expenses, when the
> Special Committee had previously insisted that Merhav bear all of its own
> expenses in providing management services to Ampal.

(¶ 77; *accord* ¶¶ 27(a), 38, 40-44.)  In addition, it asserts that the Independent Directors breached

their fiduciary duty to review and approve, as fair, a "consulting

 fee in the sum of 4.5 million NIS paid to MNF in 2010.  (¶ 80.)

The First Claim is not supported by allegations that satisfy the pleading requirements of

*Stern*.  The First Claim attacks the process by which the Committee reached the decision to

approve the Superseding Agreement.  It does not expressly charge the Independent Directors

with waste, but the implication is there.  It fails, however, to allege facts explaining the improper

purpose in approving the Superseding Agreement, which had the effect of doubling MNF's

compensation.  In fact, it alleges a proper purpose.  Eluz advised the Committee that MNF had

been inadequately compensated under the 2009 Agreement, and in response, the Committee

voted to void the 2009 Agreement and approved in principle the Superseding Agreement.  (¶¶

39-40.)  The *Complaint* does not, in this regard, allege that it was improper or not in Ampal's

best interests to hire MNF to oversee the activities of Ampal's direct and indirect subsidiaries or

20

pay MNF for doing it.  In fact, it compliments "[t]he careful consideration that the Special

Committee undertook in approving the original Management Agreement in February 2009," (¶

78), and compares it to the lack of similar consideration that attended its consideration of the

Superseding Agreement.

At most, the First Claim pleads gross negligence or lack of due care.  The Independent

Directors approved the Superseding Agreement without the same careful consideration they

showed when they approved the Management Agreement.  To paraphrase *Walt Disney*, 906 A.2d

at 64-65, the Independent Directors failed to inform themselves of available material facts,

which, without more, does not constitute bad faith.  *See also Trinsum Grp.*, 466 B.R. at 611 (bad

faith required knowing and complete failure to undertake responsibility) (internal quotations

omitted).

The Trustee's authorities, all involving Delaware law, do not support the argument that

bad faith or "conscious disregard" may be based solely on inadequate inquiry; instead, the

Trustee's authorities required conscious wrongdoing.  *See In re JPMorgan Chase & Co.

Derivative Litig.*, No. 12 Civ. 03878, 2014 WL 1297824, at *4 (S.D.N.Y. Mar. 31, 2014) ("Bad

faith 'in the corporate fiduciary duty of loyalty context [includes] (among other things) a failure

to act in the face of a known duty to act, which demonstrates a conscious disregard of one's

duties,'" and may be shown by a conscious disregard of an obligation to be reasonably informed

about the business and its risks or the duty to monitor and oversee the business) (quoting *Gatz

Properties, LLC v. Auriga Capital Corp.,* 59 A.3d 1206, 1216–17 (Del. 2012) (quotation marks

omitted)); *Trinsum Grp.*, 466 B.R. at 618 ("An allegation that a director breached its fiduciary

duty by a conscious disregard of such duty must be plead with particularity.").  Furthermore, in

those cases cited by the Trustee in which the court denied a motion to dismiss, the allegations of

bad faith were far more particularized than those in the *Complaint*. *See KDW Restructuring &*
*Liquidation Servs. LLC v. Greenfield*, 874 F.Supp.2d 213, 226 (S.D.N.Y. 2012), (allegations of
bad faith sufficient against one director of KDW that voted to continue doing business with
another company (Jara) in which he had a personal interest and which was already in default to
KDW and against other directors that repeatedly transacted with Jara despite its default, their
chairman's conflict of interest and prior warnings regarding the minimal benefits of the
transaction); *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings,*
*Inc.)*, 388 B.R. 548, 565 (Bankr. D. Del. 2008) (allegations of directors' breach of duties of
loyalty and good faith sufficient where (1) they abdicated responsibility over a major sale
transaction to the CFO who initiated the transaction 72 hours after he joined the company; (2)
there was no competitive bidding, no retention of an investment banker to "shop" the deal, and
only minimal efforts to find other potential buyers; (3) the first offer from the buyer was
accepted with few changes and required the corporation to deal exclusively with the buyer; and
(4) the directors approved the sale at a $28 million price even though the assets were worth $126
million and three competitors complained that they did not get sufficient notice that the assets
were for sale and would have been serious potential buyers if they had been given the
opportunity).

    Finally, in *Pereira v. Cogan*, 294 B.R. 449, 528-29 (S.D.N.Y. 2003), *vacated and*
*remanded on other grounds*, 413 F.3d 330 (2d Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006),
the Court found after trial that the defendant directors had breached their duty of loyalty by
declaring a dividend when the debtor did not have a surplus and ratifying the compensation of
the debtor's dominant and controlling shareholder, Marshall Cogan. As to the dividend, the
evidence showed that the Board did not determine whether the particular director had correctly

calculated a surplus or showed such calculations to the other directors, there were no practices in

place to determine whether the director had correctly calculated the surplus, and the directors

knew that the debtor was in a precarious financial situation, which should have caused them to

question any calculations of a surplus. *Id.* at 528. As to Cogan's compensation, there was no

evidence that the Board had met to discuss its ratification or that they actually knew the level of

compensation they were ratifying. Further, although they had received a report on Cogan's

compensation for part of the same period two years earlier, there was no evidence that they

remembered what they had heard or relied on what they had been told two years earlier. *Id.* at

528-29.

The *Complaint* does not allege that the Independent Directors had an interest in the

transaction with MNF or ignored obvious red flags indicating that the Superseding Agreement

was not in the best interest of Ampal. In fact, the Committee had already made the decision,

which the Trustee does not challenge, that it was in Ampal's interest to hire MNF and pay it a

management fee. Instead, the gist of the First Claim is that the Independent Directors acted in

bad faith by renegotiating MNF's compensation after Eluz had advised them that MNF had been

underpaid under the 2009 Agreement without adequately considering that Ampal might be able

to pay less. Assuming that this states a claim for breach of duty, it does not allege dishonesty or

an improper purpose, and the mere invocation of "bad faith" does not transform the claim into

something it's not. At most, the First Claim alleges that the Independent Directors acted without

due care in approving the Superseding Agreement.

The First Claim also alleges that the Independent Directors acted in bad faith in

connection with the payment of the 2010 "consulting" fee. The allegations are sparse. The

*Complaint* alleges that the Independent Directors did not approve the payment. (¶¶ 47, 80.)[18]  If

the Independent Directors did not consider or approve the payment of the "consulting" fee, the

Trustee cannot challenge their decision to approve its payment or the process by which they

made that decision.[19]  To the extent that the Trustee is alleging that the Independent Directors

should have informed themselves and stopped the payment and were grossly negligent in doing

so, the claim sounds in breach of the duty of due care.  Moreover, the *Complaint* fails to allege

that the Independent Directors acted with an improper purpose, and again, invoking the phrase

"bad faith" does not transform an exculpated claim into an unshielded claim.

Accordingly, the Exculpation Provision shields the Independent Directors from liability

for the conduct alleged in the First Claim, and it is dismissed as against the Independent

Directors.

### iii.    Second Claim – 2011 Fees

MNF's compensation under the Superseding Agreement was to be determined

retrospectively at or near the end of the year "based on (a) a presentation by Merhav of its

expenses incurred in providing services to Ampal; and (b) an agreed percentage of the direct and

---

[18]    The Independent Directors suggested that the Trustee was asserting a failure to monitor corporate operations or a lack of oversight of the type discussed in *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).  (*Director Motion* at 28.)  There, the Delaware Court of Chancery explained that a board could be liable for an "unconsidered failure…to act in circumstances in which due attention would, arguably, have prevented the loss."  *Id.* at 967.  While the *Caremark* court viewed the claim as one for breach of the duty of care, *see id.*, subsequent courts have characterized the claim as one for breach of the duty of loyalty.  *See In re JPMorgan Chase & Co. Derivative Litig.*, No. 12 Civ. 03878 (GBD), 2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014) (citing *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 980-82 (Del. Ch. 2013).  In any case, the Trustee has stated that he is not asserting a *Caremark* claim.  (*Opposition to Director Motion* at 25 n.13.)

[19]    The Compensation Committee, comprised of the same three Independent Directors, also met on December 19, 2010, and reviewed Maiman's achievements as Ampal's CEO for the year.  It approved a $1.25 million cash bonus payment to Maiman and increased his monthly salary to 350,000 NIS.  (*Dec. 2010 Minutes* at 6-7.)  The December 19, 2010 exchange rate was $1 to 3.588 NIS, and, therefore, $1.25 million equaled 4,485,000 NIS.  This may be the 4.5 million NIS "consulting" fee referred to in the *Complaint*.

indirect expenses of Merhav in providing these services." (¶ 83.)  The Second Claim alleges that the Committee breached its fiduciary duty in 2011 by "(a) failing to demand or receive any presentation from Merhav of the services it rendered to Merhav during 2011, and (b) failing to consider, evaluate and negotiate with Merhav and Maiman a management fee for 2011 that was fair to Ampal and in Ampal's best interest." (¶ 86.)  Failing to "supervise, evaluate, negotiate and approve" the 2011 management fees and allowing Ampal to continue to pay "the same excessive amount approved retroactively and paid in 2010," without considering "what management fees would be 'fair' and in Ampal's best interest for 2011," constituted bad faith. (¶ 87.)  In addition, the Independent Directors breached their duty by failing to review and approve the payment of a 5,539,500 NIS "consulting" fee to MNF in February 2011. (¶ 89.)

The Second Claim differs from the First Claim in one important respect; the Committee never approved the 2011 payments to MNF. (¶ 87.)  Hence, the Trustee cannot challenge the Committee's process or resulting decision because it did not make the decision to approve the fees.  Rather, the substance of the Second Claim is that the Independent Directors acted in bad faith by permitting Ampal's management to pay the management and "consulting" fees that they never approved.

Like the First Claim, the Second Claim pleads, at most, a lack of due care by the Independent Directors.  It does not allege that the Independent Directors were motivated by an improper purpose in failing to monitor MNF's performance, expenses or ultimately, the payment of its compensation.

Finally, the Second Claim also charges that the Independent Directors acted in bad faith in failing to review, evaluate, negotiate or approve the 2011 "consulting" fee. (¶¶ 47, 89.)  This

claim suffers from the same deficiencies as those pertaining to the payment of the 2010 fee.

Accordingly, the Exculpation Provision also shields the Independent Directors from liability for the conduct alleged in the Second Claim, and it is dismissed as against the Independent Directors.

### iv.    Third Claim – Extension of the Loan Maturity Date

The Third Claim focuses on a different transaction – the Loan and Option relating to the Project.  It challenges the decision to extend the maturity date of the Loan to December 2012 on substantive grounds, alleging that the decision was a bad one because

> (a) on three previous occasions, the Special Committee had agreed to extend the maturity of the Loan for another year, based on Maiman's representations that bank financing for the project was in hand, or would be within a matter of months, yet that financing had still not materialized by year-end 2011; and (b) since the Special Committee's last extension of the Loan, terrorists had attacked EMG's pipeline, creating disruptions in the flow of natural gas, which significantly affected both the value of the investments of Ampal and Merhav/Maiman in EMG, and their cash flow from EMG available to meet their respective outstanding obligations.

(¶ 92.)  As a result, a "prudent" Committee "would have considered" denying the extension, limiting its length, requiring additional assurances regarding financing and payment of the Loan by MNF and/or Maiman if the financing was not forthcoming, increasing the interest rate as the Committee had done in 2008 and/or obtaining additional collateral.  (¶ 93.)

The Third Claim also challenges the process the Committee followed in reaching its decision.  When the Committee granted the first extension at the end of 2008, it had consulted with Houlihan Lokey and demanded a personal guaranty from Maiman.  In 2011, it failed to consider demanding similar additional assurances and protections.  (¶ 94.)

The Third Claim second guesses the process and substance of a business decision that the Committee reached and asserts that the Committee erred by failing to call the Loan or insist on additional consideration and protections in exchange for the extension granted in 2011. The Third Claim does not include allegations that the Committee's decision was motivated by an improper purpose and it is hard to understand how it could have been. By 2011, Ampal had exercised its Option to convert the Loan to an equity interest dependent on MNF's ability to obtain the necessary financing, and the Trustee does not challenge that decision.

Furthermore, the minutes of the November 12, 2011 Committee meeting reflect the extensive consideration and due diligence that led the Committee to conclude that the Option was valuable and should be kept alive. (*Nov. 2011 Minutes* at 1-2.) The minutes recount that the Committee and Eluz had visited the Project in Colombia; met with the Project's management, the Colombian Minister of Energy and the Project's contractor; and visited another commercial sugarcane-to-ethanol project in Brazil. The Committee "valuate[d] and "appreciate[d]" the Project's current status, development and progress to date. It recognized that it had to consider extending the Option to participate in the Project's equity. Vaknin recommended that the Option be extended for another twelve months based on the meetings, the Committee's first hand impression and the Project's potential.

Eluz, who was also impressed with what she saw, suggested that Ampal expand its rights under the Option to allow it to be converted upon approval of the financing. This would make it easier to procure a third-party investor. Vaknin criticized Eluz's proposal, although he understood its rationale, and suggested that the Committee would consider it in the future should the issue arise.

27

The minutes reflect that the Committee focused on the decision to extend the Option

without change for one year and did not specifically consider the Loan.  They could not extend

the Option and also call the Loan because the Loan would disappear once the exercise of the

Option was consummated.  The Committee's decision to extend the Option, and hence, not call

the Loan, was made in good faith and with due care.[20]  Furthermore, Ampal already held

Maiman's guaranty and a pledge of MNF's shares in Ampal.  Thus, the Trustee's Third Claim

comes down to the premise that the Committee should have sought some additional assurances

and loan protections before extending what it viewed as a valuable Option.  Even if such a

decision could be said to have been made, it was not made in bad faith.  Accordingly, the Third

Claim is barred by the Exculpation Provision and is dismissed.

### b.    Claims Against Eluz

Eluz is sued in her capacity as an officer of Ampal, and is subject to the same fiduciary

duties as a director.  *Compare* N.Y. BUS. CORP. LAW §§ 715(h) ("An officer shall perform his

duties as an officer in good faith and with that degree of care which an ordinarily prudent person

in a like position would use under similar circumstances.") *with* 717(a) ("A director shall

perform his duties as a director, including his duties as a member of any committee of the board

upon which he may serve, in good faith and with that degree of care which an ordinarily prudent

person in a like position would use under similar circumstances.").  "A corporate officer's

fiduciary duty includes discharging corporate responsibilities 'in good faith and with

conscientious fairness, morality and honesty in purpose' and displaying 'good and prudent

---

[20]    The Trustee has since recovered a judgment against MNF and Maiman on account of the Loan and guaranty.  *See Merhav Ampal Group, Ltd. v. Merhav (M.N.F.) Ltd. (In re Ampal-Am. Israel Corp)*, Adv. P. No. 14-02385 (SMB), 2015 WL 5176395 (Bankr. S.D.N.Y. Sept. 2, 2015).

management of the corporation.'" *Gully v. Nat'l Credit Union Admin. Bd.,* 341 F.3d 155, 165 (2d Cir. 2003) (*quoting Alpert v. 28 Williams St. Corp.,* 473 N.E.2d 19, 26 (1984)). "Although corporate officers may not owe fiduciary duties to a corporation regarding aspects of the management of the corporation that are not within their responsibility or are within the exclusive province of the board, non-director officers may be held liable for breach of fiduciary duty 'to the extent that they have discretionary authority over, and the power to prevent, the complained of transactions,' in which case they will be held to the same standards as a director." *Official Committee of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006) (interpreting Delaware law); *accord Pereira*, 294 B.R. at 520; *see also* A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 BUS. LAW. 215, 218 (1992) (noting that non-director officers with discretionary authority are held to the same standards of conduct as directors).

Although Eluz cannot invoke the Exculpation Provision because she is sued in her capacity as an officer, she may be shielded by the business judgment rule, which bars judicial inquiry into actions by corporate fiduciaries "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979), *accord Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005). A complaint charging a breach of fiduciary duty must "plead around" the business judgment rule. To survive a motion to dismiss, the complaint must allege that the director or officer acted fraudulently or in bad faith, *Stern*, 924 F.2d at 477; *Lippe v. Bairnco Corp.*, 230 B.R. 906, 916-17 (S.D.N.Y. 1999); *Kittay v. Atlantic Bank of New York* (*In re Global Serv. Grp., LLC*), 316 B.R. 451, 461 (Bankr. S.D.N.Y. 2004), lacked disinterested independence, *Patrick v. Allen*, 355 F. Supp. 2d at 711, or acted without due care or reasonable diligence. *Geltzer v.*

*Altman* (*In re 1st Rochdale Coop. Group, Ltd.*), No. 07 Civ. 7852 (DC), 2008 WL 170410, at *3

(S.D.N.Y. Jan. 17, 2008).  If it does, the complaint cannot be dismissed solely upon the

application of the business judgment rule.  *Patrick v. Allen*, 355 F. Supp. 2d at 711 (declining to

apply business judgment rule where complaint adequately alleged that defendants were

interested); *see also Croton River Club, Inc. v. Half Moon Bay Homeowners Assoc., Inc.* (*In re

Croton River Club, Inc.*), 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when

a corporate director or officer has an interest in a decision, the business judgment rule does not

apply.").

The *Complaint* alleges that Eluz breached her fiduciary duty in connection with the

payment of the 2010 and 2011 management and "consulting" fees because she was not

disinterested and acted in bad faith and without due care.

### i.    First Claim – 2010 Fees

The First Claim alleges that Eluz breached her fiduciary duties to Ampal in connection

with the 2010 fees by (a) failing to review quarterly the services provided to Ampal by MNF; (b)

failing to advise the Committee in a timely fashion of any change in the nature, extent or scope

of the services provided by MNF pursuant to the 2009 Agreement during 2010; and (c)

recommending that the Committee approve the Superseding Agreement, which more than

doubled the amount paid to Merhav for 2010 without any legal or valid business reason.  (¶¶ 38-

40, 75.)  She also breached her fiduciary duty by allowing Ampal to pay a 4.5 million NIS

"consulting" fee to MNF without the Committee's approval.  (¶ 80.)

The Trustee argues that the business judgment rule does not apply because Eluz lacked

disinterestedness and owed allegiance to Maiman.  As noted earlier, a complaint may plead self-

interest in a transaction either by showing that the director or officer stood to realize a personal benefit from the transaction or that there was a "loss of independence" because the director or officer, while having no direct interest in the transaction, was controlled by one who was interested in the transaction. *Marx v. Akers*, 666 N.E.2d at 1041. This Court has previously recognized that under Delaware law, a complaint states a plausible claim of lack of independence against an officer involved in a transaction between his own company and another entity where he is dependent on that other entity for his compensation and benefits. *Responsible Person of Musicland Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008)

Here, the *Complaint* pleads a plausible claim that Eluz was self-interested with respect to the payment of the 2010 (and 2011) management fees. It does not allege that she had a financial interest in the transactions between Ampal and MNF. It alleges, however, that she was promoted by Maiman from a junior position with MNF and installed as an officer of Ampal by him as part of his management team, (¶ 16), and her continued employment and compensation depended on Maiman. (¶ 76.) In addition, the meeting minutes also show that to a great degree she acted as his advocate when the Committee considered MNF's management fees. This does not mean that her conduct was wrongful, but only that she is not entitled to avail herself of the business judgment rule based on the allegations in the *Complaint*. Furthermore, the fact that the Committee ultimately approved the 2010 fee, as reflected in the Superseding Agreement, misses the point. The *Complaint* charges that Eluz failed to monitor MNF's work or any changes in its nature or scope, and did not, therefore, provide the Committee with the information it needed to make an informed decision regarding MNF's management fee during 2010.

The allegations relating to the payment of the 2010 "consulting" fee, however, are insufficient.  The *Complaint* alleges, without more, that "Eluz breached her fiduciary duty by allowing Ampal to pay these amounts without Special Committee approval, and is therefore also liable to Ampal for these amounts."  (¶ 80.)  This does not describe her role in the payment of the "consulting" fee or what she did or failed to do; the *Complaint* does not allege that she authorized the payment or that it was made with her knowledge or consent.  It is a conclusory allegation without any factual support and does not provide her with fair notice of the misconduct with which she is charged.

Accordingly, the motion to dismiss the portion of the First Claim relating to the payment of the 2010 management fee based on the business judgment rule is denied but the motion to dismiss the portion of the First Claim relating to the payment of the "consulting" fee is granted.

### iii.    Second Claim – 2011 Fees

The Second Claim charges that Eluz continued to breach her fiduciary duties by paying MNF 24 million NIS on a quarterly basis in 2011, the same compensation approved for 2010, without awaiting the Committee's year end determination of the appropriate fee as required by the Superseding Agreement.  (¶¶ 85, 89.)  In fact, the *Complaint* alleges that the Committee never approved the 2011 management fee.  (¶ 87.)

In addition to the issue relating to Eluz's lack of disinterestedness, the Second Claim also includes specific allegations asserting a breach of the duty of due care.  The Superseding Agreement provided that the Committee would determine the management fee "at or around the end of the fiscal year" based on a presentation of MNF's expenses and make such adjustments as the parties agreed "may be reasonably appropriate in light of the work performed or to be

performed by [MNF]." Eluz signed the Superseding Agreement on behalf of Ampal and was familiar with its terms. The *Complaint* alleges that despite this limitation and the Committee's ultimate failure to approve the payment of any compensation, Eluz permitted the unapproved fee to be paid in the same amount as the previous year.

The allegations concerning the payment of the 2011 "consulting" fees, on the other hand, suffer from the same deficiencies as the 2010 "consulting" fees. The *Complaint* simply states that "Eluz breached her fiduciary duty by allowing Ampal to pay these amounts [the 2011 "consulting" fee] without Special Committee review and approval." (¶ 89.) As with the 2010 payment, the allegation lacks factual support and fails to provide fair notice of the claim against her.

Accordingly, the motion to dismiss the portion of the Second Claim relating to the payment of the 2011 management fee based on the business judgment rule is denied but the motion to dismiss the portion of the Second Claim relating to the payment of the "consulting" fee is granted.

### C.    Leave to Amend

The Trustee has requested leave to amend the *Complaint* to replead any dismissed claims. The Defendants have cited to numerous meeting minutes that the Court has not considered because the Trustee did not rely on these minutes or the meetings to which they pertain in drafting the *Complaint*. Nevertheless, the minutes appear to undercut the Trustee's claims. For example, they indicate that the Committee received and considered information regarding MNF's services before approving the 24 million NIS management fee in 2010. They also indicate a similar consideration when the Compensation Committee, consisting of the same three

Independent Directors, approved a $1.25 million bonus (approximately 4.5 million NIS) to

Maiman in 2010.  In addition, the Superseding Agreement stated that an Ampal affiliate would

actually pay the management fees.

    Accordingly, the parties should schedule a conference with the Court to discuss the

Trustee's motion for leave to amend.


Dated: New York, New York
    January 5, 2016


    /s/ *Stuart M. Bernstein*
    STUART M. BERNSTEIN
    United States Bankruptcy Judge