UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                               :
                                                     :
AMPAL-AMERICAN ISRAEL CORP.,                         :        Chapter 7
                                                     :        Case No. 12-13689 (SMB)
            Debtor.                                  :
------------------------------------------------------X
ALEX SPIZZ, as Chapter 7 Trustee for               :
Ampal-American Israel Corp.,                         :
                                                     :
            Plaintiff,                               :
                                                     :
      —against—                                      :        Adv. Proc. No. 14-02110 (SMB)
                                                     :
IRIT ELUZ, THE ESTATE OF YEHUDA                      :
KARNI, MENAHEM MORAG, DANIEL                         :
VAKNIN and REVITAL DEGANI,                           :
                                                     :
            Defendants.                              :
------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER DENYING MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND MODIFY SCHEDULING ORDER

**A P P E A R A N C E S :**

AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103

        John P. Campo, Esq.
        Darryl R. Graham, Esq.
            Of Counsel

*Special Litigation Counsel to the Chapter 7 Trustee*

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019

        Steven L. Klepper, Esq.
        David S. Gold, Esq.
            Of Counsel

*Attorneys for Defendant Irit Eluz*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Alex Spizz, the chapter 7 trustee ("Trustee") of the debtor, Ampal-American Israel

Corporation ("Ampal"), moved in this adversary proceeding against Irit Eluz ("Eluz"),

the remaining defendant, to compel the production of certain documents and extend the

deadline for fact discovery. (*Motion to Extend Discovery Deadlines and Compel*

*Discovery*, dated Mar. 1, 2019 ("*Motion*") (ECF Doc. # 63).)[1]  Both branches of the

*Motion* arise from certain revelations Eluz supposedly made for the first time during her

November 2018 deposition.  For the reasons that follow, the Court denies the *Motion*.

## BACKGROUND

The background to this adversary proceeding, derived from the allegations in the

complaint, dated Aug. 27, 2014 ("*Complaint*") (ECF Doc. # 1), is set forth in the Court's

prior decision, *Spizz v. Eluz* (*In re Ampal-Am. Israel Corp.*), 543 B.R. 464 (Bankr.

S.D.N.Y. 2016) ("*Dismissal Decision*").  I assume familiarity with the *Dismissal Decision*

and limit the discussion to the facts relevant to the *Motion*.

At all relevant times, Ampal, a New York corporation, acted as a holding company

that invested in various businesses in Israel.  In or around 2002, Yosef Maiman

acquired a majority interest in Ampal.  At the time, Maiman was also conducting

business through another Israeli corporation, Merhav (M.N.F.) Ltd. ("Merhav").

Following his acquisition of a majority stake, Maiman became a director of Ampal and

the Chairman of the Board.  He subsequently promoted Eluz from a junior position with

---

[1]       Unless otherwise indicated, "ECF" refers to the electronic docket in this adversary proceeding.
"ECF Main" refers to the electronic docket in Ampal's main bankruptcy case.

Merhav to Chief Financial Officer, Senior Vice President and Treasurer of Ampal and a member of his management team.

In February 2009, a Special Committee of Independent Directors ("Committee") reviewed and considered a proposed Management Service Agreement ("2009 Agreement") with Merhav. Eluz informed the Committee that the purpose of the 2009 Agreement was to compensate Merhav for managing various Ampal projects. She explained that Ampal's management would "monitor" the compensation paid to Merhav in accordance with "detailed reports" submitted quarterly by Merhav. Following Eluz's briefing, the Committee approved the 2009 Agreement in principle.

At a December 19, 2010 meeting of the Committee, Eluz stated that she had reviewed Merhav's activities during 2010 and concluded that the compensation provided under the 2009 Agreement was "inadequate." The Committee thereupon approved a new Cooperation and Management Agreement ("Superseding Agreement") to replace the 2009 Agreement, effective retroactively to January 1, 2010. The 2009 Agreement and Superseding Agreement are referred to collectively herein as the "Management Agreements."

Unlike the 2009 Agreement, which stipulated a flat fee and required Merhav to cover its own expenses, the Superseding Agreement provided that Ampal would pay Merhav's fee based on a percentage of its Ampal-related expenses as determined by the Committee at or near the end of the year. In addition, Merhav was required to present its expenses and the parties agreed to review the fee in good faith and "make such adjustments as they agree may be reasonably appropriate in light of the work performed

or to be performed by [Merhav]." Finally, the Committee determined, and Merhav

agreed, that the fee for 2010 would be NIS 24,157,000, and Ampal continued to pay

Merhav at the same rate in 2011. In addition to management fees, Ampal paid

"consulting" fees to Merhav in the amounts of NIS 4,500,000 and NIS 5,539,500 in

2010 and 2011, respectively.

The First Claim in the *Complaint* alleged, *inter alia*, that Eluz breached her

fiduciary duties in connection with the payment of the 2010 fees by (1) failing to review

Merhav's services to Ampal on a quarterly basis, (2) failing to timely advise the

Committee of changes in the nature or scope of Merhav's services under the 2009

Agreement, (3) recommending that the Committee approve the Superseding Agreement

that increased Merhav's fees for 2010 and (4) allowing Ampal to pay a NIS 4.5 million

consulting fee to Merhav. The Second Claim alleged, *inter alia*, that Eluz breached her

fiduciary duties by (1) paying Merhav NIS 24 million on a quarterly basis, the same

compensation paid in 2010, without awaiting the Committee's year-end determination

of the appropriate fee, as required under the Superseding Agreement and (2) allowing

Ampal to pay Merhav NIS 5,539,500 in consulting fees.

Eluz moved to dismiss the *Complaint* for failure to state a claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure relying primarily on the business

judgment rule.[2] The Court denied her motion with respect to the 2010 and 2011

management fees because the *Complaint* plausibly alleged that Eluz was self-interested

with respect to the payment of the management fees. Maiman had promoted her from a

---

[2]        The other defendants, all former directors, also moved to dismiss and their motion was granted.

junior position with Merhav and had installed her as an officer and member of the
Ampal management team, and her continued employment and compensation depended
on Maiman.  In addition, she had acted as Maiman's advocate when the Committee
considered Merhav's management fees.  The Court granted her motion to dismiss the
consulting fee claims because they were legally insufficient.  (*Dismissal Decision*, 543
B.R. at 481-83.)

Eluz filed her answer on February 16, 2016 (*"Answer"*).  (ECF Doc. # 30.)  Among
other things, she denied that she failed to monitor or review Merhav's services under the
2009 Agreement or advise the Committee regarding any changes in the nature of those
services during 2010 (*compare Complaint* ¶ 38 *with Answer* ¶ 38 and *Complaint* ¶ 75
*with Answer* ¶ 75), that she recommended that the Committee approve the Superseding
Agreement without justification, (*compare Complaint* ¶ 75 *with Answer* ¶ 75), and that
she continued to pay Merhav the management fee in 2011 at the same rate as 2010
without awaiting the Committee's year-end determination.  (*Compare Complaint* ¶ 85
*with Answer* ¶ 85).  She also asserted, as affirmative defenses, that "the challenged fees
paid to Merhav were all properly authorized by a special committee of independent
outside directors following careful consideration of the fairness and propriety of those
payments," (*Answer* at p. 14 (Third Separate Defense), and Ampal ratified "some or all
of the alleged actions or omissions at issue."  (*Id.* at p. 15 (Fourth Separate Defense).)

## A. Discovery in the Bankruptcy Case

Discovery in this matter has been shaped, in part, by events in the bankruptcy
case that pre-dated the adversary proceeding.  In October 2013, after Ampal's
bankruptcy case was converted to a chapter 7 liquidation, the Trustee moved to compel

the turnover of Ampal's computer servers and office computers ("Ampal Servers").
(*Chapter 7 Trustee's Motion for Order Compelling the Debtor (Through Yosef A.*
*Maiman, Debtor's Court-Designated Representative) to Deliver Property of the Estate*
*to the Trustee*, dated Oct. 7, 2013 (ECF Main Doc. # 348).)  A number of former Ampal
employees, including Eluz (collectively, "Objectors"), objected, primarily on privacy
grounds relating to their Ampal emails, and sought to limit the Trustee's access solely to
information relating to Ampal's business ("Ampal Information") while restricting access
to information unrelated to Ampal ("Non-Ampal Information").  (*Joint Objection by*
*Merhav (M.N.F.) Limited and Certain of the Debtor's Former Officers and Employees*
*to Chapter 7 Trustee's Motion to Compel Delivery of Certain Property to Trustee*, dated
Oct. 24, 2013 (ECF Main Doc. # 353).)

On February 6, 2014, the Trustee and the Objectors entered into a stipulation to
resolve their concerns.  (*So Ordered Stipulation Concerning Trustee's Access to*
*Debtor's Files, Books and Records*, dated Feb. 6, 2014 ("*February Stipulation*") (ECF
Main Doc. # 395).)  Under the *February Stipulation*, a third-party IT expert, Tic Tac,
created three identical replicas of the Ampal Servers.  (*February Stipulation* at ¶ 1.)
One "backup" replica, delivered to the Trustee, provided immediate access to certain
designated Ampal Information.  All other information on the Trustee's replica was
protected by a password known only to the Objectors.  Another replica (the "Replica")
was delivered or made available to the Objectors.  The third replica was retained by Tic-
Tac.  The *February Stipulation* gave each Objector the opportunity to review (1)
ampal.com emails claimed to be privileged, (2) ampal.com emails to or from the
Objectors that constituted Non-Ampal Information, *i.e.* private emails and (3) non-

email documents that were privileged or private ("Privilege/Privacy Review"). (*Id.* at ¶ 3.) After the Privilege/Privacy Review, the Objectors were required to deliver a log to the Trustee listing any documents withheld under the stipulated terms. (*Id.* at ¶ 4.) The Trustee had the opportunity to review the logs and if appropriate, dispute any objection to disclosure. (*Id.* at ¶¶ 6, 7.)

The Objectors' production, as limited by their objections following the Privilege/Privacy Review, all of which is described below, generated several discovery disputes. The parties worked them out and on December 5, 2014, the Trustee entered into another stipulation with the Objectors which stated that the Objectors had satisfied their obligations under the *February Stipulation* and all disputes thereunder had been resolved. (*Supplemental Order Concerning Trustee's Access to Debtors Files, Books and Records*, dated Dec. 5, 2014, at p. 2 ("*December Stipulation*") (ECF Main Doc. # 532).) Under the parameters of the *February* and *December Stipulations*, Tic-Tac produced over one million pages of information from the Ampal Servers/Replica to the Trustee.

## A. Discovery in the Adversary Proceeding

In the meantime, the Trustee commenced this adversary proceeding and served his First Request for Production ("*First RFP*") on January 23, 2015, propounding fifteen separate document requests.[3] In response, Eluz produced nearly 1,000 pages through

---

[3]    The requests in the *First RFP* are embedded in the copy of Defendant's Responses and Objections thereto, which is attached as Exhibit A to the *Motion*. As relevant here, the *First RFP* sought the following documents:

March 2015 ("Initial Eluz Production") and another 23 pages in October 2017 ("2017

Eluz Production").[4]  The 2017 Eluz Production included emails sent from Eluz's

ampal.com account to her personal account on September 8, 2014 and March 16, 2016

("Disputed Emails"),[5] after she supposedly no longer had access to the Replica

containing her Ampal emails.

---

- [A]ll documents concerning any and all management fees, consulting fees and/or other payments made by Ampal to Merhav. (*First RFP # 1.*)

- [A]ll documents concerning the nature, extent and/or value of services provided by Merhav to Ampal, including without limitation, (a) Your efforts to analyze or monitor those services and/or (b) any reports or information concerning those services provided by You to the Special Committee. (*First RFP # 2.*)

- [A]ll documents concerning any and all meetings of the Special Committee, Audit Committee, or Compensation Committee, at which You were present, and at which [management fees, consulting fees, or other compensation paid or to be paid by Ampal to Merhav] were discussed . . . . (*First RFP # 5.*)

- [A]ll documents concerning any communications between You and any employee or other representative of Merhav regarding [management fees, consulting fees, or other compensation paid or to be paid by Ampal to Merhav]. (*First RFP # 6.*)

- [A]ll documents concerning any communications between You and Maiman regarding [management fees, consulting fees, or other compensation paid or to be paid by Ampal to Merhav]. (*First RFP # 7.*)

- [A]ll documents concerning any communications between You and any employee of Ampal regarding [management fees, consulting fees, or other compensation paid or to be paid by Ampal to Merhav]. (*First RFP # 8.*)

- [A]ll documents concerning Your employment by Merhav prior to Your employment by Ampal, including only documents sufficient to show Your title(s), Your duties, and Your compensation. (*First RFP # 13.*)

- [A]ll documents concerning Your compensation from Ampal, including, without limitation, any increase therein and the role or participation of Maiman in determining Your compensation. (*First RFP # 14.*)

[4]    The combined 2017 Eluz Production and Initial Eluz Production are referred to herein as the "Eluz Production."

[5]    Copies of the Disputed Emails are attached as Exhibit K to the *Motion*.

Eluz served her First Request for Production on January 23, 2015.  On April 19, 2017, the Trustee produced 115,554 documents (approximately 423,000 pages) in response.  (*Defendant Irit Eluz's Memorandum of Law in Opposition to Plaintiff's Motion to Extend Discovery Deadlines and Compel Discovery*, dated Mar. 12, 2019, at 10 ("*Opposition*") (ECF Doc. # 65).)

Beginning on April 29, 2015, the parties entered into a series of scheduling orders in which they agreed to extend the deadline for fact discovery.  On July 12, 2018, the Trustee confirmed that "documents have been completely reviewed [and] exchanged," and declared that "[a]ll written discovery is over."  (*Transcript of 07/12/2018 Hr'g,* at 6:17-18 ("*Hr'g Tr. (7/12)*") (ECF Doc. # 52).)   The Trustee conceded that "what remains of the case is fairly straightforward," especially since the *Dismissal Decision* had narrowed the issues.  (*Id.* at 7:10-11; 7:15-16.)  The Court entered the eighth, and most recent scheduling order, extending the fact discovery cutoff to January 31, 2019 ("Discovery Deadline"), (*see Eighth Discovery Scheduling Order*, dated on Oct. 30, 2018 (ECF Doc. # 57)), primarily to allow the Trustee to depose Eluz.

## B.  Eluz's Deposition and the Supplemental Requests

The Trustee deposed Eluz on November 28 and 29, 2018 ("Deposition") and it is her testimony that triggered the *Motion*.[6]  The gravamen of the Trustee's claims against Eluz center on her failure to monitor Merhav's 2010 and 2011 management fees.  At her Deposition, she was asked whether there were any records of requests that Ampal made to Merhav for services.  Eluz stated that she was sure that the Trustee would find the

---

[6]     A copy of Eluz's Deposition transcript ("*Eluz Tr.*") is attached as Exhibit D to the *Motion*.

requests in emails, (*Eluz Tr.* at 238:19-22; 239:20-240:3), but she did not have the emails because her access to the Ampal server had been cut off in May or June 2013 before the adversary proceeding was commenced.  (*Id.* at 238:19-22; 239:8-240:3; 361:13-16, 362:10-363:4.)  In addition, the Trustee showed Eluz numerous SEC documents that contained her conformed signature but she was unable to state that they were in fact copies of the documents she signed.  Finally, she could not explain how she was able to forward an email from her Ampal email account to her personal email account in 2016 after she claimed that she no longer had access to her Ampal email account.  (*Id.* at 420:19-22 ("**Q. . .** [I]f you had no access to your e-mail accounts, how are you e-mailing this to yourself?  **A.** I have no idea.").)

Eluz's testimony suggested to the Trustee that she had (and may still have) access to the Ampal Servers and/or the Replica and had failed to produce the emails she testified about that documented the management services performed by Merhav.  Following the Deposition, the Trustee propounded 317 supplemental discovery requests on January 28, 2019, only three days before the Discovery Deadline.  The new requests consisted of (1) a Second Request for Production of Documents ("*Second RFP*"); (2) a First Set of Interrogatories ("*Rogs*"); and (3) a First Request for Admissions ("*RFA*," and collectively, "*Supplemental Requests*").[7]  Eluz's counsel refused, however, to consent to

---

[7]    The *Supplemental Requests* are attached to the Motion as Exhibits F (*Second RFP*), G (*Rogs*) and H (*RFA*) and consist, respectively, of 77 document requests, 25 interrogatories, and 215 requests for admission.  The bulk of the *Supplemental Requests*, particularly the *RFA*, seek confirmation that Ampal's SEC filings on EDGAR are true and correct and that they accurately reflect Ampal's profit and losses and Eluz's compensation. (*E.g.*, *RFA ##* 5-172.)  However, Eluz's counsel has stipulated that SEC-filed documents bearing Eluz's conformed signature are indeed signed by Eluz and certify the accuracy of the document's contents. (*Transcript of 4/16/2019 Hr'g* at 54:5-8 ("*Hr'g Tr. (4/16)*") (ECF Doc. # 78).)  The Trustee accepted this stipulation, thus mooting the demands relating to Ampal's SEC filings. (*Id.* at 54:15 ("Then that should satisfy the SEC side."); *see also id.* at 54:25-55:1 ("[Trustee's counsel]: The certifications certify the accuracy.  The Court: Right.").)

a proposed ninth scheduling order that would have extended the Discovery Deadline by 90 days.

At an ensuing conference, the Court suggested that the dispute involved two issues. If the Trustee's request for *additional* discovery was "triggered" by the Deposition, *i.e.*, that he learned something he did not know and could not have reasonably anticipated, he would have to seek to modify the scheduling order for good cause shown under Rule 16(b)(4) of the Federal Rules of Civil Procedure. (*Transcript of 2/14/2019 Hr'g* at 12:24-13:4, 21:14-18 ("*Hr'g Tr. (2/14)*") (ECF Doc. # 61).) If, on the other hand, the Trustee was seeking to compel Eluz to produce documents that were in her possession, custody or control, he did not have to modify the scheduling order, and instead, should move to compel discovery. Although both issues arose from the Deposition and overlapped, the *Motion* pursues both forms of relief.

## C. The *Motion*

The *Motion* asserts that the *Supplemental Requests* relate to questions and issues raised or created for the first time at the Deposition. First, it seeks to compel Eluz to produce documents that were purportedly in her possession, custody or control, and are responsive to the *First RFP* but were never produced as part of the Eluz Production. The Trustee also insists that Eluz must review and produce responsive documents from the over 100,000 documents, a subset of the Replica, that the Trustee produced to her. (*See Reply in Further Support of Motion to Extend Discovery Deadlines and Compel Discovery*, dated Mar. 15, 2019, at 9 ("*Reply*") (ECF Doc. # 68).) Eluz counters that she has already produced the responsive documents in her possession, custody or control, that the only other documents she has are the more than 100,000 largely Hebrew

documents that the Trustee produced to her.  She argues that the *Motion* is a thinly-veiled attempt to saddle her with the burden of reviewing the Trustee's own documents for his benefit.  (*See Opposition* at 19-20.)

Second, the Trustee contends that he had no basis to anticipate these issues beforehand, so good cause exists to modify the scheduling order and extend the Discovery Deadline under Rule 16(b)(4).  Eluz counters that the sought-after discovery concerns issues that have always been central to the litigation, despite the Trustee's "blanket assertions" that the *Supplemental Requests* "stem" from the Deposition.  (*Id.* at 28.)  Eluz also argues that her remarks at the Deposition about the existence of certain emails documenting Merhav service requests did not suggest that she personally possessed the documents in question.  (*Id.* at 19-20.)

### a. Motion to Compel

Rule 37 of the Federal Rules of Civil Procedure governs a motion to compel discovery.  "Though Rule 37 does not establish time limits for such a motion, a party seeking to file a motion to compel after discovery has closed must . . . establish good cause."  *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 328 F.R.D. 450, 452 (S.D.N.Y. 2018) (citation omitted).  As courts have "broad latitude to determine the scope of discovery and to manage the discovery process," *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) (citing *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)), "motions to compel, pursuant to Rule 37, are left to the sound discretion of the court."  *See Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, No. 15-md-02631 (CM) (SDA), 327 F.R.D. 52, 54, 2018 WL 4941773, at *2 (S.D.N.Y. 2018) (citations omitted).  Further, "a party . . . who has responded to . . .

12

[a] request for production . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(e)(1).  Rule 26(e) is a "continuing obligation" and is not subject to "any limitation of time." *Grand River Enters. Six Nations, Ltd. v. King*, No. 02 CIV. 5068 (JFK), 2009 WL 1360686, at \*2 (S.D.N.Y. May 15, 2009) (citing *Weiss v. Chrysler Motors Corp.,* 515 F.2d 449, 457 (2d Cir. 1975)).

The first issue raised by the motion to compel is factual; what documents did Eluz have in her possession, custody or control when she responded the *First RFP*. Specifically, did she have access to the Replica which apparently contained the universe of documents or, as the Trustee contends, to Merhav's servers and computers?  Given the parties' disagreement, the Court issued the *Order Regarding Discovery*, dated May 1, 2019 ("*Clarifying Order*") (ECF Doc. # 79).)  The Trustee was directed to provide one or more declarations by persons with personal knowledge identifying those documents that he contended were within Eluz's possession, custody or control when the Trustee served the *First RFP* and state whether he had access to the same documents.  In addition, he was required to state what happened to the Replica after the Objectors completed their Privilege/Privacy Review in December 2014.  Eluz was then directed to submit an affidavit or declaration based on personal knowledge stating whether she had access to each document identified in the Trustee's declarations, explaining the circumstances under which she lost access and identifying who had physical possession of the Replica and what happened to it after the Objectors completed their Privilege/Privacy Review.

13

In response to the Court's *Clarifying Order*, the Trustee submitted the

*Declaration of Arthur Goldstein*, dated May 21, 2019 ("*Goldstein Declaration*") (ECF

Doc. # 82).  The *Goldstein Declaration* is largely hearsay based on "implicit,

circumstantial, and indirect knowledge" acquired by the Declarant.  In answer to the

first question, Goldstein asserted upon information and belief that Tic-Tac supplied the

Objectors, "care of Mr. Maiman/Merhav," with all of the information contained on the

servers and computers including "all of Ampal's e-mails, Merhav's e-mails, and the files

contained on the computers of Ampal's employees." (*Goldstein Declaration* at ¶ 6.)  The

Trustee received a copy of the same Replica, but because of password protection, did not

have access to the "culled documents that excluded the purportedly private and

privileged documents." (*Id.* at ¶ 7.)  Goldstein concluded, again on information and

belief, that after the Objectors concluded their Privilege/Privacy Review "the Replica

and/or the relevant original Servers and Computers remained within the possession,

custody or control of the Objectors, care of Mr. Maiman, at Merhav MNF's office" in

Israel.  (*Id.* at ¶ 8.)[8]  Notwithstanding the latter assertion, Goldstein said that "the

information on the Servers and Computers remained in the Objectors' possession,

custody or control from February 2014 through at least December 4, 2014." (*Id.* at ¶ 12;

*accord id.* at ¶ 14 ("the Defendant had possession, custody or control of the information

on the Servers and Computers before the January 2015 Demand.").)

---

[8]      Goldstein subsequently stated, based on conversations with Tic-Tac, that the latter had two of the replicas, the third was in possession of the Trustee's agent but "the original Servers and Computers are within the possession, custody or control of the Objectors, care of Mr. Maiman, at Merhav MNF's office" in Israel. (*Supplemental Declaration of Arthur Goldstein re: Order Regarding Discovery*, dated June 6, 2019, at ¶ 3 ("*Goldstein Supplemental Declaration*") (ECF Doc. # 83.)

Eluz's response recounted the history of the pre-litigation discovery disputes and confirmed that she did not have access to the Replica after December 2014. The Replica always remained in the possession of Tic-Tac. The Objectors' Privilege/Privacy Review was overseen by Yoram Firon, Ampal's former Vice President of Corporate Affairs. (*Declaration of Steven L. Klepper*, dated June 12, 2019 ("*Klepper Declaration*") (ECF Doc. # 84); *accord Declaration of Irit Eluz*, dated June 10, 2019, at ¶ 4).)[9] By May 2, 2014, and after the Privilege/Privacy Review, Tic-Tac delivered 54,808 documents/files and 341,369 emails (with attachments) to the Trustee. (*Klepper Declaration* at ¶ 9.) The only documents contained on the servers that the Trustee did not receive were those withheld by the Objectors based on privilege or privacy grounds, and the privilege/privacy logs were delivered to the Trustee on or about May 14, 2014. (*Id.*)

Subsequent motion practice ensued relating to some of the withheld documents. The Trustee had objected to approximately 5,500 internal Ampal emails that did not contain a subject line ("No Subject Emails"), approximately 947 emails (with attachments) and files that the Trustee claimed were not privileged ("Challenged Privileged Documents") and approximately 84,000 emails (with attachments) that the Trustee claimed were not private ("Challenged Private Documents"). (*Id.* at ¶ 12.) After further review of the No Subject Emails and the Challenged Private Documents, additional emails in these categories were produced. (*Id.* at ¶¶ 13-14.)

The Challenged Private Documents presented the biggest problem. They totaled 328,000 pages which was reduced to approximately 174,000 pages after de-duplication,

---

[9]     The Eluz Declaration is annexed as Exhibit A to the *Klepper Declaration.*

and approximately 47,000 pages were in Hebrew.  (*Id.* at ¶ 15.)  The parties first
attempted to review the documents using predictive coding but in November 2014, they
agreed that the Objectors would produce all of the Challenged Private Documents, the
Trustee would keep the private information confidential and if he desired to use
confidential information, he would first give the Objectors written notice and an
opportunity to object.  (*Id.* at ¶ 20.)  This resolved all objections to the pre-litigation
discovery, as reflected in the *December Stipulation*, one month before the Trustee
served the *First RFP*.  A report submitted by Yoav Silberstein of Tic-Tac confirmed that
one replica was delivered to the Trustee's representative and the other two replicas were
always maintained by Tic-Tac.  No replica was ever delivered to Merhav although
Silberstein speculated that Merhav could have backed up the information at any time.
(*Id.*, Ex. C, at ¶¶ 5-6.)

Generally, "a party's good faith averment that the items sought simply do not
exist, or are not in [her] possession, custody, or control, should resolve the issue of
failure of production since one 'cannot be required to produce the impossible.'" *Mason
Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 42
(S.D.N.Y. 2016) (quoting *Zervos v. S. S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y.
1978)); *accord Menard v. Chrysler Grp. LLC*, No. 14 Civ. 6325 (VB), 2015 WL 5472724,
at *1 (S.D.N.Y. July 2, 2015).  "In the face of a denial by a party that [she] has
possession, custody or control of documents, the discovering party must make an
adequate showing to overcome this assertion." *Golden Trade S.r.L. v. Lee Apparel Co.*,
143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992).

Here, Eluz has denied access to any Ampal or Merhav information either directly or through Firon after December 2014. The Trustee assumes that Eluz had possession, custody or control of the original servers and computers "care of Maiman" located in Merhav's offices. (*Goldstein Declaration* at ¶ 8; *Goldstein Supplemental Declaration* at ¶ 3.) However, Eluz testified at the Deposition that after she resigned from Ampal in May 2013, she began working for Eluznet Ltd., a company she had previously formed. (*Eluz Tr.* at 382:22-383:15.) She did not return to Merhav or Maiman, and the Trustee has failed to demonstrate that she had access to Merhav's servers or computers after she left Ampal. While this does not explain the Disputed Emails, the Disputed Emails do not establish that access in light of the contrary evidence. Furthermore, as discussed below, the Trustee has unduly delayed raising any issues relating to the production of the Disputed Emails.

But even if Eluz had access to the Replica or the Merhav servers and computers, the Trustee is still not entitled to an order compelling discovery. Where requested documents are within the opposing party's possession, custody or control, the Court need not "compel discovery when the discovering party could easily obtain the documents elsewhere without any of the difficulties that might result from compelled production." *Sec. & Exch. Comm'n v. Strauss*, No. 09 CIV. 4150 RMB/HBP, 2009 WL 3459204, at *10 (S.D.N.Y. Oct. 28, 2009); *accord Valenzuela v. Smith*, 04 Civ. 0900, 2006 WL 403842, at *2 (E.D. Cal. Feb. 16, 2006) (physician defendant not required to produce documents that plaintiff could instead obtain from his own medical file or the prison law library); *Baum v. Vill. of Chittenango*, 218 F.R.D. 36, 40–41 (N.D.N.Y. 2003) ("[C]ompelling discovery from another is unnecessary when the documents sought are

17

equally accessible to all."); *In re Aid Auto Stores, Inc.*, No. CV 98-7395(DRH), 2001 WL
1478803, at *1 (E.D.N.Y. July 13, 2001) ("[P]laintiffs' motion to compel production by
Grant Thornton of the documents it obtained from the Aid Auto warehouse is denied,
since plaintiffs will have access to the same source of information."); *Bleecker v.
Standard Fire Ins. Co.*, 130 F.Supp.2d 726, 738 (E.D.N.C. 2000) (declining to compel
production both of insurance manuals that were in the public record and of insurance
manuals that were not in the public record but that were readily available from a third
party); *Sec. & Exch. Comm'n v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995–96
(S.D.N.Y. 1973) ("It is well established that discovery need not be required of documents
of public record which are equally accessible to all parties."); *Blair v. Travelers Ins. Co.*,
9 F.R.D. 99, 99 (W.D. Mo. 1949) (motion for production denied where "[n]early all the
documents sought can be obtained by the plaintiff as easily as they can be obtained by
the defendant"); *cf.* 7 MOORE'S FEDERAL PRACTICE, § 34.12[5][b] (3d ed. 2018) ("A court
may refuse to order production of documents of public record that are equally accessible
to all parties.").

The Trustee received (and still possesses) the replica delivered by Tic-Tac and
from which he produced the 100,000 documents to Eluz from the over 400,000
documents on the replica.  He initially did not receive the privileged and private
documents identified on the Objectors' logs.  After he objected to certain
privilege/privacy designations as well as the withholding of No Subject Emails, and after
further review, the Objectors produced additional No Subject Emails and Challenged
Privilege Documents and the Trustee subsequently received all the Challenged Private
Documents in confidence.  This resolved all of the discovery disputes, including the

18

privilege and privacy issues.[10]  Furthermore, the Trustee has had custody of all the

Challenged Private Documents for several years, and although held in confidence, the

Trustee has not indicated that he notified any of the Objectors that he intends to use

their private emails.

In short, the Trustee has access to all of the non-privileged documents to which

he is entitled.  These, or a subset he produced to Eluz, are the same documents that the

Trustee is now seeking to compel Eluz to cull for the emails she mentioned during the

Deposition.  The Trustee's counsel advised the Court that the Trustee spent hundreds of

hours and hundreds of thousands of dollars searching all the documents in his

possession but could not find any of the emails.  (*Hr'g Tr. (4/16)* at 17:22-18:5.)  That

may be because Eluz's speculation was wrong and they do not exist or because the

Trustee did not use the right search terms.  The Trustee is obviously free to run any

additional searches at his own expense.  But there is no reason to compel Eluz to spend

hundreds of hours and hundreds of thousands of her own dollars searching the same

documents.  Each side can prepare his or her own case based on the same documents

and disclose the documents he or she intends to offer at trial in the Joint Pre-Trial

Order.

Accordingly, the motion to compel is denied.

---

[10]    It is not clear whether Eluz, through Firon, asserted any privacy/privilege claims regarding her emails.

### b. Motion to Modify the Scheduling Order

The Trustee also seeks to modify the existing scheduling order, under which the discovery deadlines have expired, and to obtain supplemental discovery based on supposedly unforeseen revelations emanating from the Deposition. The following list of revelations has been gleaned from the *Motion:* (i) the Disputed Emails showed that Eluz had access to the Ampal Server long after she said she lost it, (*Motion* at ¶ 20, pp. 27, 28); (ii) she disclosed the existence of relevant emails that she never produced, (*id.* at ¶¶ 22, 23, pp. 26-27); (iii) she gave unclear and conflicting testimony about her post-Ampal employment, (*id.* at p. 27); (iv) she was unable to verify Ampal's yearly gains and losses, (*id.*); (v) her testimony regarding her monitoring and evaluating of Merhav's management activities was "vague," (*id.* at p. 28); (vi) she gave "unclear, incomplete, and, at times," conflicting testimony regarding her "role in the context of committee meeting minutes, negotiating the relevant management agrees[*sic*], determining to retain Merhav, and determining Merhav's compensation" and "Plaintiff had no basis to believe that Eluz was not involved in the negotiation of the management agreements – because the minutes said the opposite"; (*id.* at p. 28; *accord Reply* at 16);[11] and (vii) "Plaintiff was unaware (and had no basis to know) that Ampal Services Company played a significant role in the management of Ampal or of its relationship with Merhav." (*Motion* at p. 28.)  In addition, she was unable to authenticate SEC documents copied from EDGAR, but this matter has been resolved by a stipulation between the parties.

---

[11]    The *Complaint* does not allege that Eluz negotiated or participated in the negotiation of the Management Agreement.  It alleges that "Ampal's management" negotiated the Management Agreement. (*Complaint* ¶¶ 30, 43.)

Rule 16(b)(4) of the Federal Rules of Civil Procedure provides that "[a] schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4); FED. R. BANKR. P. 7016(b)(4). A finding of "good cause" depends on the diligence of the moving party. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *accord Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (citing *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)), *certified question answered by* 286 Ga. 636 (2010), *aff'd*, 383 F. App'x 18 (2d Cir.), *cert. denied*, 562 U.S. 1102 (2010); *see also* FED. R. CIV. P. 16 advisory committee's note (1983) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). "To satisfy the good cause standard 'the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met.'" *Enzymotec Ltd. v. NBTY, Inc.,* 754 F. Supp. 2d 527, 536 (E.D.N.Y. 2010) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.,* No. 05 Civ. 3749(KMW)(DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009)), *reconsideration denied*, No. 08-CV-2627 (ADS)(ETB), 2011 WL 2601500 (S.D.N.Y. June 29, 2011). "Where a party seeks to modify the scheduling order, he must show that he had no reason to expect the information that forms the basis of the motion." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79-80 (S.D.N.Y. 2012).

The gravamen of the motion to modify the scheduling order is that Eluz either didn't remember or gave testimony at odds with what the Trustee thought she would say and he needs more time to follow up. But the issues he highlights relating to her and Ampal's monitoring and evaluation of Merhav's management activities, Merhav's

compensation and her own compensation (hence, the questions about her post-Ampal
employment) are the very issues he raised at the beginning of the case and this Court
highlighted in the *Dismissal Decision*. In addition, Eluz's *Answer* denied the allegations
relating to her lack of monitoring and evaluation of Merhav's activities and
compensation and her failure to keep the Committee informed. At bottom, the Trustee
failed to pursue these issues with any diligence. He served the *First RFP* in January
2015 but did not take Eluz's deposition until November 2018. While there may have
been some practical difficulties in arranging her deposition — she resides in Israel —
that did not stop the Trustee from serving written discovery relating to these issues
much earlier. Had he done so, he would have acquired the information he now seeks
regarding her and Ampal Services Company's roles in monitoring and evaluating
Merhav's activities, her post-Ampal compensation and her role in negotiating the
management agreements. Furthermore, the Trustee could not realistically expect that
she would be able to verify Ampal's gains and losses other than what the SEC documents
reflect.

The Trustee's reliance on the Disputed Emails further highlights his lack of
diligence. Eluz's October 2017 production (only 23 pages) included the Disputed
Emails. It is difficult to understand how the Trustee missed their significance at that
time. He had assumed that Eluz lost access to the Ampal Servers once he and the
Objectors resolved their discovery disputes. (*Reply* at 3 ("As of that point in time,
unless Eluz knows something the Plaintiff does not, Eluz should have not had any
access, independent of this lawsuit, to receive or review any files, e-mails, and/or the
information contained on the Ampal servers."); *id.* at 4 (As of March 2015, "the Plaintiff,

as Trustee, had already taken possession of the Ampal servers, which, as a practical matter, would have limited Eluz's production to what she literally had in her 'personal' possession.")  The objections were fully resolved by December 2014 before he served the *First RFP.*  The Trustee did not follow up at the time the Disputed Emails were produced and represented to the Court after their production and before the Deposition that written discovery was complete.  To the extent that the disclosure of the Disputed Emails triggered a new revelation about Eluz's access to a larger universe of documents, the Trustee sat on that information and did not pursue it for more than one year.

Finally, the references to the emails relating to requests for Merhav services which she mentioned during the Deposition do not justify reopening discovery.  The references were general, did not point to any specific emails and appeared to be speculative at best.  (*See, e.g., Eluz Tr.* at 238:19-22 ("**Q.** Okay. Is there any record of the requests that Ampal made to Merhav? **A.** I am sure that there will - - you will find them in the [e]mails."); *see also id.* at 239:20-240:3 ("So I am sure that you will find in your records mails between me and Dr. Nimrod Novick asking for a Moody's wants to meet with the Minister of Energy; Moody's want to meet with the bank, International Bank of Egypt; Moody's want -- please arrange it.  And he was arranging it.  That's one example."); *id.* at 290:5-17 ("**Q. . .** Do you have any document that shows that these negotiations were held between the committee members/independent directors and Merhav?  That's a simple yes or a no question.  **A.** Yes, there are a lot of mails.  **Q.** Where are they?  **A.** On the servers, a lot of mails between Yehuda Karni and Danny Vaknin and the others.  **Q**. Okay. And you don't have any of them?  **A.** No, I don't have any mail."); *id.* at 362:18-363:4 ("**Q.** Aside from the statement that's in the minutes that

says that these negotiations took place and they agreed that they were fair, do you have any document that you're aware of that can -- that memorializes the negotiations? **A.** Again, I have no documents, the documents are in your server. I'm sure that if you will go to the server and look after mails, you will find the relevant documents."). Armed with whatever names and references Eluz provided, the Trustee still could not find any of the emails that Eluz believed existed. The point, noted earlier, is that the Trustee has had possession of all of the Ampal Information, including the Challenged Private Documents, for years. He could have run whatever searches he thought appropriate. For the reasons stated in connection with the motion to compel, there is no reason to force Eluz to spend the time or money to do it and hence, no reason to extend discovery to force Eluz to do it.

In short, the Trustee has failed to identify any information disclosed during the Deposition that he could not have anticipated or discovered had he exercised greater diligence. This adversary proceeding is five years old, the remaining issues are narrow and the case is ready for trial. Accordingly, the branch of the *Motion* seeking to extend the scheduling order is denied. The parties are directed to arrange a conference with the Court for the purpose of scheduling a trial.

Dated: New York, New York
      August 7, 2019

/s/ *Stuart M. Bernstein*
   STUART M. BERNSTEIN
United States Bankruptcy Judge