UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                                   :
                                                         :
AMPAL-AMERICAN ISRAEL CORP.,            :    Chapter 7
                                                         :    Case No. 12-13689 (SMB)
                    Debtor.                          :
---------------------------------------------------------X
ALEX SPIZZ, as Chapter 7 Trustee for       :
Ampal-American Israel Corp.,                   :
                                                         :
                    Plaintiff,                        :
                                                         :
    —against—                                    :    Adv. Proc. No. 14-02110 (SMB)
                                                         :
IRIT ELUZ,                                           :
                                                         :
                    Defendant.                    :
---------------------------------------------------------X

# MEMORANDUM DECISION AND ORDER GRANTING MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF STEVEN D. SOLOMON

**A P P E A R A N C E S:**

AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103

    John P. Campo, Esq.
    Darryl R. Graham, Esq.
        Of Counsel

*Attorneys for Plaintiff*

COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019

    Steven L. Klepper, Esq.
    David S. Gold, Esq.
        Of Counsel

*Attorneys for Defendant*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The chapter 7 trustee ("Trustee") of the debtor Ampal-American Israel Corporation ("Ampal") commenced this adversary proceeding alleging that Irit Eluz, Ampal's former Chief Financial Officer, as well as the former members of Ampal's Special Committee of Independent Directors ("Special Committee"), breached their fiduciary duties to Ampal. The Court previously dismissed the claims against the directors, *Spizz v. Eluz* (*In re Ampal-Am. Isr. Corp.*), 543 B.R. 464, 476-81 (Bankr. S.D.N.Y. 2016) ("*Dismissal Decision*"). Eluz, the sole remaining defendant, has now moved ("Motion") *in limine* to exclude the expert report (the "Report")[1] and testimony of Professor Steven D. Solomon ("Solomon") – a corporate governance expert retained by the Trustee.[2] The Trustee opposes the Motion.[3] For the reasons that follow, the Motion is granted.

## BACKGROUND

### A. The *Dismissal Decision* and the Remaining Claims

The background to this dispute is set out in the *Dismissal Decision*, familiarity with which is assumed. The following recitation highlights the background relevant to the instant dispute.

---

[1] A copy of the Report is attached as Exhibit A to the *Declaration of Steven L. Klepper*, dated Oct. 29, 2019 ("*Klepper Declaration*") (ECF Doc. # 89-1). "ECF Doc. # _" refers to the documents filed on the electronic docket of this adversary proceeding.

[2] *See Memorandum of Law in Support of Defendant Irit Eluz's Motion In Limine to Exclude the Expert Report and Testimony of Steven D. Solomon*, dated Oct. 29, 2019 (ECF Doc. # 90) ("*Defendant's Brief*"), and *Reply Memorandum of Law in Further Support of Defendant Irit Eluz's Motion In Limine to Exclude the Expert Report and Testimony of Steven D. Solomon*, dated Nov. 27, 2019 (ECF Doc. # 92) ("*Defendant's Reply*").

[3] *See Plaintiff's Memorandum of Law and Response in Opposition to Defendant Irit Eluz's Motion In Limine to Exclude the Expert Report and Testimony of Steven D. Solomon*, dated Nov. 19, 2019 (ECF Doc. # 91) ("*Plaintiff's Brief*").

Ampal is a corporation organized under the laws of the State of New York with its principal place of business in Herzliya, Israel. From its inception, Ampal acted as a holding company that invested in various businesses in the State of Israel. In or around 2002, Yosef Maiman acquired a majority interest in Ampal, and at the time, was also conducting business through another Israeli corporation, Merhav (M.N.F.) Ltd. ("MNF"). Following his acquisition of a majority stake in Ampal, Maiman became a director of Ampal and the Chairman of the Board. According to the Complaint, dated Aug. 27, 2014 (ECF Doc. # 1), Maiman "installed" former employees of MNF in management positions at Ampal, including Eluz, who had been a junior executive at MNF, and at all relevant times, served as the Chief Financial Officer, Senior Vice President, and Treasurer of Ampal.

In February 2009, the Special Committee and Eluz met to consider entering into a management services agreement with MNF to compensate it for managing several of Ampal's projects. MNF originally asked for 20 million New Israeli Shekels ("NIS") per year, but the fee was negotiated down to 10 million NIS payable in quarterly installments. Trustee does not contest the decision to hire MNF to manage Ampal in accordance with the 2009 agreement and the Complaint alleges that the Special Committee approved the amount of the fee after "careful consideration." (Complaint ¶ 78.)

Nearly two years later, at a December 19, 2010 Special Committee meeting, Eluz stated that the compensation paid to MNF under the 2009 agreement was "inadequate." The Special Committee approved a new agreement (the "Superseding Agreement") under which Ampal would pay MNF a fee based on a percentage of its Ampal-related

3

expenses. The Superseding Agreement required MNF to present its expenses, and the parties agreed to review the fee in good faith and make adjustments as appropriate in light of the work performed by MNF.  For 2010, the Special Committee and MNF agreed on management fees of 24,157,000 NIS (the "2010 Fee").  In 2011, Ampal paid MNF the same amount that it had paid in 2010 (the "2011 Fee") but the Special Committee never approved that fee.

The Complaint alleges that Eluz breached her fiduciary duty in connection with Ampal's payment of the 2010 Fee to MNF by (i) failing to review quarterly the services provided by MNF, (ii) failing to advise the Special Committee of any changes in the nature or scope of MNF's services during 2010, and (iii) recommending to the Special Committee that it approve the Superseding Agreement.  (Complaint at ¶ 75 (First Claim for Relief).)  The Complaint also alleges that Eluz breached her fiduciary duty with respect to the 2011 Fee by continuing to pay MNF the same amount that MNF had received in 2010 without awaiting the Special Committee's year-end determination as to the appropriateness of the fee as required by the Superseding Agreement.  (*Id.* at ¶ 85 (Second Claim for Relief).)  The Trustee contends, on information and belief, that Eluz's failure to exercise her fiduciary duties was induced by Maiman – the person for whom her continued employment at Ampal and compensation were dependent.  (*Id.* at ¶ 76.)

Eluz moved to dismiss for failure to state a claim invoking the business judgment rule.  In the *Dismissal Decision*, the Court ruled that the Trustee had alleged a lack of disinterestedness on the part of Eluz.  Although she did not personally have a direct interest in the payment of management fees to MNF, the Trustee alleged that she was controlled by Maiman, who did have an interest. *Dismissal Decision*, 543 B.R. at 482

4

(citing *Marx v. Akers*, 666 N.E.2d 1034, 1041 (N.Y. 1996)). Accordingly, the Trustee had sufficiently pleaded a breach of her fiduciary duty of loyalty that, at least for purposes of her dismissal motion, precluded Eluz's reliance on the business judgment rule.

**B.    Solomon's Report and the Motion**

The Trustee retained Solomon as an expert on corporate governance, and he issued the Report on September 26, 2019. As set forth in greater detail below, the Report contains three opinions: (1) the Special Committee relied primarily on Eluz when Ampal entered into the 2009 fee agreement and the Superseding Agreement with MNF, (2) Eluz did not appropriately monitor and report to the Special Committee regarding MNF's activities, and (3) Eluz did not obtain Special Committee approval of MNF's fees. (¶¶ 4, 43-61.)[4]

Following an October 8, 2019 Court conference, Eluz filed the instant Motion to preclude the Report and Solomon's trial testimony. According to Eluz, the Report contains factual narratives and opines on legal standards, (*Defendant's Brief* at 4-11), contains factual conclusions going to the ultimate issues in the case, (*id.* at 11-15), and any probative value is outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.[5] (*Id.* at 15-18.) The Trustee responded to Eluz's arguments and asserted that the Motion was premature and speculative because the Trustee has not yet deposed Solomon. (*Plaintiff's Brief* at 5-7.)

---

[4]    "(¶ _ )" refers to paragraphs of the Report.

[5]    The parties have stipulated to a trial by jury before me.

5

**DISCUSSION**

A. **Standards Governing the Motion**

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire du Canton de Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987)).  The Court may defer ruling on an *in limine* motion until trial, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996), or alter a prior *in limine* ruling at trial.  *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

The party offering the expert carries the burden of establishing the requirements imposed by Rule 702 of the Federal Rules of Evidence,[6] and the court acts as a "gatekeeper" to ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Teachers' Ret. Sys. of La. v. Pfizer, Inc.* (*In re Pfizer Inc. Sec. Litig.*), 819 F.3d 642, 658 (2d Cir. 2016) (citations and internal quotation

---

[6] Rule 702 pr0vides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

marks omitted). "The inquiry envisioned by Rule 702 is . . . a flexible one," and the "focus" of the inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993). "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), and "[q]uestions about the weight or the sufficiency of the evidence upon which the expert relied, or the conclusions generated therefrom, are for cross-examination." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011). As such, "[c]ourts generally permit expert corporate governance testimony," but they "are restricted to explaining general corporate governance concepts . . . ." *United States v. Brooks*, No. 06–CR–550 (S–1)(JS), 2010 WL 291769, at *4 (E.D.N.Y. Jan. 11, 2010).

An expert's testimony should be precluded if it is speculative, conjectural or conclusory. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (citations and internal quotation marks omitted). Moreover, expert testimony may not usurp "either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it." *Nimely*, 414 F.3d at 397; *accord United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.), *cert. denied*, 502 U.S. 813 (1991). Likewise, an expert should not testify about the factual background of the case because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004); *accord Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (an expert should not

7

testify about "lay matters which a jury is capable of understanding and deciding without the expert's help"). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). For the same reasons, "[i]nferences about the intent or motive of parties lie outside the bounds of expert testimony." *Rezulin*, 309 F. Supp. 2d at 547. And in cases involving corporate governance experts, courts "overwhelmingly . . . preclude the expert from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts." *Brooks*, 2010 WL 291769, at *4 (footnote omitted). Nor may an expert testify in the form of a factual narrative based on evidence about which he lacks personal knowledge. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016).

Finally, expert testimony, like other evidence, is subject to the limitation set forth in FED. R. EVID. 403 "if its probative value is substantially outweighed by a danger" of, *inter alia*, unfair prejudice, confusing the issues or misleading the jury. *Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not be Amended*, 138 F.R.D. 631, 632 (1991)).

### B. Application of the Standards to the Report

The Report, which comprises a complete statement of the opinions Solomon will express at trial, *see* FED. R. CIV. P. 26(a)(2)(B)(i), is patently improper expert testimony. It includes a factual narrative, despite Solomon's lack of personal knowledge, which is,

8

at best, based on a selective reading of the entire record,[7] it makes "factual findings" based on this selective reading which usurps the role of the jury (as noted, this is a jury case), it declares the law that this Court should apply essentially charging the jury, and renders a decision on the appropriate outcome based on the facts and the law. The Report also describes matters for which any probative value is substantially outweighed by the risk of confusing the issues and misleading the jury.

### 1. Improper Fact Testimony

#### a. Factual Background

After an introduction and summary of Solomon's qualifications (¶¶ 1-14), the Report begins with a "Factual Background" section which summarizes the Trustee's allegations in the Complaint. (¶¶ 15-20.)[8] It is plainly improper for Solomon to testify about the factual background of the case, let alone from the Trustee's perspective. These matters will be presented to the jury through fact witnesses and properly authenticated documents, not an expert who lacks personal knowledge of the facts.

#### b. Predicates to Opinions

Improper fact testimony was not limited to the "Factual Background" section of the Report. Immediately preceding the discussion of Solomon's three opinions, the Report provides two "predicates" for his opinions. First, Solomon finds that Eluz had a

---

[7] Appendix C to the Report shows that Solomon considered only a handful of documents comprising of the Complaint, various briefs and declarations filed by the Trustee, the *Dismissal Decision*, Eluz's deposition transcript, and certain of Ampal's corporate documents and filings.

[8] Footnotes 8 through 28 of the Report, which are keyed to ¶¶ 15-20, all cite to the Trustee's Complaint as the source of information, although many of the footnotes also cite certain Ampal Board meeting minutes.

9

conflict of interest with respect to Ampal's payment of management fees to MNF. (¶¶ 37-41.) Solomon states that Eluz reported to Maiman, he had control over her compensation, and her compensation generally increased over time as follows: $1.24 million[9] in 2007; $1.43 million in 2008; $1.38 million in 2009; $1.87 million in 2010; and $1.1 million in 2011. (¶ 38.) Based on those findings, Solomon opines that Eluz's facilitation of favorable management fees to MNF was "indicial evidence of . . . a *quid pro quo.*" (¶ 41.)

But this is precisely what the jury must decide after hearing *all* of the evidence and that determination is not beyond the jury's ken. The jury does not require Solomon's opinion to decide whether Eluz was so under Maiman's thumb that she placed his interests ahead of Ampal's. Moreover, there is evidence that supports the opposite conclusion. According to the Report, (i) Eluz received a raise even before MNF received management fees (from 2007 to 2008) and (ii) Eluz's compensation decreased by over $700,000 in 2011 even though payment of the 2011 Fee forms the basis of the Trustee's second claim for relief. (¶ 38.) Additionally, Solomon's opinion that Eluz was engaged in a *quid pro quo* is wholly conjectural and improperly speculates about Eluz's motives and subjective intent. Finally, the conclusion that Eluz had a conflict of interest is improper testimony on an ultimate legal issue. *See Pereira v. Cogan*, 281 B.R. 194, 198 (S.D.N.Y. 2002) (striking various legal conclusions by a corporate governance expert including that "[t]he Board members were not disinterested"). Whether Eluz was disinterested with respect to the payment of MNF's management fees will determine

---

[9] Compensation amounts are in U.S. dollars.

10

whether she is entitled to the protections afforded by the business judgment rule, *see Dismissal Decision*, 543 B.R. at 481-82, and Solomon may not directly opine that she was conflicted. (*See, e.g.*, ¶ 36 (Eluz was "fundamentally conflicted"); ¶ 40 ("Eluz would be considered under Maiman's control for purposes of a conflict of interest transaction").)

Solomon's second predicate to his opinions is that Eluz is a sophisticated individual who is aware of customs typically utilized to deal with transactions involving conflicted parties. (¶ 42.) This testimony is also plainly improper. The jury does not need Solomon to tell them what Eluz knew or didn't know about corporate transactions, and Solomon is purely speculating about Eluz's state of mind. Indeed, the only source cited in the Report on this predicate is Eluz's deposition transcript. (*See* ¶ 42 nn. 79-82 (citing Eluz deposition).) At trial, tthe Trustee can ask Eluz or any other witness with personal knowledge what she knew.

### c. The Opinions

Solomon's three opinions are not the usual opinions of a corporate governance expert "explaining general corporate governance concepts." *Brooks*, 2010 WL 291769, at *4. Rather, his opinions are conclusions reached by Solomon based primarily upon a purported absence of evidence to the contrary. (*See, e.g.*, ¶ 44 ("There is no record that the [Special Committee] sought or retained independent advisors in this matter."); ¶ 49 ("there is no record of such reports in any meeting minutes I have reviewed either written or oral"); ¶ 58 ("there is no evidence that Eluz" received authorization from the Special Committee to pay MNF's management fees).) On that basis, Solomon makes the factual finding that the Special Committee relied primarily on Eluz with respect to the

11

payment of MNF's management fees (opinion #1), Eluz failed to monitor MNF's work and failed to provide reports to the Special Committee (opinion #2), and Eluz failed to obtain authorization from the Special Committee for the payments to MNF (opinion #3).

Again, Solomon's factual conclusions usurp the role of the jury. The jury is capable, without Solomon's assistance, of deciding who the Special Committee relied on, whether Eluz monitored MNF and reported her findings to the Special Committee, and whether authorizations were received for the payments to MNF. Furthermore, Eluz has pointed to evidence[10] which undercuts Solomon's conclusions and hence, his opinions. For instance, to rebut the conclusion that the Special Committee relied predominately on Eluz, defense counsel provided emails from an attorney at Bryan Cave LLP – advisors to the Special Committee – answering inquiries relating to the payment of management fees to MNF, (*Klepper Declaration*, Ex. B), emails between a Bryan Cave attorney and an Ampal officer transmitting drafts of the management agreement and Special Committee meeting minutes and seeking advice, (*id.*, Ex. C), and an email from a Bryan Cave attorney to an Ampal officer attaching a draft management agreement "for services to be provided by [MNF] to Ampal as we discussed yesterday." (*Id.*, Ex. D.)

Eluz also provided evidence to rebut Solomon's finding that Eluz failed to provide reports to the Special Committee. Defense counsel submitted a December 19, 2010 resolution of the Special Committee that directed Eluz "to prepare a report with regards to the services rendered by [MNF] during 2010, and to submit such report to the

---

[10]   Defense counsel states that these documents are in the Trustee's possession. (*Defendant's Brief* at 5.)

12

Committee's inspection." (*Id.*, Ex. E at Bates No. TR00188645.) It approved MNF's compensation subject to receipt of Eluz's report. Eluz prepared the report, (*id.*, Ex. F), and it was circulated to the Special Committee on December 23, 2010. (*See id.*, Ex. E at Bates No. TR00188642.) The Trustee does not contend that Eluz miscalculated MNF's expenses or the amount of its compensation under the formula approved by the Special Committee, and the Special Committee never withdrew its approval of MNF's compensation after receiving and reviewing Eluz's report. When material facts are subject to *bona fide* dispute, an expert lacking personal knowledge of the facts is clearly not the person to provide testimony about those facts.

### 2. Improper Law Testimony

The Report contains a section titled "The Law Governing Conflict of Interest Transactions," in which Solomon provides commentary on legal matters such as the business judgment rule, the duty of loyalty, and the duty of care. (¶¶ 21-29.) Solomon's legal analysis is not limited to this section and is included in other parts of the Report. (*See, e.g.*, ¶¶ 31-32, 52.) Testimony as to the applicable legal standard is plainly improper. *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir.) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. . . . The special legal knowledge of the judge makes the witness' testimony superfluous.") (citation omitted), *cert. denied*, 434 U.S. 861 (1977). The Court will instruct the jury on the law.

### 3. Confusing or Misleading Testimony

The remaining section of the Report titled "Customs and practices utilized in addressing and ameliorating conflict of interest transactions," (¶¶ 30-35), is precluded

13

under FED. R. EVID. 403 because its probative value is substantially outweighed by the risk of confusing the issues and misleading the jury. According to the Report, when deciding whether to enter into a transaction that involves a conflict of interest, best-practices require that (i) the corporation form a committee of independent directors to consider the transaction, (ii) such committee retain its own legal counsel and financial advisors, (iii) such committee be informed of all material facts surrounding the transaction, and (iv) the corporation formally document all matters related to the transaction so that challenges to the transaction can be addressed. (¶ 33.) Solomon imposes the duty on Eluz, a non-lawyer, to advise the Special Committee on these best-practices, (¶ 44 ("Nor is there any record of Eluz recommending that the Committee retain independent advisors.")), and blames Eluz for the Special Committee's failure to follow these best-practices. (*Id.* ("The [Special Committee] and Eluz thus did not follow this practice and procedure which would have more ably supported an arms-length, market-based renumeration of [MNF].").)

What the Special Committee should have done is irrelevant but even if it is relevant, it is highly prejudicial to Eluz. Eluz was not member of the Board or the Special Committee. To permit Solomon to suggest that Eluz breached her fiduciary duty because the Board or the Special Committee did not follow these best practices creates the risk that a jury will attribute the Board's or the Special Committee's purported failure to Eluz – the sole remaining defendant in this action.

Finally, the Trustee argues that the Motion is premature because defense counsel has not yet deposed Solomon. (*Plaintiff's Brief* at 2-3.) However, the Report contains "a complete statement" of Solomon's opinions, FED. R. CIV. P. 26(a)(2)(B)(i), and it is

under FED. R. EVID. 403 because its probative value is substantially outweighed by the risk of confusing the issues and misleading the jury. According to the Report, when deciding whether to enter into a transaction that involves a conflict of interest, best-practices require that (i) the corporation form a committee of independent directors to consider the transaction, (ii) such committee retain its own legal counsel and financial advisors, (iii) such committee be informed of all material facts surrounding the transaction, and (iv) the corporation formally document all matters related to the transaction so that challenges to the transaction can be addressed. (¶ 33.) Solomon imposes the duty on Eluz, a non-lawyer, to advise the Special Committee on these best-practices, (¶ 44 ("Nor is there any record of Eluz recommending that the Committee retain independent advisors.")), and blames Eluz for the Special Committee's failure to follow these best-practices. (*Id.* ("The [Special Committee] and Eluz thus did not follow this practice and procedure which would have more ably supported an arms-length, market-based renumeration of [MNF].").)

What the Special Committee should have done is irrelevant but even if it is relevant, it is highly prejudicial to Eluz. Eluz was not member of the Board or the Special Committee. To permit Solomon to suggest that Eluz breached her fiduciary duty because the Board or the Special Committee did not follow these best practices creates the risk that a jury will attribute the Board's or the Special Committee's purported failure to Eluz – the sole remaining defendant in this action.

Finally, the Trustee argues that the Motion is premature because defense counsel has not yet deposed Solomon. (*Plaintiff's Brief* at 2-3.) However, the Report contains "a complete statement" of Solomon's opinions, FED. R. CIV. P. 26(a)(2)(B)(i), and it is

"unnecessary to defer [preclusion of an expert's testimony] until his deposition has been taken or the trial has begun." *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998); *accord New Colt Holding Corp. v. RJG Holdings of Fla.*, No. Civ.3:02CV173(PCD), 2003 WL 23508131, at *1 n. 2 (D. Conn. Aug. 11, 2003). Indeed, the parties and the Court specifically contemplated "an expedited motion in limine" at the October 8, 2019 conference. (Transcript of Oct. 8, 2019 Hr'g at 9:5-15 (ECF Doc. # 88).)

## CONCLUSION

For the reasons stated, the Motion is granted.

So ordered.

Dated:  New York, New York
        May 14, 2020

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge

15