UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                           :
                                                 :
AMPAL-AMERICAN ISRAEL CORP.,                     :        Chapter 7
                                                 :        Case No. 12-13689 (SMB)
                        Debtor.                  :
------------------------------------------------------X
ALEX SPIZZ, as Chapter 7 Trustee for             :
Ampal-American Israel Corp.,                      :
                                                 :
                        Plaintiff,               :
                                                 :
        —against—                                :        Adv. Proc. No. 14-02110 (SMB)
                                                 :
IRIT ELUZ,                                       :
                                                 :
                        Defendant.               :
------------------------------------------------------X

## MEMORANDUM DECISION GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, New York 10022

    John P. Campo, Esq.
    Darryl R. Graham, Esq.
       Of Counsel

*Attorneys for Plaintiff*

COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019

    Steven L. Klepper, Esq.
    David S. Gold, Esq.
       Of Counsel

*Attorneys for Defendant*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Defendant Irit Eluz moves ("Motion") for summary judgment on Count I of the chapter 7 trustee's ("Trustee") complaint alleging that she breached her fiduciary duty to Ampal-American Israel Corporation ("Ampal") in connection with Ampal's entry into an agreement in 2010 to pay and the payment of certain management fees to Merhav (M.N.F.) Ltd. ("MNF").[1]  The Trustee opposes the Motion.[2]  For the reasons that follow, the Motion is granted.

## BACKGROUND[3]

Ampal is a New York corporation that acquired and invested in businesses located primarily in the State of Israel.  (¶ 1.)  Around 2002, Yosef Maiman acquired a controlling equity interest in Ampal.  At the time, Maiman was conducting his other businesses primarily through MNF and its subsidiaries and affiliates.  (¶ 2.)  At all relevant times, Eluz was Ampal's CFO, Treasurer and Senior Vice President, and on May 5, 2010, she became a director.  (¶ 3.)

On October 28, 2004, Ampal's Board of Directors ("Board") formed a Special Committee of independent directors ("Special Committee"), (*see* Definitive Proxy

---

[1]     *See Memorandum of Law in Support of Defendant Irit Eluz's Motion for Partial Summary Judgment*, dated Mar. 4, 2020 ("*Eluz Brief*") (ECF Doc. # 97-21); *see also Reply Memorandum of Law in Further Support of Defendant Irit Eluz's Motion for Partial Summary Judgment*, dated May 12, 2020 ("*Eluz Reply*") (ECF Doc. # 108).  "ECF Doc. # _" refers to documents filed on the electronic docket of this adversary proceeding.

[2]     *See Plaintiff's Response and Opposition to Defendant's Motion for Partial Summary Judgment Regarding Count I of the Complaint*, dated Apr. 28, 2020 ("*Trustee Brief*") (ECF Doc. # 104).

[3]     The factual background is derived from exhibits attached to the *Declaration of Steven L. Klepper*, dated Mar. 4, 2020 ("*Klepper Declaration*") (ECF Doc. # 97-1) and the *Declaration of Darryl R. Graham*, dated Apr. 28, 2020 ("*Graham Declaration*") (ECF Doc. # 105).  The Court will also cite to the parties' statement of facts (*see* ECF Doc. ## 97-22 and 106) submitted pursuant to Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York.  "(¶ _)" refers to the paragraphs of the fact statements containing an undisputed fact.  Disputed facts from the parties' respective fact statements will be denoted as "(*Trustee Fact* ¶ _ )" and "(*Eluz Fact* ¶ _ )."

Statement on Schedule 14A, dated Sept. 12, 2005[4] at ECF p. 19 of 60[5]), to "review[] and approve[] transactions with any related party." (Definitive Proxy Statement on Schedule 14A, dated Oct. 19, 2009 ("October 2009 Proxy Statement")[6] at ECF p. 13 of 25.) In 2009 and 2010, the Special Committee was composed of Yehuda Karni, Menahem Morag and Daniel Vaknin (collectively, the "Independent Directors") each of whom also served on Ampal's Board, Audit Committee and Compensation Committee. (¶ 5.)

Effective as of September 19, 2006, and as reported in Ampal's public filings with the SEC, the Board determined that Maiman would set the annual base salary and non-equity-based annual bonuses for Ampal's executive officers which would include Eluz, the CFO. (Form 10-K for fiscal year ended Dec. 31, 2006 ("2006 Form 10-K")[7] at ECF p. 78 of 196.)[8] Between 2007 and 2011, Ampal paid Eluz the following compensation:

| | |
|---|---|
| 2007 | $1,242,390 |
| 2008 | $1,434,588 |
| 2009 | $1,387,657 |
| 2010 | $1,877,050 |
| 2011 | $1,100,153 |

(Definitive Proxy on Schedule 14A, dated Mar. 31, 2010 at ECF p. 25 of 37; Definitive

[4]       Attached as *Graham Declaration*, Ex. 1.

[5]       "ECF p. _" refers to the page number imprinted at the top of the page by the electronic filing system.

[6]       Attached as *Graham Declaration*, Ex. 2.

[7]       Attached as *Graham Declaration*, Ex. 7.

[8]       Two of the Independent Directors – Karni and Morag – signed the 2006 Form 10-K. (2006 Form 10-K at ECF p. 101 of 196.)

Proxy on Schedule 14A, dated Mar. 31, 2011 at ECF p. 28 of 47; and Definitive Proxy on Schedule 14A, dated Apr. 30, 2012 at ECF p. 26 of 49.)[9]  Eluz concedes for the purposes of the Motion that Maiman controlled her employment and compensation.  (*Eluz Reply* at 3. n. 3.)

## A.    The 2009 Management Fee

The Special Committee met on February 15, 2009 to discuss entering into a management services agreement with MNF under which Ampal would pay MNF a fee for managing Ampal's assets.  (*See* Minutes of Special Committee Meeting, held Feb. 15, 2009 ("February 2009 Minutes").)[10]  Eluz attended the meeting by invitation and told the committee that:

- MNF's staff was producing new business opportunities for Gadot Chemical Tanks & Terminals Ltd. ("Gadot") – a wholly owned Ampal subsidiary;

- MNF's staff managed Ampal's projects at Global Wind Energy Ltd. ("GWE") – a subsidiary in which Ampal held a 50% interest; and

- MNF's staff included experts with many years of experience including Dr. Novik who supervised Eastern Mediterranean Gas, Ltd. ("EMG") – an entity in which Ampal held a 12.5% interest.

(*Id.* at Bates Nos. ELUZ000576-77.)  Eluz also reported that MNF had acquired experience and expertise in identifying investment projects, verifying the feasibility of the projects, finding financing options, and negotiating with foreign officials.  Subject to the Special Committee's approval, MNF and Ampal negotiated an annual fee of 10 million New Israeli Shekels (NIS) payable in equal quarterly installments, which, according to Eluz, "the parties considered fair."  (*Id.* at Bates No. ELUZ000577.)  When

---

[9]    Attached as *Graham Declaration*, Exs. 10-12.

[10]    Attached as *Graham Declaration*, Ex. 14.

asked by an Independent Director why the fee was set at 10 million NIS, Eluz responded that the figure was arrived at after "extensive[]" negotiation and was negotiated down from MNF's bid of 20 million NIS. (*Id.*) Eluz added that MNF would bear its own costs and expenses under the arrangement. (*Id.*) Lastly, Eluz stated that the "renumeration will be monitored by Ampal's management, in accordance with [MNF's] detailed reports of its services, and if need be, it may be altered. [MNF] shall report to Ampal's management, on a quarterly basis, with regards to the services rendered by [MNF] in the respective quarter." (*Id.*)

The Special Committee resolved in principle to approve the management services agreement with MNF (the "2009 Agreement")[11] on the terms Eluz outlined. (February 2009 Minutes at Bates Nos. ELUZ000577-78.) The finalized 2009 Agreement stated in pertinent part that:

- MNF agreed to "provide to Ampal the management, marketing, financial, development and other administrative services from time to time requested by Ampal" (2009 Agreement at § 1);

- The agreement was effective as of January 1, 2008, ran for one year, but would automatically renew for successive one-year terms unless either party gave notice at least thirty days before the end of the current term (*i.e.*, by December 1) that it did not intend to renew (*id.* at § 2);

- Ampal would pay MNF an annual fee of 10 million NIS payable in equal quarterly installments, and MNF would bear its own expenses (*id.* at § 3); and

- MNF would provide reports regarding the nature and scope of its services to Ampal on no less than a quarterly basis. (*Id.* at § 5.)

---

[11]    The executed copy of the 2009 Agreement is attached as *Graham Declaration*, Ex. 3.

**B.    The 2010 Agreement**

On December 17, 2010, Kenneth Henderson, a New York attorney with Bryan Cave LLP, Ampal's counsel, sent a draft of a term sheet to Eluz reflecting their discussions about a revised agreement between Ampal and MNF. (*Graham Declaration*, Ex. 18, at Bates No. BC_AMP 0029255.)  In relevant part, it provided that as compensation for the services under the Agreement, "Ampal will pay [MNF] a Management Fee of _____ per month," the parties would review the Management Fee annually and "make such adjustments as they agree may be reasonably appropriate in light of the work performed or to be performed by [MNF]," and in addition to the Management Fee, "determine in good faith whether [MNF] should be compensated with regard to any particular project out of the project budget or, after completion, from project operations." (*Id.* at Bates No. BC_AMP 0029257.)  The term sheet did not mention paying MNF a percentage of its expenses.

The Special Committee met on December 19, 2010, and Eluz attended by invitation. (*See* Minutes of Special Committee Meeting, held Dec. 19, 2010 ("December 2010 Minutes").)[12]  Eluz stated that she had "reviewed [MNF's] contribution and activities with regards to Ampal's holdings and businesses over the year 2010, and the inadequate remuneration received by [MNF] for such activities." (*Id.* at Bates No. ELUZ000995.)  The Special Committee resolved to enter into a new agreement with MNF to be prepared by Ampal's attorneys under which the management fee would equal 50% of the expenses MNF incurred in rendering services to Ampal.  MNF's

---

[12]        Attached as *Graham Declaration*, Ex. 15.

expenses (and thus, the fee) would be determined "in accordance with an annual settling of accounts, which shall be based upon [MNF's] management report of services rendered by [MNF] and agreed by the [Special Committee] at that time." (*Id.* at Bates No. ELUZ000996.) To determine the appropriate fee for 2010, the Special Committee instructed Eluz "to prepare a report with regards to the services rendered by [MNF] during 2010, and to submit such report to the [Special Committee's] inspection." (*Id.*) The 50% expense reimbursement deviated from the monthly fee arrangement that Eluz and Henderson had discussed, and Eluz testified at her deposition that it was the Special Committee, not she, that decided on the 50% figure. (Eluz Deposition Transcript ("Eluz Dep.") at 460:16-25.)[13]

At the time the Special Committee approved the new management-fee agreement and 50% expense sharing in principle, it did not know the amount of the expenses that would be shared. Between December 20 and December 23, Henderson and Ampal VP Yoram Firon exchanged drafts. (*See Graham Declaration*, Ex. 19.) On December 20, Firon sent Henderson a marked-up draft of the term sheet. The provision for the monthly Management Fee and other fee considerations remained but the 50% expense sharing provision was added with the amount left blank. (*Id.* at Bates No. BC_AMP 0027938.) Eluz was "copied" on Firon's email to Henderson.

On December 21, Henderson sent a modified draft agreement that reflected his discussions with Firon. (*Id.* at Bates No. BC_AMP 0029284.) The draft no longer contained the monthly Management Fee provision, and the amount of the 50% expense

---

[13]    The Eluz Dep. was taken on November 28, and 29, 2018, and a copy of the transcript is attached as *Graham Declaration*, Ex. 5.

share was again left blank. (*Id.* at Bates No. BC_AMP 0029286.) A new provision stated that the Special Committee would also fix the amount of an advance payable to MNF on account of the Management Fee for the next year that would be paid in quarterly installments and subject to recoupment or adjustment once the Special Committee determined the fee for that year. (*Id.*)

Firon returned a marked-up draft the next day. This draft removed the provision relating to the payment of a quarterly advance. In addition, Firon promised to get Henderson the actual NIS figure, representing the 50%, later that day. (*Id.* at Bates No. BC_AMP 0027948.)

Henderson returned the final draft for distribution to the Special Committee the same day, noting in his email to Firon that the only open item was the amount of the 2010 Management Fee. (*Id.* at Bates No. BC_AMP 0029293.) The scope of services that MNF had provided and would provide were spelled out in great detail. Unlike the 2009 Agreement, which simply stated that MNF would provide "management, marketing, financial, development and other administrative services from time to time requested by Ampal," the new agreement stated:

> [MNF] has assisted and will continue to assist Ampal and its subsidiaries in identifying, evaluating, selecting, structuring, developing and managing projects. The services provided by [MNF] will include, among other things, seeking and identifying new project opportunities, assisting Ampal in evaluating whether to invest in projects, performing due diligence, engineering work, feasibility studies, project supervision and management and technical support. The services will be provided on a regular basis as requested by Ampal, and the parties will work together to establish the scope of services with regard to any existing or potential project. [MNF] will devote such resources as may be reasonably required to enable it to perform such services for Ampal.

(*Id.* at Bates No. BC_AMP 0029294.)

On December 23, 2010, Firon sent the Independent Directors a packet[14] which included, among other things, draft December 2010 Minutes, a draft Cooperation and Management Agreement between MNF and Ampal (the "Superseding Agreement"),[15] and a summary of MNF's 2010 activities and expenses (the "Eluz Summary").[16] The draft sent to the Special Committee left a blank space for the amount of 50% Management Fee for 2010. The Eluz Summary described in detail MNF's work in connection with Ampal's portfolio companies Gadot, GWE, and EMG. In addition, it described MNF's development activities relating to various energy projects in the Middle East, United States, Australia and Peru. It also included a chart listing MNF's 2010 expenses totaling 48,314,000 NIS.

The summary of MNF's services in the Eluz Summary was prepared by an Ampal employee and reviewed by Eluz prior to submission to the Special Committee. (Eluz Dep. at 431:24-432:24.) Eluz prepared the summary of expenses personally. (*Id.* at 438:2-439:5.) As an employee of the Ampal service company which provided back-office accounting and bookkeeping services for MNF, Eluz and her accounting colleagues had intimate familiarity with MNF's expenses. (*Id.* at 439:9-12; 440:17-443:5; 444:7-10; 445:15-22; 465:15-466:15; 467:18-469:23.) She and her colleagues tracked every MNF expense, (*id.* at 467:15-469:23), she was familiar with each category of expenses including employee wages, advisory fees, office and communication

---

[14]    Attached as *Klepper Declaration*, Ex. L.

[15]    The version of the Superseding Agreement approved by the Special Committee is attached as *Klepper Declaration*, Ex. N at Bates Nos. TR00035273-77.

[16]    The Eluz Summary submitted to the Special Committee was in Hebrew, and the certified English translation of the Eluz Summary is attached as *Klepper Declaration*, Ex. M.

expenses, travel expenses, and project management expenses, (*id.* at 440:22-441:16),

she tracked MNF's bank accounts, (*id.* at 466:4-9), she was familiar with MNF's

suppliers and advisors, (*id.* at 467:22-23), and she (along with others) signed the actual

checks MNF used to pay its expenses.  (*Id.* at 439:9-12.)

By unanimous consent, dated December 30, 2010,[17] the Special Committee

approved Ampal's entry into the Superseding Agreement under which MNF would

provide the services previously identified to Ampal in exchange for a management fee

> equal to a percentage of direct and indirect expenses incurred by [MNF] in
> connection with providing services to or for the benefit of Ampal . . . .  The
> Management fee shall be determined by the [Special Committee] at or
> around the end of each fiscal year (beginning with 2010) based on a
> presentation by [MNF] of expenses incurred in providing services
> hereunder during the current year.

(Superseding Agreement at Bates No. TR00035274.)  For 2010, the Special Committee

determined to pay MNF a management fee in the sum of 24,157,000 NIS ("2010 Fee"),

(*id.*), which represented 50% of the expenses identified in the Eluz Summary.

## C.    This Adversary Proceeding and the Instant Motion

The Trustee commenced this adversary proceeding on August 27, 2014, asserting

breach of fiduciary duty claims against Eluz and the Independent Directors.  (*See*

Complaint, dated Aug. 27, 2014 ("*Complaint*") (ECF Doc. # 1).)  In *Spizz v. Eluz* (*In re*

*Ampal-Am. Isr. Corp.*), 543 B.R. 464 (Bankr. S.D.N.Y. 2016) ("*Ampal*"), the Court

dismissed the claims against the Independent Directors, *see id.* at 466, but denied the

motion to dismiss the claims against Eluz.  The instant Motion concerns Count I in

which the Trustee alleges that Eluz failed to review MNF's work on a quarterly basis,

---

[17]    Attached as *Klepper Declaration*, Ex. N.

failed to advise the Special Committee about the nature and scope of work MNF performed under the 2009 Agreement, and improperly recommended to the Special Committee that it approve the Superseding Agreement and the 2010 Fee.  (*Complaint* at ¶ 75.)  Moreover, Eluz's breach of fiduciary duty was induced by Maiman to whom her employment and compensation were dependent.  (*Id.* at ¶ 76.)  Therefore, Eluz should return "an amount not less than 14 million NIS" to the Trustee – roughly the difference between MNF's 2009 management fee and the 2010 Fee.  (*Id.* at ¶ 79.)

Eluz now moves for summary judgment on Count I.  She argues that Maiman's control over her compensation was well known by, and fully disclosed to, the Independent Directors, and the Special Committee unanimously adopted the Superseding Agreement and payment of the 2010 Fee.  (*Eluz Brief* at 4-7.)  Moreover, Eluz provided the Special Committee with the Eluz Summary as requested, and the Trustee has not asserted that the information set forth in the summary was inaccurate.  (*Id.* at 7.)  Last, the Trustee cannot establish any damages to Ampal directly caused by Eluz's actions.  (*Id.* at 7-9.)

## DISCUSSION

### A.    Standards Governing the Motion

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quotation omitted). The moving party bears the initial burden of showing that the undisputed facts entitle her to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Where, as here, the defendant is the movant, she is entitled to summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."). Moreover, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation," and must instead "produce specific facts indicating that a genuine factual issue exists." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks and citation omitted).

## B.    Breach of Fiduciary Duty

Ampal is a New York corporation, and New York law governs the breach of fiduciary duty claim under the internal affairs doctrine. *Official Comm. of Unsecured*

*Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346-47 (Bankr. S.D.N.Y. 2010).  To establish a claim for breach of fiduciary duty under New York law, "a plaintiff must prove (1) the existence of a fiduciary relationship; (2) misconduct by defendant constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff directly caused by defendant's conduct."  *Solely v. Wasserman*, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). The first element is undisputed because Eluz, as an officer,[18] owed a fiduciary duty to Ampal.  *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 165 (2d Cir. 2003).

With respect to the second element, the Court must identify "the particular obligations owed before determining whether there has been a breach."  *Solely*, 823 F. Supp. 2d at 232.  An officer's fiduciary duty extends only to matters she has "discretionary authority over, and the power to prevent, the complained of transactions," in which case she will be held to the same standards as a director.  *Ampal*, 543 B.R. at 481 (citing precedent); *accord Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006) (interpreting Delaware law[19]); *see also* N.Y. Bus. Corp. Law ("BCL") § 715(g) ("All officers as between themselves and the corporation shall have such authority and perform such duties in the management of the corporation as may be provided in the by-laws or, to the extent not so provided, by the board.").  For matters within her

---

[18]    Although Eluz was also a director of Ampal, Count I focuses on her officer role.  (*See Complaint* at ¶¶ 74-76; *see also Trustee Brief* at 16-17 (arguing that BCL § 713 – which permits ratification of transactions involving self-interested directors – is inapplicable because Eluz was a self-interested officer).)

[19]    To the extent consistent with New York law, courts within this District routinely look to Delaware precedent on corporate law matters.  *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 205-06 (S.D.N.Y. 2009), *aff'd*, 412 F. App'x 337 (2d Cir.), *cert. denied*, 565 U.S. 816 (2011).

purview, the officer must perform her duties "in good faith and with that degree of care which an ordinary prudent person in a like position would use under similar circumstances."  BCL § 715(h); *accord Gully*, 341 F.3d at 165 (An officer's "fiduciary duty includes discharging corporate responsibility 'in good faith and with conscientious fairness, morality and honesty in purpose' and displaying 'good and prudent management of the corporation.'") (quoting *Alpert v. 28 Williams St. Corp.*, 473 N.E.2d 19, 26 (N.Y. 1984)).  The duty of care is subject to the business judgment rule which bars judicial inquiry into actions of corporate fiduciaries "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."  *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979).

Officers also owe a duty of loyalty to the corporation which "derives from the prohibition against self-dealing that inheres in the fiduciary relationship."  *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984).  An officer may lack disinterestedness not only if she has a direct interest, but also if she is "controlled" by another who does.  *Marx v. Akers*, 666 N.E.2d 1034, 1041 (N.Y. 1996).  The duty of loyalty also forbids an officer from acting in "bad faith."  *Norlin*, 744 F.2d at 265.  The duty to act in good faith in the context of the duty of loyalty "proscribes conduct that is not disloyal but is 'qualitatively more culpable than gross negligence.'"  *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 222 (S.D.N.Y. 2012) (interpreting Delaware law and quoting *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 66 (Del. 2006)).  Bad faith can be established where a corporate fiduciary intentionally acts with a purpose other than to advance the corporation's best interests, acts with the intent to violate applicable law or

intentionally fails to act in the face of a known duty to act demonstrating conscious disregard of her duties. *Id.* (citations omitted); *In re JPMorgan Chase & Co. Derivative Litig.*, No. 12 Civ. 03878(GBD), 2014 WL 1297824, at *4 (S.D.N.Y. Mar. 31, 2014) ("A plaintiff can thus show bad faith by 'properly alleging particularized facts that show that a director consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business.'") (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009)). Once self-dealing or bad faith is demonstrated, the burden shifts to the breaching fiduciary to "prove that the transaction was fair and reasonable to the corporation." *Norlin Corp.*, 744 F.2d at 265 (quoting *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 382 (2d Cir. 1980)).

Finally, the third element requires that the plaintiff show causation, *Solely*, 823 F. Supp. 2d at 232, and the "level of causation required in breach of fiduciary duty . . . cases depends on the type of remedy sought." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999); *accord Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009). Where, as here, the plaintiff seeks money damages, the plaintiff must establish that the alleged breach of fiduciary duty was "both a 'but for' and proximate cause" of the damages. *Solely*, 823 F. Supp. 2d at 232 (citation and internal quotation marks omitted). Further, the plaintiff "must prove with reasonable certainty, though not mathematical precision, the amount of the loss." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 907-08 (2d Cir. 1998); *accord Sea Trade Maritime Corp. v. Coutsodontis*, 744 F. App'x 721, 725-26 (2d Cir. 2018) (summary order) (the plaintiff must prove "non-speculative damages"); *Ackerman v. Pilipiak* (*In re Marine Risks, Inc.*), 441 B.R. 181,

206 (Bankr. E.D.N.Y. 2010) ("Because the record is barren of any quantifiable basis to fix damages with any degree of certainty, the Trustee has failed to satisfy his burden of proof."), *aff'd*, 457 B.R. 191 (E.D.N.Y. 2011); *Drucker v. Mige Assocs. II*, 225 A.D.2d 427, 428-29 (N.Y. App. Div.), *cert. denied*, 670 N.E.2d 448 (N.Y. 1996).

The Trustee's arguments fall into two general categories. First, Eluz breached her duty of loyalty to Ampal because she acted as Maiman's advocate before the Special Committee which adopted the Superseding Agreement and the 50% fee. (*Trustee Brief* at 1-2, 5-7.) Second, Eluz acted in bad faith and breached her duty of care to Ampal by failing to monitor MNF, failing to provide periodic reports to the Special Committee about MNF's work and fees, and providing an inadequate report to the Special Committee in connection with its approval of the 2010 Fee. (*Id.* at 2, 8-15.) The Trustee contends that due to Eluz's breach of the duty of loyalty and lack of good faith, the business judgment rule does not apply, and the burden of proof shifts to Eluz to show that the Superseding Agreement and the payment of the 2010 Fee was intrinsically fair. (*Id.* at 15-21.)

### 1. Approval of the Superseding Agreement and the 2010 Fee

According to the Trustee, Eluz breached her fiduciary duty in advocating to change/increase MNF's 2010 fee because it was already late December 2010 and there was nothing MNF or Maiman could do about the 2010 compensation. The then-current term of the 2009 Agreement ran until December 31, 2009 and would automatically renew for the next year unless either party gave notice of an intent not to renew by December 1, 2009. Neither party did. Consequently, the Trustee argues, MNF was already locked in contractually to compensation of only 10 million NIS for 2010 when

Eluz advocated in favor of a new agreement covering 2010.  At oral argument, counsel for the Trustee argued that there was no risk that MNF would stop providing services, (*Transcript of 5/19/20 Hr'g*, at 13:8-9 (ECF Doc. # 110)), "there was no way for [MNF] to negotiate a larger fee after December 1st," (*id.* at 18:18-19), "there was no recourse for [MNF] to obtain the higher fees retroactively," (*id.* at 18:23-24), and "[t]here was no risk to Ampal that it would ever have had to incur this higher cost, but they voluntarily chose to continue." (*Id.* at 19:1-3.)

This argument ignores the fact that the Special Committee, not Eluz, approved the Superseding Agreement that changed MNF's compensation from a flat fee to a percentage of expenses and increased MNF's compensation for 2010.  Ampal created the Special Committee to consider related-party transactions.[20]  Although Eluz had the discretion not to *recommend* a new agreement, the *approval* of the new agreement was solely committed to the Special Committee's discretion and Eluz had no vote.  Moreover, Morag and Karni, two of the three members of the Special Committee, were also members of the Board that specifically assigned to Maiman the responsibility for "determining the annual base salary and non-equity based annual bonuses for all executive officers" including Eluz.  (2006 Form 10-K at ECF p. 78 of 196.)  They knew, therefore, that Eluz owed the amount of her compensation to Maiman.  In addition, the same Independent Directors that approved the 2009 Agreement, Karni, Morag and

---

[20]    The Trustee argues that the Special Committee's role was limited to transactions where Maiman was conflicted and suggests that a separate committee was required to consider transactions in which Eluz had a conflict.  (*Trustee Brief* at 17.)  However, the Special Committee was tasked with reviewing and approving transactions "with any related party" (October 2009 Proxy Statement at ECF p. 13 of 25), not just transactions in which Maiman had a conflict.  Furthermore, the Superseding Agreement was between Maiman's MNF and Ampal, precisely the type of transaction committed to the Special Committee.  Eluz, on the other hand, was not a party to the Superseding Agreement.

Vaknin, were also the Independent Directors and members of the Special Committee that approved the Superseding Agreement.  Under New York law, "a signatory to a contract is presumed to have read, understood and agreed to be bound by all terms . . . ." *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001); *accord Orix Credit Alliance, Inc. v. Brown*, No. 93 Civ. 1019, 1994 WL 392240, at *4 (S.D.N.Y. July 27, 1994).  Although the Independent Directors did not sign the 2009 Agreement, they reviewed and approved it.  Therefore, they should be presumed to have "read, understood and agreed" to its contents including the provision on renewal and there is no contrary evidence, such as might be revealed through the depositions of the Independent Directors, that they were unaware of Eluz's potential conflict or the provisions of the 2009 Agreement.[21]

In short, when the Special Committee heard Eluz's presentation of MNF's contributions and recommendation at the December 19 meeting, reviewed the Eluz Summary and approved the Superseding Agreement and the payment of approximately 24 million NIS for 2010, the Independent Directors knew that (i) the amount of Eluz's compensation depended on Maiman and (ii) the 2009 Agreement fixed MNF's 2010 compensation at 10 million NIS.  The Special Committee nonetheless voted unanimously to approve the Superseding Agreement and pay MNF 50% of the amount shown in the Eluz Summary.  The approval by the Special Committee forecloses the

---

[21]    The Trustee cites *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453 (S.D.N.Y. 2009) to argue that conclusory statements of knowledge of certain board members based merely on their service on a committee is insufficient as a matter of law to establish their knowledge. (*Trustee Brief* at 9-10.)  As explained in the text, *supra*, the Independent Directors' knowledge is not based merely on their membership on the Ampal Board or the Special Committee.  It is based on the actions they took as members.

claim that Eluz breached her fiduciary duty by recommending what ultimately became the Superseding Agreement which resulted in the increased 2010 Fee. *See S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 851 (2d Cir. 1987) (affirming instruction to the jury that "acts by an employee that would otherwise constitute a breach of fiduciary duty would not be a breach if done with the employer's knowledge and consent"); *Mediators, Inc. v. Manney* (*In re Mediators, Inc.*), Adv. No. 93 CIV. 2304 (CSH), 1996 WL 297086, at *10 (S.D.N.Y. June 4, 1996) (a corporation may "knowingly consent" to an officer's self-dealing "in which case the self-dealing does not constitute a breach of fiduciary duty"), *rev'd on other grounds*, No. 93 CIV. 2304 (CSH), 1996 WL 554576 (S.D.N.Y. Sept. 30, 1996); *Mediators, Inc. v. Manney* (*In re Mediators, Inc.*), 190 B.R. 515, 528 (S.D.N.Y. 1995), *aff'd*, 105 F.3d 822 (2d Cir. 1997); *cf.* BCL § 713 (a transaction involving a self-interested director is not void if the conflict was disclosed or known and the transaction is ratified by the vote of disinterested directors or shareholders).[22]

Accordingly, the Trustee cannot assert a claim based on Eluz's breach of her duty in advocating entry into a revised compensation agreement on behalf of MNF with Ampal or paying 50% of MNF's expenses.

### 2.    Eluz's Obligation to Monitor and Report

The Special Committee's ratification of the Superseding Agreement does not protect Eluz to the extent her actions breached a fiduciary duty separately owed to

---

[22]    The Trustee had also asserted claims in the *Complaint* that the Independent Directors breached their duty of care in approving the Superseding Agreement, but those claims were dismissed. The Trustee's theory attempts to shift the blame to Eluz for what he had contended was a breach of the duty of care by the Special Committee.

Ampal to monitor and report on MNF's activities and expenses compensated through

that agreement.  *See Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 430-31

(S.D.N.Y. 2015) (notwithstanding a vote by a disinterested board, a breach of fiduciary

duty claim against an officer would not be dismissed where it was alleged that the officer

provided inaccurate financial information to the board which the board relied upon in

making its determination).  If she failed to provide information that she was under a

duty to provide or gave misinformation out of carelessness or out of a conflict, she may

still have breached her fiduciary duties.  For the period between the February 2009 and

December 2010 Special Committee meetings, the Trustee asserts that (i) the Special

Committee "tasked Eluz with monitoring" MNF's service and fees, and (ii) Eluz had a

"contractual obligation" to provide quarterly written reports to the Special Committee.

(*Trustee Facts* ¶¶ 30-32; *see also Trustee Brief* at 8-9.)

The Trustee has failed to identify a contractual duty to monitor MNF's services

and fees, or a direction by the Special Committee to do so, but there is evidence that

Eluz assumed that duty.  While the 2009 Agreement placed the reporting obligation on

MNF to provide "business reports" regarding its services on at least a quarterly basis for

Ampal's review, (2009 Agreement at § 5),[23] Eluz represented to the Special Committee

at the February 15, 2009 meeting at which it approved the 2009 Agreement that MNF

would report its services to Ampal's management on a quarterly basis and Ampal's

---

[23]    The Trustee's counsel disingenuously argues that Eluz "readily admits to shirking her monitoring
obligations and, in effect, hoisting them onto [MNF] (the interested party)."  (*Trustee Brief* at 9.)  In fact,
it was the Special Committee, through the adoption of the 2009 Agreement and the Superseding
Agreement, that "hoisted" the reporting obligations on MNF.  Moreover, given the Trustee's overriding
contention that Eluz was loyal to Maiman rather than Ampal, I fail to understand why it should make a
difference to his case whether Maiman or Eluz prepared the report of expenses.

management would monitor MNF's remuneration based on those reports.  She testified that during 2010, she was busy dealing with other urgent matters and "the last thing that I was thinking or worried about or running after was the management fee."  (Eluz Dep. at 456:23-25; 457:15-18.)  There is no evidence that Eluz was monitoring or reporting on MNF's activities, at least on any formal basis.

On the other hand, the only specific task the Special Committee gave Eluz was to prepare a report of MNF's 2010 activities in connection with its consideration of the Superseding Agreement.  The Trustee complains that Eluz did not personally prepare or vet the Eluz Summary, and it was instead prepared by MNF.  (*Trustee Fact* ¶ 46; *Trustee Brief* at 10, 12.)  In fact, as already noted, an Ampal employee prepared the summary of activities and Eluz reviewed it before presenting it to the Special Committee.  (Eluz Dep. at 431:24-432:24.)  Further, she testified that she prepared the list of expenses, (Eluz Dep. at 438:2-439:5), and that she and her accounting colleagues had a thorough understanding of MNF's expenses, (*id.* at 439:9-12 (MNF "was our service company, I knew every number, every invoice, every salary, I was signing the checks, I knew exactly what they spent."); *id.* at 440:17-441:16; 467:15-25) and maintained a bookkeeping system to keep track of all expenses.  (*Id.* at 465:10-466:15.)

The Trustee also complains that the Eluz Summary "lacked year-over-year comparison data to discern changes that would have allowed for appropriate adjustments, if necessary."  (*Trustee Brief* at 13.)  He points to other reports rendered by Ampal in other contexts that contained year-to-year comparisons.  (*Id.* at 13 & n. 2.)  The short answer is the Special Committee did not ask for a year-to-year comparison; it asked for a summary of MNF's 2010 activities.  This is presumably what the Special

Committee needed to make its decision, and this is what Eluz gave the Independent
Directors.

Whether Eluz adequately or honestly monitored and reported on MNF's services
and expenses, a separate question, raises issues of fact that cannot be resolved on this
motion.  As noted, she testified that she was not paying attention to the Management
Fee in 2010 because she was busy on other matters.  Nevertheless, if I assume the worst,
that Eluz breached her duties of loyalty and good faith by serving Maiman's and MNF's
interests to the detriment of Ampal, she is still entitled to summary judgment
dismissing Count I because the Trustee has failed to prove damages.

### 3.    Damages

The Trustee asserts two theories of damages.  First, he contends that damages
total 14 million NIS – roughly the difference between the 2009 management fee and the
2010 Fee.  (*Complaint* at ¶ 79.)  This amount is premised on the notion that Eluz
breached her fiduciary duties because Ampal entered into the Superseding Agreement
and paid the 2010 Fee.  (*Trustee Brief* at 2 ("[T]he Trustee has established that
questions of fact exist as to whether [MNF's] retroactive increase of approximately 14
million NIS was fair and appropriate, and thus Eluz has failed to establish that there is
no question of material fact with respect to Ampal's damages.").)  As explained above,
Eluz's advocacy on MNF's behalf was not a breach of fiduciary duty because the Special
Committee approved the Superseding Agreement and 2010 Fee with knowledge of
Eluz's possible conflict and the limit on MNF's compensation under the 2009
Agreement.

Second, as reflected in the last parenthetical quotation, the Trustee conflates Eluz's possible burden to prove the entire fairness of the Superseding Agreement and 2010 Fee with his burden to prove damages. *See Fed. Ins. Co. v. Mertz*, 12-cv-1597-NSR, 2016 WL 164618, at *4 (S.D.N.Y. Jan. 12, 2016) ("[W]hile Chubb is correct that the burden of proof is placed on a self-dealing fiduciary to show that the transaction is just and fair . . . that does not relieve the plaintiff of its burden to prove damages."). The burden to establish non-speculative damages is on the Trustee. *Sea Trade Maritime Corp.*, 744 F. App'x at 725-26. To defeat Eluz's Motion, the Trustee must come forward with evidence showing that a genuine factual issue exists. *Scotto*, 143 F.3d at 114. This adversary proceeding has been pending for six years and the Trustee has had the opportunity to engage in extensive discovery, particularly, the MNF expenses incorporated into the Eluz Summary which was used to calculate the 2010 Fee. The Trustee has not identified a single expense incurred by MNF and reimbursed by Ampal that was (i) not actually incurred or (ii) incurred but not reimbursable under the terms of the Superseding Agreement. Rather, the Trustee merely speculates that such evidence exists. (*See Trustee Brief* at 22 ("[I]t is certainly plausible that Eluz's failure to discharge her fiduciary duties and properly inform the Special Committee caused the Special Committee to approve the unfair and unsubstantiated" Superseding Agreement).) His mere speculation that Ampal might have been damaged is insufficient to defeat Eluz's summary judgment motion. *Scotto*, 143 F.3d at 114.

23

## CONCLUSION

For the reasons stated, the Motion is granted.  The Court has considered the

parties' other arguments and concludes that they lack merit or are mooted by the

disposition of the Motion.  Settle order on notice.

Dated:  New York, New York
       August 25, 2020

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge