**TRIAL DATE AND TIME: JUNE 28, 2022 AT 9:30 A.M.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | Case No. 12-13689 (DSJ) |
| ) | |
| AMPAL-AMERICAN ISRAEL CORPORATION, ) | |
| ) | |
| Debtor. ) | |
| ALEX SPIZZ, as Chapter 7 Trustee for Ampal- ) | |
| American Israel Corporation, ) | Adv. No. 14-02110 (DSJ) |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| IRIT ELUZ, ET AL., ) | |
| ) | |
| Defendants. ) | |

## JOINT PRE-TRIAL ORDER

Plaintiff, Alex Spizz, as the Chapter 7 Trustee for the estate of Ampal-American Israel
Corporation (the "Trustee") and Defendant Irit Eluz (the "Defendant" or "Eluz"), by and through
undersigned counsel, having conferred among themselves and with the Court pursuant to Fed. R.
Civ. P. 16, adopt the following statements, directions and agreements as the Pretrial Order herein.

## I.    NATURE OF THE CASE

This is an adversary proceeding brought by Alex Spizz, as Chapter 7 Trustee (the
"Plaintiff" or "Trustee") for the estate of Ampal-American Israel Corporation (the "Debtor" or
"Ampal"), in which the Trustee seeks money damages on a claim for breach of fiduciary duty
against the former Chief Financial Officer (CFO) of Ampal, Defendant Irit Eluz.  The Trustee's
breach of fiduciary duty claim arises from allegedly unauthorized quarterly payments made in
2011 by Ampal to Merhav M.N.F. Ltd ("Merhav"), a company wholly owned by Yosef Maiman
("Maiman"), who was also Ampal's controlling shareholder, pursuant to a management services

agreement with Ampal. The Trustee seeks to recover the full amount of the 2011 payments (NIS

24,157,000 (approximately $6.6 million)) plus prejudgment interest, taxable costs, and

disbursements. Ms. Eluz denies that she breached her fiduciary duties owed to Ampal, asserts

certain other affirmative defenses, and seeks a with-prejudice dismissal of this claim.

## II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has subject matter jurisdiction over this adversary pursuant to 28 U.S.C.

§1334(b), 28 U.S.C. § 157, and the Amended Standing Order of Reference, M-431, dated January

31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) and (O),

and the Parties consent to this Court holding a jury trial and entering judgment as a matter of law,

a final order, or judgment after a jury trial is held.

## III.   STIPULATED FACTS WHICH REQUIRE NO PROOF[1]

[TO BE UPDATED]

## IV.   PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following,

contentions of the parties:

### A.    Plaintiff's Contentions

1.    Between 2007 and 2011 Maiman determined Eluz's compensation from Ampal,

except for her long term compensation, which was determined by Maiman and the Board. As such,

Maiman controlled Eluz's compensation and could affect the terms of her employment either

---

[1] The Parties are in the process of meeting and conferring in good faith on the stipulated facts and will file a supplemental Joint Pre-Trial Memorandum once this process is completed.

directly or through his selection of the Board.  Due to Maiman's control over Eluz's compensation, Eluz was beholden to Maiman.

2.      In early 2009, Eluz, on behalf of Ampal, called a meeting of the Special Committee to discuss a proposed management agreement between Ampal and Merhav.  In advance of this meeting, Eluz had requested Ampal's attorneys to draft a proposed management agreement between Ampal and Merhav.  At the February 15, 2009 Special Committee meeting, Eluz informed the Special Committee of the negotiating strategy and purported fairness of the compensation number agreed to and to be provided in the proposed 2009 Management Agreement, which was pre-fixed at 10 million NIS to be paid quarterly (i.e., 2.5 million NIS per quarter as the year progressed).  Consequently, the Special Committee was reliant on Eluz for ensuring that the proposed agreement was commercially proper and entered into on an arms-length basis.  The only additional point of clarity from the Special Committee was to ensure that the flat management fee paid to Merhav would be exclusive of Merhav's costs and expenses, and that Merhav's costs and expenses would not be reimbursed by Ampal.

3.      At this meeting, Eluz represented to the Special Committee that Merhav's "remuneration will be monitored by Ampal's management, in accordance with detailed reports of services, and if need be, it may be altered.  Merhav shall report to Ampal's management, on a quarterly basis, with regards to the services rendered by Merhav in the respective quarter." Merhav's obligation to report to Ampal was particularly relevant and for the benefit of the Special Committee, as they were not employed by Ampal or Merhav and did not maintain an office in the physical location that these entities shared.  Thus, the members of the Special Committee needed reports to remain apprised of Merhav's activities, which followed from Merhav, to Ampal's management, and then to the Special Committee.

4.      In fact, Eluz was the main conduit to the Special Committee with respect to Merhav's management services and the primary source of information for the Special Committee regarding Merhav's activities for Ampal.  Eluz herself acknowledged that the Special Committee relied on her and the information she provided to make its decisions.

5.      After the Special Committee meeting on February 15, 2009, the next time Merhav's services and remuneration were discussed was more than twenty (20) months later at the Special Committee meeting held on December 19, 2010 where, for the second time, Eluz raised the issue of Merhav's management services to the Special Committee, and advocated for increasing Merhav's compensation.

6.      At the December 19, 2010 meeting, Eluz informed the Special Committee that "[she] reviewed Merhav's contribution and activities with regards to Ampal's holdings and business over the year 2010, and the inadequate renumeration received by Merhav for such activities. Based on this statement, the Special Committee resolved to:

> approve in principle the entering into a Management Services Agreement with Merhav, to be prepared by Ampal's attorneys, according to which Merhav shall render services to Ampal, and Ampal  shall bear a percentage of Merhav's expenses for its services, in accordance with an annual settling of accounts, which shall be based upon Merhav's management report of services rendered by Merhav and agreed by the Committee at that time.  Such agreement shall be deemed effective as of January 1st, 2010.

7.      The drafts of the 2010 Management Agreement, in addition to altering the compensation from a fixed to a variable amount, explicitly changed the timing of payments to Merhav from quarterly to an annualized payment, which is reflected by Ampal's edits to the draft agreement that struck out the specific language authorizing quarterly payments of Merhav's management fee in favor of the final operative approach, which provided that Merhav's

compensation would be fixed at year-end upon evaluation of Merhav's expenses and results by the Special Committee.

8.     The final language of the 2010 Management Agreement confirmed that payment and fixing of Merhav's compensation would occur on an annualized basis and upon express approval of the Special Committee.  Indeed, the 2010 Management Agreement recognized that during the particular year Merhav may receive reimbursement or may otherwise recoup its expenses from other parties and thus Merhav's actual expenses are unknown and subject to change, which necessitated the annual review and establishment of Merhav's management fee "at or about the end of each fiscal year" and a presentation of "expenses [actually] incurred in providing services … during the current year."  By fixing Merhav's compensation at year-end, the Special Committee, pursuant to the 2010 Management Agreement, was able to take into account Merhav's services and expenses, factor in other reimbursements Merhav received throughout the year, and then fix Merhav's management fee without inadvertently providing double compensation.

9.     The executed 2010 Management Agreement changed the method of how Merhav's compensation was calculated, and, as a consequence, the management fee specifically set for 2010 and paid in 2010 increased, while the scope of Merhav's services remained unchanged.

10.     Notwithstanding that Ampal affirmatively altered the contractual language that provided authorization to Ampal for the timing of payment of Merhav's compensation from quarterly to annually, Eluz caused Ampal to make unauthorized quarterly payments to Merhav in 2011 at the same rate of the total compensation for 2010.  Consequently, Eluz had caused Ampal to make quarterly payments to Merhav during 2011 without approval from the Special Committee to either make those quarterly payments or to pay the amounts of the payments Eluz caused Ampal to make.

11.     At the March 7, 2011 meetings, the Board and the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee (or the Board) receive information from Ampal's management identifying Merhav's expenses for 2011.   No resolution was reached authorizing payment of management fees to Merhav at these March 7, 2011 meetings.

12.     In advance of the March 7, 2011 meetings, Ampal's management did not inform the Audit Committee or the Board that Merhav's services, expenses, or management compensation would be discussed at the meetings, and Ampal's management (including Eluz) did not provide the Audit Committee or the Board with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the first quarter of 2011, or the scope of Merhav's services during that time period.

13.     In advance of the quarterly payment to Merhav in the first quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the first quarter of 2011, and did not authorize – by resolution reflected in meeting minutes or unanimous written consent – Merhav's management compensation for the first quarter in 2011, nor did they receive full and complete information from Ampal's management sufficient to undertake such a decision.   Yet, Eluz caused Ampal to make the quarterly payment without authorization.

14.     At a May 5, 2011 Board meeting, Ampal re-confirmed that Eluz's signature, along with Maiman, is the only way for Ampal to authorize payments greater than $100,000,  which was consistent with the financial payment protocol from the prior year.   Due to the size of Merhav's management fee compensation payments in 2011, Ampal's payments could only be authorized by Eluz and Maiman.

15.     At the May 5, 2011 meetings, the Board and the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

16.     In advance of the May 5, 2011 meetings, Ampal's management did not inform the Audit Committee or the Board that Merhav's services, expenses, or management compensation would be discussed at the meetings, and Ampal's management (including Eluz) did not provide the Audit Committee or the Board with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the first quarter of 2011, or the complete scope of Merhav's services during that time period.

17.     In advance of the quarterly payment to Merhav in the first quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the first quarter of 2011, and did not authorize – by resolution reflected in meeting minutes or unanimous written consent – Merhav's management compensation for the first quarter in 2011, nor did they receive full and complete information from Ampal's management sufficient to undertake such a decision.  Yet, Eluz caused Ampal to make the quarterly payment without authorization.

18.     At the August 4, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

19.     In advance of the August 4, 2011 meetings, Ampal's management did not inform the Audit Committee that Merhav's services, expenses, or management compensation would be discussed at the meetings, and Ampal's management (including Eluz) did not provide the Audit Committee with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the second quarter of 2011, or the scope of Merhav's services during that time period.

20.    In advance of the quarterly payment to Merhav in the second quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the third quarter of 2011, and did not authorize – by resolution reflected in meeting minutes or unanimous written consent – Merhav's management compensation for the second quarter in 2011, nor did they receive full and complete information from Ampal's management sufficient to undertake a decision on Merhav's management compensation for the second quarter in 2011.  Yet, Eluz caused Ampal to make the quarterly payment without authorization.

21.    At the November 9, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

22.    At the November 12, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

23.    At the November 13, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

24.     In advance of the November 13, 2011 meetings, Ampal's management did not inform the Audit Committee that Merhav's services, expenses, or management compensation would be discussed at the meetings, and Ampal's management (including Eluz) did not provide the Audit Committee with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the third quarter of 2011, or the scope of Merhav's services during that time period.

25.     In advance of the quarterly payment to Merhav in the third quarter of 2011, the Special Committee did not meet (nor did any other committee) to discuss or review Merhav's expenses for the third quarter of 2011, and did not authorize – by resolution reflected in meeting minutes or unanimous written consent – Merhav's management compensation for the second quarter in 2011, nor did they receive full and complete information from Ampal's management sufficient to undertake a decision on Merhav's management compensation for the second quarter in 2011.  Yet, Eluz caused Ampal to make the quarterly payment without authorization.

26.     At the November 28, 2011, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

27.     The Special Committee met once in 2011 (on November 12, 2011) and acted once by unanimous consent (on December 31, 2011), but neither action related to Merhav's management fee for 2011, Merhav's expenses for 2011, and nor did either event include approval or the fixing of Merhav's compensation for 2011.

28.     In 2011, without a contractual basis or authorization from the Special Committee, Eluz made unauthorized payments of management fees to Merhav on a quarterly basis at the

amount fixed for Merhav's 2010 management fee.  Eluz admits that she authorized payments by Ampal to Merhav without complying with the contractual requirements for fixing Merhav's compensation in 2011.  While the Special Committee met "at or about the end of [the] fiscal year" in 2011, it only conducted business regarding the Ethanol Project in Colombia. The Special Committee never authorized – let alone discussed – Merhav's 2011 compensation.  Likewise, while the Audit Committee, which is composed of the same independent directors as the Special Committee, met frequently during and at the end of 2011, it neither discussed nor approved Merhav's management fee compensation for 2011.  Thus, Eluz had no authorization to make payments to Merhav in 2011.

29.    After entering into the 2010 Management Agreement, Ampal repeatedly acknowledged and represented to the public that Merhav's management fee was "determined annually and shall be equal to a percentage of the direct and indirect expenses in connection with providing services to or for the benefit of Ampal."  And, that the "management fee shall be determined by the Special Committee … at or around the end of each fiscal year."

30.    While Ampal disclosed the 2010 Management Agreement in its 2011 public filings, these filings establish that Ampal did not (and could not) disclose that the Special Committee "determined" the "management fee" for Merhav for 2011, nor did it disclose that the Special Committee had authorized quarterly payments to Merhav in 2011, nor did the public filings made in 2011 actually identify the management fee paid to Merhav – either quarterly or annually.

31.    Unlike in prior years, in regards to every other related-party transaction involving Merhav, Ampal (and specifically Eluz), failed to bring the issue of Merhav's management compensation for 2011 to the Special Committee to obtain its authorization to make those

payments to a related party, and nor did Ampal (or Eluz) alert the Special Committee that such authorization was necessary.

32.    Eluz admits that Ampal paid management fees to Merhav in 2011 without the Special Committee's oversight because Eluz's mistakenly (and negligently) viewed the quarterly management payments as contractual obligations, like payments of rent, as opposed to payments that required authorization of the Special Committee.

33.    Eluz acknowledges that the 2010 Management Agreement required that the Special Committee was obligated to decide the management compensation for Merhav at the end of each year while the agreement was in effect, but that this requirement never occurred in 2011 because they were too busy dealing with EMG and the debenture holders and never got around to it.

34.    Instead, Eluz chose to pay Merhav quarterly in 2011 at the rate paid in 2010 without approval from the Special Committee because Merhav billed Ampal quarterly.

35.    At a January 11, 2012 meeting of the Board, Vaknin, an independent director and the chair of the Audit and Special Committees, stated that Ampal's "Management should prepare a plan to cut its costs and expenses."  Eluz confirmed that such a plan was made and would be discussed by the Audit Committee.  No action was taken at this meeting and the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.  The B debenture holders further argued that payments to one group and not the other would be improper, and that the payment to the A Holders in late 2011, as well as the "extension of the option to the [related transaction] Ethanol project in Colombia can be considered as unfair preference of creditors."  Further, the debenture holders demanded, among other things, "an undertaking not to distribute dividends" and "a substantial cut in payments of salaries." Notably, as a precaution to avoid the reduction of Ampal's cash, the debenture holders sought the

right of "preapproval" for any "out of the ordinary transactions" of Ampal. Also, the B Holders were demanding that Ampal cancel the extension to Merhav of its option on the Colombia ethanol project. Ultimately, Ampal recognized that delaying principal payments "will be considered as a declaration of insolvency." Among other things, the Board "unanimously resolved" to postpone principal payments coming due on the debentures holders, but continue making interest payments.

36.     At the January 22, 2012 meeting, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

37.     The Audit Committee, at a meeting on January 30, 2012, discussed a "cost reduction plan," for Ampal in 2012. Ampal proposed that Merhav's management fee would be a flat fee of US $2.4 million, like the prior structure with the 2009 Management Agreement, "and all other expenses of Merhav will be borne by Mr. Maiman." In responding to questions about managing these proposed reductions, Eluz explained that some of the past expenses were "special and onetime transactions and possible transactions," but that they were not anticipated in 2012. Notably, Eluz only identified such expenses occurring in 2009 and 2010, but nothing from 2011.

38.     At the January 30, 2012 Audit Committee meeting, Independent Director Morag requested "a summary of Merhav's employees work related to Ampal during 2011." However, Eluz never provided this summary and the record is devoid of any evidence to suggest one was ever provided. Mr. Morag has never provided testimony to the contrary.

39.     The Audit Committee made no resolution at the January 30, 2012 meeting and did not discuss Merhav's management activities in 2011 or Merhav's management-related expenses in 2011.

40.     On February 19, 2012, Lee Botvin (from Ampal's legal department) e-mailed Yoram Firon and said "[t]he attached agreement stipulates the payment determined by the special

committee for 2010. Nir [Bernstein] asks whether a decision has been made for the amount of payment for 2011. Do you remember anything about this?" The record is devoid of evidence regarding whether Mr. Firon responded, but the record also demonstrates that the Special Committee was not convened on or after February 19, 2012 to discuss and/or approve Merhav's compensation for 2011. Mr. Botvin sent this e-mail to Firon because he knew (as Ampal's management also knew) that there was no unanimous consent from the Special Committee that fixed Merhav's compensation for 2011, like had been done in 2010.

41.    On February 21, 2012, Ampal publicly disclosed in its 8-K filing that it held a meeting with the B Holders on the previous day and that Ampal presented the B Holders with a proposal for an agreement going forward. Ampal requested a "two-year postponement of principal payments" with only interest payments made during this period. In exchange for this, among other things, Ampal would agree to "reduce its current expenses by approximately 50%" and Merhav would grant to Ampal an option to sell back Ampal's interest in the Colombia Ethanol Project. In other words, the offer to the B holders included undoing the agreement authorized by the Special Committee on December 8, 2011 regarding the Colombia Ethanol Project.

42.    On February 26, 2012, the Board met to discuss the status of negotiations with the debenture holders. The crucial issue discussed was whether the B Holders would accelerate the debt due to non-payment of principal or reach an agreement with Ampal. The B Holders were scheduled to vote on acceleration due to non-payment of principal on February 29, 2012. In effect, the B Holders were in control and that if they accelerated than Ampal "should file for bankruptcy" and "should [B Holders] vote for the acceleration … Ampal will be at the hands of B [Holders] Committee." To avoid this outcome, Ampal's management reported on the substance of its February 20 meeting and proposal to the B Holders. With respect to the right to exercise the

13

Colombia Put Option, the parties disagreed over whether the Special Committee or the B Holders should control that decision. Ultimately, the B Holders' main concern was focused on Ampal's "cash levels." The Board took no action at this meeting. At the February 26, 2012 meeting, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

43.    At the March 5, 2012 meeting, other than noting that management fees to Merhav is an open issue with the debenture holders, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

44.    On March 5, 2012 and March 6, 2012, Lee Botvin, Yoram Firon, and Amit Mansur (all employees of Ampal and subordinates of Eluz) and Eluz exchanged various e-mails discussing the 2010 Management Agreement and Merhav's compensation for 2011. With respect to the March 5, 2012 e-mail, Eluz requested a copy of the 2010 Management Agreement for an upcoming meeting. With respect to the March 6, 2012 e-mail, Mr. Botvin sent Mr. Firon a draft (and unsigned) unanimous consent addressed to the Special Committee, which is identical to the unanimous consent used to authorize Merhav's compensation in 2010, but edited for Merhav's purported management compensation for 2011 and containing the exact same rate as 2010.

45.    However, the Special Committee did not meet in March 2012, nor did the Special Committee ever hold a meeting to discuss Merhav's compensation for 2011 or the draft unanimous consent circulated internally with Ampal's management. Ampal's management never sent that unanimous consent to the Special Committee, and the Special Committee never executed that draft unanimous consent.

46.    On March 11, 2012, the Audit Committee met to discuss EMG's valuation and PwC's concerns. PwC sought clarification on the applicability of the valuations in light of EMG's

issues, as well as the appropriate tax treatment – either 0% or 20%.  After discussions, the Audit

Committee concluded that the valuations were relevant and reasonable, and further directed

management to re-evaluate the assumptions to ensure they are appropriately conservative.  At the

March 11, 2012 meeting, the Audit Committee did not discuss Merhav, Merhav's management

activities in 2011, or Merhav's management-related expenses in 2011.

47.    On March 14, 2012, Ampal's counsel in connection with the debenture holder

negotiations e-mailed Ampal's management regarding certain questions and requests for

documents from the debenture holders, which included questions regarding Merhav's management

compensation.  Eluz responds to the questions as requested by counsel in red type.  *Id.*  Ultimately,

the answer Ampal's counsel provided to the B Holders was, in relevant part:

> Regarding your request to pay management fees to Merhav in
> accordance with details of the work performed: this is determined
> by a special committee of the board of directors, which determines
> participation in the expenses of Merhav every year, according to the
> information presented to it.

48.    However, this statement and answer from Eluz to the B Holders regarding Merhav's

management fee is false, as the Special Committee never received information presented to it from

Ampal's management regarding Merhav's expenses for 2011, nor did the Special Committee

actually "determine" the amount of Ampal's "participation in the expenses of Merhav" for 2011.

49.    On March 22, 2012, Ampal's management sent a draft of the 10-K, along with an

agenda, for the audit and board meetings scheduled for 11 a.m. on March 25, 2012 to discuss and

approve same.  The 10-K attached to this e-mail and the other documents did not include any

reference to Merhav's management compensation for 2011, or that it was an issue to be discussed.

50.    At the March 25, 2012  meeting, the Audit Committee did not discuss Merhav,

Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

51.     At the March 25, 2012 Board meeting, Eluz announced an agreement in principle with the B Committee, which included a certain payment to them, concessions by Ampal and Maiman, Maiman waiving a salary for two years, and providing the B Committee – not Ampal or the Special Committee – with the right to exercise Ampal's Put Option regarding the Ethanol Project in Colombia.  In addition, the meeting also focused on Ampal's 10-K for 2011 as Eluz explained that there were still open issues to resolve. Other than discussing Ampal's "inability to pay its debt to its debenture holders" and that a "going concern" notice regarding Ampal will be included in the 10-K, the outstanding issue was that PPT's valuation of EMG was lower than Ampal's valuation and the valuation from Houlihan Lokey.  No resolution was made at this time on this issue.

52.     At the March 25, 2012 meeting, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

53.     On March 25, 2012, Nir Bernstein e-mailed Eluz to tell her that PwC is requiring additional, non-EMG, disclosures regarding related party transactions, including Merhav's management fee and the aircraft sharing agreement.  Eluz questioned this obligation, and conferred with Firon and discussed the past disclosure in the Proxy but that PwC is requiring the disclosure in the annual report.  Ultimately, Eluz responded to Nir Bernstein and told him to "[p]repare both, there is no choice."  Neither this exchange, nor the issue regarding the additional disclosure regarding Merhav's management fee and the aircraft agreement, was ever discussed with the Special Committee (or the Audit Committee), nor was the Audit Committee alerted to this additional disclosure prior to its approval of the 10-K on March 28, 2012.

54.     On March 28, 2012, Ampal's management circulated materials for a conference call of the Audit Committee to be held that evening at 9 pm, with the Board to convene at 9:10

pm, so that the Audit Committee and Board could approve the 10-K for 2011. The documents circulated included the agenda for the Audit Committee and the Board, a revised draft 10-K, and a comparison to the draft previously provided to the Audit Committee. The only items on the agenda were "discussing and approving the 10-K and the Financial Statements as of December 31, 2011" and "[m]iscellaneous." The agenda made no mention of Merhav's compensation for 2011.

55.     On March 28, 2012, the Audit Committee telephonically reconvened to discuss Ampal's 10-K for 2011. In the minutes, Eluz explains that the "Report was amended to include the items requested by the auditors, as discussed on Sunday." In response, PwC's representative explained that he had "no further comments" and they find the revised Report "satisfactory." With that limited discussion, the Audit Committee approved the 10-K. At the March 28, 2012 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011. At the March 28, 2012 meeting, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

56.     However, in addition to the additional disclosures required by PwC, which the Audit Committee was alerted to on March 27, 2012, Ampal's management (and PwC) failed to mentioned that the 10-K for 2011 included a new note 20, which had never been included previously, that references "transactions with related parties" and made reference to the 2010 Management Agreement and the "annual consideration in the year ended December 31, 2011 of NIS 24.2 million ($6.6 million)."

57.     Ampal's management did not provide information relating to Merhav's services and expenses for 2011 in advance of the March 28, 2012 meeting.

58.     The 10-K filed on or about March 28, 2012 did not qualify as an approval or authorization of the management fee for Merhav for 2011 and, even if it could (which Plaintiff disputes) it was not knowingly done by the Audit Committee, it was a task for the Special Committee, and regardless the independent directors had not received complete information regarding Merhav's expenses and services in 2011 necessary to make that decision to approve and fix Merhav's compensation for management services in 2011.

59.     Because the Special Committee consists of independent directors who did not work at Ampal and did not regularly have access to company information, these directors were reliant upon Eluz (and her management team at Ampal) to provide them the relevant information as to Merhav's work, services, and expenses in 2011, in order for them to have sufficient information to determine Merhav's management fee for 2011, pursuant to the 2010 Management Agreement.

60.     The independent directors served different functions and undertook different actions depending on whether they acted as members of the Audit Committee or the Special Committee.  For the most part, the Audit Committee was focused on supervising the preparation and approval of Ampal's financial statements for submission to the SEC, as well as dealing with other major financial issues, such as the EMG crises and the debenture issues.  The sole purpose of the Special Committee was to address transactions and approve (or disapprove) of those transactions between Ampal and related-parties, such as Maiman and Merhav, due to the inherent conflict of interest present due to Maiman's ownership of both.

61.     Consequently, Eluz was obligated, in order to appropriately satisfy her fiduciary duties to Ampal, to bring the issue of Ampal's payment of management fees to Merhav in 2011 to the Special Committee, even if the Audit Committee and the Special Committee were comprised

of the same individuals. Eluz's obligation was both due to the 2010 Management Agreement itself, and because this was the sole reason for the formation of the Special Committee, which Eluz knew.

62.     Any decision by the Special Committee had to be formally made and recorded in the minutes or by written unanimous consent, as the Special Committee had done with every other decision before and after the issue of Merhav's compensation for 2011. The record is devoid of any approval by the Special Committee of Ampal's compensation to Merhav in 2011, as Mr. Vaknin also concedes.

63.     Eluz breached her fiduciary duties of care and loyalty to Ampal by causing Ampal to make unauthorized quarterly payments to Merhav in 2011 totaling 24,157,000 NIS.

64.     The damages to Ampal as a result of Eluz's breach of her fiduciary duties to Ampal totals 24,157,000 NIS, which is the amount of the unauthorized payments, plus interest at the New York statutory rate of nine (9%) percent per annum.

**B.     Defendant's Contentions**

1.     Ms. Eluz contends that she did not breach her fiduciary duties to Ampal in any way in connection with the quarterly management fees paid to Merhav in 2011.

2.     Ms. Eluz contends that, at all relevant times, she acted lawfully, in good faith, in accordance with her best business judgment, in accordance with her fiduciary duties as Ampal's CFO, in accordance with the 2010 Management Agreement, and in Ampal's best interests.

3.     Ms. Eluz contends that on December 19, 2010, Ampal's Independent Directors unanimously resolved to approve the 2010 Management Agreement, and on December 30, 2010, the Independent Directors signed a written consent approving the 2010 Management Agreement.

4.     Ms. Eluz contends that the quarterly management fees paid to Merhav in 2011 pursuant to the 2010 Management Agreement were either explicitly or implicitly approved, or

explicitly or implicitly ratified, by Ampal's Independent Directors, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

5.      Ms. Eluz contends that the Trustee's breach of fiduciary duty claim is barred by the Independent Directors' approval and/or ratification of the 2011 payments, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

6.      Ms. Eluz contends that the Independent Directors were, at or around the end of the first quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the first quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials. Ms. Eluz further contends that the Independent Directors were, at or around the end of the first quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the following three quarters of 2011.

7.      Ms. Eluz contends that at or around the end of the first quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the first quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

8.      Ms. Eluz contends that the Independent Directors were, at or around the end of the second quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the second quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

Ms. Eluz further contends that the Independent Directors were, at or around the end of the second quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the following two quarters of 2011.

9.      Ms. Eluz contends that at or around the end of the second quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the second quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

10.     Ms. Eluz contends that the Independent Directors were, at or around the end of the third quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the third quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials. Ms. Eluz further contends that the Independent Directors were, at or around the end of the third quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the fourth quarter of 2011.

11.     Ms. Eluz contends that at or around the end of the third quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the third quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

12.     Ms. Eluz contends that the Independent Directors were, at all relevant times, fully aware of the totality of the quarterly management fees paid to Merhav in 2011, as evidenced by

Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

13.    Ms. Eluz contends that at or around the end of 2011, the Independent Directors either approved or explicitly or implicitly ratified the totality of the quarterly management fees paid to Merhav in 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

14.    Ms. Eluz contends that the Independent Directors, sitting on Ampal's Board of Directors, Audit Committee, and Special Committee, carefully reviewed and approved Ampal's publicly-filed quarterly and annual financial statements for 2011, each of which includes references to the services provided by Merhav on Ampal's behalf and the quarterly management fees paid to Merhav in 2011, as evidenced by the Board and Committee meeting minutes, the public filings, the financial statements, and other materials.

15.    Ms. Eluz contends that Ampal's Special Committee and/or Ampal's Audit Committee, which consisted of the same Independent Directors, were charged with the oversight and approval of related party transactions, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

16.    Ms. Eluz contends that to the extent the Independent Directors required information to meet their obligations in reviewing/approving Ampal's public filings or for any other reason, they could and did request that information from Ampal's management.

17.     Ms. Eluz contends that to the extent the Independent Directors requested any information or documentation from her in 2011, she provided that information and documentation in a timely manner.

18.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, did not prohibit Ampal from making quarterly management fee payments to Merhav throughout 2011, and indeed, it did not provide any express instructions as to the timing of those payments.

19.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, automatically renewed unless one party provided notice of termination.

20.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, allows for quarterly management fee payments subject to "adjustments as [the parties] agree may be reasonably appropriate in light of the work performed or to be performed by Merhav."

21.     Ms. Eluz contends that the quarterly management fees paid to Merhav in 2011, totaling NIS 24.2 million ($6.6 million), were entirely reasonable, fair, and provided value and benefit to Ampal.

22.     Ms. Eluz contends that Merhav provided more services, spent more time providing those services, and incurred higher expenses in 2011 than in 2010 due to, among other things, the need to address the fallout from the terrorist attack on the Egyptian gas pipeline that supplied gas to one of Ampal's largest investments, East Mediterranean Gas Company, S.A.E. ("EMG"). Ms. Eluz further contends that Merhav, who managed Ampal's projects in 2011, was critical in addressing these and related issues and spent significant time and expense in doing so.

23.     Ms. Eluz contends that the services and expenses incurred by Merhav on behalf of Ampal in 2011 were greater than the services and expenses incurred by Merhav on behalf of Ampal in 2010 for which Merhav was compensated NIS 24.2 million ($6.6 million).

24.     Ms. Eluz contends that on January 30, 2012, the Independent Directors, sitting as Ampal's Audit Committee, were presented with the amount of the management fee paid to Merhav in 2011, as evidenced in the Audit Committee meeting minutes and accompanying exhibit.  With full knowledge of the amount of the management fee paid to Merhav in 2011, the Independent Directors knowingly decided not to adjust Merhav's management fee for 2011.

25.     Ms. Eluz contends that the decision whether to conduct a formal reconciliation and/or adjust Merhav's management fee for 2011 was the sole responsibility of the Independent Directors, not Ms. Eluz.

26.     Ms. Eluz contends that the Independent Directors were, at all relevant times, fully aware that: (i) Ms. Eluz previously served as Associate Chief Financial Officer of Merhav; and (ii) Mr. Maiman controlled Ms. Eluz's compensation.

27.     Ms. Eluz contends that she did not receive a direct financial benefit from the quarterly management fees made to Merhav in 2011, and her compensation was not contingent on the management fees paid to Merhav in 2011.  In 2011, Ms. Eluz received less total compensation than she received in 2010.  Ms. Eluz did not receive a cash bonus in 2011.

28.     Ms. Eluz contends that Ampal's external auditors at PricewaterhouseCoopers ("PWC") reviewed each of Ampal's financial statements for 2011 and found no material errors and had no material comments, as evidenced by the Board and Committee meeting minutes.

29.     Ms. Eluz contends that Ampal did not sustain any loss, damage, harm, or detriment of any kind as a result of the quarterly management fees paid to Merhav in 2011, including with respect to any alleged conduct by Ms. Eluz.

30.     Ms. Eluz contends that to the extent it is found that Ampal did sustain any loss, damage, harm, or detriment of any kind as a result of the quarterly management fees paid to

Merhav in 2011, Ampal's Independent Directors failed to mitigate such damages by failing to object to and/or take action to stop or claw back the payments upon becoming aware of them and/or upon becoming aware that Ampal intended to make management fee payments to Merhav in each quarter of 2011.

31.     Ms. Eluz contends that any action or inaction by the Independent Directors cannot serve as the basis for liability against Ms. Eluz.

32.     Ms. Eluz contends that any alleged decisions or other conduct by her as Ampal's CFO are shielded by the business judgment rule.

## V.     ISSUES TO BE TRIED -  Disputed

### A.     Plaintiff's Proposed Issues

1.     Whether the Special Committee approved Ampal's payment to Merhav in 2011 of management fees totaling 24,157,000 NIS in accordance with the 2010 Management Agreement.

2.     Whether Defendant Eluz breached her fiduciary duties of care and loyalty in authorizing Ampal's payments to Merhav in 2011.

3.     The amount of damages stemming from Eluz's breach.

### B.     Defendant's Proposed Issues

1.     Whether Ms. Eluz breached her fiduciary duties to Ampal in connection with Ampal's payment of quarterly management fees to Merhav in 2011;

2.     Whether the alleged decisions or other conduct by Ms. Eluz, acting as Ampal's CFO, are shielded by the business judgment rule presumption;

3.     Whether Ms. Eluz was self-interested in connection with the quarterly management fees paid to Merhav in 2011;

4.     Whether Ampal's Independent Directors expressly approved the quarterly management fees paid to Merhav in 2011;

5.      In the event it is found that Ampal's Independent Directors did not expressly approve the quarterly management fees paid to Merhav in 2011, whether the Independent Directors knowingly ratified payment of the quarterly management fees to Merhav in 2011;

6.      Whether, throughout 2011, Ampal's Independent Directors were fully aware of the quarterly management fees paid to Merhav in 2011;

7.      Whether the management fees paid to Merhav in 2011 provided value to Ampal, were fully or partially fair and reasonable to Ampal, and were in Ampal's best interest;

8.      The intent of the parties when entering into the 2010 Management Agreement, including whether the "Fee/Expense Reimbursement" section allows for quarterly payments in 2011 subject to adjustments based on the work performed or to be performed by Merhav in 2011;

9.      In the event a formal reconciliation and/or adjustment of the 2011 management fees paid to Merhav was required and not conducted, who is responsible for that omission;

10.     Whether Ampal sustained any damages as a result of Ms. Eluz's alleged conduct and, if so, how those damages are to be calculated; and

11.     In the event it is found that Ampal did sustain damages as a result of the alleged conduct, whether Ampal's Independent Directors failed to mitigate those damages through their inaction upon becoming aware of the quarterly management fees paid to Merhav in 2011.

## VI.    THE PARTIES' JOINT EXHIBITS

The parties continue to meet and confer on a final set of joint exhibits for trial.  A tentative exhibit list, subject to addition and deletions of the parties, each side reserving all objections accordingly, is attached hereto as **Exhibit A**.

## VII.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

1.      The parties have stipulated to the admissibility of the Joint Exhibits __ through __.

26

## VIII.   PLAINTIFF'S WITNESS LIST

1. Alex Spizz
2. Irit Eluz
4. Daniel Vaknin
3. Yoram Firon
5. Steven Solomon (expert)
6. Rebuttal and impeachment witnesses

## IX.      DEFENDANT'S WITNESS LIST

1. Irit Eluz
2. Yoram Firon
3. Daniel Vaknin
4. Jonathan R. Macey (expert)

## X.       RELIEF SOUGHT

The Trustee seeks a judgment against Eluz on Count II in the amount of 24,157,000 NIS, plus interest calculated at the New York statutory rate of 9% from the dates of payment in 2011 through entry of final judgment, along with applicable costs and fees, and such other relief as may be deemed appropriate, including sanctions and attorney's fees that the Trustee seeks or intends to seek as a result of Eluz's bad faith and entirely frivolous defenses.

Ms. Eluz has not asserted any claims in this proceeding.  Ms. Eluz seeks the dismissal of Count II in its entirety and with prejudice, along with applicable costs and fees, and such other relief as may be deemed appropriate.  Ms. Eluz claims that the Trustee's allegations against her are entirely frivolous and brought in bad faith and seeks, or intends to seek, sanctions and an award of attorney's fees and costs incurred in defending against those claims.

Dated: New York, New York
    June 22, 2022

**AKERMAN LLP**


By:    */s/ John P. Campo*
    John P. Campo
    Darryl. R. Graham
    Brian S. Fraser
    1251 Avenue of the Americas,
    37th Floor
    New York, NY 10020
    Tel. (212) 259-6428
    E-mail: john.campo@akerman.com
    E-mail: darryl.graham@akerman.com
    E-mail: brian.fraser@akerman.com

*Counsel for Plaintiff/Trustee*

Dated: New York, New York
    June 22, 2022

**COLE SCHOTZ P.C.**


By:    */s/ Steven L. Klepper*
    Steven L. Klepper
    David S. Gold
    Donald A. Ottaunick
    Courtney G. Hindin
    1325 Avenue of the Americas
    19th Floor
    New York, New York 10019
    Telephone: (646) 532-5324
    E-mail: sklepper@coleschotz.com
    E-mail: dgold@coleschotz.com
    E-mail: dottaunick@coleschotz.com
    Email: chindin@coleschotz.com

*Counsel for Defendant Irit Eluz*


**IT IS SO ORDERED:**

Dated: New York, New York
    June 24, 2022

    *s/ David S. Jones*
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## Exhibit A – Preliminary Joint Trial Exhibit List

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 1. | Ampal-American Israel Corporation ("Ampal")'s Annual Report on Form 10-K for the Fiscal Year Ended Dec. 31, 2006, filed on or about April 2, 2007 (Adv Doc. No. 128-4, Exhibit 2, p. 608-783) |
| 2. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 8, 2004 (Adv Doc. No. 128-4, Exhibit 3, p. 785-816) |
| 3. | Ampal's *Definitive Proxy on Schedule 14A*, filed on November 20, 2007 |
| 4. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 17, 2008 |
| 5. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 19, 2009 (Adv Doc. No. 128-4, Exhibit 4, p. 818-841) |
| 6. | Ampal's *Definitive Proxy on Schedule 14A*, filed on March 31, 2010 (Adv Doc. No. 128-5, Exhibit 5, p. 2-37) |
| 7. | Ampal's *Definitive Proxy on Schedule 14A*, filed on March 31, 2011 (Adv Doc. No. 128-5, Exhibit 6, p. 39-84) |
| 8. | Ampal's *Definitive Proxy on Schedule 14A*, filed on April 30, 2012 (Adv Doc. No. 128-5, Exhibit 7, p. 86-133) |
| 9. | Minutes of a Meeting of the Board of Directors of Ampal, dated November 5, 2008 (Adv Doc. No. 128-5, Exhibit 8, p. 135-140) |
| 10. | Ampal's Form 8-K, filed December 5, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 142-145) |
| 11. | Ampal's *Definitive Proxy Statement on Schedule 14A*, filed September 12, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 146-171) |
| 12. | Ampal's Form 10-K for year ending 2004, filed March 15, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 172-269) |
| 13. | Ampal's Form 10-K for year ending 2009, filed March 8, 2010 |
| 14. | Ampal's Form 10-K for year ending 2010, filed March 17, 2011 (Adv Doc. No. 122-18, Exhibit Q, p. 2-122) |
| 15. | Minutes of a Meeting of the Special Committee of Ampal, dated February 15, 2009 (Adv Doc. No. 128-5, Exhibit 10, p. 271-273) |
| 16. | Management Services Agreement, dated February 23, 2009 (Adv Doc. No. 128-6, Exhibit 11, p. 2-6); ELUZ000458-ELUZ000462 |
| 17. | BC Draft of Management Services Agreement, dated February 11, 2009 (Adv Doc. No. 128-6, Exhibit 11, p. 7-13); TR00035298-TR TR00035304 |
| 18. | 05/04/2009 Special Committee Meeting Minutes (TR00035305-41) |

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 19. | 03/08/2010 Compensation Committee Meeting Minutes (TR00037436-37) |
| 20. | 12/19/2010 Compensation Committee Meeting Minutes (TR00037244-45) |
| 21. | Minutes of a Meeting of the Special Committee of Ampal, dated December 19, 2010 (Adv Doc. No. 128-6, Exhibit 12, p. 15-18) |
| 22. | Minutes of a Meeting of the Special Committee of Ampal, dated May 5, 2010 (Adv Doc. No. 128-6, Exhibit 13, p. 20-22) |
| 23. | List of Merhav (M.N.F.) Ltd ("Merhav")'s Activities and Services for 2010, provided to the Special Committee of Ampal on or about December 23, 2010 – Hebrew and English translation (Adv Doc. No. 128-6, Exhibit 14, p. 24-30) |
| 24. | Email, dated November 23, 2010, from Kenneth Henderson to Irit Eluz (with attachment) (ELUZ000327-32) |
| 25. | Email, dated December 18, 2010, from Kenneth Henderson to Irit Eluz, forwarded to Yoram Firon (with attachment) (ELUZ000167-71) |
| 26. | E-mail from Yoram Firon to Ken Henderson (copy to Irit Eluz), dated December 20, 2010, with blackline of draft ("BC Draft 12/17/2010") term sheet for Cooperation and Management Agreement between Ampal and Merhav (Adv Doc. No. 128-7, Exhibit 15, p. 2-7); BC_AMP_0027935-40 |
| 27. | E-mail from Ken Henderson to Yoram Firon (copy to Irit Eluz and Serge Nehama), dated December 21, 2010, with draft ("BC Draft 12/21/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav and blackline comparison of December 17, 2010 and December 21, 2010 drafts (Adv Doc. No. 128-7, Exhibit 15, p. 8-16); BC_AMP_0029284-92 |
| 28. | E-mail from Yoram Firon to Ken Henderson (with copy to Irit Eluz and Lee Botvin), dated December 22, 2010, with blackline comparison of the draft ("BC Draft 12/21/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav (Adv Doc. No. 128-7, Exhibit 15, p. 17-24); BC_AMP_0027945-50 |
| 29. | E-mail from Ken Henderson to Yoram Firon (copy to Irit Eluz and Serge Nehama), dated December 22, 2010, with draft ("BC Draft 12/22/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav and blackline comparison of December 21, 2010 and December 22, 2010 drafts (Adv Doc. No. 128-7, Exhibit 15, p. 25-31); BC_AMP_0029293-301 |

2

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 30. | E-mail exchange between Yoram Firon and Ken Henderson (copy to Eirt Eluz and Serge Nehama), dated December 22, 2010, regarding 2010 Memorandum of Understanding with revisions and blackline comparison from December 22, 2010 draft (Adv Doc. No. 128-7, Exhibit 15, p. 32-33) |
| 31. | Email exchange between Yoram Firon and Ken Henderson (copy to Irit Eluz and Derge Nehama), dated December 22-23, 2010, regarding revisions to 2010 Memorandum of Understanding and blackline comparison from December 22, 2010 draft (Adv Doc. No. 128-7, Exhibit 15, p. 34-40); BC_AMP_0029302-08 |
| 32. | Emails, dated December 29, 2010, between Yoram Firon and Dany Vaknin (SPIZZ00261466) |
| 33. | Email, dated December 30, 2010, from Yoram Firon to Dany Vaknin and others (with attachments) (VAKNIN001883-1905) |
| 34. | Cooperation and Management Agreement Memorandum of Understanding, between Ampal and Merhav, dated December 30, 2010 (Adv Doc. No. 128-7, Exhibit 16, p. 42-46) BC_AMP_0175630 |
| 35. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 7, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 128-7, Exhibit 17, p. 48-91) |
| 36. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 7, 2011 (Adv Doc. No. 128-7, Exhibit 17, p. 93-98) |
| 37. | 03/07/2011 Compensation Committee Meeting Minutes (TR00037434-5) |
| 38. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 17, 2011 (Adv Doc. No. 122-6, Exhibit E, p. 2-3); TR00157826-7 |
| 39. | 03/17/2011 Board of Directors Meeting Minutes (TR00037110-1) |
| 40. | Ampal's Form 8-K, dated March 21, 2011, and Exhibit 99.2 (Company Presentation – March 2011) attached to Ampal's Form 8-K, dated March 21, 2011 ((Adv Doc. No. 128-8, Exhibit 18, p. 2-25) |
| 41. | Minutes of a Meeting of the Audit Committee of Ampal, dated May 5, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 128-8, Comp. Ex. 19, p. 27-42); TR00157823-TRTR0157825. |
| 42. | Ampal – Audit Committee – Interim Report as of March 31, 2011 Agenda (Adv Doc. No. 128-8, Comp. Ex. 19, p. 44-45) |

64158599;1

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 43. | Minutes of a Meeting of the Board of Directors of Ampal, dated May 5, 2011 (Adv Doc. No. 128-8, Comp. Ex. 19, p. 46-51); TR00037118-TR00037123. |
| 44. | Minutes of a Meeting of the Audit Committee of Ampal, dated May 15, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 122-9, Exhibit H, p. 2-4); TR00157820-TRTR0157822. |
| 45. | Minutes of a Meeting of the Audit Committee of Ampal, dated August 4, 2011, with PowerPoint Presentation (Adv Doc. No. 128-8, Exhibit 20, p. 53-72); TR00157815-TR00157819. |
| 46. | Ampal – Audit Committee – Interim Report as of June 30, 2011 Agenda (Adv Doc. No. 128-8, Exhibit 20, p. 74-75) |
| 47. | Minutes of a Meeting of the Board of Directors of Ampal, dated September 6, 2011, with PowerPoint Presentation (Adv Doc. No. 122-11, Exhibit J, p. 2-6); TR00103861-TR00103865. |
| 48. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 9, 2011, with Nov 7, 2011 PowerPoint Presentation (Adv Doc. No. 128-9, Comp. Ex. 21, p. 3-20); TR00035901-TR00035922. |
| 49. | Ampal – Audit Committee – Interim Report as of September 30, 2011 Agenda (Adv Doc. No. 128-9, Comp. Ex. 21, p. 22-24) |
| 50. | 11/09/2011 Compensation Committee Meeting Minutes (TR00037238) |
| 51. | GADOT Presentation to BOD, dated November 1, 2011 (Adv. Doc. No. 128-9, Comp. Ex. 21, p. 26-35); TR00035924-TR00035933. |
| 52. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 12, 2011, with PowerPoint Presentation (Adv Doc. No. 128-9, Comp. Ex. 21, p. 37-41); TR00035883-TR0035887 (minutes). |
| 53. | E-mail chain from Irit Eluz to C. Morag and R. Degani, dated November 11, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 42-44) |
| 54. | E-mail chain from Irit Eluz to D. Vaknin, C. Morag and R. Degani, dated November 11, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 45-47) |
| 55. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 13, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 49-50); TR00035894-TR00035895. |
| 56. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 28, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 52-56); TR00103196-TR00103200. |

64158599;1

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 57. | Ampal's Form 10-Q, dated November 14, 2011 (Adv Doc. No. 128-9, Exhibit 22, p. 58-91) |
| 58. | Minutes of a Meeting of the Special Committee of Ampal, dated November 12, 2011 (Adv Doc. No. 128-9, Exhibit 23, p. 93-94) |
| 59. | Minutes of a Meeting of the Board of Directors of Ampal, dated December 8, 2011 (Adv Doc. No. 128-9, Exhibit 24, p. 96-113) |
| 60. | Unanimous Consent of the Special Committee of the Board of Directors of Ampal, dated December 8, 2011 (Adv. Doc. No. 128-10, Exhibit 25, p. 2-3) |
| 61. | Letter Amendment to Colombia Ethanal Project Option Agreement (unsigned draft), dated December 8, 2011 (Adv. Doc. No. 128-10, Exhibit 25, p. 4-5) |
| 62. | Ampal's Form 8-K, dated January 6, 2011 (and related exhibits) |
| 63. | Ampal's Form 8-K, dated December 9, 2011 (and related exhibits) (Adv. Doc. No. 128-10, Exhibit 26, p. 8-10) |
| 64. | Minutes of a Meeting of the Board of Directors of Ampal, dated December 19, 2011 (Adv Doc. No. 128-10, Exhibit 27, p. 12-14) |
| 65. | Ampal's DEF14A/Proxy Statement, dated March 31, 2011 (Adv Doc. No. 128-10, Exhibit 28, p. 16-61) |
| 66. | Ampal's Form 10-Q, dated May 16, 2011 (Adv Doc. No. 128-10, Exhibit 29, p. 63-101) |
| 67. | Ampal's Form 10-Q, dated August 4, 2011 (Adv Doc. No. 128-10, Exhibit 30, p. 103-145) |
| 68. | Ampal Form 10-Q for the quarterly period ended March 31, 2012 |
| 69. | Ampal Form 10-Q for the quarterly period ended June 30, 2012 |
| 70. | Ampal Form 10-Q for the quarterly period ended September 30, 2012 |
| 71. | Ampal's Form 8-K, dated April 2, 2012, and Exhibit 99.2 to Ampal's Form 8-K, dated April 2, 2012 (Adv Doc. No. 128-11, Exhibit 31, p. 2-26) |
| 72. | Ampal's Form 8-K, dated January 3, 2012, and Exhibit 99.1 (Debentures' Holders Meeting Presentation) to Ampal's Form 8-K, dated January 3, 2012 (Adv Doc. No. 128-11, Exhibit 32, p. 28-46) |
| 73. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 10, 2012 (Adv Doc. No. 128-11, Exhibit 33, p. 48-55) |
| 74. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 11, 2012 (Adv Doc. No. 128-11, Exhibit 34, p. 57-59) |
| 75. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 12, 2012 (Adv Doc. No. 128-11, Exhibit 35, p. 61-66) |

64158599;1

| JX NO. | DESCRIPTION OF EXHIBITS |
|--------|-------------------------|
| 76. | Ampal's Form 8-K, dated January 22, 2012, and Exhibit 99.1 to Ampal's Form 8-K (Adv Doc. No. 128-11, Exhibit 36, p. 68-69) |
| 77. | Minutes of a Meeting of the Audit Committee of Ampal, dated January 30, 2012 (Adv Doc. No. 128-11, Exhibit 37, p. 71-75); TR00036111-TR00036115 |
| 78. | Ampal's Form 8-K, dated February 21, 2012, and referenced Exhibit 99.1 (Ampal's Proposal to the Debenture Holders Committee) attached thereto (Adv Doc. No. 128-11, Comp. Ex. 38, p. 78-88) |
| 79. | Minutes of a Meeting of the Board of Directors of Ampal, dated February 26, 2012 (Adv Doc. No. 128-11, Exhibit 39, p. 90-97) |
| 80. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 5, 2012 (Adv Doc. No. 128-11, Exhibit 40, p. 99-105) |
| 81. | Ampal's Form 8-K, filed March 12, 2012 (Adv Doc. No. 128-12, Exhibit 41, p. 3-5) |
| 82. | 8-K of Ampal, dated April 2, 2012, and Exhibit 99.2 (dated March 30, 2012) attached to Ampal's Form 8-K (Adv Doc. No. 128-12, Exhibit 42, p. 7-31) |
| 83. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 11, 2012 (Adv Doc. No. 128-13, Exhibit 43, p. 2-4) |
| 84. | E-mail from Lee Botvin to "PWC Team" (copy to Yoram Firon, Nir Berstein, and Fiora Bar-Nir), dated March 22, 2012, with materials for Board and Audit Committee Meeting, scheduled for March 25, 2012 - Hebrew and English translation (Adv. Doc. No. 128-13, Exhibit 44, p. 6-118) |
| 85. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 25, 2012 (Adv Doc. No. 128-14, Exhibit 45, p. 2-61) |
| 86. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 25, 2012 (Adv Doc. No. 128-15, Exhibit 46, p. 2-5) |
| 87. | E-mail from Yoram Firon to Dany Vaknin (copy to Irir Eluz, Amit Mantsur, Nir Bernstein, and Lee Botvin), dated March 27, 2012, with list of items to be disclosed – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibits 47-48, p. 7-9, 11, 17-18) |
| 88. | Various e-mail communication between Ampal, PwC, and Audit Committee, dated March 27-28, 2012 – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibit 48, p. 11-22) |
| 89. | E-mail communication from Sharon Barkan to the Audit Committee and Board of Directors, dated March 28, 2012, with attached documents – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibit 49, p. 24-27) |

64158599;1

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 90. | Attachment to Sharon Barkan's E-mail to Audit Committee titled "Ampal 10-K – 2011 – Draft 7 – marked comparison to directors.doc.doc File" |
| 91. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 28, 2012 (Adv Doc. No. 128-15, Exhibit 50, p. 29-30) |
| 92. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 28, 2012 (Adv Doc. No. 128-16, Exhibit 51, p. 2-3) |
| 93. | Ampal's Form 10-K for Year End 2011, dated March 30, 2012, along with Exhibit 10ii to the 10-K (Adv Doc. No. 128-16, Exhibit 52, p. 6-101) |
| 94. | 06/05/2012 Compensation Committee Meeting Minutes (TR00037452-53) |
| 95. | Minutes of a Meeting of the Board of Directors of Ampal, dated July 23, 2012 (Adv Doc. No. 128-16, Exhibit 53, p. 103-107) |
| 96. | E-mail from Lee Botvin to Yoram Firon, dated February 19, 2012 – Hebrew and English Translation (Adv Doc. No. 128-16, Exhibit 54, p. 109-112) |
| 97. | E-mail exchange between Irit Eluz and Yoram Firon (copy to Lee Botvin and Amit Mantsur), dated March 5, 2012, regarding Merhav MNF service agreement – december 2010 – Hebrew and English Translation (Adv Doc. No. 128-16, Exhibit 55, p. 114-118) |
| 98. | E-mail exchange between Lee Botvin and Yoram Firon, dated March 6, 2012, regarding Merhav MNF service agreement – december 2010 and draft written consent of 2011 management fee for Merhav (with both documents attached) – Hebrew and English Translation of E-mail included (Adv Doc. No. 128-16, Exhibit 55, p. 119-131) |
| 99. | E-mail communication chain and exchange dated March 14, 2012 (Hebrew and English translation) regarding discussion with Tal Lenchner (red in original). (Adv Doc. No. 128-16, Exhibit 56, p. 133-140) |
| 100. | E-mail from Nir Bernstein to Yoram Firon (copy to Irit Eluz, Lee Botvin, and Zahi Ben-Atav), dated March 12, 2012, with draft 2 of Ampal 10-K (Adv Doc. No. 128-16, Exhibit 57, p. 143-235) |
| 101. | E-mail from Nir Bernstein to Yoram Firon, dated March 21, 2012, with draft 3 of Ampal 10-K (Adv Doc. No. 128-16, Exhibit 57, p. 237-393) |
| 102. | E-mail from Yoram Firon to Adam Klein and Ephraim Friedman regarding Ampal's 10-K, dated March 13, 2012 (Adv Doc. No. 128-16, Exhibit 57, p. 395) |

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 103. | E-mail from Nir Bernstein to Lee Botvin and Yoram Firon regarding draft 3 of Ampal's 10-K, dated March 22, 2012 (Adv Doc. No. 128-16, Exhibit 57, p. 397-490) |
| 104. | E-mail from Lee Botvin to PwC Team (copy to Yoram Firon, Nir Bernstein, and Giora Bar-Nir) regarding March 25, 2012 meeting of Ampal BOC and Audit Committee, dated March 22, 2012 (Adv. Doc. No. 128-16, Exhibit 57, p. 492-587) |
| 105. | E-mail communication from Nir Bernstein to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 2-5) |
| 106. | E-mail communication from Yoram Firon to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 6-9) |
| 107. | E-mail communication from Nir Bernstein to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 10-13) |
| 108. | E-mail communication from Irit Eluz to Yoram Firon, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 14-17) |
| 109. | E-mail from Yoram Firon to Serge Nehama, Chaeri Tornay, and Lee Botvin regarding Ampal's 10-K, dated March 26, 2012, and attaching redline comparison of "Draft 4" of the Form 10-K (Adv. Doc. No. 128-17, Exhibit 59, p. 19-120) |
| 110. | E-mail from Yoram Firon to PwC regarding "Ampal – updated language", dated March 27, 2012 – Hebrew and English Translation (Adv. Doc. No. 128-17, Exhibit 60, p. 123-200) |
| 111. | E-mail from Yoram Firon to PwC regarding "10K status", dated March 28, 2012 (Adv. Doc. No. 128-17, Exhibit 60, p. 202-203) |
| 112. | E-mail from Nir Bernstein to Lee Botvin, dated March 27, 2012, asking "Is there a signed management fee agreement for Merhav for 2011?" – Hebrew and English Translation (Adv. Doc. No. 128-17, Exhibit 60, p. 205-208) |
| 113. | E-mail from Nir Bernstein to SEC Filing & Printing Service (copy to Irit Eluz et al), dated March 27, 2012, regarding "Ampal's 10K" with Exhibit 10ii and "final version" of 10-K attached (Adv. Doc. No. 128-17, Exhibit 62, p. 210-307) |
| 114. | Letter from Yoram Firon to Ampal's Special Committee, dated December 16, 2010, providing notice of December 19, 2010 meeting of Special Committee and providing outline of Agenda for the meeting (Adv. Doc. No. 128-17, Exhibit 63, p. 309-310) |
| 115. | Unanimous Consent of Special Committee of the Board of Directors of Ampal, dated December 30, 2010 (Adv. Doc. No. 128-17, Exhibit 63, p. 311-314); TR00035269-TR00035272. |

8

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 116. | E-mail from Lee Botvin to the Special Committee (with copy to Irit Eluz), dated March 6, 2012, attaching two press releases regarding the debenture negotiations and another EMG explosion (Adv. Doc. No. 133-1, Exhibit 64, p. 2-7); VAKNIN005423- VAKNIN005428. |
| 117. | E-mail from Lee Botvin to, among others, the Special Committee (with copy to Irit Eluz and Yoram Firon), dated March 8, 2012, enclosing a draft of minutes from a meeting of Ampal's Board of Directors held on March 5, 2012 (Adv. Doc. No. 133-1, Exhibit 65, p.9-7); VAKNIN005398-VAKNIN005405. |
| 118. | E-mail from Irit Eluz to Dany Vaknin, dated March 13, 2012, which attaches a draft Valuation Report regarding the Colombian Ethanal Project (Adv. Doc. No. 133-1, Exhibit 66, p.18-50); VAKNIN008399-VAKNIN008428 |
| 119. | E-mail from Nir Bernstein to Independent Directors (with copy to Irit Eluz, Yoram Firon, et al), dated March 26, 2012, which attaches Ampal's financial highlights for Q4 2011 (Adv. Doc. No. 133-1, Exhibit 67, p.49-66); VAKNIN008671-VAKNIN008688 |
| 120. | Minutes of a Meeting of the Special Committee of Ampal, dated November 28, 2006 |
| 121. | Minutes of a Meeting of the Special Committee of Ampal, dated November 9, 2009 |
| 122. | Minutes of a Meeting of the Special Committee of Ampal, dated December 15, 2009 |
| 123. | Minutes of a Meeting of the Special Committee of Ampal, dated December 27, 2012 |
| 124. | Minutes of a Meeting of the Special Committee of Ampal, dated January 7, 2013); DEGANI000523-4 |
| 125. | Minutes of a Meeting of the Board of Directors of Ampal, dated August 29, 2012 ( |
| 126. | Minutes of a Meeting of the Special Committee of Ampal, dated November 23, 2005 and attached memorandum |
| 127. | Email, dated August 4, 2011, from Zahi Ben-Atav to Dany Vaknin and others (with attachments) (VAKNIN004684-720) |
| 128. | Email, dated October 24, 2011, from Zahi Ben-Atav to Irit Eluz and Amit Mantsur (with attachments) (SPIZZ00019216-17) |
| 129. | Email, dated February 02, 2012, from Dany Vaknin to Orit (with attachments) (VAKNIN000831-911) |
| 130. | Unanimous Consent of the Ampal's Board of Directors, dated February 22, 2012 (VAKNIN006520-31) |

| JX NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 131. | Emails, dated July 31, 2012 through August 5, 2012, between various individuals (VAKNIN009286-89) |
| 132. | Email, dated October 24, 2011 from Amit Matsur to Zahi Ben-Atav (with attachment) (SPIZZ000054807-08) |
| 133. | Ampal's Definitive Proxy Statement on Schedule 14A, dated Oct. 20, 2004 |
| 134. | Ampal's Definitive Proxy Statement on Schedule 14A, dated Nov. 11, 2007 |
| 135. | Ampal's Form 10-K for year ended Dec. 31, 2003, filed March 29, 2004 |
| 136. | Ampal's Form 10-K for year ended Dec. 31, 2005, filed March 29, 2006 |
| 137. | Ampal's Form 10-K for year ended Dec. 31, 2008, filed March 5, 2009 |

64158599;1