**TRIAL DATE AND TIME: JUNE 28, 2022 AT 9:30 A.M.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-13689 (DSJ) |
| ) | |
| AMPAL-AMERICAN ISRAEL CORPORATION, ) | |
| ) | |
| Debtor. ) | |
| | |
| ALEX SPIZZ, as Chapter 7 Trustee for Ampal- ) | |
| American Israel Corporation, ) | Adv. No. 14-02110 (DSJ) |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| IRIT ELUZ, ET AL., ) | |
| ) | |
| Defendants. ) | |

### SECOND AMENDED JOINT PRE-TRIAL ORDER

Plaintiff, Alex Spizz, as the Chapter 7 Trustee for the estate of Ampal-American Israel Corporation (the "Trustee") and Defendant Irit Eluz (the "Defendant" or "Eluz"), by and through undersigned counsel, having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, adopt the following statements, directions and agreements as the Pretrial Order herein.

## I.   NATURE OF THE CASE

This is an adversary proceeding brought by Alex Spizz, as Chapter 7 Trustee (the "Plaintiff" or "Trustee") for the estate of Ampal-American Israel Corporation (the "Debtor" or "Ampal"), in which the Trustee seeks money damages on a claim for breach of fiduciary duty against the former Chief Financial Officer (CFO) of Ampal, Defendant Irit Eluz. The Trustee's breach of fiduciary duty claim arises from allegedly unauthorized quarterly payments made in 2011 by Ampal to Merhav M.N.F. Ltd ("Merhav"), a company wholly owned by Yosef Maiman ("Maiman"), who was also Ampal's controlling shareholder, pursuant to a management services

agreement with Ampal.  The Trustee seeks to recover the full amount of the 2011 payments (NIS 24,157,000 (approximately $6.6 million)) plus prejudgment interest, taxable costs, and disbursements.  Ms. Eluz denies that she breached her fiduciary duties owed to Ampal, asserts certain other affirmative defenses, and seeks a with-prejudice dismissal of this claim.

## II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL JUDGMENT

This Court has subject matter jurisdiction over this adversary pursuant to 28 U.S.C. §1334(b), 28 U.S.C. § 157, and the Amended Standing Order of Reference, M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) and (O), and the Parties consent to this Court holding a jury trial and entering judgment as a matter of law, a final order, or judgment after a jury trial is held.

## III.    STIPULATED FACTS WHICH REQUIRE NO PROOF[1]

### A.    Introduction

1.    Ampal is a New York corporation founded in 1942.  From its inception, Ampal was a holding company that acquired and/or invested in businesses.  At various times, Ampal held, among other things, ownership interests in Gadot Chemical Tankers and Terminals Ltd. ("Gadot"), East Mediterranean Gas Company, S.A.E. ("EMG"), and 012 Smile Telecom Ltd. ("012 Smile").

2.    In or around 2002, a controlling, majority equity interest in Ampal was acquired, directly and through affiliates, by Yosef Maiman ("Maiman").  At the time Maiman acquired his equity interest in Ampal, Maiman was conducting his other businesses primarily through Merhav and its subsidiaries and affiliates.

---

[1] The parties reserve the right to amend this section further upon agreement of the parties and direction of the Court, and to further raise issues with the Court regarding the stipulated facts.

43382540

3.      Ms. Eluz graduated from college in Israel and began working as an accountant in 1992.  Her first job as an accountant was with PwC Kesselman & Kesselman in 1992.  In or about 1995, Ms. Eluz joined Kamor Group as Comptroller.

4.      In or about January 2000, Ms. Eluz left Kamor Group and joined Merhav.  "From January 2000 through April 2002, Ms. Eluz was the Associate Chief Financial Officer of Merhav." [JX 67, p. 69].  At all relevant times, Maiman controlled, wholly owned, and served as the CEO of Merhav.  Thereafter, Ms. Eluz joined Ampal.

**B.    Eluz's Compensation at Ampal**

5.      From May 2002 to October 2004, Ms. Eluz was Vice President – Finance, Treasurer, and Chief Financial Officer of Ampal. [JX 72, p. 7].  From October 2004 through the end of her tenure at Ampal, Ms. Eluz was the Senior Vice President - Finance, Treasurer, and Chief Financial Officer of Ampal.  On or about May 5, 2010, Ms. Eluz became a director of Ampal.

6.      From 2002 through 2005, Ms. Eluz's compensation was as follows:

| Type of Compensation | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| *Salary* | 100,993 | 183,959 | 219,980 | 242,757 |
| *Bonus* | - | 55,698 | 132,332 | 423,599 |
| *Other annual Compensation* | 21,959 | 39,631 | 32,732 | 25,525 |
| *Option Awards – Class A Stock* | 78,500 | - | 280,000 | |
| *All Other Compensation* | 21,735 | 42,000 | 49,349 | 57,374 |
| **Total (US Dollars)** | $223,187 | $321,288 | $714,393 | $749,255 |

43382540

[JX 67, at p. 70; JX 68, at p. 67].

7.      On or about September 19, 2006, Maiman became Ampal's President and CEO.

8.      In or around May 2002, Yoram Firon was appointed Vice President – Investments and Corporate Affairs and Secretary of Ampal, and acting General Counsel, which positions he maintained for the rest of his tenure at Ampal.  [JX 73, at p. 15].  "During the preceding five years, Mr. Firon was a Vice President of Merhav and a partner in the law firm of Firon Karni Sarov & Firon."  [JX 67, at p. 69].

9.      In or around November 2008, Daniel Vaknin ("Vaknin") was appointed to Ampal's Board of Directors (the "Board") as an independent director under the rules of the NASDAQ Global Market, which position he maintained at all relevant times.  *Id.* at p. 6.  During his tenure on the Board, Mr. Vaknin served on three committees of the Board; Audit Committee; Special Committee; and Compensation Committee.  [JX 67, at pp. 11-12].  Mr. Vaknin was designated as the "audit committee financial expert[,]" pursuant to rules promulgated by the U.S. Securities and Exchange Commission ("SEC").  *Id.* at p. 6.

10.      Effective as of September 19, 2006, the Board "determined that Mr. Maiman will be responsible for (i) determining the annual base salary and non-equity based annual bonuses for all executive officers (other than the Chief executive Officer)," including Ms. Eluz, and "for (ii) recommending to the Board director compensation and benefit programs."  [JX 70, at p. 11; JX 72, at p. 18.)

11.      From 2006 through 2011, Ms. Eluz's compensation was as follows:

| Type of Compensation | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| *Salary* | 263,848 | 304,989 | 342,937 | 357,265 | 440,450 | 518,413 |
| *Bonus* | 673,692 | 832,033 | 824,829 | 905,960 | 380,389 | - |

43382540

| Options – Class A Stock | - | - | - | - | - | - |
|---|---|---|---|---|---|---|
| Option Awards | 152,664 | 132,510 | 221,140 | | 269,668 | |
| Other | 152,928 | 105,368 | 156,107 | 124,432 | 786,543 | 581,740 |
| Total (US Dollars) | $1,243,133 | $1,374,900 | $1,434,299 | $1,387,657 | $1,877,050 | $1,100,153 |

[JX 70, at p. 17; JX 71, at p. 20; JX 72, at p. 23; JX 73, at p. 21]

12.    Regarding Ms. Eluz's 2010 compensation, Ampal's March 2011 Proxy explain:

For the year ended December 31, 2010, Mr. Maiman, in his sole discretion, determined the base salary and annual cash bonus for Ms. Irit Eluz.

…

In December 2009, Mr. Maiman set the base salary for Ms. Eluz for 2010 and took into account her leadership roles in supervising other members of management in general and with regard to various key business transactions of the Company during 2009, her continued service as CFO of the Company since 2002 and the overall performance of her duties with the Company.  After the end of 2010, Mr. Maiman determined Ms. Eluz's cash bonus for 2010 in large part because of her leadership role in consummating several important transactions for the Company in 2010 and also her seniority and total performance with the Company.  Mr. Maiman especially considered Ms. Eluz achievements in the successful closing of the purchase of 012 Smile including the financing of the purchase, the ongoing handling and supervision of the 012 Smile business and the successful offering of the Company's Series C debentures.  The result of these determinations was a base salary and cash bonus for 2010 that was higher than what Ms. Eluz received for 2009.

[JX 72, at p. 18].

13.    Regarding Ms. Eluz's 2011 compensation, Ampal's April 2012 Proxy explains:

For the year ended December 31, 2011, Mr. Maiman, in his sole discretion, determined the base salary for Ms. Irit Eluz.

43382540

…

> In December 2010, Mr. Maiman set the base salary for Ms. Eluz for
> 2011 and took into account her leadership roles in supervising other
> members of management in general and with regard to various key
> business transactions of the Company during 2010 and Ms. Eluz's
> expected performance during 2011, her continued service as CFO of
> the Company since 2002 and the overall performance of her duties
> with the Company. In spite of Ms. Eluz's achievements and
> successful performance during 2011 and due to the Company's
> current financial status, Ms. Eluz did not receive a cash bonus for
> 2011.

[JX 73, at p. 17].

**C.     Composition of Ampal's Board and Ampal's Audit and Special Committees**

14.     Ampal's management team reported to Ampal's Board of Directors. Maiman was

the Chairman of Ampal's Board, a director on the Board, President and CEO of Ampal.

15.     At all times relevant to this dispute, the directors of Ampal's Board included

various non-independent and three independent directors. The independent directors sat on

Ampal's Board's various committees, including the Compensation Committee, Audit Committee,

and Special Committee. "Prior to Mr. Vaknin's appointment to the Board and Audit Committee

on November 5, 2008, Mr. Haber served on the Audit committee." [JX 69, at p. 62]. Thereafter,

the independent directors were Mr. Vaknin, Menahem Morag ("Morag") and Yehuda Karni

("Karni"). In May 2011, Karni retired and was replaced by Revital Degani ("Degani").

16.     "As of [November 14, 2007], a group of shareholders (the "Controlling Shareholder

Group") consisting of Yosef A. Maiman, Ohad Maiman, Noa Maiman, and Yoav Maiman, and

the companies [Merhav], De Majorca Holdings Ltd.("De Majorca") and Di-Rapallo Holdings Ltd.

("Di-Rapallo") beneficially owns approximately 57.4% of the voting power of our Class A Stock.

The Controlling Shareholder Group was formed in recognition of the Maiman family's strong

connection with the Company and in furtherance of the group's common goals and objectives as

43382540

shareholders, including the orderly management and operation of the Company.  By virtue of its ownership of Ampal, the Controlling Shareholder Group is able to control our affairs and to influence the election of the members of our board of directors."  [JX 66, at p. 1-2].  "The Controlling Shareholder Group has advised the Company that it will vote in favor of the Board's slate of nominees for directors and in favor of the ratification of the appointment of Kesselman & Kesselman as the independent registered public accounting firm of the Company for the fiscal year ending December 31, 2007." *Id.*

17.     "Because the Controlling Shareholder Group owns more than 50% of the voting power of the Company, the Company is deemed to be a "controlled company" under the rules of the NASDAQ Global Market. As a result, the Company is exempt from the NASDAQ Global Market rules that require listed companies to have (i) a majority of independent directors on the Board, (ii) a compensation committee and nominating committee composed solely of independent directors, (iii) the compensation of executive officers determined by a majority of independent directors or a compensation committee composed solely of independent directors and (iv) a majority of the independent directors or a nominating committee composed solely of independent directors elect or recommend director nominees for selection by the Board.  The Company has an Audit Committee of the Board consisting of Messrs. Karni, Haber and Morag, each of whom is an independent director as defined under the rules of the National Association of Securities Dealers, Inc. and the rules promulgated by the [SEC]. Other than the members of the Audit Committee, there are no other independent directors that serve on the Board." *Id.* at 8.

18.     As set forth in its founding Charter, "[t]he Audit Committee [was] appointed by the Board … of Ampal … to assist the Board in its oversight responsibilities relating to (1) the integrity of the financial statements of the Company and its financial reporting process, (2) internal and

external auditing and the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditors, (4) the integrity of the Company's systems of internal accounting and financial controls, and (5) the compliance by the Company with legal and regulatory requirements." [JX 65, at Appendix, p. 1]. One of the 28 delineated responsibilities of the Audit Committee was to "[r]eview with management and the independent auditor and approve all transactions or courses of dealing with parties related to the Company." *Id.* at 2-4.

19.    The Audit Committee met at least quarterly to review Ampal's financial statements and approve its quarterly (10-Q) and annual (10-K) reports to the SEC. Upon the Audit Committee's approval of the relevant 10-Q or 10-K, the full Board of Ampal would then approve the relevant 10-Q or 10-K for filing with the SEC.

20.    On or about October 28, 2004, the Board formed a Special Committee of Independent Directors (the "Special Committee"). "The Board appointed the Special Committee of independent directors to consider alternatives available to the Company to maximize shareholder value. The Special Committee was formed in response to a suggestion from Mr. Yosef A. Maiman, Chairman of the Board and member of the Controlling Shareholder Group, that he is reviewing his alternatives with regard to his investment in the Company. The Special Committee reviews and approves transactions with any related party." [*Id.* at pp. 1-12].

21.    "On December 1, 2005, the Company, through Merhav Ampal Energy, Ltd., a wholly-owned subsidiary of the Company, entered into an agreement with [Merhav] for the purchase from Merhav of a portion of its interest in EMG. Under the terms of the transaction, the Company acquired the beneficial ownership of 1,200 shares of EMG's capital stock, representing a 2% beneficial ownership in EMG." *Id.* at 5. "The transaction was approved by a special

committee of the Board of Directors composed of the Company's independent directors. Houlihan Lokey Howard & Zukin Financial Advisors, Inc. [("Houlihan Lokey"] acted as financial advisors to the special committee." *Id.* at 12; *see also* [JX 64].

22.    "On August 1, 2006 the Company acquired the beneficial ownership of 4.6% of the outstanding shares of EMG's capital stock from Merhav." [JX 1, at p. 21].   "Because of the foregoing relationships, a special committee of the Board of Directors composed of the Company's independent directors, who also constitute all of the members of the Company's Audit Committee, negotiated and approved the transaction.  Houlihan Lokey …, which was retained as financial advisor to the special committee, delivered a fairness opinion to the special committee regarding the transaction." *Id.*

23.    "On December 21, 2006, the Company acquired the beneficial ownership of an additional 5.9% of the outstanding shares of EMG's capital stock pursuant to an option granted by Merhav in August 2006." *Id.* at 22.  "Because of the foregoing relationships, a special committee of the … Company's independent directors, who also constitute all of the members of the Company's Audit Committee, negotiated and approved the transaction.  Houlihan Lokey …, which was retained as financial advisor to the special committee, advised the special committee on these transactions." *Id.*  On November 28, 2006, the Special Committee "unanimously resolved" to "approve [this transaction] in accordance with the [terms discussed at the meeting], and to recommend to Ampal's Board of Directors to approve the Proposed Transaction."  [JX 58].

24.    "As a result of this transaction, Ampal beneficially owns 12.5% of the total outstanding shares of EMG" and "is the Company's most significant holding as of December 31, 2006[.]  [JX 1, at pp. 43, 15].

9

25.     "EMG is an Egyptian joint stock company organized in accordance with the Egyptian Special Free Zones system which has been given the right to export natural gas from Egypt to Israel and other locations in the East Mediterranean basin and other countries." *Id.* at p. 43.

### D.    Ampal and Merhav's 2009 Management Agreement

26.     On February 15, 2009, the Special Committee met for a meeting "called at the request of Ampal's management" to discuss "the proposed Management Services Agreement between Ampal and Merhav."  [JX 75, at p. 1].  Ms. Eluz "informed the Committee that the Agreement's purpose is to remunerate Merhav for management services it had rendered and still rendering to Ampal."  Ms. Eluz further explained that "Merhav's staff includes experts with many years of experience.  For example, Dr. Novik is part of EMG's executive management, which actually supervises all of EMG's business." *Id.*

27.     Ms. Eluz explained to the Special Committee, among other things, that "[d]etermining remuneration and putting a price tag on it is difficult.  However, in negotiations held, the parties have compromised on an annual remuneration of 10 million [New Israel Shekels ("NIS")], payable in equal quarterly installments, which the parties considered fair, if and when the Agreement will be approved."  Ms. Eluz further stated to the Special Committee that Merhav had initially "requested 20 million NIS," but that "the parties negotiated the remuneration extensively, and compromised at a sum which in both parties opinion was fair[.]"  In addition, Ms. Eluz stated that the "remuneration will be monitored by Ampal's management, in accordance with Merhav's detailed reports of its services, and if need be, it may be altered" and that "Merhav shall report to Merhav's management, on a quarterly basis, with regards to the services rendered by Merhav in the respective quarter."  *Id.*

43382540

28.     At the conclusion of the February 15, 2009 meeting, the Special Committee resolved "to approve in principal entering into [the 2009 Management Agreement with Merhav, according to which Merhav shall render services to Ampal[.]" *Id.*

29.     The Special Committee further resolved, "[i]n accordance with Ampal's management's calculations and estimates of Merhav's services, to approve that the remuneration for Merhav's services will be set at an annual sum of 10 million NIS plus VAT, in accordance with applicable law, payable in quarterly installments." *Id.*

30.     The Special Committee further resolved that "the Agreement should state that all of Merhav's expenses and costs of any kind whatsoever required to be spent or actually spent by Merhav in performing its duties under the Agreement shall be borne and paid exclusively by Merhav and Ampal shall not be requested to pay Merhav any additional sums." *Id.*

31.     The Special Committee further resolved that "after Ampal's management shall have reached final understandings with Merhav with regards to the Agreement's provisions, the Committee will convene to discuss and approve the Agreement." *Id.*

32.     On or about February 23, 2009, the Special Committee approved the Management Services Agreement between Merhav and Merhav-Ampal Energy Ltd., pursuant to which Merhav would "provide certain management, marketing, financial, business development and administrative services to [MAE], including without limitation, providing management, marketing and business development services through [MAE] to [Gadot], a wholly owned subsidiary of [MAE], to Global Wind Energy Ltd. [("GWE")], a 50% owned subsidiary of [MAE] and to managing [MAE's] 12.5% holdings in [EMG]."  [JX 76, at pp. 1, 5].

33.     The 2009 Agreement was executed by Maiman, on behalf of Merhav, and Ms. Eluz and Mr. Firon, on behalf of Ampal.  *Id.*

11

34.    The 2009 Management Agreement was made effective as of January 1, 2008 and automatically renewed each year unless certain action was taken.  *Id.*

35.    As to Merhav's compensation, the 2009 Management Agreement provided that:

> Ampal shall pay Merhav the sum of NIS 10 Million per year, payable in arrears in equal quarterly installments, in consideration for the Services, plus VAT and against tax invoices, all in accordance with the law. . . .  It is agreed that Merhav shall bear any and all expenses and costs incurred by Merhav due to and/or emanating from the provision of the Services.  *Id.*

36.    Ampal's Form 10-K for the year ending December 31, 2008, which was filed on March 5, 2009, states, among other things: "Ampal entered into a management services agreement with Merhav, according to which Merhav provides Ampal and its subsidiaries with management, marking, financial, development and other administrative services for an annual consideration of NIS 10 million ($2.6 million)."  [JX 69, at p. 51].

37.    Pursuant to the 2009 Management Agreement, Ampal paid Merhav annual compensation of NIS 10 million ($2.6 million) for the year 2009, in "equal quarterly installments." (*See* 2009 Management Agreement, at p. 1.)  The 2009 Management Agreement also provided for retroactive payment to Merhav of NIS 10 million ($2.6 million) for services provided in 2008.  *Id.*

**E.    Ampal, the Special Committee, and Merhav's 2010 Management Agreement**

38.    "The Special Committee held two meetings and acted once by written consent during the fiscal year ended December 31, 2010." [JX 72, at p. 13].

39.    On May 5, 2010, the Special Committee met "to consider a proposal for the Company's subsidiary, [Gadot], to acquire Merhav Argo Ltd. ("Merhav Argo"), an agricultural products distributor based in Israel, from Mr. Maiman, the Company's Chairman, President and CEO and a member of the Company's controlling shareholder group.  In accordance with the Company's governance principles and NASDAQ rules, the matter require[d] the review and

approval of the Committee." [JX 11, at p. 1]. The Special Committee "engaged Houlihan Lokey … as financial advisors to review the proposed transaction, provide pricing and valuation advice and if appropriate issue a fairness opinion." *Id.*

40.    "After discussion, the Committee unanimously determined that an acquisition of Merhav Argo would be in the best interests of the Company and approved moving forward to negotiate the transaction with Mr. Maiman and approved a recommendation to the Board that the Board authorize Gadot to proceed to with (sic) the transaction … subject to the receipt by the Committee and the Board of the Company of a fairness opinion as to the financial terms of the transaction from Houlihan Lokey." *Id.* at p. 2.

41.    On December 19, 2010, the Special Committee met to discuss and review three related-party transactions between Ampal and Merhav: i) "the sugarcane ethanol production project in Colombia (the "[Colombia Ethanol ]Project,"); ii) the "Cooperation and Management Agreement" with Merhav; and, iii) "Ampal's use of Merhav's Aircraft" (the "Aircraft Agreement"). [JX 77, at p. 1-3].

42.    At the December 19, 2010 meeting, Ms. Eluz addressed Ampal's management agreement with Merhav and "reviewed Merhav's contribution and activities with regards to Ampal's holdings and businesses over the year 2010, and the inadequate remuneration received by Merhav for such activities." *Id.* at p. 2.

43.    The Special Committee "unanimously resolved" to "approve in principle the entering into a Cooperation and Management Agreement [(the "2010 Management Agreement")] with Merhav, to be prepared by Ampal's attorneys, according to which Merhav shall render services to Ampal, and Ampal shall bear a percentage of Merhav's expenses for it services, in

43382540

accordance with an annual settling of accounts, which shall be based upon Merhav's management report of services rendered by Merhav and agreed by the Committee at that time." *Id.*

44.     Further, the Special Committee "unanimously resolved" that such "agreement shall be deemed effective as of January 1, 2010 and replace the existing [2009 Management Agreement] between Merhav-Ampal Energy Ltd. and Merhav dated February 23, 2009." *Id.*

45.     At this meeting, the Special Committee also "unanimously resolved" to request that "Ms. Eluz … prepare a report with regards to the services rendered by Merhav during 2010, and to submit such report to the Committee's inspection."

46.     Finally, the Special Committee "unanimously resolved" that "[s]ubject for receiving the aforesaid report for 2010 and its approval by the Committee, Ampal shall bear 50% of Merhav's agreed expenses for 2010." *Id.*

47.     Thereafter, on December 23, 2010, Ms. Eluz provided the Special Committee with the requested information, including a list of Merhav's activities for 2010, an outline of certain categories of expenses that Merhav incurred in 2010, and a draft of the 2010 Agreement.  [JX 53, at p. 2].  The list identified Merhav's activities in 2010 and provided a total of its 2010 expenses. [JX 78, at pp. 1-2].

48.     The list of "activities of Merhav in the portfolio companies" included various identified activities regarding EMG, Gadot, and GWE, and a list of "development activities" regarding six (6) potential projects.  *Id.* at pp. 1-2.  The list of identified expenses for 2010 was broken into five (5) categories: i) "Wages and related benefits", ii) "Advisors", iii) "Office and communication expenses", iv) "Overseas travel expenses"; and, v) "Direct expenses for project development Belarus, COMISA, Inambari IPP in Israel, CNG, Panama".  *Id.* at p. 3.

43382540

49.     On December 30, 2010, the Special Committee acted through unanimous written consent to: i) "authorize and approve the execution of [the 2010 Management Agreement] by and between [Ampal] and [Merhav] …"; ii) "authorize and approve the execution of an Aircraft Time Sharing Agreement by and between [Ampal] and Merhav …"; and, iii) authorize and approve the execution of an Amendment to Colombia Ethanol Option Agreement by and between [Ampal] and Merhav … ." [JX 117, at p. 1].

50.     On December 30, 2010, the 2010 Management Agreement was executed by Maiman, on behalf of Merhav, and Ms. Eluz and Mr. Firon, on behalf of Ampal.  [JX 82, at p. 5].

51.     The Preamble to the 2010 Management Agreement states that:

> This Memorandum of Understanding ("MOU") sets out the framework and certain essential terms of a Cooperation and Management Agreement (the "Agreement") between Ampal [defined as "Ampal-American Israel Corporation"] and Merhav for the purpose of setting forth their agreements with regard to the identification, selection, development and management of projects in the Investment Sectors.  The parties acknowledge that Merhav-Ampal Energy Ltd., a wholly owned subsidiary of Ampal, will be principally involved in the Investment Sectors and will therefore be working with Merhav and paying the Management Fee described below.  (2010 Management Agreement, at p. 1.)

52.     As to the "Scope of Services" to be provided by Merhav, the 2010 Management Agreement provides:

> Merhav has assisted and will continue to assist Ampal and its subsidiaries in identifying, evaluating, selecting, structuring, developing and managing projects.  The services provided by Merhav will include, among other things, seeking and identifying new project opportunities, assisting Ampal in evaluating whether to invest in projects, performing due diligence, engineering work, feasibility studies, project supervision and management and technical support, and will also include management, marketing, administrative and financial services as request by Ampal or its subsidiaries from time to time.  The services will be provided on a regular basis as requested by Ampal, and the parties will work together to establish the scope of services with regard to any existing

or potential project.  Merhav will devote such resources as may be reasonably required to enable it to perform such services for Ampal.

Ampal will determine from time to time, with the assistance of Merhav, the types of projects that it desires to pursue as a priority. The types of projects so identified from time to time are referred to as "Target Projects." (*Id.* at pp. 1-2.)

53.    As to the "Fee/Expense Reimbursement", the 2010 Management Agreement

provides:

In consideration for Merhav's services and undertakings, Ampal will pay Merhav a Management Fee, which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal, to the extent not reimbursed or recouped from other parties (such as from a joint venture or project budget).  The Management Fee shall be determined by the Special Committee (the "Special Committee") of the Board of Directors of Ampal (composed solely of Independent Directors) at or around the end of each fiscal year (beginning with 2010) based on a presentation by Merhav of expenses incurred in providing services hereunder during the current year.  The parties will review the amount of the Management Fee annually in good faith and shall make such adjustments as they agree may be reasonably appropriate in light of the work performed or to be performed by Merhav.

For 2010, the Special Committee has determined and Merhav has agreed that the Management Fee will be 24,157,000 New Israeli Shekel, which represents approximately 50% of the expenses incurred by Merhav for services of the type described in this MOU.

The parties will determine in good faith whether Merhav should be compensated with regard to any particular project out of the project budget or, after completion, from project operations.  In such event, the parties (and any joint venture) will enter into appropriate agreements and the parties will take into account in determining the Management Fee for any year any compensation received by Merhav from a particular project. (*Id.* at p. 2.)

54.    The "Term and Termination" provision of the 2010 Management Agreement states:

"The term of the Agreement shall be for one year (expiring December 31, 2011), and shall

automatically renew for one year periods thereafter unless either party otherwise elects on notice given not less than 60 days before an expiration date." *Id.* at p. 3.

55.     In addition, the 2010 Management Agreement contains the following provisions:

Merhav Rights to Procced with Rejected Projects

If Ampal elects not to participate in a Target Project presented by Merhav to Ampal, then Merhav may proceed with such a project with a non-related third party, provided that Merhav shall offer Ampal with opportunity to participate in such project with a third party on terms to be reasonably agreed to by Ampal and Merhav.

Credit for Development Costs

Merhav and Ampal shall seek credit under any financing for amounts spent during the development phase of any project and shall further seek reimbursement of expenses and fees (without duplication) from the project financing.

Certain Approvals

Merhav understands that Ampal's participation in any project in which Merhav is a partner may be subject to the approval of its Board and Special Committee.  Merhav shall cooperate with Ampal in providing all necessary information with respect to the project to Ampal, its Board and the Special Committee.  *Id.* at p. 3.

56.     In addition, the 2010 Management Agreement contains a provision addressing "replacement of existing agreement," which provides: "The Agreement replaces and supersedes as of January 1, 2010 the Management Services Agreement by and between Merhav and Merhav-Ampal Energy Ltd. dated February 23, 2009 (the '2009 Agreement').  The 2009 Agreement is hereby terminated as of December 31, 2009." *Id.* at p. 4.

57.     Ampal paid Merhav in equal quarterly installments throughout 2011.

**E.      Audit Committee Meetings and SEC filings in or regarding 2010**

58.     In 2010, the Audit Committee of Ampal met to approve Ampal's 10-Qs and 10-K financial reporting with the SEC.

43382540

59.    During 2010, Ampal filed three 10-Qs with the SEC, for the quarters ending March 31, 2010, June 30, 2010, and September 30, 2010.  In each 10-Q, Ampal publicly disclosed, among other things, that "Ampal and Merhav entered into an agreement pursuant to which Ampal shall pay Merhav annual management fees totaling in the aggregate NIS 10 million ($2.7 million), in consideration for management, marketing, financial, development and other administrative services rendered by Merhav to Ampal."

60.    In addition, with respect to Ampal's identified "general, administrative and other expense" costs incurred as of the filing of each of the three 10-Qs, the amounts identified were "$12.6 million", "$25.8 million", and "$47.1 million", respectively, and Ampal explained that the "increase [was] primarily the result of the general, administrative and other expense[s] of 012 Smile which the Company included for the first time in 2010."  [JX 139-141].

61.    On March 17, 2011, the Audit Committee met to discuss approval of Ampal's Form 10-K report for the year 2010.  At this meeting, the Audit Committee resolved to "approve the Financial Statements and the 10-K Report of the Company for the year ended December 31, 2010." [JX 85].

62.    In Item 13 of the Form 10-K regarding "certain relationships and related transactions and director independent" the filing stated: "The information with respect to certain relationships and related transactions and director independence required by this Item 13 is hereby incorporated in this Annual Report on Form 10-K by reference to our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, for our annual meeting of stockholders to be held in 2011."  [JX 74, at p. 35].

43382540

63.     On March 31, 2011, Ampal filed Ampal's Proxy Statement, which Maiman executed "by order of the Board of Directors."  [JX 72, pp. 2, 38].  Therein, the members of the Audit Committee "recommended that the audited financial statements referred to [above their signatures on page 12] be included in the Company's annual report on Form 10-K for the year ended December 31, 2010."  *Id.*

64.     Later in the Proxy Statement, Ampal included an answer to the question "Does the Company enter into transactions with affiliated parties?" and answered with the disclosure that, among other things, "[Ampal] entered into a management services agreement with Merhav, according to which Merhav provides [Ampal] and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration of NIS 24.2 million ($6.8 million)." *Id.*

65.     This section also included disclosures related to other related-party transactions, including the Colombia Ethanol Project and the Aircraft Agreement.

**F.     Board and Audit Committee Meetings and SEC Filings in and for 2011, Explosion and Disruption of Service of EMG**

66.     On May 5, 2011, the Audit Committee met "to discuss and approve the Form 10-Q Report for the quarter ended March 31, 2011 ('Report').  "The Committee [first heard] the report of Ampal's management ('Management') and later … the report and comments of Ampal's auditing accountants ('PWC')."  [JX 86, at p. 1].  "Ms. Eluz reviewed Ampal's financial statements for [the] quarter, in accordance with the presentation attached [t]hereto as ANNEX A …."  Given certain changes to be made to the draft 10-Q, "[n]o resolution was made at that time" to approve the 10-Q.  *Id.* at p. 3.

67.    On May 15, 2021, the Audit Committee convened another meeting "to approve the Form 10-Q Report for the quarter ended March 31, 2011 (the 'Report'), which was discussed by the Committee on May 5, 2011.

68.    Following a discussion among the Audit Committee members, Mr. Gleit of PWC, and Ampal's management, including Ms. Eluz and Mr. Firon, the Audit Committee "unanimously resolved [t]o approve the Financial Statements and the 10-Q Report of the Company for the quarter ended March 31, 2011 subject to finalizing the wording of the disclosure regarding EMG between the Company and the Auditors." *Id.* at pp. 2-3.

69.    On May 16, 2011, Ampal filed with the SEC its 10-Q for the period ending March 31, 2011.  [JX 104].

70.    The Ampal 10-Q 1Q 2011 disclosed "Services and Management Agreements," including that:

> Ampal entered into a management services agreement with Merhav, according to which Merhav provides the Company and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal. The management fee shall be determined by the Special Committee of the Board of Directors of Ampal (composed solely of independent directors) at or around the end of each fiscal year.
>
> …
>
> As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal and a member of the controlling shareholder group of Ampal, is the sole owner of Merhav.  Because of the foregoing relationship, a special committee of the Board of Directors composed of Ampal's independent directors negotiated and approved the transactions between Ampal and Merhav.

*Id.* at pp. 11.

43382540

71.    In addition, the Ampal 10-Q 1Q 2011 disclosed that "[i]n the three months ended March 31, 2011, the Company recorded $13.8 million of general, administrative and other expenses, as compared to $11.9 million in the corresponding period in 2010.  The increase resulting mainly from the revaluation of the NIS compared to the U.S. Dollar and the increase in payments on account of annual management fees."  *Id.* at p. 17.

72.    On August 4, 2011, the Audit Committee met to "discuss and approve the Form 10-Q for the quarter ended June 30, 2011 ('Report')."  [JX 90].  Mr. Ben-Atav "reviewed Ampal's financial statements for the quarter, in accordance with the presentation attached [t]hereto as ANNEX A."  *Id.*  Mr. Fellus, a representative of PWC, reviewed the audit performed on Ampal's financial statements for the second quarter of 2011 and "informed the Committee that the external auditors did not find any material errors in the Report and do not have any material comments to it."  *Id.* at p. 5.  The Audit Committee thereafter "unanimously resolved [t]o approve the Financial Statements and the 10-Q Report of the Company for the quarter ended June, 2011."  *Id.*

73.    On August 4, 2011, Ampal filed its 10-Q for the quarter ended June 30, 2011.  [JX 105].

74.    The Ampal 10-Q 2Q 2011 disclosed "Services and Management Agreements," including that:

> On December 30, 2010, Ampal entered into a management services agreement with Merhav, according to which Merhav provides the Company and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal. The management fee shall be determined by the Special Committee of the Board of Directors of Ampal (composed solely of independent Directors) at or around the end of each fiscal year.
>
> …

>As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal and a member of the controlling shareholder group of Ampal, is the sole owner of Merhav. Because of the foregoing relationship, a special committee of the Board of Directors composed of Ampal's independent directors negotiated and approved the transactions between Ampal and Merhav.

*Id.* at pp. 12-13.

75.     In addition, the Ampal 10-Q 2Q 2011 disclosed that "[i]n the six months ended June 30, 2011, the Company recorded $30.9 million of general, administrative and other expenses, as compared to $24.4 million in the corresponding period in 2010. The increase resulting mainly from the revaluation of the New Israeli Shekel ("NIS") compared to the U.S. Dollar and the increase in payments on account of annual management fees." *Id.* at p. 18.

76.     On November 9, 2011, the Audit Committee held a meeting "to discuss and approve the Form 10-Q Report for the quarter ended September 30, 2011 ('Report')[,]" including reports by Ampal's management and external auditors at PWC. [JX 93]. Ms. Eluz "reviewed Ampal's cash and cash equivalents, and Ampal's solo balance sheet." *Id.*

77.     The Audit Committee thereafter "unanimously resolved [t]o approve the Financial Statements and the 10-Q Report of the Company for the quarter ended September, 2011." *Id.*

78.     On November 13, 2011, the Audit Committee met to discuss and approve Ampal's 10-Q for the quarter ending September 30, 2011. After discussion, the Audit Committee "unanimously resolved [t]o approve the Financial Statements and the 10-Q of [Ampal] for the quarter ended September 30, 2011." *Id.* at p. 2.

79.     On November 14, 2011, Ampal filed its 10-Q for the quarter ended September 30, 2011. [JX 99].

80.     The Ampal 10-Q 3Q 2011 disclosed "Services and Management Agreements," including that:

> On December 30, 2010, Ampal entered into a management services agreement with Merhav, according to which Merhav provides the Company and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal. The management fee shall be determined by the Special Committee of the Board of Directors of Ampal (composed solely of independent directors) at or around the end of each fiscal year.
>
> …
>
> As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal and a member of the controlling shareholder group of Ampal, is the sole owner of Merhav.  Because of the foregoing relationship, a special committee of the Board of Directors composed of Ampal's independent directors negotiated and approved the transactions between Ampal and Merhav.

*Id.* at p. 13

81.    In addition, the Ampal 10-Q 3Q 2011 disclosed that "[i]n the nine months ended September 30, 2011, the Company recorded $45.69 million of general, administrative and other expenses, as compared to $36.4 million in the corresponding period in 2010.  The increase resulting mainly from the revaluation of the New Israeli Shekel ('NIS') compared to the U.S. Dollar and the increase in payments of annual management fees." *Id.* at p. 19.

## G.    Ampal's Board and Committee Meetings and SEC Filings in 2012

82.    On January 30, 2012, the Audit Committee met to "discuss the Company's proposed cost reduction plan." [JX 108, at p.1].    "Ms. Eluz presented the Company's management's proposed cost reduction plan, in accordance with the attached Exhibit A, including a breakdown of the Company's expenses during 2010-2011, and the expected expenses for 2012." *Id.*

83.    The Exhibit A attached to the Minutes was a chart of Ampal's "Administration and General Expenses" and included columns of the "annual average cost" in 2010, 2011, and 2012

for various items, including Ampal's "management fees" for those years, which were identified as

6,639,000 and $6,606,000 for 2010 and 2011, respectively, and the proposed cost for 2012 of $2.4

million.  *Id.* at p. 7.

84.    Ms. Eluz proposed that the "management fees to be paid to Merhav during 2012

will be cut to US$2.4 million, and all other expenses of Merhav will be borne by Mr. Maiman, as

part of this contribution to the Company's agreements with the debenture holders."  *Id*

85.    Further, Ms. Eluz confirmed that "Merhav's activities will not be downsized [in

2012], but rather will stay the same and be paid for by Mr. Maiman … [and] Merhav will continue

to handle business development of Gadot, the Colombian project and EMG, and will not seek other

new activities for Ampal."  *Id.*  Independent Director Vaknin also suggested "cutting Mr.

Maiman's entire salary."  Ms. Eluz responded that this would be "considered." *Id.*

86.    Thereafter, the January 30, 2012 meeting concluded but "[n]o resolution was made

at this point." *Id.* at p. 6.

87.    On March 28, 2012, the Audit Committee convened to discuss and approve

Ampal's 10-K for the fiscal year ended December 31, 2011.  [JX 114, at p. 1].  Also on March 28,

2012, Ampal's Board met "to approve the Form 10-K Report for the year ended December 31,

2011 ('Report'), which was approved by Ampal's Audit Committee before this Meeting[.]"  [JX

115].

88.    On March 30, 2012, Ampal filed its 10-K for the fiscal year ended December 31,

2011.  [JX 116].

89.    In "Note 20 – transactions with related parties", the Ampal 2011 10-K stated:

> The Company entered into a management services agreement with
> Merhav, according to which Merhav provides the Company and its
> subsidiaries with management, marketing, financial, development

and other administrative services for an annual consideration in the
year ended December 31, 2011 of NIS 24.2 million ($6.6 million).

*Id.* at p. 36.

90.    In addition, the "Consolidated Statements of Operations" of "[Ampal] and
subsidiaries" included a line item for "General, administrative and other expenses" that listed 2011
and 2010 as $59.123 million (USD) and 59,648 million (USD), respectively. *Id.* at p. 4.

## IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following,
contentions of the parties:

## A.    Plaintiff's Contentions

1.    Plaintiff contends that Eluz's compensation increased significantly after 2005.

2.    Plaintiff contends that, between 2006 and 2011, Mr. Maiman controlled Eluz's
compensation and could affect the terms of her employment either directly or through his selection
of the Board.  Plaintiff contends that, due to Mr. Maiman's control over Eluz's compensation, Eluz
was beholden to Maiman.

3.    Plaintiff contends that, in early 2009, Eluz, on behalf of Ampal, called a meeting of
the Special Committee to discuss a proposed management agreement between Ampal and Merhav.

4.    Plaintiff contends that, before 2009, and during all relevant times prior to 2009,
Merhav provided certain management services to Ampal, including, but not limited to regarding
EMG, without any demand or request for compensation.

5.    Plaintiff contends that Merhav provided management services to Ampal without
any compensation or without any management agreement because Merhav also held ownership or
equity in Ampal's investments and therefore had its own incentive to management these assets.

43382540

6.    Plaintiff contends that before the February 15, 2009 meeting of the Special Committee, and before any approval from the Special Committee's members, Ampal, on or before February 11, 2009, Ampal requested that its outside counsel prepared a management agreement between Ampal and Merhav in anticipation of entry into that agreement with Merhav.

7.    Plaintiff contends that, at the February 15, 2009 Special Committee meeting, Eluz informed the Special Committee of the negotiating strategy and purported fairness of the compensation number agreed to and to be provided in the proposed 2009 Management Agreement, which was pre-fixed at 10 million NIS to be paid quarterly (i.e., 2.5 million NIS per quarter as the year progressed).

8.    Plaintiff contends that, consequently, the Special Committee relied on Eluz to ensure that the proposed agreement was commercially proper and entered into on an arms-length basis.  The only additional point of clarity from the Special Committee was to ensure that the flat management fee paid to Merhav would be exclusive of Merhav's costs and expenses, and that Merhav's costs and expenses would not be reimbursed by Ampal.

9.    Plaintiff contends that Eluz further represented to the Special Committee that Merhav's "remuneration will be monitored by Ampal's management, in accordance with detailed reports of services, and if need be, it may be altered.  Merhav shall report to Ampal's management, on a quarterly basis, with regards to the services rendered by Merhav in the respective quarter."

10.    Plaintiff contends that Merhav's obligation to report to Ampal was particularly relevant, and for the benefit of the Special Committee, because the Special Committee members were not employed by Ampal or Merhav and did not maintain an office in the physical location that these entities shared.  As a result, the members of the Special Committee needed Ampal to

convey these reports to them to ensure that they remained apprised of Merhav's activities, which information flowed from Merhav, to Ampal's management, and then to the Special Committee.

11.    Plaintiff contends that Eluz was the main conduit of information flow to the Special Committee with respect to Merhav's management services and the primary source of information for the Special Committee regarding Merhav's activities for Ampal, which Eluz herself acknowledged that the Special Committee relied on her and the information she provided to make its decisions.

12.    Plaintiff contends that, after the Special Committee met on February 15, 2009, the next time Merhav's services and remuneration were discussed with the Special Committee was more than twenty (20) months later at the Special Committee meeting held on December 19, 2010 where, for the second time, Eluz raised the issue of Merhav's management services to the Special Committee, and advocated for increasing Merhav's compensation.

13.    Plaintiff contends that during the period of February 15, 2009 through December 19, 2010, Eluz did not report to the Special Committee regarding Merhav's expenses and Merhav's activities, and Plaintiff further contends that Eluz did not provide the Special Committee members with written reports or breakdowns of Merhav's expenses and activities during this period.

14.    Plaintiff contends that, on December 16, 2010, Mr. Firon, Ampal's Vice President – Investments and Corporate Affairs and general counsel, sent notice to the Special Committee scheduling a meeting of the Special Committee, to be held on December 19, 2010, along with an agenda for the meeting, which included, among other things, "[d]iscussion of the Management Services Agreement between Ampal and [Merhav]." [JX 53].

15.    Plaintiff contends that, at the December 19, 2010 meeting, Eluz informed the Special Committee that Merhav received "inadequate renumeration" for its services and advocated

43382540

for an increase in Merhav's compensation for management services.  Based on Eluz's advocacy,

the Special Committee resolved to:

> approve in principle the entering into a Management Services
> Agreement with Merhav, to be prepared by Ampal's attorneys,
> according to which Merhav shall render services to Ampal, and
> Ampal  shall bear a percentage of Merhav's expenses for its
> services, in accordance with an annual settling of accounts, which
> shall be based upon Merhav's management report of services
> rendered by Merhav and agreed by the Committee at that time.  Such
> agreement shall be deemed effective as of January 1st, 2010.

16.     Plaintiff contends that, between December 20, 2010 and December 23, 2010, Mr.

Firon and Ampal's outside corporate counsel, Ken Henderson, with the law firm Bryan Cave

Leighton Paisner LLP ("Bryan Cave"), exchanged various e-mails and drafts of the proposed 2010

Management Agreement, with copy to Ms. Eluz.  [JX 12-14, 79-81].

17.     Plaintiff contends that, on December 21, 2010, Mr. Henderson sent an e-mail to Mr.

Firon (with copy to Eluz) attaching "a revised draft of the [2010 Management Agreement] between

Ampal and Merhav, modified as we discussed this morning and to reflect the comments that you

emailed yesterday."  [JX 80, at p. 1].  Mr. Henderson also stated "I believe I captured the expense

reimbursement /fee concept that was agreed and approved.  If not, please let me know."  *Id.*

18.     Plaintiff contends that the attached revised draft included the following edits to the

"Fees / Expense Reimbursement" section:

> In consideration for Merhav's services and undertakings under the
> Agreement, Ampal will pay Merhav a Management Fee of
> _____ per month, which will be determined annually and shall
> be equal to a percentage of the direct and indirect expenses incurred
> by Merhav in connection with providing services to or for the benefit
> of Ampal, to the extent not reimbursed or recouped from other
> parties (such as from a joint venture or project budget).   The
> Management Fee shall be determined by the Special Committee (the
> "Special Committee") of the Board of Directors of Ampal
> (composed solely of Independent Directors) at or around the end of
> each fiscal year (beginning with 2010) based on a presentation by

43382540

<u>Merhav of expenses incurred in providing services hereunder during the current year</u>.   The parties will review the amount of the Management Fee annually in good faith and shall make such adjustments as they agree may be reasonably appropriate in light of the work performed or to be performed by Merhav.

~~In addition to the regular Management Fee, the~~ <u>In addition, after the determination of the Management Fee for any particular year, the Special Committee shall fix the amount of an advance payable to Merhav on account of the Management Fee for the next year, which advance shall be paid in equal installments on a quarterly basis and shall be subject to recoupment or adjustment based on the final year-end Management Fee determination.</u>

<u>For 2010, the Special Committee has determined and Merhav has agreed that the Management Fee will be $_____, which represents approximately 50% of the expenses incurred by Merhav for services of the type described in the MOU.</u>

<u>The</u> parties will determine in good faith whether Merhav should be compensated with regard to any particular project out of the project budget or, after completion, from project operations.  In such event, the parties (and any joint venture) will enter into appropriate agreements and the parties will ~~in addition review in good faith whether~~ <u>take into account in determining</u> the Management Fee ~~above should be adjusted in light of~~ <u>for any year</u> any compensation received by Merhav from a particular project.

[JX 80, at p. 7].

19.     Plaintiff contends that, on December 22, 2010, Mr. Firon responded and "[a]attached our comments to the following agreements" including the "[2010 Management Agreement] between Merhav & Ampal.   [JX 81, at p. 1].   With respect to Mr. Henderson's revisions to the "Fees / Expense Reimbursement" section, Mr. Firon's attached draft accepted all of Mr. Henderson's edits, except for the following language, which was removed: "In addition, after the determination of the Management Fee for any particular year, the Special Committee shall fix the amount of an advance payable to Merhav on account of the Management Fee for the next year, which advance shall be paid in equal installments on a quarterly basis and shall be subject to recoupment or adjustment based on the final year-end Management Fee determination."  *Id.* at p.

4.  Mr. Firon also included a note in the draft that stated, "I'll give you the amount later today" with respect to the Management Fee number for 2010.  *Id.*, at p. 4.

20.    Plaintiff contends that, on December 30, 2010, the Special Committee acted through unanimous written consent to: i) "authorize and approve the execution of [the 2010 Management Agreement] by and between [Ampal] and [Merhav] …"; ii) "authorize and approve the execution of an Aircraft Time Sharing Agreement by and between [Ampal] and Merhav …"; and, iii) authorize and approve the execution of an Amendment to Colombia Ethanol Option Agreement by and between [Ampal] and Merhav … ." [JX 117, at p. 1].

21.    Plaintiff contends that the final version of the 2010 Management Agreement adopted Ampal's preferred language and omitted contractual authorization to make quarterly payments in advance of Merhav's management fee in 2011.

22.    Plaintiff contends that the drafts of the 2010 Management Agreement, in addition to altering the compensation from a fixed to a variable amount, explicitly changed the timing of payments to Merhav from quarterly to an annualized payment, which is reflected by Ampal's edits to the draft agreement that struck out the specific language authorizing quarterly payments of Merhav's management fee in favor of the final operative approach, which provided that Merhav's compensation would be fixed at year-end upon evaluation of Merhav's expenses and results by the Special Committee.

23.    Plaintiff contends that, although the 2010 Management Agreement's effective date was retroactive to January 1, 2010, as a practical matter, Ampal paid Merhav quarterly in the amount of 2.5 million NIS per quarter in 2010, and then paid Merhav an additional sum of 14,157,000 NIS at or after the execution date of the 2010 Management Agreement.

43382540

24.     Plaintiff contends that, notwithstanding that Ampal affirmatively altered the contractual language that limited authorization of Ampal for the timing of payment of Merhav's compensation from quarterly to annually (and only with Special Committee determination), Eluz caused Ampal to make unauthorized advance quarterly payments to Merhav in 2011 at the same rate of compensation set for 2010.

25.     Plaintiff contends that Eluz breached her fiduciary duty to Ampal by causing Ampal to make quarterly payments to Merhav during 2011 without approval from the Special Committee.

26.     Plaintiff contends that, during 2011, Eluz caused Ampal to make unauthorized advance quarterly payment to Merhav at the same rate set for 2010, totaling 24,157,000 NIS, as her signature was necessary for Ampal to effect payments of these amounts.

27.     Plaintiff contends, neither the Special Committee nor the Audit Committee met or approved the payment of quarterly management fees to Merhav in 2011, as reflected in the executed minutes and written consents of these committees in 2011 or 2012.

28.     Plaintiff contends, neither the Special Committee nor the Audit Committee, received sufficient information from Eluz (or her staff at Ampal) in 2011 and/or 2012 necessary to consider and determine Merhav's management fee compensation for 2011, as Eluz never provided the Special Committee with Merhav's expenses, activities, or requisite information set forth in the 2010 Management Agreement.

29.     Plaintiff contends that, in advance of the March 7, 2011 meetings, Ampal's management did not inform the Audit Committee or the Board that Merhav's services, expenses, or management compensation would be discussed at the meetings, nor did Ampal's management (including Eluz) provide the Audit Committee or the Board with information sufficient to know

31

Merhav's expenses incurred on behalf of Ampal for the first quarter of 2011, or the scope of Merhav's services during that time period.

30.     Plaintiff contends that, at the March 7, 2011 meetings, the Board and the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses incurred for Ampal in 2011, nor did the Audit Committee (or the Board) receive information from Ampal's management identifying Merhav's expenses for 2011 sufficient to knowingly evaluate and / or approve any management compensation payment to Merhav.  No resolution was reached authorizing payment of management fees to Merhav at these March 7, 2011 meetings.

31.     During March 7, 2011 meetings, the Board and Audit Committee discussed, among other things, the terrorist attack (during the events of the Arab Spring) that damaged and caused the interruption of EMG's ability to supply gas to Israel.  The Audit Committee recognized that if the gas supply interruption continued, Ampal would have to "re-evaluate EMG's valuation." *Id.*

32.     Plaintiff contends that, on March 17, 2011, the Audit Committee met to discuss approval of Ampal's Form 10-K report for the year ending December 31, 2010, but that the Audit Committee, as reflected in the minutes, did not review, discuss, or approve any related-party transactions between Ampal and Merhav, including, but not limited to the amount of Merhav's management compensation for 2011.  Plaintiff contends that the Audit Committee resolved only to "approve the Financial Statements and the 10-K Report of the Company for the year ended December 31, 2010."

33.     Plaintiff contends that Ampal's Form 10-K for the year ending December 31, 2010, as was customary for Ampal, did not identify the 2010 Management Agreement between Ampal

and Merhav, nor did it include a section discussing "related-party transactions", "transactions with related parties" or "certain relationships and related transactions and director independence."

34.     Plaintiff contends that, in advance of the quarterly payment of management fees to Merhav in the first quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the first quarter of 2011, nor did the Special Committee authorize – by resolution reflected in meeting minutes or unanimous written consent – Ampal to pay Merhav management compensation for the first quarter in 2011, nor did the Special Committee receive full and complete information from Ampal's management regarding Merhav's expenses and services on behalf of Ampal sufficient to undertake such a decision.

35.     Plaintiff contends that notwithstanding the foregoing, Eluz caused Ampal to make an unauthorized advance quarterly payment to Merhav of management fees in the first quarter of 2011 at the rate set for 2010.

36.     Plaintiff contends that, on May 5, 2011, the Audit Committee met "to discuss and approve the Form 10-Q Report for the quarter ended March 31, 2011 ('Report'). "The Committee [first heard] the report of Ampal's management ('Management') and later … the report and comments of Ampal's auditing accountants ('PWC')."  [JX 86, at p. 1].  "Ms. Eluz reviewed Ampal's financial statements for [the] quarter, in accordance with the presentation attached [t]hereto as ANNEX A", noted the "gain from the sale of 012 Smile in a total amount of approximately 54 US million dollars" and stated that "net income in the quarter was approximately 17 US million dollars."  *Id.*  "Mr. Gleit … informed the Committee that, in the quarter, the material issue was the sale of 012 Smile, and that Gadot did not meet debt financing covenants in two loans of approximately 62 million NIS, and that therefore the loans were classified as short terms loans.

The financing banks did not call for early repayment of these loans." *Id.* at p. 2. Further, "Mr. Gleit informed that since EMG is recorded in the cost method, Ampal asked Houlihan Lokey to update EMG's valuation. The update has not been finalized yet." *Id.* Then, "Mr. Vaknin state that the [10-Q] will obviously not be filed prior to the completion of the valuation [of EMG]" and "provided a few comments to the draft 10-Q." *Id.* Given the changes to be made to the draft 10-Q, "[n]o resolution was made at that time" to approve the 10-Q. *Id.* at p. 3.

37.    Plaintiff contends that, at a May 5, 2011 Board meeting, Ampal re-confirmed that Eluz's signature, along with Maiman, is the only way for Ampal to authorize payments greater than $100,000, which was consistent with the financial payment protocol from prior years, and due to the amount of Merhav's management fee compensation payments in 2011, Ampal's payments could only be authorized by Maiman *with* Eluz.

38.    Plaintiff contends that, in advance of the May 5, 2011 meetings, Ampal's management did not inform the Audit Committee or the Board that Merhav's services, expenses, or management compensation would be discussed at the meetings, nor did Ampal's management (including Eluz) provide the Audit Committee or the Board with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the first quarter of 2011, or the scope of Merhav's services during that time period.

39.    Plaintiff contends that, at the May 5, 2011 meetings, the Board and the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses incurred for Ampal in 2011, nor did the Audit Committee (or the Board) receive information from Ampal's management identifying Merhav's expenses for 2011 sufficient to knowingly evaluate and / or approve any management compensation payment to

43382540

Merhav.  No resolution was reached authorizing payment of management fees to Merhav at these May 5, 2011 meetings.

40.     Plaintiff contends that, advance of the quarterly payment of management fees to Merhav in the first quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the first quarter of 2011, nor did the Special Committee authorize – by resolution reflected in meeting minutes or unanimous written consent – Ampal to pay Merhav management compensation for the first quarter in 2011, nor did the Special Committee receive full and complete information from Ampal's management regarding Merhav's expenses and services on behalf of Ampal sufficient to undertake such a decision.

41.     Plaintiff contends that notwithstanding the foregoing, Eluz caused Ampal to make an unauthorized advance quarterly payment to Merhav of management fees in the first quarter of 2011 at the rate set for 2010.

42.     Plaintiff contends that, on May 15, 2021, the Audit Committee convened another meeting "to approve the Form 10-Q Report for the quarter ended March 31, 2011 (the 'Report'), which was discussed by the Committee on May 5, 2011.  Since that date, EMG's gas supply has not yet resumed.  Ampal's management is currently discussing the appropriate disclosure language in the Report regarding the situation of EMG with the Company's external auditors, in order to finalize the Report."  [JX 89, at p. 1].

43.     Plaintiff contends that, on August 4, 2011, the Audit Committee met to "discuss and approve the Form 10-Q for the quarter ended June 30, 2011 ('Report')."  [JX 90].  During the meeting, Mr. Erez Meltzer, "reviewed Gadot's financial statements for the quarter, and indicated

43382540

that Gadot's results are better than the annual operating plan," and that "Gadot had a very good 2nd quarter" Id. at p. 1.

44.     Plaintiff next contends that Ms. Eluz "reviewed EMG's current status" and stated that "[c]urrently gas is not flowing, and the Egyptian government is negotiating with the Bedouins in the region.  The Egyptian pipeline requires about 3-5 days of repair, which await a settlement to be reached between the government and the Bedouins.  Furthermore EMG's site was attached, but the attack did not damages the facility.  In light of the above, Houlihan Lokey were requested to update their independent evaluation in EMG.  According to the evaluation, about 30% of contracted gas will flow during 2011 (so far, 45% has flowed), and more during 2012 and 2013, but still not 100% during these three years."  Id. at p. 3.

45.     Plaintiff contends that Mr. Ben-Atav then "reviewed Ampal's financial statements for the quarter, in accordance with the presentation attached [t]hereto as ANNEX A.  [Mr. Ben-Atav] reviewed Ampal's debentures repurchase program.  Ampal's debentures' ratings were downgraded, which inflects higher interest for Series C debentures.  EMG's investment was impaired to reflect a value to EMG of US$2.05 billion.  EMG was previously reflected in Ampal's report at its costs of US $2.13 billion for EMG." Id. at p. 4.  Mr. Ben-Atav further stated that "[t]he net loss in the first half was approximately 22 US million dollars."  Id.

46.     Plaintiff contends, at the August 4, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

47.     Plaintiff contends that, in advance of the August 4, 2011 meetings, Ampal's management did not inform the Audit Committee or the Board that Merhav's services, expenses, or management compensation would be discussed at the meetings, nor did Ampal's management

36

43382540

(including Eluz) provide the Audit Committee or the Board with information sufficient to know Merhav's expenses incurred on behalf of Ampal for the second quarter of 2011, or the scope of Merhav's services during that time period.

48.     Plaintiff contends that, in advance of the quarterly payment to Merhav in the second quarter of 2011, the Special Committee did not meet (nor did any other committee meet) to discuss or review Merhav's expenses for the second quarter of 2011, and did not authorize – by resolution reflected in meeting minutes or unanimous written consent – Merhav's management compensation for the second quarter in 2011, nor did they receive full and complete information from Ampal's management sufficient to undertake a decision on Merhav's management compensation for the second quarter in 2011.

49.     Plaintiff contends that notwithstanding the foregoing, Eluz caused Ampal to make an unauthorized advance quarterly payment to Merhav of management fees in the second quarter of 2011 at the rate set for 2010.

50.     Plaintiff contends that, on November 9, 2011, the Audit Committee held a meeting "to discuss and approve the Form 10-Q Report for the quarter ended September 30, 2011 ('Report')."  Ampal's 10-Q for the Quarter Ended September 30, 2011, including reports by Ampal's management and external auditors at PWC.  [JX 93].  During the meeting, Mr. Vaknin "suggested that the Committee will receive a review of the [10-Q] Report and the events of the third quarter." *Id.* at p. 1.  Thereafter, Ms. Eluz "reviewed Ampal's financial statements for the quarter, in accordance with the presentation attached [t]hereto as ANNEX A" and Ms. Eluz "reviewed Ampal's debentures repurchase program, from which Ampal recorded a gain of US$3.8 Million." *Id.*  In response to Mr. Vaknin's question of "what is the current debt of Ampal to the

debenture holders," Ms. Eluz "replied that [it] is approximately US$212 million." *Id.* Further,

Ms. Eluz stated:

> In the last quarter Ampal's debentures' rating were downgraded by
> two notches, which inflicts higher interest for Series C debentures.
> The cumulative impact was US$2.7 million. The EMG's
> investment was impaired to reflect a value to EMG of US$2.05
> billion. EMG was previously reflected in Ampal's report at its cost
> of US $2.13 billion for EMG. The US Dollar increased this quarter
> by 8.7% against the NUIS, and the Israeli CPI decreased by 0.6%.
> The above had positive impact of 8.1% on Ampal's results in the
> quarter. In the nine months period we had a net loss of US$29.8
> million, of which an impairment of our investment in EMG US$22.2
> million, an impairment of tax assets, mainly due to the impairment
> [o]f the investment in EMG, of US$14.1 million, and Ampal's price
> purchase allocation and depreciation during the quarter has a
> negative impact of US$6.1 million."

*Id.*at p. 2.

51.     Plaintiff contends that Ms. Eluz also "reviewed Ampal's cash and cash equivalents,

and Ampal's solo balance sheet." *Id.*

52.     Finally, Plaintiff contends that Mr. Amir Gleit, a representative of PWC, "informed

Mr. Vaknin of the review PWC performance on Ampal's financial statements of the quarter" and

informed the Audit committee that:

> The external auditors did not find any material errors in the Report
> and do not have any material comments to it." The management
> received a valuation of EMG from an independent valuator, and
> used the valuation's no tax scenario. In accordance with the
> valuation the Company recorded charges of $16.8 million in
> addition to a $16.9 million in the previous quarter, and impairment
> due to tax assets. In this quarter, has was not supplied, and it
> resumed recently, after the quarter ended. The auditors requested
> that the Company will include the discount rate used in EMG's
> valuation and the sensitivity analysis will be used in the Report. The
> reasons for that is that the value of EMG is material to Ampal, and
> there is a material difference between Ampal's market value and
> equity. Since Ampal did not match the equity to the market value,
> the auditors determined that this disclosure is important. Ampal's
> management has agreed to this . The Company did not meet debt
> financing covenants in the Discount loan, there was a discussion

between the Company and the auditors, and whether the covenants are examined in the end of the quarter or only when the Report is approved. This issue was resolved by a factual disclosure in the Report. The auditors accepted this solution. The last issue is the going concern in the discussion between the Company and the auditors were satisfied that the Company has sufficient funds to meet its obligations till the end of 2012. Nevertheless, the Company lacks sufficient funds to meting its obligation in the first quarter of 2013. The Company presented the auditors with a business plan which includes the partial sale of Gadot and receiving dividend from EMG. The auditors are planning to further examine this issue for the year end and the first quarter of 2012. The auditors expect to see an active implementation of that plan.

*Id.* at p. 4.

53.    Plaintiff contends that, at the November 9, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

54.    Plaintiff contends that notwithstanding the foregoing, Eluz caused Ampal to make an unauthorized advance quarterly payment to Merhav of management fees in the third quarter of 2011 at the rate set for 2010.

55.    Plaintiff contends that, on November 12, 2011, "Mr. Gleit informed [the Audit Committee] that the meeting was convened at PWC's request, for the Committee to consider a few items. The 10-Q report as it is drafted today includes a certain impairment in EMG. The procedure whether an impairment is required, was conducted when the gas supply was in high quantities, whether the government of Egypt expressed its intention that gas will flow and there was an international activity to pressure Egypt to continue the supply. [JX 96].

43382540

56.     Plaintiff contends that Mr. Gleit further explained "I believe that after the last explosion in the Egyptian pipeline, the environment has changed, and the Company and the Committee should look differently in the valuation, especially considering the time period in which the gas will not be supplied or supplied partially. Till today, the Company assumed that there will not be gas supply for a year and a half.  The independent valuator has sued a period of three years, in rising quantities."  Mr. Gleit then stated, "I think the Company should examine with the independent valuator whether a change in the assumptions and calculations [is] appropriate, and the valuation should be amended accordingly."  Finally, Mr. Gleit stated that "if there will be another explosion, there will be an automatic substantial impairment in Ampal's holdings in EMG. Since the 10-Q was not published yet, we ask the Committee to consider all the above.  *Id.* at pp. 1-2.

57.     Plaintiff contends that, at the request of PwC, the Audit Committee met again to discuss EMG, the appropriate impairment, and disclosures following the most recent explosion. *Id.*  Specifically, PwC determined that, in light of recent explosions and EMG's continued problems, Ampal needed to reconsider the value of EMG and the "time period in which the gas will not be supplied or supplied partially."  *Id.*  PwC's representative explained that the valuation for Ampal had increased in the last two reporting periods based on the assumption that the issues with EMG would draw to an end and EMG would commence supplying gas in higher and higher quantities.  However, because the opposite had occurred, the publicly disclosed valuations of Ampal were misaligned.  The two major recommendations from PwC were to omit the tax benefit due to the change in legislation, and to amend the time frame for recommencing gas flow to three years out and that this time period should restart with each new explosion.  *Id.*

43382540

58.     Plaintiff contends that the Audit Committee then discussed this matter, and then reported to PWC that, among other things, "[r]egarding the last explosion – an appropriate subsequent event disclosure will be included in the 10-Q report." *Id.* at p. 4.

59.     Plaintiff contends that, at the November 12, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

60.     Plaintiff contends that, on November 13, 2011, the Audit Committee met to discuss and approve Ampal's 10-Q for the quarter ending September 30, 2011.  "Mr. Vaknin stated … he was informed that the current understandings between the parties are that the Report should include an additional impairment charge of US$12.5 million to the carrying amount of the Company's investment in EMG, in addition to the impairment charge that was included in the Report which was approved by the Committee a few days ago."  [JX 97, at p. 1.].  The Audit Committee thereafter "unanimously resolved [t]o approve the Financial Statements and the 10-Q of [Ampal] for the quarter ended September 30, 2011." *Id.* at p. 2.

61.     Plaintiff contends that, at the November 13, 2011 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

62.     Plaintiff contends that, an advance of the November 9, 12, and 13, 2011 meetings, Ampal's management did not inform the Audit Committee that Merhav's services, expenses, or

management compensation would be discussed at the meetings, and Ampal's management
(including Eluz) did not provide the Audit Committee with information sufficient to know
Merhav's expenses incurred on behalf of Ampal for the third quarter of 2011, or the scope of
Merhav's services during that time period.

63.     Plaintiff contends that , in advance of the quarterly payment to Merhav in the third
quarter of 2011, the Special Committee did not meet (nor did any other committee) to discuss or
review Merhav's expenses for the third quarter of 2011, and did not authorize – by resolution
reflected in meeting minutes or unanimous written consent – Merhav's management compensation
for the third quarter in 2011, nor did they receive full and complete information from Ampal's
management sufficient to undertake a decision on Merhav's management compensation for the
third quarter in 2011.

64.     Plaintiff contends that, on November 28, 2011, the Audit Committee met at
Ampal's request to discuss PwC and "management's desire to end the current engagement with
PwC, prior to the filing of the Company's annual financial reports for year-end 2011."  [JX 98].
"Ms. Eluz stated that since Mr. Berger of PWC refused to meet with Ampal's CEO and CFO, the
Company cannot continue the engagement with PWC, and she cannot see a way to continue
working with them."  Id. at p. 4.  "Mr. Vaknin informed that … the Committee wishes to meet
with Mr. Berger and Mr. Fellus of PWC, prior to make any decision in the matter." Id.  Thereafter,
the Audit Committee "unanimously resolved [t]o continue the discussion only after the Committee
will meet with PWC, without Ampal's management."  Id.

65.     Plaintiff contends that, at the November 28, 2011, the Audit Committee did not
discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related
expenses in 2011, nor did the Audit Committee receive sufficient information in advance of this

meeting to hold such discussion, and the Audit Committee also did not approve the payment of Merhav's management fee for any or all periods of 2011 at this meeting.

66.    Plaintiff contends that, on December 8, 2011, the Board held a conference call and Mr. Maiman "gave a brief review of the current political situation in Egypt, and its influence on EMG, as well as the current status of the Egyptian gas pipeline." [JX 101, at p. 1.].  Next, "Ms. Eluz introduced to the Board Messrs. Altit, Well and Bonen which will represent Ampal in its future discussion with the institutional holders of Ampal's shares and debenture, as well as the trustees of Ampal's debentures.  She reviewed Ampal's current financial status, as well as it current business and financial alternatives, in accordance with a presentation attached [t]hereto as Annex A.  She [stated that] Ampal's current debt to its debenture holders includes a US$240 million unsecured debt." Id. at pp. 1-2

67.    Plaintiff contends that Eluz further stated that "Ampal [paid] the first principal repayment to its Series A debentures' holders, on November 2011, at a sum of approximately US$18 million."  *Id*. at p. 2.  "Since that payment, there were two consecutive terror attacks in the Sinai, and the Egyptian election results are unfortunately not pro-Israel, and currently Ampal's management believes that there will be no dividend payments from EMG during 2012 and 2013, and that Ampal[] will not be able to refinance its current debts until such time that EMG's gas will be continuously supplied to EMG and its Israeli clients." Id.

68.    Plaintiff contends that Eluz continued, "[i]n conclusion, Ampal's management believes that Ampal is headed for a period of at least two years in which Ampal will not be able to make principle payments to its debenture holders[.]"   "Therefore, Ampal will try to reach an agreement with the debenture holders[.]" Ms. Eluz further stated that "Ampal will also agree to

undertake that Ampal's cash will only be utilized in order to better its two current major holdings."
*Id*.

69.     Plaintiff contends that "Mr. Morag queried how Ampal is getting ready from a public relations point of view." Id. at p. 5.  Ms. Eluz stated that "the media coverage of the process is expected to be aggressive and massive at first" and that "[t]he worst case scenario is that Ampal will not reach agreements with the debenture holders and they will begin a process of receivership."

70.     Plaintiff contends that Ms. Degani then "queried what will happen should Ampal's efforts for delay of payment will fail."  Id. at p. 7.  "Mr. Firon informed that Ampal's attorneys are preparing documents for the filing of Chapter 11 in the states.  Chapter 11 is a reorganization of creditor's composition, but is regarded by Israelis as bankruptcy.  This process has its advantages – it requires consent of only 66% (and not 75%) of all unsecured creditors together …, it can only be litigated in the states, which will make it most uneasy for Israeli institutional investors and so on.  At this point, Ampal does not plan to file for Chapter 11."  *Id*. at pp. 7-8.

71.     Plaintiff contends that no resolutions were made at this meeting, other than to "approve the minutes of the last meeting held on September 6, 2011." *Id*.

72.     Plaintiff contends that, on December 19, 2011, the Board held a meeting "due to management's request to summon a debenture holders meeting."  [JX 102, at p. 1].  Thereafter, the Board "unanimously resolved [t]o request the trustees of Ampal's three debenture series to summon a joint debenture holders meeting, and to authorize Ampal's management to act on behalf of Ampal in discussions with said trustees and in said debenture holders meeting."  *Id*. at p. 2.

73.     Plaintiff contends that the Special Committee met once in 2011 (on November 12, 2011) and acted once by unanimous consent (on December 30, 2011), but neither action related to

Merhav's management fee for 2011, Merhav's expenses for 2011, and nor did either event include approval or the fixing of Merhav's compensation for 2011.

74.    Plaintiff contends that, on November 12, 2011, the Special Committee met to discuss "the current agreement between the Company and Merhav according to which the Company has exercised the option (the 'Option') to convert the loan given to Merhav to 25% in the [Colombia Ethanol Project], subject to first withdrawal to the financing of the [Colombia Ethanol] Project, as further detailed in the agreement between the parties." [JX 100, at p. 1].  Mr. Vaknin stated that "in the last days the Committee visited the [Colombia Ethanol] Project in Pivijal, Colombia, conducted meeting with the Project's management in Bogota, Colombia, held a meeting with eth Colombian minister of Energy, held meetings with the Project's contractor in Brazil and visited a commercial sugarcane-to-Ethanol production plant in Brazil."  Mr. Vaknin further stated that "[a]s the Company's Option expires on December 31, 2011, the Committee should consider whether to extend the Option or not" and "[h]e suggested to extend the Option for another twelve months period."  Id. at p. 1.

75.    Plaintiff contends that "Ms. Eluz stated that this [was] her first visit to the Project and that she was most impressed from what she saw.  She suggested to expand the Company's rights under the Option, to allow the Option to be converted when there will be financial approval for the Project from financing institutes."  Id.  "Mr. Vaknin replied that he believes that the Company should not change the Options terms at this time, although he fully understands the reasons for Ms. Eluz's suggestion."  Id. at p. 2.  Thereafter, the Special Committee "unanimously resolved [t]o approve the postponement of the Option's termination date to December 31, 2021, and to request Ampal's attorneys to prepare all necessary documentation for such postponement, as shall be reviewed and approved by the Committee."  Id.

43382540

76.     Plaintiff contends that, on December 8, 2011, the Special Committee acted by

Unanimous Consent "to the adoption of the following preambles and resolutions:"

> WHEREAS, during November 2011 the Committee visited the
> Project's (as defined below) site in Colombia, and on November 12,
> 2011, the Committee held a meeting in which the Committee has
> contemplated and discussed in length the option (the "Option") to
> convert the loan given to Merhav to 25% in the Ethanol project in
> Colombia (the 'Project'), the current status of the Project, and the
> agreement between Merhav and [Ampal]; and

> WHEREAS, in said meeting, the Committee has resolved to
> approve the postponement of the Option's termination date to
> December 31, 2012, and to request [Ampal's] attorneys to prepare
> all necessary documentation for such postponement, as shall be
> reviewed and approved by the Committee; and

> WHEREAS, [Ampal's] attorneys have prepared and submitted for
> the Committee's approval a letter titled 'Amendment to Colombia
> Ethanol Project Option Agreement', attached hereto as Annex A.
> NOW THEREFORE, be it

> RESOLVED, after much contemplation and for the benefit of
> [Ampal], to approve the letter attached hereto as Annex A, and to
> authorize [Ampal's] officers to execute the letter on behalf of
> [Ampal].

*Id.* at p. 1.

77.     Plaintiff contends that, in 2011, without a contractual basis or authorization from

the Special Committee, Eluz made unauthorized payments of management fees to Merhav on a

quarterly basis at the amount fixed for Merhav's 2010 management fee.  Eluz admits that she

authorized payments by Ampal to Merhav without complying with the contractual requirements

for fixing Merhav's compensation in 2011.  While the Special Committee met "at or about the end

of [the] fiscal year" in 2011, it only conducted business regarding the Ethanol Project in Colombia.

The Special Committee never authorized – let alone discussed – Merhav's 2011 compensation.

Likewise, while the Audit Committee, which is composed of the same independent directors as

43382540

the Special Committee, met frequently during and at the end of 2011, but it neither discussed nor approved Merhav's management fee compensation for 2011. Thus, Eluz had no authorization to make payments to Merhav in 2011.

78.    Plaintiff contends that, after entering into the 2010 Management Agreement, Ampal repeatedly acknowledged and represented to the public that Merhav's management fee was "determined annually and shall be equal to a percentage of the direct and indirect expenses in connection with providing services to or for the benefit of Ampal." And, that the "management fee shall be determined by the Special Committee … at or around the end of each fiscal year."

79.    Plaintiff contends that, while Ampal disclosed the 2010 Management Agreement in its 2011 public filings, these filings establish that Ampal did not (and could not) disclose that the Special Committee "determined" the "management fee" for Merhav for 2011, nor did it disclose that the Special Committee had authorized quarterly payments to Merhav in 2011, nor did the public filings made in 2011 actually identify the management fee paid to Merhav – either quarterly or annually.

80.    Plaintiff contends that, unlike in prior years, in regards to every other related-party transaction involving Merhav, Ampal (and specifically Eluz), failed to bring the issue of Merhav's management compensation for 2011 to the Special Committee to obtain its authorization to make those payments to a related party, and nor did Ampal (or Eluz) alert the Special Committee that such authorization was necessary.

81.    Plaintiff contends that, notwithstanding the language of the 2010 Management Agreement, which Eluz executed, knew and understood, Eluz admits that Ampal paid management fees to Merhav in 2011 without the Special Committee's approval because Eluz considered the

quarterly management payments a contractual obligation of Ampal, like payments of rent, as opposed to payments that required authorization from the Special Committee.

82.     Plaintiff contends that Eluz acknowledges that the 2010 Management Agreement required that the Special Committee was obligated to decide the management compensation for Merhav at the end of each year while the agreement was in effect, but that this requirement never occurred in 2011 because she was too busy dealing with EMG and the debenture holders and never got around to it.

83.     Plaintiff contends that, instead, Eluz chose to pay Merhav quarterly in 2011 at the rate paid in 2010 without approval from the Special Committee because Merhav billed Ampal quarterly.

84.     Plaintiff contends that, on January 11, 2012, the Board met for a "management update and discussion [Ampal's] business and financial status."  [JX 10761 at p. 1].  MS. Eluz stated that "Ampal received official results of the voting of Series B debentures, according to which a separate committee of Series B holders will be formed.  Therefore, Series A and C trustees will hold another vote to determine whether they wish to form separate or joint committees.  Ampal's management has further discussions with Ampal's Israeli and American attorney, in light of the above."  Mr. Vaknin stated at the Board meeting that "Management should prepare a plan to cut its costs and expenses" and "Ms. Eluz stated that such a plan is already made, and that the audit committee will convene in two weeks to discuss it."  Id. at p. 3.

85.     Plaintiff contends that, on January 22, 2012, the Board met for a "Management update and discussion on the Company's business and financial status."  [JX 24, at p. 1].  "Ms. Eluz stated that two debenture holders' committees were formed – one to represent Series B debenture holders ('B Committee' and the other represents Series A and Series C debenture

holders ('A+C Committee')." Id.  and another to represent the B Holders ("B Committee").  Id.

Eluz further stated that "[o]n this date, according to Series B planned payment schedule, Ampal is

to pay the Series B debentures holders approximately US$27 million for principal, as well as US$5

million for interest.  Management's suggested solution for this matter is the repayment, at this

time, only of interest payments (US$5 million), without seeking release of funds held by the Series

B debenture trustee for such payments."  Id. at p. 2.

86.     Plaintiff contends that, at the conclusion of the January 22, 2012 meeting, the Board

"unanimously resolved" that:

> In accordance with the layout outlined by Ampal in a meeting of the
> holders of the Debentures held on January 1, 2012, Ampal, at this
> point, will postpone making principal payments currently coming
> due on the Debentures, but continuing interest payments as
> scheduled; and During the negotiations between Ampal and the
> elected Debenture holders' committees, Ampal will continue to
> make interest payments on the Debentures and will not seek release
> of funds held by the Debentures' trustees for payments.  However,
> in any final agreement between the Debenture holders and Ampal,
> the release of such finds held by the trustees will be necessary for
> Ampal to meet its future cash flow projections.

*Id.*, at p. 6.

87.     Plaintiff contends that, the Audit Committee, at a meeting on January 30, 2012,

discussed a "cost reduction plan," for Ampal in 2012 only, and Ampal proposed that Merhav's

management fee would be a flat fee of US $2.4 million, like the prior structure with the 2009

Management Agreement.

88.     Plaintiff contends that, at the January 30, 2012 Audit Committee meeting, Mr.

Morag requested "a summary of Merhav's employees work related to Ampal during 2011", but

Eluz failed to provide him with that summary and the record is devoid of any evidence to suggest

one was ever provided.  Mr. Morag has never provided testimony to the contrary.

89.     Plaintiff contends that the Audit Committee made no resolution at the January 30, 2012 meeting and did not discuss Merhav's management activities in 2011 or Merhav's management-related expenses in 2011.

90.     Plaintiff contends that Ampal, and specifically Eluz, knew that the Special Committee had not fixed or otherwise determined the amount of Merhav's compensation for 2011, but that approval from the Special Committee was required, as internal communications at Ampal in February and March 2012 reflected inquiries as to "whether a decision has been made for the amount of payment for 2011." Plaintiff contends that if the Audit Committee approved the compensation to Merhav in 2011, no such approval would be necessary.

91.     Plaintiff contends that the record establishes that Special Committee never met to discuss Merhav's compensation for 2011 or executed a unanimous consent that fixed Merhav's compensation for 2011, like had been done in 2010.

92.     Plaintiff contends that in early 2012 that Ampal was on the verge of bankruptcy, as Ampal and its Board was fully aware of, and Ampal's management was attempting to negotiate with the various debenture holders to avoid principal payments for two-years in exchange for various concessions, including, without limitation, significant reduction in costs, management fees, and salaries, among other things. Plaintiff contends that because Eluz had already caused Ampal to make quarterly payments in Merhav in 2011, and to avoid attention from the debenture holders regarding the 2011 payments, formal approval from the Special Committee was avoided to ensure that the debenture holders would not force a reduction in these management fees and the recoupment of the unauthorized payments to Merhav in 2011. Plaintiff further contends that PwC and Ampal were aware of the need for approval of the Special Committee for this related party transaction and the obligation to include reference to this in the 10-K for the year ending in 2011.

43382540

Plaintiff further contends that the Board, including the Special Committee members, were on notice from Mr. Henderson of their fiduciary duties to Ampal and potential liability stemming from authorizing insider transactions with related-parties. Therefore, Plaintiff contends that to avoid this issue with the Special Committee and to avoid the attention of the debenture holders, Eluz had Ampal include note 20 in the final draft of the 10-K for 2011 without informing the members of the Audit Committee who then approved the 10-K in 2011 without knowingly also disclosing the payment to Merhav of management fees in 2011 at the same rate fixed for management fees in 2010.

93.    Plaintiff contends that for every other related party transaction between Merhav and Ampal from 2009 through 2013, other than the payment of Merhav's management compensation or 2011, the Special Committee received information regarding the related-party transaction, a meeting was held regarding the related party transaction, the Special Committee discussed and made a decision regarding the related party transaction, and then the Special Committee authorized the related party transaction with in written minutes or written unanimous consent of the Special Committee.

94.    Plaintiff contends that in 2012 neither the Board, Audit Committee, and Compensation Committee discussed or approved Merhav's compensation for 2011, and that under corporate governance norms, no one but the Special Committee had the actual authority and ability to approve Merhav's compensation for 2011.

95.    Plaintiff contends that Ampal, in the beginning of 2012, was unable to make payments to the debenture holders as they became due. Ampal's lack of cash began internal discussions at Ampal about a bankruptcy filing as the B Holders themselves began asking questions about Ampal's cash reserves, its projects, and assets. Ampal's cash reserves in 2012 were

depleted in part as a result of Eluz's unauthorized payments to Merhav at a time when the company was on the verge of financial ruin.

96.     Plaintiff contends that based on the email communications on March 5, 2012 and March 6, 2012 between Lee Botvin, Yoram Firon, and Amit Mansur (all employees of Ampal and subordinates of Eluz) and Eluz, all parties copied to these communications clearly knew that the Special Committee had never approved the payment of Merhav's 2011 fees, that the Special Committee had never executed a unanimous consent approving those fees, and that a formal approval and unanimous consent from the Special Committee were needed.

97.     Plaintiff contends that, on March 5, 2012, the Board met for a "Management update and discussion on the Company's negotiations with the Debentures' Committees." [JX 110, at p. 1].   "Ms. Eluz reviewed the current status of discussion with the two debenture holders' committees – one representing the Series B debenture holders ('B Committee') and the other representing the Series A and C debenture Holders ('A+C Committee').   Currently, there are still no discussion with the A+C Committee, and there have been no changes since the Board's last meeting on February 26, 2012.  Ampal's Management ('Management') has been having discussion with the B Committee and there are currently three open issues: the Colombia Put Option …; a plan to sell Ampal's assets during the upcoming 12 months to increase Ampal's cash; and, Ampal's ongoing G&A expenses, including management fees to [Merhav] and investments in Ampal's subsidiaries.  Currently, no agreement has been reached on any of these three issues.  A meeting with the B Committee is scheduled for tomorrow, March 6, 2012." *Id.* at pp. 1-2.

98.     Plaintiff contends that, at this meeting, Mr. Henderson, Ampal's U.S. counsel, Mr. Henderson, "elaborated on the fiduciary duties and other duties of a corporation's board of directors under to the laws of the State of New York[.]  As long as the Company is solvent, the

duties are focused on operating the Company for the benefit of the shareholders, and when a company becomes insolvent, then the duties are focused on operating the Company for the benefit of the unsecured creditors of such corporation.  The Board must exercise due care and loyalty to the Company, and a thoughtful process when making its decisions." *Id.* at p. 3.  Mr. Vaknin then "commented that according to his understanding …, the NY courts would not take into account assets that cannot be sold, and currently, due to the situation in Egypt, EMG cannot be sold at a reasonable price, and therefore should be disregarded.  Therefore, Ampal's entire debt is bigger than its relevant assets." *Id.*

99.     Plaintiff contends that, "Ms. Eluz stated that should the Series B Resolution be approved, the debt to Series B will be due and payable two weeks from tomorrow, and at that time, Ampal will become insolvent." *Id.* at p. 4.

100.     Plaintiff contends that "Mr. Altit queried whether making the payment [to the Series C holders] will expose the members of the Board to claims from other creditors."  "Mr. Henderson answered that no such exposure is expected, assuming the Board utilizes due care and they do not allow payments to any related party at this point." *Id.*  He further explained that "[t]he Board should make an informed, thoughtful decision regarding what should be done with the Company's cash at this point." *Id.*

101.     Plaintiff contends that, thereafter, the Board "unanimously resolved" that "a. Ampal intends to make the Series C Interest Payment, if the Series B Resolution is not approved; and[,] b. If the Series B Resolution is approved, the Series C Interest Payment will be postponed until it is clear to Ampal if the Series B Resolution to accelerate the entire debt to the Series B Debenture holders and set it to immediate payment will be implemented or not; and[,] c. To disclose these resolutions as soon as practicable." *Id.* at p. 6.

43382540

102.    Plaintiff contends that on March 11, 2012, the Audit Committee met to discuss EMG's valuation and PwC's concerns.  PwC sought clarification on the applicability of the valuations in light of EMG's issues, as well as the appropriate tax treatment – either 0% or 20%. After discussions, the Audit Committee concluded that the valuations were relevant and reasonable, and further directed management to re-evaluate the assumptions to ensure they are appropriately conservative.  At the March 11, 2012 meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

103.    Plaintiff contends that on March 14, 2012, Ampal's counsel in connection with the debenture holder negotiations e-mailed Ampal's management regarding certain questions and requests for documents from the debenture holders, which included questions regarding Merhav's management compensation.  Eluz responds to the questions as requested by counsel in red type. *Id.*  Ultimately, the answer Ampal's counsel provided to the B Holders was, in relevant part:

> Regarding your request to pay management fees to Merhav in accordance with details of the work performed: this is determined by a special committee of the board of directors, which determines participation in the expenses of Merhav every year, according to the information presented to it.

104.    Plaintiff contends that the Ampal's counsel's and Eluz's answer to the B Holders are false, as the Special Committee never received information presented to it from Ampal's management regarding Merhav's expenses for 2011, nor did the Special Committee actually "determine" the amount of Ampal's "participation in the expenses of Merhav" for 2011.

105.    Plaintiff contends that, on March 22, 2012, Mr. Firon sent the Audit Committee "notice" that "a meeting of the Audit Committee will be held on March 25, 2012 at Ampal's offices in Herzliya, Israel, on 11:00 Israel time" and that the "Agenda of the meeting will be: a. Discussing

and approving the 10-K Report and the Financial Statements as of December 31, 2011 (Draft attached); b. Approving the minutes of the meetings held on November 28, 2011, January 30, 2012, and March 11, 2012 (Drafts attached); c. miscellaneous. [JX 29, at p. 105]].

106.   Plaintiff contends that, on March 25, 2012, the Audit Committee met for a "discussion and approval of the Form 10-K reports for the year 2011." [JX 112, at p.1]. During the meeting, Ms. Eluz noted that the 10-K "Report will not be approved at this Meeting, as there are still few open issues that are under discussion." *Id.* Ms. Eluz further noted that "the Committee will first hear the report by Ampal's management ('Management') and later on the report and comments of Ampal's auditing accountants." *Id.* "Mr. Vaknin informed that the documents sent to the Committee for its review were sent only recently [three days prior], and that the Committee should have more time in the future to review the financial statements." *Id.* "Ms. Eluz concurred and stated that as she has to go abroad, and since Ampal I snow in the midst of changing controlling, this Meeting had to be held today, while keeping in mind that the Committee did not have a prolonged time to study the statements, and that they will have additional time, as the Reports is not to be approved today." *Id.* at p.2.

107.   Plaintiff contends that Ampal's new controller, Nir Bernstein, "reviewed Ampal's financial statements for 2011 in accordance with the presentation attached hereto as ANNEX A. He reviewed Ampal's major events during 2011: the sale of 012 Smile, the events in Egypt and Ampal's inability to pay its debts to its debenture holders. He continued to review Ampal's solo balance sheet, Ampal's equity decrease, Ampal's cash and Ampal's Profit and Loss Report for December 31, 2012." *Id.* at p. 2.

108.   Plaintiff contends that Mr. Gleit of PWC reviewed the audit performed by PWC of Ampal's 2011 financial statements and "informed the Committee that the external auditors did not

43382540

find any material errors in the Report and do not have any material comments to it, but there are still a few open issues, concerning Gadot's valuation." *Id.* at pp. 3-4. Ultimately, Ms. Eluz "stated that the Committee will be reconvened on Tuesday morning, to approve the final revised Report, after all of the open issues will be [*sic*] settled," and "[n]o Resolution was made at this point." *Id.* at p. 4.

109.    Plaintiff contends that, on March 26, 2012, Mr. Firon an e-mail with the "latest draft of the 10K" to Bryan Cave, which was identified in the e-mail's "attachments" as "Ampal 10-K – 2011 – Draft 4.doc." [JX 48, at p. 1]. Mr. Firon explained that "we **must** send it to the Edgar agent for XBRL process tomorrow morning in Israel to meet the filing deadline date of March 29th." *Id.*(emphasis in original). In the attached draft, among other things, the revisions included "Note 20 – Transactions with related parties." *Id.* at p. 99. Specifically, the note read:

> **Note 20 – Transactions with related parties**
>
> a)    The Company entered into a management services agreement with Merhav, according to which Merhav provides the Company and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration in the year ended December 31, 2011 of NIS 24.2 million ($6.6 million).
>
> b)    The Company entered into an Aircraft Sharing Agreement with Merhav, according to which the Company has a limited and non exclusive right to use the Aircraft possessed and operated by Merhav. For the usage of the Aircraft, the Company will pay paid Merhav a pro rata share of the fixed costs related to the Aircraft (calculated annually based on the flight hours of the Aircraft used by the Company compared to the total flight hours of the Aircraft, with a maximum amount of $500,000 per annum) and the direct costs and expenses of operating each flight for the Company.
>
> c)    For information regarding Option Agreement with Merhav for Sugarcane Ethanol Project in Colombia, see Note 3a1.
>
> d)    On July 1, 2010, Gadot completed the acquisition of all of the issued share capital of Merhav Agro Ltd. ("Agro") from Merhav. Agro is a supplier of plant protection products, plant growth regulators and seeds in Israel. See also Note 3a5

*Id.*

110.    Plaintiff contends that, on March 27, 2012, at 10:10 AM, Mr. Firon e-mailed Audit Committee Chairman Vaknin (with copy to Eluz), with the subject line "FW: Additional disclosures in the financial statements" and stated that "[f]ollowing our conversation, attached is a file that we received tonight at 2 AM from [PwC], requesting further disclosures regarding EMG's valuation."  [JX 30, at p. 10].  Mr. Firon also stated "[p]lease note, as the chairman of the audit committee, that to meet the deadline for submitting the report on Friday [March 30, 2012], we are required to send the Edgar agent the final report by this afternoon for the XBRL report. After the report is submitted for XBRL, no changes can be made at all."  *Id.*

111.    Plaintiff contends that, the attached file was named "The following items should be disclosed.zip", *id.* at  p. 11, and stated: "The following items should be disclosed – some of which could go in the discussion about critical accounting estimates vs. note 2 in the financial statements:"

1. What percentage of the gross profit assumptions are based on contracted amounts – again, seems like this should be disclosed.  To the extent that they are not contractual, what support does the company have for the price?  What currency are the contracted denominated in – US dollars?
2. Has consideration been given that the cost of the gas could be increased?  Regardless, it would seem this point should be disclosed.
3. Discount rate and reductions in gross profit by percent for 2012, 2013 and 2014.
4. It would seem worthwhile for the company to disclose the discounted cash flow presumptions for the next 5 years or so years and thereafter so a reader can see the cash flows.
5. Projections assume that an increasing percentage of gas will be delivered and that those percentages are above the recent levels of delivery.
6. Assumptions around the tax scenario that the Company used in the valuation.

7.    Possible pricing changes that the government of Egypt could impose upon the company.

8.    The use of the word "independent" valuations, while the valuation is largely based on the Company's assumptions.

9.    Political climate in Egypt, including – if factually correct – the Vote of the parliament and how this could impact the valuation

10.   Explain how the discount rate was determined. The explanation should explain as to why it is not higher. In that regard, it does not seem that the points listed on page 17 of the Houlihan report drive the risk – e.g., risk of attacks and the Egypt could increase the price. If the view is that this discount rate reflects only the risks once the gas is delivered into Israel, please help us understand how a why these (and other) risks should not be factored into the rate. The disclosure should address these points.

11.   Explain how much cash the Company have received during the last three years. How come they have not received anything?

12.   The company should indicate the amount or range that the company expects the price will increase in the years to come - e.g., profit will be impacted.

13.   The company should disclose the percentage of gas that they assume will be obtained in 2012, 2013 and 2014 and beyond and how much was received in 2011 and through the issuance date.

*Id.* at p. 3.

112.    Plaintiff contends that, thereafter, Mr. Vaknin forward this e-mail from Mr. Firon, with copy to Mr. Firon, to the other members of the Audit Committee and stated:

> Please see below. The dispute with the auditors may result in a delay in publication of the annual report on time. I instructed the legal counsel to try and to agree with the maximum disclosure requirements of the US auditors, provided of course that this information does not harm the company. For your information I will keep you updated if there is any news on the matter.

*Id.* at p. 9.

113.    Plaintiff contends that, on the following morning of March 28, 2012, Mr. Firon responded to the Audit Committee and stated:

> Tonight, after expanding the disclosure about EMG's valuation, we were able to complete the auditor's review of the financial

statement. The national office confirmed that it had also completed the procedure from its point of view.

We submitted the report for the XBRL process last night [March 27, 2012], and I hope (and I have a reasonable basis to believe) that we will meet the deadline for submitting the report on Friday.

We will send the final report to you this morning [March 28, 2012], with the changes compared to the draft that was presented at the last meeting, and we will schedule conference calls for the audit committee and the board of directors to approve the report today [March 28, 2012].

*Id.*, at p. 9.

114.    Plaintiff contends that, at 12:10 PM on March 28, 2012, Ampal sent an e-mail to members of the Board, the Audit Committee, and PwC stating "Attached is material for tonight's conference call at 9:00 PM (audit committee) and the board of directors' conference call at 21:10 PM." "For your convenience, the final version of the financial statement is attached, as well as a document comparing the final version with the previous version sent to you." *Id.* at 5.  The e-mail included an "attachments" line that identified several documents, including "Ampal 10-K – 2011 – Draft 7 – marked comparison for directors.doc" and "Ampal 10K – 2011 – Final draft to Directors.docx." *Id.*

115.    Plaintiff contends that, on March 28, 2012, the Audit Committee convened to discuss and approve Ampal's 10-K for the fiscal year ended December 31, 2011. [JX 114, at p. 1].  During the meeting, "Ms. Eluz stated that since the Committee's last meeting on Sunday, March 25th, the Company's management and auditors discussed the 10-K report for the year ended December 31, 2011 ('Report'), and that the Report was amended to include the items requested by the auditors, as discussed on Sunday." *Id.* at p. 1. "Mr. Gleit [of PWC] stated that he has no further comments, and that the auditors received the revised Report, and that they find it satisfactory," and "Mr. Vaknin proposed to approve the latest draft of the Report." *Id.*   Thereafter, the Audit

Committee "unanimously resolved: [t]o approve the Financial Statements and the 10-K Report of the Company for the quarter ended December 31, 2011." *Id.* at p. 2.

116.    Plaintiff also contends that, on March 28, 2012, Ampal's Board met "to approve the Form 10-K Report for the year ended December 31, 2011 ('Report'), which was approved by Ampal's Audit Committee before this Meeting[.]" [JX 115]. "Mr. Vaknin informed the members of the Board that the Company's Audit Committee had reviewed the Report, and approved it unanimously a few minutes ago, after some additional work done in the last few days by PWC and management." (*Id.* at p. 2.)  Thereafter, the Board "unanimously resolved: [t]o approve the Financial Statements and the Form 10-K Report of the Company for the year ending December 31, 2011." *Id.*

117.    Plaintiff contends that the draft of the 10-K sent by Ampal's management on March 22, 2012, along with an agenda, to the Audit Committee members in preparation for  the audit and board meetings scheduled for 11 a.m. on March 25, 2012 did not include any reference to Merhav's management compensation for 2011, or that it was an issue to be discussed.

118.    Plaintiff contends that at the March 25, 2012  Audit Committee meeting, the Audit Committee did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

119.    Plaintiff contends that at the March 25, 2012 Board meeting, Eluz announced an agreement in principle with the B Committee, which included a certain payment to them, concessions by Ampal and Maiman, Maiman waiving a salary for two years, and providing the B Committee – not Ampal or the Special Committee – with the right to exercise Ampal's Put Option regarding the Ethanol Project in Colombia.  In addition, the meeting also focused on Ampal's 10-K for 2011 as Eluz explained that there were still open issues to resolve. Other than discussing

60

Ampal's "inability to pay its debt to its debenture holders" and that a "going concern" notice regarding Ampal will be included in the 10-K, the outstanding issue was that PPT's valuation of EMG was lower than Ampal's valuation and the valuation from Houlihan Lokey. No resolution was made at this time on this issue. At the March 25, 2012 meeting, the Board did not discuss Merhav, Merhav's management activities in 2011, or Merhav's management-related expenses in 2011.

120.    Plaintiff contends that on March 25, 2012, Nir Bernstein e-mailed Eluz to tell her that PwC is requiring additional, non-EMG, disclosures regarding related party transactions, including Merhav's management fee and the aircraft sharing agreement. Eluz questioned this obligation, and conferred with Firon and discussed the past disclosure in the Proxy but that PwC is requiring the disclosure in the annual report. Ultimately, Eluz responded to Nir Bernstein and told him to "[p]repare both, there is no choice." Neither this exchange, nor the issue regarding the additional disclosure regarding Merhav's management fee and the aircraft agreement, was ever discussed with the Special Committee (or the Audit Committee), nor was the Audit Committee alerted to this additional disclosure prior to its approval of the 10-K on March 28, 2012.

121.    Plaintiff contends that Note 20 in Ampal's Form 10-K for the year ending 2011 is unique to this 10-K, and Ampal did not include this "Note 20 – transactions with related parties" in any of its previous 10-Ks. Further, note 20 conflicts with the disclosure in Part III, Item 13 of the 10-K, which explains that information regarding "related transactions" is "hereby incorporated in this Annual Report on Form 10-K by reference to our Proxy Statement, to be filed with the SEC within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, for our annual meeting of stockholders to be held in 2012."

122.    Plaintiff contends that 10-K filed on or about March 28, 2012 did not qualify as an approval or authorization of the management fee for Merhav for 2011 and, even if it could (which Plaintiff disputes) it was not knowingly done by the Audit Committee, it was a task for the Special Committee, and regardless, the independent directors had not received complete information regarding Merhav's expenses and services in 2011 necessary to make that decision to approve and fix Merhav's compensation for management services in 2011.

123.    Plaintiff contends that because the Special Committee consists of independent directors who did not work at Ampal and did not regularly have access to company information, these directors were reliant upon Eluz (and her management team at Ampal) to provide them the relevant information as to Merhav's work, services, and expenses in 2011, in order for them to have sufficient information to determine Merhav's management fee for 2011, pursuant to the 2010 Management Agreement.

124.    Plaintiff contends that the independent directors served different functions and undertook different actions depending on whether they acted as members of the Audit Committee or the Special Committee.  For the most part, the Audit Committee was focused on supervising the preparation and approval of Ampal's financial statements for submission to the SEC, as well as dealing with other major financial issues, such as the EMG crises and the debenture issues.  The sole purpose of the Special Committee was to address transactions and approve (or disapprove) of those transactions between Ampal and related-parties, such as Maiman and Merhav, due to the inherent conflict of interest present due to Mr. Maiman's ownership of both.

125.    Plaintiff contends that Eluz was obligated, in order to appropriately satisfy her fiduciary duties to Ampal, to bring the issue of Ampal's payment of management fees to Merhav in 2011 to the Special Committee, even if the Audit Committee and the Special Committee were

comprised of the same individuals. Eluz's obligation was both due as a result of the 2010 Management Agreement itself, and because this was the sole reason for the formation of the Special Committee, which Eluz knew.

126.  Plaintiff contends that any decision by the Special Committee had to be formally made and recorded in the minutes or by written unanimous consent, as the Special Committee had done with every other decision before and after the issue of Merhav's compensation for 2011. The record is devoid of any approval by the Special Committee of Ampal's compensation to Merhav in 2011, as Mr. Vaknin also concedes.

127.  Plaintiff contends that Eluz breached her fiduciary duties of care and loyalty to Ampal by causing Ampal to make unauthorized quarterly payments to Merhav in 2011 totaling 24,157,000 NIS.

128.  Plaintiff contends that the damages to Ampal as a result of Eluz's breach of her fiduciary duties to Ampal totals 24,157,000 NIS, which is the amount of the unauthorized payments, plus interest at the New York statutory rate of nine (9%) percent per annum.

129.  Plaintiff contends that, on August 29, 2012, Ampal filed its voluntary petition for Chapter 11 bankruptcy protection.

130.  Plaintiff contends that, on September 25, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").

131.  Plaintiff contends that, on December 27, 2012, the Special Committee met to discuss related party transactions of Ampal, including the payment of Merhav's management fee. [JX 61]. At the meeting, Ampal's management recognized that "it is appropriate for the Special Committee to review the current level of compensation and services to determine the appropriate amount for Merhav to be compensated." Thereafter, the Special Committee "unanimously

43382540

resolved" that "the Company's Management will provide the Committee with a summary of the expected services to be received from Merhav during Q1/2013, and their respective costs/values, and that the Company's attorneys will provide their written views on the matter of the Committee's autonomy in this matter, all in order for the Committee to fully and thoroughly review the matter of the Management Fees to be paid to Merhav for its services during Q1/2013." *Id.*

132.    Plaintiff contends that, on April 8, 2013, the Court ordered the appointment of a Chapter 11 trustee and the Office of the U.S. Trustee thereafter designated Michael Luskin as Chapter 11 trustee.

133.    Plaintiff contends that Michael Luskin, as Chapter 11 trustee, moved to convert this case to Chapter 7 on the grounds that, among other things, the Debtor was administratively insolvent.

134.    Plaintiff contends that, by Order dated May 2, 2013 (the "Conversion Date"), the Court converted the case to one under Chapter 7.

135.    Plaintiff contends that, on May 3, 2013, the Office of the U.S. Trustee appointed Alan Nisselson as interim Chapter 7 trustee.

136.    Plaintiff contends that, on May 20, 2013 (the "Election Date"), Alex Spizz was elected Chapter 7 Trustee of the Debtor pursuant to section 702 of the Bankruptcy Code and was duly qualified thereafter.

137.    Plaintiff contends that, on August 27, 2014, Spizz commenced this adversary proceeding.

**B.    Plaintiff's Contentions – SEC Filings[2]**

---

[2] At the final pre-trial conference held on June 27, 2022, the parties stipulated that all Ampal SEC filings are deemed admissible, true, and accurate for use at trial, subject to either parties' right to assert a good faith challenge thereto based on either accuracy or completeness.

43382540

1.      **Ampal's Financial Performance from January 1, 2008 through September 30, 2012**

138.    "The Company recorded a consolidated net loss of $16.7 million for the fiscal year ended December 31, 2008, as compared to a net income of $7.8 million for the same period in 2007.  The decrease in earnings is primarily attributable to the gain on sale of discontinued operations in 2007, the increase in interest expense and increase in the Israeli consumer price index that the Company's debentures (issued in 2008) are linked to."  [JX 69, at p. 39].

139.    "The Company recorded a consolidated net loss of $20.8 million for the fiscal year ended December 31, 2009, as compared to a net loss of $16.7 million for the same period in 2008. The decrease in earnings is primarily attributable to gain from the repurchase of the Company's debentures in 2008." [JX 9, at p. 39].

140.    "The Company recorded a consolidated net loss of $44.7 million for the fiscal year ended December 31, 2010, as compared to a net loss of $19.5 million for the same period in 2009. The increase in losses in 2010 is primarily attributable to the interest expenses resulting from the loans obtained for the financing of the purchase of 012's, ADPO's and Agro's business, depreciation of the intangible assets and the translation loss." [JX 74, at p. 27].

141.    "The Company recorded a consolidated net loss of $95.3 million for the fiscal year ended December 31, 2011, as compared to a net loss of $44.7 million for the same period in 2010. The increase in losses in 2011 is primarily attributable to the impairment of the investment in EMG and increase in income tax expenses (resulting from decrease in deferred income taxes) in the amount of $100.9 million and $14.1 million, respectively, offset by a $28.9 million capital gain that was recorded from the sale of 012 Smile Telecom Ltd. ("012 Smile") and translation gain in the amount of $21.7 million." [JX 116, at p. 30].

142.    "The Company recorded a consolidated net loss of $221.1 million for the nine months ended September 30, 2012, compared to a net loss of $42.3 million for the corresponding period in 2011. The loss in the period ended September 30, 2012 is primarily attributable to the impairment of the investment in EMG in the amount of $260.4 million (including noncontrolling interest), as compared to a $50.5 million loss in the corresponding period in 2011." [JX 130, at p. 27].

**2.    Ampal issued debentures between November 2006 and September 2010**

143.    "On November 20, 2006, the Company entered into a trust agreement with Hermetic Trust (1975) Ltd. pursuant to which the Company issued Series A debentures to institutional investors in Israel in the principal aggregate amount of NIS 250 million (approximately $58 million) with an interest rate of 5.75%, which is linked to the Israeli consumer price index. The notes shall rank pari passu [i.e., on equal footing] with our unsecured indebtedness.  The notes will be repaid in five equal annual installments commencing on November 20, 2011, and the interest will be paid semi-annually."  [JX 103, at p. 22].

144.    "On April 29, 2008 the Company completed its Series B debenture offering in Israel. Ampal accepted subscriptions in the amount of NIS 577.8 million (approximately $165.7 million) for its Series B debentures. The debentures are linked to the Israeli consumer price index and will carry an annual interest rate of 6.6%. The notes shall rank pari passu with our unsecured indebtedness. The notes will be repaid in five equal annual installments commencing on January 31, 2012, and the interest will be paid semi-annually." *Id.* at p. 23.

145.    On September 13, 2010, Ampal completed a public offering in Israel of NIS 170.0 million (approximately $45.0 million) aggregate principal amount of its Series C debentures, due in 2019. The debentures are linked to the CPI and carry an annual interest rate of 6.95%. The Series

C debentures rank pari passu with Ampal's unsecured indebtedness. The debentures will be repaid in six equal annual installments commencing on September 7, 2014, and the interest will be paid semi-annually." [JX 104, at p. 20].

3.   **Explosion and Disruption of Service of EMG**

146.   Ampal first reported EMG's interruption of service in an exhibit to an 8-K filed on March 11, 2011. [JX 15]. In this exhibit, Ampal explained that "[t]he gas supply suffered a supply interruption from February 5th, 2011 to March 15th, 2011, due to an explosion and subsequent fire in a facility of GASCO (the Egyptian gas transport company) which is part of a pipeline leading to Jordan, Lebanon and Syria, located some 30 kilometers (about 18.6 miles) from EMG's pipeline." *Id.* at Exhibit 99.2, at p. 9.

4.   **Meetings and Actions of Special Committee in 2011**

147.   "The Special Committee held one meeting and acted once by written consent during the fiscal year ended December 31, 2011." [JX 73, p. 12].

5.   **Ampal's Board and Committee Meetings, SEC Filings, and Bankruptcy Filing in 2012**

148.   "On January 1, 2012, [Ampal] held a meeting of holders of the Company's debentures traded on the Tel-Aviv Stock Exchange (the "Meeting"). In addition, on January 1, 2012, the Company made available on its website (www.ampal.com) the presentation in Hebrew presented by the Company at the Meeting. A translation to English of the full text of the Presentation is furnished as Exhibit 99.1 and is incorporated herein by reference. [JX 23].

149.   In Exhibit 99.1, Ampal concluded that: i) "Ampal should get ready for a period of at least two years in which Ampal's main use of its cash will be designated for the strengthening and securing its current assets" and ii) "During the next two years there will be a need for a special

managerial effort of Ampal's management, and an allegation of financial resources for handling EMG's situation at two levels: Political-Commercial and Legal, and for the strengthening of Gadot." *Id.* at p. 12.

150.    Further, Ampal disclosed "Financial Debt Payments During 2012-2013, assuming two-year postponement of Principal Payments" and stated that Ampal's "[e]stimated cash balance at January 1st, 2012 – approximately US$60 million", "[e]xpected interest payments for debentures' holders during 2012-2013 – approximately US$32 million", and "[e]xpected payments for banks during 2012-2013 – approximately US$20 million." *Id.* at p. 18.

151.    On January 26, 2012, Ampal filed an 8-K that indicated a January 22, 2012 press release stating that the "Company, at this point, will postpone making the principal payments currently coming due on the [Series A, Series B and Series C Debentures], but [will] continue making interest payments as scheduled." [JX 25, at p. 5].

152.    "On February 23, 2012, [Ampal] provided an undertaking (the 'B Undertaking') to the representatives (collectively, the "B Debenture Representatives") of the B Holders" and "agreed to certain restrictions on its operations", which included, among other things: (d) "neither the Company nor any of the Controlled Entities will make any payments to the controlling shareholder of the Company, his relatives or any entities owned or controlled by him and/or his relatives (other than with respect to certain existing and ongoing transactions), without the prior written consent of the B Debenture Representatives." [JX 116, at pp. 37-38.].

153.    "On March 6, 2012, [holders of Ampal's Series B Debentures] voted to accelerate and set to immediate repayment [of] the entire outstanding amounts under the Debentures." [JX 27, at p. 2]. "The acceleration will be effective two weeks after March 6, 2012, unless an additional two-week extension is granted by the committee[.] *Id.* "Additionally, the [holders of Ampal's

Series B Debentures] voted to authorize the commencement of legal actions and other measures

… to collect the principal payment which was due on January 31, 2012 and which [Ampal] did

not make[.]"  *Id.*  The [holders of Ampal's Series B Debentures] also voted to empower the

Committee to continue negotiations with [Ampal] to settle payments to the [holders of Ampal's

Series B Debentures] and/or to restructure the Debentures, to protect [their rights] and to receive

all required information from [Ampal] regarding its financial status and its ability to meet its

obligations."  *Id.*

154.    "On April 4, 2012, [Ampal] announced that [Ampal] ha[d] reached an agreement

in principle on a proposed outline for arrangement (the 'Term Sheet') with the Series B Committee.

The Term Sheet sets out the proposed guiding principles for a detailed agreement to modify the

terms of all of the Debentures.  According to the Term Sheet, Ampal will postpone all of the

principal payments due to the Debenture holders by two years, and will continue to make interest

payments due to all of its Debentures, in accordance with the original amortization schedule.  The

Term Sheet provides that the postponement on the principal payments was provided in

consideration for, among other things, (i) Ampal (A) issuing warrants for equity to the Debenture

holders, (B) providing additional security and liens to the Debenture holders, (C) reducing its

operating expenses and management fees paid (including Mr. Maiman, the Chairman, CEO and

President, not being paid a salary during the postponement period) and (D) being subject to

additional financial covenants, including restrictions on investments, and (ii) the controlling

shareholder group (A) agreeing to make additional capital contributions to Ampal, (B) providing

a security interest in the Sugarcane Ethanol Project and (C) providing the Debenture holders with

the right to cause Ampal to call the loan it made in connection with the Sugarcane Ethanol project."

[JX 129, at p. 13].

155.    "On July 17, 2012, [Ampal] announced that it published a new proposed outline for arrangement (the 'New Term Sheet') to be voted on by the Debenture holders by ballot in the upcoming days.  The New Term Sheet sets out the proposed guiding principles for a detailed agreement to modify the terms of all of the outstanding Debentures. The New Term Sheet reflects the ongoing negotiations with the committees formed by the Holders." *Id.* at p. 14.  "If the New Term Sheet is adopted, various court approvals, registration statements and a detailed Debenture holders' consent will be required." *Id.*

156.    "According to the New Term Sheet, [Ampal] the Company w[ould] postpone all of the principal payments due to all of its Debentures by two years (the 'Postponement Period'), starting in December 2011." *Id.*

157.    "The New Term Sheet include[d] various undertakings to be taken by both [Ampal] and by its controlling shareholder group upon final agreement, including, among others: … (15) During the Postponement Period, [Ampal] will not make any out-of-the-ordinary-course-of business transactions with its controlling shareholder group, without the prior consent of the Debenture holders;" and "(23) During the Postponement Period, [Ampal]'s general and administrative expenses, including management fee payments to one of the members of the controlling group and payments to [Ampal]'s CFO will be reduced substantially. Should one of the three milestones detailed in Section 21 above occur, a sum of $250,000 out of the reduced sum as aforesaid will be paid to that member and to the CFO[.]" *Id.*

158.    Plaintiff contends that, on April 3, 2013, Ampal filed a Form 8-K stating that, on or before April 9, 2013, "Revital Degani, Irit Eluz, Leo Malamud, Erez Meltzer, Menahem Morag, Sabih Saylan and Daniel Vaknin" "were resigning from their positions as directors of the

43382540

Company" and that "Nir Bernstein, Irit Eluz, Yoram Firon and Amit Mantsur" "were resigning
from their positions as officers with the Company[.]"  [JX 3, at p. 2].

## C.  Defendant's Contentions

1.  Ms. Eluz contends that she did not breach her fiduciary duties to Ampal in any way
in connection with the quarterly management fees paid to Merhav in 2011.

2.  Ms. Eluz contends that, at all relevant times, she acted lawfully, in good faith, in
accordance with her best business judgment, in accordance with her fiduciary duties as Ampal's
CFO, in accordance with the 2010 Management Agreement, and in Ampal's best interests.

3.  Ms. Eluz contends that on December 19, 2010, Ampal's Independent Directors
unanimously resolved to approve the 2010 Management Agreement, and on December 30, 2010,
the Independent Directors signed a written consent approving the 2010 Management Agreement.

4.  Ms. Eluz contends that the quarterly management fees paid to Merhav in 2011
pursuant to the 2010 Management Agreement were either explicitly or implicitly approved, or
explicitly or implicitly ratified, by Ampal's Independent Directors, as evidenced by Ampal's
financial statements, financial presentations made to the Independent Directors, Board and
Committee meeting minutes, public filings, and other materials.

5.  Ms. Eluz contends that the Trustee's breach of fiduciary duty claim is barred by the
Independent Directors' approval and/or ratification of the 2011 payments, as evidenced by
Ampal's financial statements, financial presentations made to the Independent Directors, Board
and Committee meeting minutes, public filings, and other materials.

6.  Ms. Eluz contends that the Independent Directors were, at or around the end of the
first quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the first
quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the

Independent Directors, Board and Committee meeting minutes, public filings, and other materials. Ms. Eluz further contends that the Independent Directors were, at or around the end of the first quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the following three quarters of 2011.

7.      Ms. Eluz contends that at or around the end of the first quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the first quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

8.      Ms. Eluz contends that the Independent Directors were, at or around the end of the second quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the second quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials. Ms. Eluz further contends that the Independent Directors were, at or around the end of the second quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the following two quarters of 2011.

9.      Ms. Eluz contends that at or around the end of the second quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the second quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

10.      Ms. Eluz contends that the Independent Directors were, at or around the end of the third quarter of 2011, fully aware of the quarterly management fees paid to Merhav in the third

43382540

quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials. Ms. Eluz further contends that the Independent Directors were, at or around the end of the third quarter of 2011, fully aware that quarterly management fees were going to be paid to Merhav in the fourth quarter of 2011.

11.     Ms. Eluz contends that at or around the end of the third quarter of 2011, the Independent Directors either approved or explicitly or implicitly ratified the quarterly management fees paid to Merhav in the third quarter of 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

12.     Ms. Eluz contends that the Independent Directors were, at all relevant times, fully aware of the totality of the quarterly management fees paid to Merhav in 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

13.     Ms. Eluz contends that at or around the end of 2011, the Independent Directors either approved or explicitly or implicitly ratified the totality of the quarterly management fees paid to Merhav in 2011, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

14.     Ms. Eluz contends that the Independent Directors, sitting on Ampal's Board of Directors, Audit Committee, and Special Committee, carefully reviewed and approved Ampal's publicly-filed quarterly and annual financial statements for 2011, each of which includes references to the services provided by Merhav on Ampal's behalf and the quarterly management

43382540

fees paid to Merhav in 2011, as evidenced by the Board and Committee meeting minutes, the public filings, the financial statements, and other materials.

15.     Ms. Eluz contends that Ampal's Special Committee and/or Ampal's Audit Committee, which consisted of the same Independent Directors, were charged with the oversight and approval of related party transactions, as evidenced by Ampal's financial statements, financial presentations made to the Independent Directors, Board and Committee meeting minutes, public filings, and other materials.

16.     Ms. Eluz contends that to the extent the Independent Directors required information to meet their obligations in reviewing/approving Ampal's public filings or for any other reason, they could and did request that information from Ampal's management.

17.     Ms. Eluz contends that to the extent the Independent Directors requested any information or documentation from her in 2011, she provided that information and documentation in a timely manner.

18.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, did not prohibit Ampal from making quarterly management fee payments to Merhav throughout 2011, and indeed, it did not provide any express instructions as to the timing of those payments.

19.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, automatically renewed unless one party provided notice of termination.

20.     Ms. Eluz contends that the 2010 Management Agreement, by its plain terms, allows for quarterly management fee payments subject to "adjustments as [the parties] agree may be reasonably appropriate in light of the work performed or to be performed by Merhav."

43382540

21.     Ms. Eluz contends that the quarterly management fees paid to Merhav in 2011, totaling NIS 24.2 million ($6.6 million), were entirely reasonable, fair, and provided value and benefit to Ampal.

22.     Ms. Eluz contends that Merhav provided more services, spent more time providing those services, and incurred higher expenses in 2011 than in 2010 due to, among other things, the need to address the fallout from the terrorist attack on the Egyptian gas pipeline that supplied gas to one of Ampal's largest investments, East Mediterranean Gas Company, S.A.E. ("EMG"). Ms. Eluz further contends that Merhav, who managed Ampal's projects in 2011, was critical in addressing these and related issues and spent significant time and expense in doing so.

23.     Ms. Eluz contends that the services and expenses incurred by Merhav on behalf of Ampal in 2011 were greater than the services and expenses incurred by Merhav on behalf of Ampal in 2010 for which Merhav was compensated NIS 24.2 million ($6.6 million).

24.     Ms. Eluz contends that on January 30, 2012, the Independent Directors, sitting as Ampal's Audit Committee, were presented with the amount of the management fee paid to Merhav in 2011, as evidenced in the Audit Committee meeting minutes and accompanying exhibit. With full knowledge of the amount of the management fee paid to Merhav in 2011, the Independent Directors knowingly decided not to adjust Merhav's management fee for 2011.

25.     Ms. Eluz contends that the decision whether to conduct a formal reconciliation and/or adjust Merhav's management fee for 2011 was the sole responsibility of the Independent Directors, not Ms. Eluz.

26.     Ms. Eluz contends that the Independent Directors were, at all relevant times, fully aware that: (i) Ms. Eluz previously served as Associate Chief Financial Officer of Merhav; and (ii) Mr. Maiman controlled Ms. Eluz's compensation.

27.     Ms. Eluz contends that she did not receive a direct financial benefit from the quarterly management fees made to Merhav in 2011, and her compensation was not contingent on the management fees paid to Merhav in 2011.  In 2011, Ms. Eluz received less total compensation than she received in 2010.  Ms. Eluz did not receive a cash bonus in 2011.

28.     Ms. Eluz contends that Ampal's external auditors at PricewaterhouseCoopers ("PWC") reviewed each of Ampal's financial statements for 2011 and found no material errors and had no material comments, as evidenced by the Board and Committee meeting minutes.

29.     Ms. Eluz contends that Ampal did not sustain any loss, damage, harm, or detriment of any kind as a result of the quarterly management fees paid to Merhav in 2011, including with respect to any alleged conduct by Ms. Eluz.

30.     Ms. Eluz contends that to the extent it is found that Ampal did sustain any loss, damage, harm, or detriment of any kind as a result of the quarterly management fees paid to Merhav in 2011, Ampal's Independent Directors failed to mitigate such damages by failing to object to and/or take action to stop or claw back the payments upon becoming aware of them and/or upon becoming aware that Ampal intended to make management fee payments to Merhav in each quarter of 2011.

31.     Ms. Eluz contends that any action or inaction by the Independent Directors cannot serve as the basis for liability against Ms. Eluz.

32.     Ms. Eluz contends that any alleged decisions or other conduct by her as Ampal's CFO are shielded by the business judgment rule.

## V.    ISSUES TO BE TRIED -  Disputed

## A.    Plaintiff's Proposed Issues

43382540

1.      Whether the Special Committee approved Ampal's payment to Merhav in 2011 of management fees totaling 24,157,000 NIS in accordance with the 2010 Management Agreement.

2.      Whether Defendant Eluz breached her fiduciary duties of care and loyalty in authorizing Ampal's payments to Merhav in 2011.

3.      The amount of damages stemming from Eluz's breach.

**B.      Defendant's Proposed Issues**

1.      Whether Ms. Eluz breached her fiduciary duties to Ampal in connection with Ampal's payment of quarterly management fees to Merhav in 2011;

2.      Whether the alleged decisions or other conduct by Ms. Eluz, acting as Ampal's CFO, are shielded by the business judgment rule presumption;

3.      Whether Ms. Eluz was self-interested in connection with the quarterly management fees paid to Merhav in 2011;

4.      Whether Ampal's Independent Directors expressly approved the quarterly management fees paid to Merhav in 2011;

5.      In the event it is found that Ampal's Independent Directors did not expressly approve the quarterly management fees paid to Merhav in 2011, whether the Independent Directors knowingly ratified payment of the quarterly management fees to Merhav in 2011;

6.      Whether, throughout 2011, Ampal's Independent Directors were fully aware of the quarterly management fees paid to Merhav in 2011;

7.      Whether the management fees paid to Merhav in 2011 provided value to Ampal, were fully or partially fair and reasonable to Ampal, and were in Ampal's best interest;

43382540

8.      The intent of the parties when entering into the 2010 Management Agreement, including whether the "Fee/Expense Reimbursement" section allows for quarterly payments in 2011 subject to adjustments based on the work performed or to be performed by Merhav in 2011;

9.      In the event a formal reconciliation and/or adjustment of the 2011 management fees paid to Merhav was required and not conducted, who is responsible for that omission;

10.     Whether Ampal sustained any damages as a result of Ms. Eluz's alleged conduct and, if so, how those damages are to be calculated; and

11.     In the event it is found that Ampal did sustain damages as a result of the alleged conduct, whether Ampal's Independent Directors failed to mitigate those damages through their inaction upon becoming aware of the quarterly management fees paid to Merhav in 2011.

## VI.    THE PARTIES' JOINT EXHIBITS

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 1. | Ampal-American Israel Corporation ("Ampal")'s Annual Report on Form 10-K for the Fiscal Year Ended Dec. 31, 2006, filed on or about April 2, 2007 (Adv Doc. No. 128-4, Exhibit 2, p. 608-783) |
| 2. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 8, 2004 (Adv Doc. No. 128-4, Exhibit 3, p. 785-816) |
| 3. | Ampal's Form 8-K, filed April 3, 2013 |
| 4. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 17, 2008 |
| 5. | Minutes of a Meeting of the Board of Directors of Ampal, dated November 5, 2008 (Adv Doc. No. 128-5, Exhibit 8, p. 135-140) |
| 6. | Ampal's Form 8-K, filed December 5, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 142-145) |
| 7. | Ampal's *Definitive Proxy Statement on Schedule 14A*, filed September 12, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 146-171) |
| 8. | Ampal's Form 10-K for year ending 2004, filed March 15, 2005 (Adv Doc. No. 128-5, Comp. Ex. 9, p. 172-269) |
| 9. | Ampal's Form 10-K for year ending 2009, filed March 8, 2010 |
| 10. | BC Draft of Management Services Agreement, dated February 11, 2009 (Adv Doc. No. 128-6, Exhibit 11, p. 7-13); TR00035298-TR TR00035304 |
| 11. | Minutes of a Meeting of the Special Committee of Ampal, dated May 5, 2010 (Adv Doc. No. 128-6, Exhibit 13, p. 20-22) |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 12. | E-mail from Ken Henderson to Yoram Firon (copy to Irit Eluz and Serge Nehama), dated December 22, 2010, with draft ("BC Draft 12/22/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav and blackline comparison of December 21, 2010 and December 22, 2010 drafts (Adv Doc. No. 128-7, Exhibit 15, p. 25-31); BC_AMP_0029293-301 |
| 13. | E-mail exchange between Yoram Firon and Ken Henderson (copy to Eirt Eluz and Serge Nehama), dated December 22, 2010, regarding 2010 Memorandum of Understanding with revisions and blackline comparison from December 22, 2010 draft (Adv Doc. No. 128-7, Exhibit 15, p. 32-33) |
| 14. | Email exchange between Yoram Firon and Ken Henderson (copy to Irit Eluz and Derge Nehama), dated December 22-23, 2010, regarding revisions to 2010 Memorandum of Understanding and blackline comparison from December 22, 2010 draft (Adv Doc. No. 128-7, Exhibit 15, p. 34-40); BC_AMP_0029302-08 |
| 15. | Ampal's Form 8-K, dated March 21, 2011, and Exhibit 99.2 (Company Presentation – March 2011) attached to Ampal's Form 8-K, dated March 21, 2011 ((Adv Doc. No. 128-8, Exhibit 18, p. 2-25) |
| 16. | E-mail chain from Irit Eluz to C. Morag and R. Degani, dated November 11, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 42-44) |
| 17. | E-mail chain from Irit Eluz to D. Vaknin, C. Morag and R. Degani, dated November 11, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 45-47) |
| 18. | Unanimous Consent of the Special Committee of the Board of Directors of Ampal, dated December 8, 2011 (Adv. Doc. No. 128-10, Exhibit 25, p. 2-3) |
| 19. | Letter Amendment to Colombia Ethanal Project Option Agreement (unsigned draft), dated December 8, 2011 (Adv. Doc. No. 128-10, Exhibit 25, p. 4-5) |
| 20. | Ampal's Form 8-K, dated January 6, 2011 |
| 21. | Ampal's Form 8-K, dated December 9, 2011 (Adv. Doc. No. 128-10, Exhibit 26, p. 8-10) |
| 22. | Ampal's Form 8-K, dated April 2, 2012, and Exhibit 99.2 to Ampal's Form 8-K, dated April 2, 2012 (Adv Doc. No. 128-11, Exhibit 31, p. 2-26) |
| 23. | Ampal's Form 8-K, dated January 3, 2012, and Exhibit 99.1 (Debentures' Holders Meeting Presentation) to Ampal's Form 8-K, dated January 3, 2012 (Adv Doc. No. 128-11, Exhibit 32, p. 28-46) |
| 24. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 22, 2012 (Adv Doc. No. 128-11, Exhibit 35, p. 61-66) |
| 25. | Ampal's Form 8-K, dated January 26, 2012, and Exhibit 99.1 to Ampal's Form 8-K |
| 26. | Ampal's Form 8-K, dated February 21, 2012, and referenced Exhibit 99.1 (Ampal's Proposal to the Debenture Holders Committee) attached thereto (Adv Doc. No. 128-11, Comp. Ex. 38, p. 78-88) |
| 27. | Ampal's Form 8-K, filed March 12, 2012 (Adv Doc. No. 128-12, Exhibit 41, p. 3-5) |
| 28. | 8-K of Ampal, dated April 2, 2012, and Exhibit 99.2 (dated March 30, 2012) attached to Ampal's Form 8-K (Adv Doc. No. 128-12, Exhibit 42, p. 7-31) |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---------|--------------------------|
| 29. | E-mail from Lee Botvin to "PWC Team" (copy to Yoram Firon, Nir Bernstein, and Fiora Bar-Nir), dated March 22, 2012, with materials for Board and Audit Committee Meeting, scheduled for March 25, 2012 - Hebrew and English translation (Adv. Doc. No. 128-13, Exhibit 44, p. 6-118) |
| 30. | E-mail from Yoram Firon to Dany Vaknin (copy to Irit Eluz, Amit Mantsur, Nir Bernstein, and Lee Botvin), dated March 27, 2012, with list of items to be disclosed – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibits 47-48, p. 7-9, 11, 17-18) |
| 31. | Various e-mail communication between Ampal, PwC, and Audit Committee, dated March 27-28, 2012 – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibit 48, p. 11-22) |
| 32. | E-mail communication from Sharon Barkan to the Audit Committee and Board of Directors, dated March 28, 2012, with attached documents – Hebrew and English Translation (Adv Doc. No. 128-15, Exhibit 49, p. 24-27) |
| 33. | Attachment to Sharon Barkan's E-mail to Audit Committee titled "Ampal 10-K – 2011 – Draft 7 – marked comparison for directors.doc" |
| 34. | Minutes of a Meeting of the Board of Directors of Ampal, dated July 23, 2012 (Adv Doc. No. 128-16, Exhibit 53, p. 103-107) |
| 35. | E-mail from Lee Botvin to Yoram Firon, dated February 19, 2012 – Hebrew and English Translation (Adv Doc. No. 128-16, Exhibit 54, p. 109-112) |
| 36. | E-mail exchange between Irit Eluz and Yoram Firon (copy to Lee Botvin and Amit Mantsur), dated March 5, 2012, regarding Merhav MNF service agreement – December 2010 – Hebrew and English Translation (Adv Doc. No. 128-16, Exhibit 55, p. 114-118) |
| 37. | E-mail exchange between Lee Botvin and Yoram Firon, dated March 6, 2012, regarding Merhav MNF service agreement – December 2010 and draft written consent of 2011 management fee for Merhav (with both documents attached) – Hebrew and English Translation of E-mail included (Adv Doc. No. 128-16, Exhibit 55, p. 119-131) |
| 38. | E-mail communication chain and exchange dated March 14, 2012 (Hebrew and English translation) regarding discussion with Tal Lenchner (red in original). (Adv Doc. No. 128-16, Exhibit 56, p. 133-140) |
| 39. | E-mail from Nir Bernstein to Yoram Firon (copy to Irit Eluz, Lee Botvin, and Zahi Ben-Atav), dated March 12, 2012, with draft 2 of Ampal 10-K (Adv Doc. No. 128-16, Exhibit 57, p. 143-235) |
| 40. | E-mail from Nir Bernstein to Yoram Firon, dated March 21, 2012, with draft 3 of Ampal 10-K (Adv Doc. No. 128-16, Exhibit 57, p. 237-393) |
| 41. | E-mail from Yoram Firon to Adam Klein and Ephraim Friedman regarding Ampal's 10-K, dated March 13, 2012 (Adv Doc. No. 128-16, Exhibit 57, p. 395) |
| 42. | E-mail from Nir Bernstein to Lee Botvin and Yoram Firon regarding draft 3 of Ampal's 10-K, dated March 22, 2012 (Adv Doc. No. 128-16, Exhibit 57, p. 397-490) |
| 43. | E-mail from Lee Botvin to PwC Team (copy to Yoram Firon, Nir Bernstein, and Giora Bar-Nir), dated March 22, 2012, with 6 attachments including draft 3 of 10-K for 2011, draft minutes, and agendas for March 25, 2012 meeting of Ampal BOC and Audit Committee |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 44. | E-mail communication from Nir Bernstein to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 2-5) |
| 45. | E-mail communication from Yoram Firon to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 6-9) |
| 46. | E-mail communication from Nir Bernstein to Irit Eluz, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 10-13) |
| 47. | E-mail communication from Irit Eluz to Yoram Firon, dated March 25, 2012 (Adv. Doc. No. 128-17, Exhibit 58, p. 14-17) |
| 48. | E-mail from Yoram Firon to Serge Nehama, Chaeri Tornay, and Lee Botvin regarding Ampal's 10-K, dated March 26, 2012, and attaching redline comparison of "Draft 4" of the Form 10-K (Adv. Doc. No. 128-17, Exhibit 59, p. 19-120) |
| 49. | E-mail from Yoram Firon to PwC regarding "Ampal – updated language", dated March 27, 2012 – Hebrew and English Translation (Adv. Doc. No. 128-17, Exhibit 60, p. 123-200) |
| 50. | E-mail from Yoram Firon to PwC regarding "10K status", dated March 28, 2012 (Adv. Doc. No. 128-17, Exhibit 60, p. 202-203) |
| 51. | E-mail from Nir Bernstein to Lee Botvin, dated March 27, 2012, asking "Is there a signed management fee agreement for Merhav for 2011?" – Hebrew and English Translation (Adv. Doc. No. 128-17, Exhibit 60, p. 205-208) |
| 52. | E-mail from Nir Bernstein to SEC Filing & Printing Service (copy to Irit Eluz et al), dated March 27, 2012, regarding "Ampal's 10K" with Exhibit 10ii and "final version" of 10-K attached (Adv. Doc. No. 128-17, Exhibit 62, p. 210-307) |
| 53. | Letter from Yoram Firon to Ampal's Special Committee, dated December 16, 2010, providing notice of December 19, 2010 meeting of Special Committee and providing outline of Agenda for the meeting (Adv. Doc. No. 128-17, Exhibit 63, p. 309-310) |
| 54. | E-mail from Lee Botvin to the Special Committee (with copy to Irit Eluz), dated March 6, 2012, attaching two press releases regarding the debenture negotiations and another EMG explosion (Adv. Doc. No. 133-1, Exhibit 64, p. 2-7); VAKNIN005423-VAKNIN005428. |
| 55. | E-mail from Lee Botvin to, among others, the Special Committee (with copy to Irit Eluz and Yoram Firon), dated March 8, 2012, enclosing a draft of minutes from a meeting of Ampal's Board of Directors held on March 5, 2012 (Adv. Doc. No. 133-1, Exhibit 65, p.9-7); VAKNIN005398-VAKNIN005405. |
| 56. | E-mail from Irit Eluz to Dany Vaknin, dated March 13, 2012, which attaches a draft Valuation Report regarding the Colombian Ethanal Project (Adv. Doc. No. 133-1, Exhibit 66, p.18-50); VAKNIN008399-VAKNIN008428 |
| 57. | E-mail from Nir Bernstein to Independent Directors (with copy to Irit Eluz, Yoram Firon, et al), dated March 26, 2012, which attaches Ampal's financial highlights for Q4 2011 (Adv. Doc. No. 133-1, Exhibit 67, p.49-66); VAKNIN008671-VAKNIN008688 |
| 58. | Minutes of a Meeting of the Special Committee of Ampal, dated November 28, 2006 |
| 59. | Minutes of a Meeting of the Special Committee of Ampal, dated November 9, 2009 |
| 60. | Minutes of a Meeting of the Special Committee of Ampal, dated December 15, 2009 |
| 61. | Minutes of a Meeting of the Special Committee of Ampal, dated December 27, 2012 |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 62. | Minutes of a Meeting of the Special Committee of Ampal, dated January 7, 2013); DEGANI000523-4 |
| 63. | Minutes of a Meeting of the Board of Directors of Ampal, dated August 29, 2012 ( |
| 64. | Minutes of a Meeting of the Special Committee of Ampal, dated November 23, 2005 and attached memorandum |
| 65. | Ampal's Definitive Proxy Statement on Schedule 14A, dated Oct. 8, 2004 |
| 66. | Ampal's Definitive Proxy Statement on Schedule 14A, dated Nov. 20, 2007 |
| 67. | Ampal's Form 10-K for year ended Dec. 31, 2003, filed March 29, 2004 |
| 68. | Ampal's Form 10-K for year ended Dec. 31, 2005, filed March 29, 2006 |
| 69. | Ampal's Form 10-K for year ended Dec. 31, 2008, filed March 5, 2009 |
| 70. | Ampal's *Definitive Proxy on Schedule 14A*, filed on October 19, 2009 (Adv Doc. No. 128-4, Exhibit 4, p. 818-841) |
| 71. | Ampal's *Definitive Proxy on Schedule 14A*, filed on March 31, 2010 (Adv Doc. No. 128-5, Exhibit 5, p. 2-37) |
| 72. | Ampal's *Definitive Proxy on Schedule 14A*, filed on March 31, 2011 (Adv Doc. No. 128-5, Exhibit 6, p. 39-84) |
| 73. | Ampal's *Definitive Proxy on Schedule 14A*, filed on April 30, 2012 (Adv Doc. No. 128-5, Exhibit 7, p. 86-133) |
| 74. | Ampal's Form 10-K for year ending 2010, filed March 17, 2011 (Adv Doc. No. 122-18, Exhibit Q, p. 2-122) |
| 75. | Minutes of a Meeting of the Special Committee of Ampal, dated February 15, 2009 (Adv Doc. No. 128-5, Exhibit 10, p. 271-273) |
| 76. | Management Services Agreement, dated February 23, 2009 (Adv Doc. No. 128-6, Exhibit 11, p. 2-6); ELUZ000458-ELUZ000462 |
| 77. | Minutes of a Meeting of the Special Committee of Ampal, dated December 19, 2010 (Adv Doc. No. 128-6, Exhibit 12, p. 15-18) |
| 78. | List of Merhav (M.N.F.) Ltd ("Merhav")'s Activities and Services for 2010, provided to the Special Committee of Ampal on or about December 23, 2010 – Hebrew and English translation (Adv Doc. No. 128-6, Exhibit 14, p. 24-30) |
| 79. | E-mail from Yoram Firon to Ken Henderson (copy to Irit Eluz), dated December 20, 2010, with blackline of draft ("BC Draft 12/17/2010") term sheet for Cooperation and Management Agreement between Ampal and Merhav (Adv Doc. No. 128-7, Exhibit 15, p. 2-7); BC_AMP_0027935-40 |
| 80. | E-mail from Ken Henderson to Yoram Firon (copy to Irit Eluz and Serge Nehama), dated December 21, 2010, with draft ("BC Draft 12/21/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav and blackline comparison of December 17, 2010 and December 21, 2010 drafts (Adv Doc. No. 128-7, Exhibit 15, p. 8-16); BC_AMP_0029284-92 |
| 81. | E-mail from Yoram Firon to Ken Henderson (with copy to Irit Eluz and Lee Botvin), dated December 22, 2010, with blackline comparison of the draft ("BC Draft 12/21/2010") term sheet for Cooperation and Management Agreement Memorandum of Understanding between Ampal and Merhav (Adv Doc. No. 128-7, Exhibit 15, p. 17-24); BC_AMP_0027945-50 |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 82. | Cooperation and Management Agreement Memorandum of Understanding, between Ampal and Merhav, dated December 30, 2010 (Adv Doc. No. 128-7, Exhibit 16, p. 42-46) BC_AMP_0175630 |
| 83. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 7, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 128-7, Exhibit 17, p. 48-91) |
| 84. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 7, 2011 (Adv Doc. No. 128-7, Exhibit 17, p. 93-98) |
| 85. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 17, 2011 (Adv Doc. No. 122-6, Exhibit E, p. 2-3); TR0157826-7 |
| 86. | Minutes of a Meeting of the Audit Committee of Ampal, dated May 5, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 128-8, Comp. Ex. 19, p. 27-42); TR00157823-TRTR0157825. |
| 87. | Ampal – Audit Committee – Interim Report as of March 31, 2011 Agenda (Adv Doc. No. 128-8, Comp. Ex. 19, p. 44-45) |
| 88. | Minutes of a Meeting of the Board of Directors of Ampal, dated May 5, 2011 (Adv Doc. No. 128-8, Comp. Ex. 19, p. 46-51); TR00037118-TR00037123. |
| 89. | Minutes of a Meeting of the Audit Committee of Ampal, dated May 15, 2011, with PowerPoint Presentation and PwC Report (Adv Doc. No. 122-9, Exhibit H, p. 2-4); TR00157820-TRTR0157822. |
| 90. | Minutes of a Meeting of the Audit Committee of Ampal, dated August 4, 2011, with PowerPoint Presentation (Adv Doc. No. 128-8, Exhibit 20, p. 53-72); TR00157815-TR00157819. |
| 91. | Ampal – Audit Committee – Interim Report as of June 30, 2011 Agenda (Adv Doc. No. 128-8, Exhibit 20, p. 74-75) |
| 92. | Minutes of a Meeting of the Board of Directors of Ampal, dated September 6, 2011, with PowerPoint Presentation (Adv Doc. No. 122-11, Exhibit J, p. 2-6); TR00103861-TR00103865. |
| 93. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 9, 2011, with Nov 7, 2011 PowerPoint Presentation (Adv Doc. No. 128-9, Comp. Ex. 21, p. 3-20); TR00035901-TR00035922. |
| 94. | Ampal – Audit Committee – Interim Report as of September 30, 2011 Agenda (Adv Doc. No. 128-9, Comp. Ex. 21, p. 22-24) |
| 95. | GADOT Presentation to BOD, dated November 1, 2011 (Adv. Doc. No. 128-9, Comp. Ex. 21, p. 26-35); TR00035924-TR00035933. |
| 96. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 12, 2011, with PowerPoint Presentation (Adv Doc. No. 128-9, Comp. Ex. 21, p. 37-41); TR00035883-TR0035887 (minutes). |
| 97. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 13, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 49-50); TR00035894-TR00035895. |
| 98. | Minutes of a Meeting of the Audit Committee of Ampal, dated November 28, 2011 (Adv Doc. No. 128-9, Comp. Ex. 21, p. 52-56); TR00103196-TR00103200. |
| 99. | Ampal's Form 10-Q, dated November 14, 2011 (Adv Doc. No. 128-9, Exhibit 22, p. 58-91) |

43382540

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 100. | Minutes of a Meeting of the Special Committee of Ampal, dated November 12, 2011 (Adv Doc. No. 128-9, Exhibit 23, p. 93-94) |
| 101. | Minutes of a Meeting of the Board of Directors of Ampal, dated December 8, 2011 (Adv Doc. No. 128-9, Exhibit 24, p. 96-113) |
| 102. | Minutes of a Meeting of the Board of Directors of Ampal, dated December 19, 2011 (Adv Doc. No. 128-10, Exhibit 27, p. 12-14) |
| 103. | Ampal Form 10-Q for quarterly period ending September 30, 2008, dated November 5, 2008 |
| 104. | Ampal's Form 10-Q, dated May 16, 2011 (Adv Doc. No. 128-10, Exhibit 29, p. 63-101) |
| 105. | Ampal's Form 10-Q, dated August 4, 2011 (Adv Doc. No. 128-10, Exhibit 30, p. 103-145) |
| 106. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 10, 2012 (Adv Doc. No. 128-11, Exhibit 33, p. 48-55) |
| 107. | Minutes of a Meeting of the Board of Directors of Ampal, dated January 11, 2012 (Adv Doc. No. 128-11, Exhibit 34, p. 57-59) |
| 108. | Minutes of a Meeting of the Audit Committee of Ampal, dated January 30, 2012 (Adv Doc. No. 128-11, Exhibit 37, p. 71-75), and translated Exhibit A; TR00036111-TR00036115 |
| 109. | Minutes of a Meeting of the Board of Directors of Ampal, dated February 26, 2012 (Adv Doc. No. 128-11, Exhibit 39, p. 90-97) |
| 110. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 5, 2012 (Adv Doc. No. 128-11, Exhibit 40, p. 99-105) |
| 111. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 11, 2012 (Adv Doc. No. 128-13, Exhibit 43, p. 2-4) |
| 112. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 25, 2012 (Karni 624-627, Adv Doc. No. 128-14, Exhibit 45, p. 5-60) |
| 113. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 25, 2012 (, Adv Doc. No. 128-15, Exhibit 46, p. 2-5) |
| 114. | Minutes of a Meeting of the Audit Committee of Ampal, dated March 28, 2012 (Adv Doc. No. 128-15, Exhibit 50, p. 29-30) |
| 115. | Minutes of a Meeting of the Board of Directors of Ampal, dated March 28, 2012 (Adv Doc. No. 128-16, Exhibit 51, p. 2-3) |
| 116. | Ampal's Form 10-K for Year End 2011, dated March 30, 2012, along with Exhibit 10ii to the 10-K (Adv Doc. No. 128-16, Exhibit 52, p. 6-101) |
| 117. | Unanimous Consent of Special Committee of the Board of Directors of Ampal, dated December 30, 2010 (Adv. Doc. No. 128-17, Exhibit 63, p. 311-314); TR00035269-TR00035272. |
| 118. | 05/04/2009 Special Committee Meeting Minutes (TR00035305-41) |
| 119. | 03/08/2010 Compensation Committee Meeting Minutes (TR00037436-37) |
| 120. | 12/19/2010 Compensation Committee Meeting Minutes (TR00037244-45) |
| 121. | Email, dated November 23, 2010, from Kenneth Henderson to Irit Eluz (with attachment) (ELUZ000327-32) |

84

| EX. NO. | DESCRIPTION OF EXHIBITS |
|---|---|
| 122. | Email, dated December 18, 2010, from Kenneth Henderson to Irit Eluz, forwarded to Yoram Firon (with attachment) (ELUZ000167-71) |
| 123. | Emails, dated December 29, 2010, between Yoram Firon and Dany Vaknin (SPIZZ00261466) |
| 124. | Email, dated December 30, 2010, from Yoram Firon to Dany Vaknin and others (with attachments) (VAKNIN001883-1905) |
| 125. | 03/07/2011 Compensation Committee Meeting Minutes (TR00037434-5) |
| 126. | 03/17/2011 Board of Directors Meeting Minutes (TR00037110-1) |
| 127. | 11/09/2011 Compensation Committee Meeting Minutes (TR00037238) |
| 128. | Ampal Form 10-Q for the quarterly period ended March 31, 2012 |
| 129. | Ampal Form 10-Q for the quarterly period ended June 30, 2012 |
| 130. | Ampal Form 10-Q for the quarterly period ended September 30, 2012 |
| 131. | 06/05/2012 Compensation Committee Meeting Minutes (TR00037452-53) |
| 132. | Email, dated August 4, 2011, from Zahi Ben-Atav to Dany Vaknin and others (with attachments) (VAKNIN004684-720) |
| 133. | Email, dated October 24, 2011, from Zahi Ben-Atav to Irit Eluz and Amit Mantsur (with attachments) (SPIZZ00019216-17) |
| 134. | Email, dated February 02, 2012, from Dany Vaknin to Orit (with attachments) (VAKNIN000831-911) |
| 135. | Unanimous Consent of the Ampal's Board of Directors, dated February 22, 2012 (VAKNIN006520-31) |
| 136. | Emails, dated July 31, 2012 through August 5, 2012, between various individuals (VAKNIN009286-89) |
| 137. | Email, dated October 24, 2011 from Amit Mantsur to Zahi Ben-Atav (with attachment) (SPIZZ000054807-08) |
| 138. | December 23, 2010 Memorandum to Special Committee – Vaknin 004419 |
| 139. | Ampal Form 10-Q for the quarterly period ended March 31, 2010 |
| 140. | Ampal Form 10-Q for the quarterly period ended June 30, 2010 |
| 141. | Ampal Form 10-Q for the quarterly period ended September 30, 2010 |
| 142. | Ampal's Form 8-K, dated January 24, 2011, and Exhibit 99.1 (Company Presentation – January 2011) attached to Ampal's Form 8-K |
| 143. | Summary Chart of Irit Eluz's Ampal Compensation (2002 – 2005) |
| 144. | Summary Chart of Irit Eluz's Ampal Compensation (2006 – 2011) |

## VII.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

1.   The parties have stipulated to the admissibility of the Joint Exhibits 1 through 144.

## VIII.   PLAINTIFF'S WITNESS LIST

1. Alex Spizz
2. Irit Eluz

43382540

4. Daniel Vaknin

3. Yoram Firon

5. Steven Solomon (expert)

6. Rebuttal and impeachment witnesses

43382540

## IX.    DEFENDANT'S WITNESS LIST

1. Irit Eluz
2. Yoram Firon
3. Daniel Vaknin
4. Jonathan R. Macey (expert)

## X.    RELIEF SOUGHT

The Trustee seeks a judgment against Eluz on Count II in the amount of 24,157,000 NIS, plus interest calculated at the New York statutory rate of 9% from the dates of payment in 2011 through entry of final judgment, along with applicable costs and fees, and such other relief as may be deemed appropriate, including sanctions and attorney's fees that the Trustee seeks or intends to seek as a result of Eluz's bad faith and entirely frivolous defenses.

Ms. Eluz has not asserted any claims in this proceeding.  Ms. Eluz seeks the dismissal of Count II in its entirety and with prejudice, along with applicable costs and fees, and such other relief as may be deemed appropriate.  Ms. Eluz claims that the Trustee's allegations against her are entirely frivolous and brought in bad faith and seeks, or intends to seek, sanctions and an award of attorney's fees and costs incurred in defending against those claims.

43382540

Dated: New York, New York
    July 4, 2022

**AKERMAN LLP**


By: /s/ *Darryl R. Graham*
    John P. Campo
    Darryl. R. Graham
    Brian S. Fraser
    1251 Avenue of the Americas,
    37th Floor
    New York, NY 10020
    Tel. (212) 259-6428
    E-mail: john.campo@akerman.com
    E-mail: darryl.graham@akerman.com
    E-mail: brian.fraser@akerman.com

*Counsel for Plaintiff/Trustee*

Dated: New York, New York
    July 4, 2022

**COLE SCHOTZ P.C.**


By: /s/ *David S. Gold*
    Steven L. Klepper
    David S. Gold
    Donald A. Ottaunick
    Courtney G. Hindin
    1325 Avenue of the Americas
    19th Floor
    New York, New York 10019
    Telephone: (646) 532-5324
    E-mail: sklepper@coleschotz.com
    E-mail: dgold@coleschotz.com
    E-mail: dottaunick@coleschotz.com
    Email: chindin@coleschotz.com

*Counsel for Defendant Irit Eluz*


**IT IS SO ORDERED:**


Dated: New York, New York
    July 5, 2022

       *s/ David S. Jones*
       HONORABLE DAVID S. JONES
       UNITED STATES BANKRUPTCY JUDGE

43382540