UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 7 |
| AMPAL-AMERICAN ISRAEL CORPORATION, | Case No. 12-13689 (DSJ) |
| Debtor. | |

---

| | |
|---|---|
| ALEX SPIZZ, as Chapter 7 Trustee for Ampal-American Israel Corporation, | |
| Plaintiff, | Adv. Pro. No. 14-02110 (DSJ) |
| v. | |
| IRIT ELUZ, ET AL., | |
| Defendants. | |

---

**DECISION AND ORDER DENYING PLAINTIFF'S
MOTION FOR (I) JUDGMENT AS A MATTER OF LAW PURSUANT TO
RULE 50(b); AND (II) A NEW TRIAL PURSUANT TO RULE 59(a)**

**AKERMAN LLP**
*Counsel for Plaintiff/Trustee*
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
By:     John P. Campo, Esq.
        Darryl R. Graham, Esq.
        Brian S. Fraser, Esq.

**COLE SCHOTZ P.C.**
*Counsel for Defendant, Irit Eluz*
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
By:     Steven L. Klepper, Esq.
        David S. Gold, Esq.
        Courtney G. Hindin, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff Alex Spizz (the "Trustee"), as Chapter 7 Trustee for Debtor Ampal-American Israel Corporation ("Ampal") moves post-trial for an order granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Rule") 50(b) or, alternatively, for a new trial pursuant to Rule 59(a) (the "Motion").[1]  The Trustee contends that, pursuant to Rule 50(b), no reasonable jury could arrive at a verdict in favor of Defendant Irit Eluz ("Eluz") based on the evidence presented at trial.  Alternatively, the Trustee argues that the Court should order a new trial pursuant to Rule 59 because the Court erroneously instructed the jury on the defense of ratification or, alternatively, because the verdict is against the weight of the evidence.  Eluz opposes the Motion.  For the reasons set forth below, the Trustee's motion for judgment as a matter of law pursuant to Rule 50(b) is DENIED.  The Trustee's alternative motion for a new trial pursuant to Rule 59 is also DENIED.

---

[1] The papers before the Court on the Motion are:  ***Plaintiff's Motion:***  (i) *Notice of Plaintiff's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and a New Trial or, in the Alternative, for a New Trial Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure* [ECF No. 224]; *Memorandum of Law in Support of Plaintiff's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and a New Trial or, in the Alternative, for a New Trial Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure* [ECF No. 224-1] **(hereafter "Pltf. Mem.")**; (iii) Exhibit A (Trial Transcripts for June 28–30, 2022, July 1, 2022 and July 5–6, 2022) [ECF No. 224-2]; Exhibit B (Verdict Sheet) [ECF No. 224-3]; Exhibit C (Declaration of Darryl R. Graham) [ECF No. 224-3]; Exhibit D (Trial Exhibit JX-082 (2010 Management Agreement) [ECF No. 224-3]; Exhibit E (Trial Exhibit JX-076 (2009 Management Agreement) [ECF No. 224-3]; Composite Exhibit F (Copies of the Jury Instructions From the First Trial (D.E. 238, P. 16) and the Second Trial (D.E. 318, PP. 11–12)) [ECF No. 224-3].  ***Defendant's Opposition:***  (i) *Memorandum of Law in Opposition to Plaintiff Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and a New Trial or, in the Alternative, for a New Trial Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure* [ECF No. 231] **(hereafter "Opp. Mem.")**; (ii) Exhibit A – JX073(Ampal Proxy Statement) [ECF No. 231-1]; Exhibit B – JX077 (Special Committee Meeting Minutes – December 19, 2010); Exhibit C – JX082 (Ampal/Merhav Memo of Understanding); Exhibit D – JX099 (Ampal Form 10-Q September 30, 2011); Exhibit E – JX104 (Ampal Form 10-Q March 31, 2011); Exhibit F – JX105 (Ampal Form 10-Q June 30, 2011); Exhibit G – JX108 (Audit Committee Meeting Minutes – January 30, 2012); Exhibit H – JX116 (Ampal Form 10-K 2011); Exhibit I – JX132 (August 4, 2011 email from Zahi Ben Atav to Vaknin, *et al.*).  ***Plaintiff's Reply:*** *Plaintiff's Memorandum of law in Further Support of an In Response to Irit Eluz's Opposition to Plaintiff's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) and a New Trial or, in the Alternative, for a New Trial Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure* [ECF No. 232] **(hereafter "Reply Mem.").**

# I.

# BACKGROUND

## A. Facts[2]

### 1. Ampal's Formation and Corporate Governance

Ampal was incorporated in New York in 1942.  (ECF No. 220 ¶ 1 ("**Stipulated Facts**")).

Ampal was a holding company that invested in various businesses around the world.  (*Id.*).  Ampal

operated out of its main office located in Herzliya, Israel.  (Tr. 51:13–17).  In 2002, a controlling,

majority equity interest in Ampal was acquired, directly and through affiliates, by Yosef Maiman

("Maiman").  (Stipulated Facts ¶ 2).  At the time Maiman acquired his equity interest in Ampal,

he conducted other businesses primarily through Merhav M.N.F. Ltd. ("Merhav") and its

subsidiaries and affiliates.  (*Id.*).  At all relevant times, Maiman controlled, wholly owned, and

served as the CEO of Merhav.  (Stipulated Facts ¶ 4).  From May 2002 through the end of her

tenure at Ampal, Eluz served as Ampal's Chief Financial Officer.  (Stipulated Facts ¶ 5).  On or

about September 19, 2006, Maiman became Ampal's President and Chief Executive Officer.

(Stipulated Facts ¶ 7).

In May 2002, Yoram Firon ("Firon") was appointed Vice President – Investments and

Corporate Affairs and Secretary of Ampal, and acting General Counsel, which positions he

maintained for the rest of his tenure at Ampal.  (Stipulated Facts ¶ 8).  In November 2008, Daniel

Vaknin ("Vaknin") was appointed to Ampal's Board of Directors (the "Board") as an independent

director under the rules of the NASDAQ Global Market, which position he maintained at all

relevant times.  (Stipulated Facts ¶ 9).  During his tenure on Ampal's Board, Vaknin served on

---

[2] The following facts are taken from the parties' Stipulated Facts Which Require No Proof ("Stipulated Facts") (ECF No. 220 at 2–25), trial exhibits ("JX___"), and trial transcripts ("Tr. _____").

three committees of the Board:  the Audit Committee, Special Committee, and Compensation Committee.  (*Id*. ¶ 9).

Ampal's management team reported to its Board.  (Stipulated Facts ¶ 14).  Ampal's Board included various non-independent and three independent directors. (Stipulated Facts ¶ 15).  The independent directors sat on the Board's various committees, including the Compensation Committee, Audit Committee, and Special Committee.  (*Id*.)  As of November 5, 2008, the independent directors were Vaknin, Menahem Morag ("Morag") and Yehuda Karni ("Karni"). (*Id*.).  In May 2011, Karni retired and was replaced by Revital Degani ("Degani") (Vaknin, Morag, Karni and Degani collectively referred to as the "Independent Directors").  (*Id*.).

The Audit Committee was appointed by the Board to assist it in its oversight responsibilities relating to, among other things, "[r]eview with management and the independent auditor and approve all transactions or courses of dealing with parties related to the Company." (Stipulated Facts ¶ 18).  On or about October 2004, the Board formed a Special Committee of Independent Directors (the "Special Committee") to consider alternatives available to the Company to maximize shareholder value.  (Stipulated Facts ¶ 20).  The Board directed the Special Committee to review and approve all transactions with related parties.  (*Id*.).  The Audit Committee and the Special Committee had identical membership consisting solely of Ampal's three independent directors:

| | Independent Director[3] | Special Committee[4] | Audit Committee[5] |
|---|---|---|---|
| Menahem Morag | √ | √ | √ |
| Daniel Vaknin | √ | √ | √ |
| Yehuda Karni (until May 2011) | √ | √ | √ |
| Revital Degani (replaced Karni) | √ | √ | √ |

### 2. Ampal and Merhav's 2009 Management Agreement

On February 15, 2009, the Special Committee met for a meeting "called at the request of Ampal's management" to discuss "the proposed Management Services Agreement between Ampal and Merhav." (Stipulated Facts ¶ 26). Eluz "informed the Committee that the Agreement's purpose is to remunerate Merhav for management services it had rendered and [is] still rendering to Ampal." (*Id*.). She explained that "[d]etermining remuneration and putting a price tag on it is difficult. However, in negotiations held, the parties have compromised on an annual remuneration of 10 million [New Israel[i] Shekels ("NIS")], payable in equal quarterly installments, which the parties considered fair, if and when the Agreement will be approved." (Stipulated Facts ¶ 27). In addition, Ms. Eluz stated that the "remuneration will be monitored by Ampal's management, in accordance with Merhav's detailed reports of its services, and if need be, it may be altered" and that "Merhav shall report to [Ampal's] management, on a quarterly basis, with regards to the services rendered by Merhav in the respective quarter." (*Id*.). On or about February 23, 2009, the Special Committee approved the Management Services Agreement. (Stipulated Facts ¶ 32). The 2009 Management Agreement was made effective as of January 1, 2008 and automatically renewed each year unless certain action was taken. (Stipulated Facts ¶ 34). Pursuant to the 2009

---

[3] *See* JX073 (Ampal Proxy Statement dated April 30, 2012) at 9–10 (describing Morag, Vaknin and Degani as the only independent directors of Ampal).

[4] *See* JX077 at p. 1 (Special Committee minutes for the December 19, 2010 meeting identifying Karni (later replaced by Degani), Vaknin and Morag as the only members of the Special Committee).

[5] *See* JX073 (Ampal Proxy Statement dated April 30, 2012) at 9–11, 15 (showing Morag, Vaknin and Degani as the only members of the Audit Committee).

Management Agreement, Ampal paid Merhav annual compensation of NIS 10 million ($2.6 million) for the year 2009, in "equal quarterly installments." (Stipulated Facts ¶ 37).

### 3. Ampal and Merhav's 2010 Management Agreement

On December 19, 2010, the Special Committee met to discuss and review three related-party transactions between Ampal and Merhav. (Stipulated Facts ¶ 41). At that meeting Eluz addressed Ampal's management agreement with Merhav and "reviewed Merhav's contribution and activities with regards to Ampal's holdings and businesses over the year 2010, and the inadequate remuneration received by Merhav for such activities." (Stipulated Facts ¶ 42). The Special Committee "unanimously resolved" to "approve in principle the entering into a Cooperation and Management Agreement [(the "2010 Management Agreement")] with Merhav, to be prepared by Ampal's attorneys, according to which Merhav shall render services to Ampal, and Ampal shall bear a percentage of Merhav's expenses for it[s] services, in accordance with an annual settling of accounts, which shall be based upon Merhav's management report of services rendered by Merhav and agreed by the Committee at that time." (Stipulated Facts ¶ 43). The Special Committee "unanimously resolved" that such "agreement shall be deemed effective as of January 1, 2010 and replace the existing [2009 Management Agreement] between Merhav-Ampal Energy Ltd. and Merhav dated February 23, 2009." (Stipulated Facts ¶ 44). The Special Committee also "unanimously resolved" to request that "Ms. Eluz . . . prepare a report with regards to the services rendered by Merhav during 2010, and to submit such report to the Committee's inspection." (Stipulated Facts ¶ 45). The Special Committee "unanimously resolved" that "[s]ubject for receiving the aforesaid report for 2010 and its approval by the Committee, Ampal shall bear 50% of Merhav's agreed expenses for 2010." (Stipulated Facts ¶ 46).

6

On December 30, 2010, the Special Committee acted through unanimous written consent to, among other things, "authorize and approve the execution of [the 2010 Management Agreement] by and between [Ampal] and [Merhav] . . . ." (Stipulated Facts ¶ 49).  As to "Fee/Expense Reimbursement," the 2010 Management Agreement provides:

> In consideration for Merhav's services and undertakings, Ampal will pay Merhav a Management Fee, which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal, to the extent not reimbursed or recouped from other parties (such as from a joint venture or project budget).  The Management Fee shall be determined by the special Committee (the "Special Committee") of the Board of Directors of Ampal (composed solely of Independent Directors) at or around the end of each fiscal year (beginning with 2010) based on a presentation by Merhav of expenses incurred in providing services hereunder during the current year.  The parties will review the amount of the Management Fee annually in good faith and shall make such adjustments as they agree may be reasonably appropriate in light of the work performed or to be performed by Merhav."

> For 2010, the Special committee has determined and Merhav has agreed that the Management Fee will be 24,157,000 New Israeli Shekel[s], which represents approximately 50% of the expenses incurred by Merhav for services of the type described in this MOU.

> The parties will determine in good faith whether Merhav should be compensated with regard to any particular project out of the project budget or, after completion, from project operations.  In such event, the parties (and any joint venture) will enter into appropriate agreements and the parties will take into account in determining the Management Fee for any year any compensation received by Merhav from a particular project.

(Stipulated Facts ¶ 53).

The "Term and Termination" provision of the 2010 Management Agreement states:  "The term of the Agreement shall be for one year (expiring December 31, 2011), and shall automatically renew for one year periods thereafter unless either party otherwise elects on notice given not less than 60 days before an expiration date."  (Stipulated Facts ¶ 54).  The 2010 Management Agreement contains a provision addressing "replacement of existing agreement," which provides:

"The Agreement replaces and supersedes as of January 1, 2010 the Management Services Agreement by and between Merhav and Merhav-Ampal Energy Ltd. dated February 23, 2009 (the '2009 Agreement'). The 2009 Agreement is hereby terminated as of December 31, 2009." (Stipulated Facts ¶ 56). Ampal paid Merhav in equal quarterly installments throughout 2011. (Stipulated Facts ¶ 57).

### 4.  Audit Committee Meetings and SEC Filings in or Regarding 2010

In 2010, Ampal's Audit Committee met to approve Ampal's 10-Qs and 10-K financial reporting with the SEC. (Stipulated Facts ¶ 58). During 2010, Ampal filed three 10-Qs with the SEC, for the quarters ending March 31, 2010, June 30, 2010, and September 30, 2010. (Stipulated Facts ¶ 59). In each 10-Q, Ampal publicly disclosed, among other things, that "Ampal and Merhav entered into an agreement pursuant to which Ampal shall pay Merhav annual management fees totaling in the aggregate NIS 10 million ($2.7 million), in consideration for management, marketing, financial, development and other administrative services rendered by Merhav to Ampal." (*Id*.).

On March 17, 2011, the Audit Committee met to discuss approval of Ampal's Form 10-K report for the year 2010. (Stipulated Facts ¶ 61). At this meeting, the Audit Committee resolved to "approve the Financial Statements and the 10-K Report of the Company for the year ended December 31, 2010." (*Id*.). In Item 13 of the Form 10-K regarding "certain relationships and related transactions and director independent" the filing stated: "The information with respect to certain relationships and related transactions and director independence required by this Item 13 is hereby incorporated in this Annual Report on Form 10-K by reference to our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal

year covered by this Annual Report on Form 10-K, for our annual meeting of stockholders to be held in 2011." (Stipulated Facts ¶ 62).

On March 31, 2011, Ampal filed its Proxy Statement, which Maiman executed "by order of the Board of Directors." (Stipulated Facts ¶ 63). The Audit Committee "recommended that the audited financial statements referred to [above their signatures on page 12] be included in the Company's annual report on Form 10-K for the year ended December 31, 2010." (*Id*.). Later in the Proxy Statement, Ampal answered the question "Does the Company enter into transactions with affiliated parties?" with the disclosure that, among other things, "[Ampal] entered into a management services agreement with Merhav, according to which Merhav provides [Ampal] and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration of NIS 24.2 million ($6.8 million)." (Stipulated Facts ¶ 64).

### 5.  Board and Audit Committee Meetings and SEC Filings in and for 2011

On May 16, 2011, Ampal filed its 10-Q for the period ending March 31, 2011. (Stipulated Facts ¶ 69), The Ampal 10-Q disclosed "Services and Management Agreements," including that:

> Ampal entered into a management services agreement with Merhav, according to which Merhav provides the Company and its subsidiaries with management, marketing, financial, development and other administrative services for an annual consideration which will be determined annually and shall be equal to a percentage of the direct and indirect expenses incurred by Merhav in connection with providing services to or for the benefit of Ampal. The management fee shall be determined by the Special Committee of the Board of Directors of Ampal (composed solely of independent directors) at or around the end of each fiscal year.
>
> …
>
> As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal and a member of the controlling shareholder group of Ampal, is the sole owner of Merhav. Because of the foregoing relationship, a special committee of the Board of Directors composed of Ampal's independent directors negotiated and approved the transactions between Ampal and Merhav.

(Stipulated Facts ¶ 70).

On August 4, 2011, Ampal filed its 10-Q for the quarter ended June 30, 2011.  (*Id*.).  This

10-Q disclosed "Services and Management Agreements," including that:

> On December 30, 2010, Ampal entered into a management services agreement with
> Merhav, according to which Merhav provides the Company and its subsidiaries
> with management, marketing, financial, development and other administrative
> services for an annual consideration which will be determined annually and shall
> be equal to a percentage of the direct and indirect expenses incurred by Merhav in
> connection with providing services to or for the benefit of Ampal. The management
> fee shall be determined by the Special Committee of the Board of Directors of
> Ampal (composed solely of independent Directors) at or around the end of each
> fiscal year.
> …
> As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal
> and a member of the controlling shareholder group of Ampal, is the sole owner of
> Merhav. Because of the foregoing relationship, a special committee of the Board of
> Directors composed of Ampal's independent directors negotiated and approved the
> transactions between Ampal and Merhav.

(Stipulated Facts ¶ 74).

On November 14, 2011, Ampal filed its 10-Q for the quarter ended September 30, 2011.

(Stipulated Facts ¶ 79).  This 10-Q disclosed "Services and Management Agreements," including

that:

> On December 30, 2010, Ampal entered into a management services agreement with
> Merhav, according to which Merhav provides the Company and its subsidiaries
> with management, marketing, financial, development and other administrative
> services for an annual consideration which will be determined annually and shall
> be equal to a percentage of the direct and indirect expenses incurred by Merhav in
> connection with providing services to or for the benefit of Ampal. The management
> fee shall be determined by the Special Committee of the Board of Directors of
> Ampal (composed solely of independent directors) at or around the end of each
> fiscal year.
> …
> As stipulated above, Yosef A. Maiman, the Chairman, President and CEO of Ampal
> and a member of the controlling shareholder group of Ampal, is the sole owner of
> Merhav. Because of the foregoing relationship, a special committee of the Board of
> Directors composed of Ampal's independent directors negotiated and approved the
> transactions between Ampal and Merhav.

(Stipulated Facts ¶ 80).

### 6. Board and Committee Meetings and SEC Filings in 2012

On March 30, 2012, Ampal filed its 10-K for the fiscal year ended December 31, 2011.

(Stipulated Facts ¶ 88). In "Note 20 – transactions with related parties," the Ampal 2011 10-K

stated:

> The Company entered into a management services agreement with Merhav,
> according to which Merhav provides the Company and its subsidiaries with
> management, marketing, financial, development and other administrative services
> for an annual consideration in the year ended December 31, 2011 of NIS 24.2
> million ($6.6 million).

(Stipulated Facts ¶ 89).

### B. Procedural History

Beset with losses caused, in part, by the collapse of a major infrastructure project in Egypt,

Ampal filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Code") on August

29, 2012, commencing Case No. 12-13689. (Bk. ECF No. 2 at 10-24). Its case was converted to

a Chapter 7 liquidation proceeding on May 2, 2013 (Bk. ECF No. 258) and Alex Spizz was elected

Chapter 7 trustee by the voting creditors. (Bk. ECF No. 275).

The Trustee commenced this adversary proceeding in 2014 "to recover damages, under

applicable provisions of the New York Business Corporation Law, for breaches of Defendants'

fiduciary duties as directors and/or officers of the Debtor prior to its bankruptcy." (ECF No. 1 at

1). The Trustee asserted three claims: (i) against Karni, Vaknin, Morag and Eluz for breach of

fiduciary duty (excessive management and consulting fees paid to Merhav in 2010) (the "First

Claim"); (ii) against Karni, Vaknin, Morag, Degani and Eluz for breach of fiduciary duty

(excessive management fees and consulting fees paid to Merhav in 2011) (the "Second Claim");

and (iii) against Vaknin, Morag and Degani for breach of fiduciary duty (extension of loan maturity

date in November 2011) (the "Third Claim").

11

In October 2014, defendants moved to dismiss on various grounds. The Court, by the then-assigned Judge Bernstein, dismissed the Complaint in its entirety as to Karni, Morag, Vaknin and Degani. (ECF No. 26). As to Eluz and the First Claim, the Court declined to dismiss the portion of the First Claim relating to the payment of the 2010 management fee based on the business judgment rule but granted the portion of the motion to dismiss the portion of the First Claim relating to the payment of the consulting fee. (*Id*. at 30–32). As to Eluz and the Second Claim, Judge Bernstein declined to dismiss the portion of the Second Claim relating to the payment of the 2011 management fee based on the business judgment rule but granted the motion to dismiss the portion of the Second Claim relating to the payment of the consulting fee. (*Id*. at 32–33).

In February 2016, Eluz filed an answer asserting a number of affirmative defenses claiming, as relevant here, that the Trustee's claims were barred, in whole or in part: (i) because the challenged fees paid to Merhav were all properly authorized by a special committee of independent outside directors following careful consideration of the fairness and propriety of those payments; (ii) by Ampal's ratification of some or all of the alleged actions or omissions at issue; and/or (iii) by Ampal's failure to mitigate damages. (ECF No. 30).

The parties conducted fact and expert discovery. In March 2020, Eluz moved for partial judgment dismissing the First Claim. (ECF No. 97). The Court granted Eluz's motion and dismissed the Trustee's First Claim. (ECF No. 121). In August, 2020, Eluz moved for partial summary judgment dismissing the Second Claim. (ECF No. 122). In October, 2020, the Trustee cross-moved for summary judgment on his Second Claim. (ECF No. 128). By Order dated February 9, 2021, the Court denied the parties' respective summary judgment motions and the Trustee's Second Claim was set down for trial. (ECF No. 138).

12

## C.  The Trial

Beginning June 28, 2022, the Court conducted a jury trial on the sole remaining live claim, the Trustee's Second Claim, which asserted that Eluz breached her fiduciary duties of care and loyalty in authorizing Ampal's payments to Merhav in 2011.  During the Trustee's direct case, the jury heard 4 fact witnesses who testified live:  Spizz (the Trustee, testifying in support of his own claim) and Eluz, Vaknin and Firon (the latter called out of order by Eluz due to witness-availability limitations).  The Trustee also presented the expert testimony of Professor Steven Solomon on issues related to corporate governance and fiduciary duties.  The Trustee introduced a multitude of documents into the record as part of his direct case.  Eluz's defense case consisted of fact testimony from three fact witnesses (Eluz, Firon, Vaknin) and one expert, Professor Jonathan R. Macey, who testified on issues related to corporate governance.  Eluz introduced a number of additional documents into evidence.  The Trustee did not put on a rebuttal case.

### 1.  The Charge Conference

The jury instructions and verdict sheet in this case were developed as follows.  On June 21, 2022, the parties submitted proposed jury instructions and verdict sheets to the Court.  (ECF Nos. 201, 202).  On June 27, 2022, pursuant to the Court's directive (ECF No. 209), the parties submitted objections to each other's proposed jury instructions and verdict sheets.  (ECF Nos. 213, 214).  Following consideration of the parties' submissions, on the evening of July 4, 2022, the Court e-mailed to the parties proposed jury instructions and a verdict sheet for review and comment in advance of a charging conference that was scheduled for the next day.  (ECF No. 221-2 at 37–38).  Later that evening, the Trustee filed a letter outlining further objections to the Court's then-contemplated jury instructions and verdict sheet.  (ECF No. 219).

On the morning of July 5, 2022, the Court conducted a charging conference, during which counsel were heard at length, with extensive focus on the issue of ratification. (*See generally* Tr. 838–996). In particular, the parties argued heatedly over how to describe who, exactly, on Ampal's Board had authority to approve the 2011 payments to Merhav for purposes of Eluz's ratification defense jury charge. The Trustee argued that the 2011 payments to Merhav were required to be approved by a special committee of independent directors that was charged with reviewing related-party transactions by Ampal, i.e. the "Special Committee." (Tr. 1221:22–25). Eluz argued that the 2011 payments to Merhav were approved in at least two ways: first, under the 2010 Management Agreement, and, second, by the independent directors sitting as either the Audit Committee or the Special Committee. (Tr. 1222:11–16). The Court determined that this was a question for the jury to decide and adopted the more generic description of "an appropriate committee." (Tr. 1226:6–1227:25).

The Court listened to and worked through the parties' various objections. As a result of those discussions, the Court generated its intended final jury instructions and final verdict sheet, taking into account the parties' competing arguments and objections as developed during the charge conference. Later that afternoon the Court e-mailed to the parties the intended final jury charge incorporating the changes made during the charge conference, a redline comparison between the July 4 version of the Court's proposed jury instructions and the July 5 version of the Court's intended final jury instructions, and the final verdict sheet.

The Court's final verdict sheet included questions keyed to specific claims and defenses. (ECF No. 222). Questions 1 and 2 asked the jurors questions as to whether liability was foreclosed by the business judgment rule. (*Id.*). Questions 3 and 4 went to whether the disputed 2011 payments to Merhav had been validly authorized before they were made. (*Id.*). Questions 5 and

6 called for specific responses as to whether Eluz had established her defense that the 2011

payments to Merhav were validly ratified after they had been made.  (*Id.*).  The verdict sheet

instructed that if any of these defenses had been established, the jury should stop its deliberations

and find for Eluz.  Otherwise, the verdict sheet instructed the jury to proceed to questions including

whether the Trustee had proven facts sufficient to establish Eluz's liability, and whether Eluz had

established a defense of failure to mitigate any damages by Ampal.  (*Id.*)

The parties gave their summations on the morning of July 6, 2022, and the Court charged

the jury later that afternoon.  The Court instructed the jury on ratification as follows:

### Affirmative Defense - Ratification

Defendant Eluz asserts as an affirmative defense on which she bears the burden of proof that an appropriate committee ratified the quarterly management fees paid to Merhav in 2011.

Ratification is the express or implied approval or adoption, that is, the recognition and approval of the unauthorized acts of another.  One may ratify an unauthorized transaction made on his behalf and the effect is the same as if he had himself originally approved the transaction. Ratification requires acceptance by the principal of the benefit of an agent's act, with full knowledge of all material facts, in circumstances indicating an intention to adopt the unauthorized arrangement. The intent can be implied from the knowledge of the principal coupled with a failure to timely repudiate where the party seeking a finding of ratification has in some way relied on the principal's silence.  The intent to ratify may not be inferred from doubtful or equivocal acts or language.

Ratification can also occur when a principal fails to object to the unauthorized act of another, despite an opportunity to do so.  Where the principal knows of an unauthorized act taken on his behalf and remains silent, he is deemed to have ratified the act.

Defendant Eluz contends that the special committee ratified the 2011 payments because its members had full knowledge of information material to the payments to Merhav and did nothing to object or seek to reverse the payments.  Full knowledge exists where the party claimed to have ratified an otherwise unauthorized act was aware that the payments took place, the material facts relating to the 2011 payments, and the amount of the transaction.  Full knowledge can also be implied when a party fails to repudiate or retains the benefits of an unauthorized transaction when he knows the materials facts at issue.

15

If you find the defendant Eluz established, by a preponderance of the evidence, that an appropriate committee was aware of some or all of the 2011 payments to Merhav, possessed full knowledge of their material terms, and took no action to either stop or reverse those payments, object to them, or seek repayment from Merhav, and that defendant Eluz relied on the silence or inaction of an appropriate committee to make or permit the 2011 payments to Merhav, then you must find that those payments were ratified and your deliberations should stop.

(Tr. 1226:6–1227:25).

As to ratification, the verdict sheet asked the jury to answer the following:

5.  Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions had full knowledge of all material facts pertaining to the 2011 Payments?

Yes_____  No_____

a.  If the answer is "Yes", proceed to Question 6.
b.  If the answer is "No", proceed to Question 7.

6.  Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions ratified the making of the NIS 24 million (approximately $6.6 million) payments to Merhav in 2011?

Yes_____  No_____

a.  If the answer is "Yes", proceed no further and report to the Court.
b.  If the answer is "No", proceed to Question 7.

(ECF No. 222).

The Court provided each juror with a copy of its instructions to review as needed during the deliberations and a verdict sheet to complete. The jury retired to deliberate.

## 2.  The Jury Notes

During jury deliberations on July 6, 2022, the jury sent out two notes. The first, Jury Note #1, asked: "If we all reach the same verdict but answer some questions differently, are we

16

finished?  For example, if we are not all in agreement for question 1 and 2 but all agree on question 3, are we finished?  (ECF No. 221-4).

Outside the jury's presence, the Court then engaged in a discussion with counsel as to how to respond to Jury Note #1.  The Court then instructed the jury as follows:

> In response to your questions, your verdict needs to be unanimous.  However, if, having deliberated, you are not in unanimous agreement regarding your answers to questions 1 and 2 but you are in unanimous agreement regarding your answer to question 3, it is possible that you may return a verdict based on your unanimous answer to question 3.  Specifically, if you unanimously agree the answer to question 3 is no, you may record your answer to that question, proceed no further, and report to the Court, as the instructions to question 3 indicate.  If, however, your unanimous answer to question 3 is yes, or you do not have a unanimous answer to question 3, you must continue to deliberate and follow the instructions on the verdict sheet.

(Tr. 1257:21–1258:8).

The Court's reasoning, stated outside the jury's presence, was that a unanimous negative answer to question 3 alone would be independently sufficient to require judgment for Eluz based on her defense that the disputed payments were authorized.  (Tr. 1242:5–1243:3).

The jury next sent a verdict form to the Court with no answers marked on questions 1 to 5. As to question 6—"Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions ratified the making of the NIS 24 million (approximately $6.6 million) payments to Merhav in 2011?"—the jury checked "Yes."  (ECF No. 221-5).  Again, outside the jury's presence, the Court and counsel discussed whether the Court could properly accept this verdict.  The Court then brought the jury back and said:

> . . . let me just say that I have the communication you sent out, which is a marked verdict sheet with the answers not filled in except that question 6 is marked yes. Your answer to question 6 is marked yes.  And the instructions for that say if the answer is yes, proceed no further and report to the Court, which you've done, ,and it's also signed by the foreperson.  However – and this is why ordinarily we have the sequential process we directed in the jury direction.  At a minimum, a verdict,

17

on the issue of ratification, which is the subject of question 6, would require appropriate answers to question 5 as well as question 6. They work in tandem. And so at a minimum, I'm going to need to ask the jury to resume deliberations with respect to question 5; and in addition, because of the nature of the process and to make sure we cover our bases and try to achieve a legally proper and sufficient outcome, I'm also going to instruct you to resume your deliberations at a minimum with regard to questions 3 and 4 as well as questions 5 and 6, and of course see if that causes you to change your answer to 6; and, further, see if further deliberation brings about unanimity as to questions 1 and/or 2 as well. So it was unusual to deviate from the sequence we had laid out. My previous answer was what it was, and we thought in that limited example that you gave in your prior answer – I should say I thought that might be an acceptable way to go, but in the present circumstances, I need to ask you to do what I just described, which, again, is resume your deliberations, and the answer regarding ratification will need to encompass both questions 5 and 6 as marked on the jury sheet, and you are to deliberate also regarding the prior questions on the sheet. If those deliberations – I'll just leave it at that. I think you understand. So that is my instruction to you. I thank you for your continued efforts. If you need it, we can give you an additional verdict sheet, because I'm going to keep the one you sent out and mark it as a Court Exhibit just so we keep clear records, okay? So [the Courtroom Deputy], either right now or in a minute, will get you a new sheet.

(Tr. 1275:12–1276:23).

So instructed, the jury resumed deliberations. A short time later the jury sent Jury Note #2 to the Court which stated: "We have come to an impasse on 3 and 4, and I doubt we will come to an agreement. But agree on 5 and 6." (ECF No. 221-6). Accompanying Jury Note #2 was a verdict form with no answers marked on questions 1 to 4. For question 5—"Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions had full knowledge of all material facts pertaining to the 2011 Payments?"—the jury checked "Yes." For question 6—"Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions ratified the making of the NIS 24 million (approximately $6.6 million) payments to Merhav in 2011?"—the jury also checked "Yes." (ECF No. 221-7). After a short discussion with counsel and over the Trustee's objection the Court determined to accept the

18

verdict. The Court then called the jury back to the courtroom, took the verdict, and polled the individual members of the jury, all of whom confirmed their verdict in favor of Eluz. (Tr. 1280:1–1284:8).

After the jury was discharged the Trustee made an oral motion "under either Rule 50 or Rule 59." (Tr. 1290:6–7). The Court responded:

> Okay. Here's what I'm going to do. I'm going to deny the motion as raised orally at this time without prejudice to the filing of a written motion under Rule 59(b), if you choose to make such a motion. I think that's the usual post-trial avenue of relief, unless you correct me and identify some other method that you want to proceed. And Rule 59(b) specifies that motions for new trial must be filed no later than 28 days after entry of judgment, so you automatically have that time. I'm not going to alter those deadlines.

> I also will just note and alert you that Rule 59(c) grants the opposing party 14 days after being served to file opposing affidavits. So that's the ordinary briefing sequence as I understand it and conceive of it, so you're on notice of that.

> To the extent you were seeking relief under any other rule, I'm going to deny it, because I agree with defendants that sufficient evidence was presented to support the jury's verdict with respect to both questions 5 and 6, which were the bases for the verdict, and I'll just state that that ruling is without prejudice to the written motion that you remain eligible to make under Rule 59(b) as I just described.

(Tr. 1290:6–1291:3).

With the consent of counsel (Tr. 1291:23–1292:10), the Court and the parties' counsel met briefly with the jurors off the record for a post-verdict conversation. Judgment on the verdict in favor of Eluz dismissing the Complaint was entered on July 8, 2022. (ECF No. 223).

The Trustee now moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and for a new trial or, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59(a).

## II.

### THE TRUSTEE'S MOTION FOR JUDGMENT
### AS A MATTER OF LAW PURSUANT TO RULE 50

The Trustee seeks judgment as a matter of law against Eluz pursuant to Fed. R. Civ. P. 50(b) on the asserted basis that no reasonable jury could find that Eluz proved her ratification defense. (ECF No. 224-1 at 6). The Court disagrees, holds that the Trustee waived entitlement to such relief by not orally moving pursuant to Rule 50(a) before the case went to the jury, and holds in the alternative that the Trustee is not entitled to judgment as a matter of law. The Court therefore denies the Trustee's Motion.

### A.  Legal Standards

#### 1.  Rule 50(a)

Under Rule 50(a), a party may move for judgment as a matter of law during trial at any time prior to the submission of the case to the jury. Fed. R. Civ. P. 50(a)(2). The Rule requires the party making such a motion to "specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.*   "Although Rule 50(a) 'does not define how specific' the motion must be, the purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri-Ambrosini v. Nat'l Realty Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citations omitted). "Accordingly, to preserve an argument for a Rule 50(b) motion, the preceding Rule 50(a) motion 'must at least identify the specific element that the defendant contends is insufficiently supported.'" *Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931, 2015 WL 3605143, at *4 (E.D.N.Y. June 5, 2015) (quoting *Galdieri-Ambrosini*, 136 F.3d at 286). A court must "view the motion in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes

20

out the motion, it may provide the opposing party with the requisite notice." *Galdieri-Ambrosini*, 136 F.3d at 286 (citations omitted).

The Second Circuit "recognizes an exception to the specificity requirement, permitting the district court to grant a Rule 50(b) motion even absent a properly-made Rule 50(a) motion if necessary to prevent 'manifest injustice' or to correct 'purely legal error.'" *Protostorm, LLC*, 2015 WL 3605143, at *4 (quoting *Malmsteen v. Berdon, LLP*, 369 Fed. App'x 248, 249 (2d Cir. 2010)).

### 2. Rule 50(b)

Federal Rule of Civil Procedure 50(b) allows a party to "renew" a Rule 50(a) motion for judgment as a matter of law which was made before the case was submitted to the jury. *In re Fosamax Products Liability Litig.*, 742 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2010); *see* Fed. R. Civ. P. 50(a), (b). But the grounds on which a party may rely in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." *Fosamax*, 742 F. Supp. 2d at 470 (alteration in original) (citing *Galdieri-Ambrosini*, 136 F.3d at 286).

The movant on a Rule 50 motion "faces a high bar." *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001). Rule 50(b) motions "should be granted cautiously and sparingly." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). In ruling on a Rule 50(b) motion, the Court "must review the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120–21 (2d Cir. 1998). The Court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini*, 136 F.3d at 289. The Second Circuit has stated that "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result or sheer surmise and conjecture, or (2) there

is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id*. (alternations in original).

### 3. Ratification

The Court acknowledges and draws upon Judge Brodie's thorough explanation of the legal standard for ratification under New York law in *Carmona v. Gene Kazlow, P.C.*, 16-CV-4723, 2017 WL 3316091, at *7–8 (E.D.N.Y. Aug. 2, 2017).

The substantive law underlying the Trustee's Rule 50 motion is well established. "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011). "Ratification may be express or implied, or may result from silence or inaction." *Id*. at 692 (alteration and citations omitted); *see also RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009) ("Under New York law, a principal can be held liable for the unauthorized acts of an agent that the principal later ratifies . . . . Ratification is the express or implied adoption, *i.e.* recognition and approval, of the unauthorized acts of another.") (internal quotation marks and citations omitted). In all cases, ratification requires both "knowledge of a defect in the act to be confirmed" and "the right to reject or ratify it." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-4394, 2016 WL 4613390, at *16 (S.D.N.Y. Aug. 31, 2016) (citing *In re Levy*, 893 N.Y.S.2d 142, 144 (App. Div., 2d Dept. 2010)). "Ratification must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Carmona*, 2017 WL 3316091, at *7 (citing *Mun. of Bremanger v. Citigroup Glob. Mkts., Inc.*, No. 09-CV-7058, 2013 WL 1294615, at *21 (S.D.N.Y. Mar. 28, 2013) (holding that the defendant had not ratified the transaction where it accepted the benefits flowing from a sale but the plaintiffs failed to proffer evidence that the defendant was fully aware of the material facts of the

22

transaction); *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 552 (1997) (holding that an insurance company had not impliedly ratified an agent's contract where it "received no premiums or any other benefit in connection with the fraudulent financing agreements") (internal quotation marks and other citations omitted).

In a seminal case on ratification, the New York Court of Appeals explained that an "implied ratification" occurs where the beneficiary's subsequent conduct "supports the reasonable conclusion that he, by his assent thereto or acquiescence therein, has accepted and adopted" the fiduciary's actions. *Pollitz v. Wabash R.R. Co.*, 207 N.Y. 113, 129 (1912) (alterations omitted); *see In re Levy*, 893 N.Y.S.2d at 144 (quoting *Pollitz*, 209 N.Y. at 129); *Hempstead Realty, LLC v. Sturrup*, 55 Misc.3d 1219(A), 2017 WL 2215747, at *6 (N.Y. Sup. Ct. 2017) (quoting *Pollitz*, 207 N.Y. at 129). Although "an act, such as an acceptance of benefits, may constitute a ratification, and acquiescence may give rise to an implied ratification," "[m]ere negligence is not ratification." *Adelphia*, 634 F.3d at 693. "However, the intent can be implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events." *Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co.*, 152 F. Supp. 3d 159, 165 (S.D.N.Y. 2016) (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999), *vacated on other grounds sum nom. Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003); *see also Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 232–33 (N.Y. App. Div. 4th Dept. 1982) (comparing cases in which a landlord received rent pursuant to a lease made by an agent and explaining that where the landlord had knowledge of the terms of the lease, he ratified the agent's acts and where the landlord did not have knowledge of the terms of the lease, he had not ratified the agent's acts).

### a. Full Knowledge and Material Facts

"A person is not bound by a ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge." Restatement (Third) of Agency § 4.06 (2006). "The burden of establishing that a ratification was made with knowledge is on the party attempting to establish that ratification occurred. . . . The fact that the principal had knowledge may be inferred, as may the principal's assumption of risk of lack of knowledge. . . . The principal's consent to be bound by what the agent has done depends on whether the principal knows the relevant facts, not the source of the principal's knowledge." *Id.* cmt. b. "Ratification is the consequence of a choice freely made by the principal. The principal may choose to ratify the action of an agent or other actor without knowing material facts. *A factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of the facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation.*" *Id*. cmt. d (emphasis added).

### B. The Trustee's Arguments

The Trustee argues that the evidence presented at trial failed to prove each element of Eluz's ratification defense. (ECF 224-1 at 6). Specifically, the Trustee maintains that "the record is undisputed and the testimony is unequivocal that the Special Committee was unaware of and never received any information regarding Merhav's 2011 Expenses." (*Id*.). Further, the Trustee contends that, based on the premise that the Special Committee lacked any knowledge about these material facts regarding the transaction, Eluz cannot, as a matter of law, establish knowing ratification by the Special Committee, and therefore the verdict must be set aside and a new trial ordered on liability. (*Id*.).

The Trustee further contends that his Rule 50 motion made at trial was procedurally appropriate. He states he moved for judgment as a matter of law post-verdict instead of sooner because "the Court had in essence stated that it would defer ruling on Rule 50 motions until after the jury returned a verdict[.]" (ECF No. 232 at 16). The Trustee further contends that his argument in opposition to Eluz's motion for a directed verdict, in which the Trustee contended that Eluz failed to demonstrate that the Special Committee had full knowledge of the material facts necessary to ratify the 2011 Payments, was "tantamount to [Trustee's] cross-motion for directed verdict on those elements of Eluz's ratification defense. (*Id.*) Alternatively, the Trustee asks the Court to grant his Rule 50(b) Motion to prevent manifest injustice. (*Id.* at 17).

### C. Eluz's Arguments

As to the Motion's merits, Eluz contends that the Trustee's entire argument is flawed because he relies on the "single, misguided proposition that 'full knowledge of all material facts' with respect to the 2011 Merhav payments required knowledge of the exact amount of Merhav's 2011 expenses." (ECF No. 231 at 1). Eluz argues that the jury was presented with substantial, unrebutted evidence from which it could conclude that "the Independent Directors had full knowledge of all material facts pertaining to the 2011 Merhav payments including (i) the terms of the 2010 Management Agreement; (ii) the exact amount of the 2011 Merhav payments; (iii) the timing of those payments; (iv) the reason for those payments; (v) the valuable services provided by Merhav in exchange for those payments; and (vi) the fact that Merhav's direct and indirect expenses in 2011 exceeded its expenses in 2010 due, in large part, to intensive work performed in 2011 to handle the collapse of a major infrastructure project in Egypt. Moreover, Eluz argues, even if the exact amount of Merhav's 2011 Expenses was a material fact, it is sufficient that the

Independent Directors knowingly elected not to request those expenses.  (ECF No. 231 at 7–13).

In other words, "the Independent Directors 'knew what they didn't know.'" (*Id.*).

Eluz also contends that the Trustee's Rule 50(b) Motion is procedurally improper because

the Trustee failed to move for judgment as a matter of law *before* the Court submitted the case to

the jury and instead impermissibly waited until *after* the jury rendered its verdict to make its

motion.  This, according to Eluz, bars the Trustee from "renewing" his motion pursuant to Rule

50(b).  Eluz also points out that the Court already orally denied the Trustee's post-verdict Rule

50(b) motion on the merits based on the same arguments that the Trustee now makes in support of

this Motion.  (ECF No. 231 at 31–34).

### D.  The Trustee Forfeited His Rule 50(b) Motion and the "Manifest Injustice" Exception Is Not Satisfied Here

The Court cannot reach the merits of the Trustee's Motion without first contending with

Eluz's argument that the Trustee forfeited his ability to pursue that motion by failing to make a

Rule 50(a) motion at trial before the case went to the jury.  The Trustee acknowledges that he

moved for judgment as a matter of law only *after* the jury returned a verdict. (ECF No. 232 at 16).

The Trustee claims that "because the Court had in essence stated that it would defer ruling on Rule

50 motions until after the jury returned a verdict, [he] moved for a JMOL at that time."  (*Id.*)

Contrary to the Trustee's contention, however, the Court did not dictate the procedure under which

a Rule 50 motion should be presented.  Rather, after extended discussion of Eluz's timely motion

for judgment as a matter of law, the Court reserved determination pending the jury's deliberations.

(Tr. 786:2–787:3).  At no point did the Court determine or say that the obligatory procedural

requirements set forth in Rule 50 were somehow being excused by the Court as to the Trustee, and

any suggestion to the contrary therefore lacks merit.

Alternatively, the Trustee claims that "in the context of Eluz's motion for directed verdict, [the Trustee] argued in opposition that that motion must fail because of Eluz's failure to demonstrate that the Special Committee had full knowledge of the material facts necessary to ratify the 2011 Payments, which is tantamount to [the Trustee's] cross-motion for directed verdict on those elements on Eluz's ratification defense."  (ECF No. 232 at 16)  But a Rule 50(a) motion requires a motion that specifies the judgment sought and the law and facts that entitle the movant to the judgment.  Fed. R. Civ. P. 50(a)(2).  And, as the Trustee does not dispute, the Trustee never so moved.

Post-verdict the Court asked the Trustee's counsel if they had any requests.  Mr. Graham responded:

> We just reraise the objections we had made regarding the unanimous verdict *and raise a motion regarding the judgment notwithstanding the verdict based on the determination of full knowledge of all the material facts*.  We believe there was no evidence put forward during the trial of all – evidence with respect to all material facts regarding the transaction – in particular, Merhav's costs, direct and indirect costs, of which I also believe we raised an issue regarding the jury charge on that point, which I don't think was included.

(Tr. 1288:15–25) (emphasis added).

The Court then asked Mr. Graham:

> Rule 59(b) – let me ask you what the exact nature of your motion was.  And Rule 59(b) concerns motions for a new trial and permits the filing of such motions no later than 28 days after entry of judgment, and I'm not sure if what you were doing was really an oral version of that or was something else.  So can you clarify for me the exact procedural posture of the oral application you just made.

(Tr. 1289:24–1290:5). Mr. Graham responded: "I think it would be under either Rule 50 or Rule 59, I believe –."  (Tr. 1290:6–7).

Again, the Trustee never moved for judgment as a matter of law before the Court submitted the case to the jury.  Because the Trustee failed to move under Rule 50(a) for judgment as a matter

of law before submission of his case to the jury, his post-trial Rule 50(b) motion is improper and is denied on this ground alone. *See Ali v. AMG Trucking L.L.C.*, No. 10-CV-2667, 2011 WL 5184219, at *1 (E.D.N.Y. Oct. 31, 2011); *see also Zhiwen Chen v. Cnty. of Suffolk*, 927 F. Supp. 2d 58, 63 (E.D.N.Y. 2013) ("Where a moving party fails to move for judgment as a matter of law under Rule 50(a) before the case is submitted to the jury, courts in [the Second Circuit] routinely deny a Rule 50(b) motion as procedurally improper").

Nor is the Trustee aided by the narrow "manifest injustice" exception to a waiver of Rule 50 relief recognized in *Protostorm,* 2015 WL 3605143, at *4. The Trustee argues that "Eluz failed to present evidence that the Special Committee had 'full knowledge' of all 'material facts,' which are requisite elements to the defense of ratification, and thus [the Trustee] has established manifest injustice." (ECF No. 232 at 17). "While what constitutes manifest injustice hinges on the specifics of a particular case, 'a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion.'" *Zhiwen Chen*, 927 F. Supp. 2d at 64 (internal quotation marks and citation omitted). "As explained below in connection with [the Trustee's] Rule 59 Motion, the verdict was not against the weight of the evidence, and therefore no manifest injustice will result [from] denying [the Trustee's] motion for judgment as a matter of law based on the purported lack of evidence supporting [Eluz's ratification defense]." *Id*.

Accordingly, the Trustee cannot "renew" his motion pursuant to Fed. R. Civ. P. 50(b), and is not entitled to relief under this rule. And even if the Trustee's Rule 50 Motion was not procedurally barred, for the reasons stated below, this Court would still deny the Motion on the merits.

### E.  Key Trial Evidence Relevant to the Trustee's Motion

Beyond the procedural bar to the Trustee's Motion, and contrary to the Trustee's contentions, abundant evidence supports the jury's determination that Eluz established a ratification defense, specifically including whether that ratification was made with full knowledge of all material facts.  Further, even if the ratification defense were flawed, that alone would not entitle the Trustee to judgment in his favor.  The jury never decided the debatable question of whether Eluz breached her fiduciary duties in the first place, and Eluz also advanced a strong mitigation-of-damages defense that the jury had no occasion to reach.

In support of his argument, the Trustee relies almost exclusively on the fact that Vaknin, the only testifying member of the Special Committee, testified that he did not receive information that identified what Merhav's direct and indirect expenses were for 2011, and that all he saw was what Ampal had paid to Merhav.  (Tr. at 422:2–22).  But Vaknin's testimony was by far not the only evidence presented to the jury.  During the six-day trial, the jury heard six witnesses testify and considered dozens of exhibits.  The trial record as a whole reflects that Ampal's Independent Directors understood that Merhav performed extensive work for Ampal during 2011 above the level done in 2010, such that there was no need to obtain a detailed accounting, the result of which may well have been an unwelcome increase in Ampal's payment obligations.

The Trustee elicited no testimony from any fact witness with direct, contemporaneous knowledge of Ampal's work or governance who expressed any concern about Ampal's payments to Merhav, or about Eluz's performance as its Chief Financial Officer.  Meanwhile, Eluz presented the jury with unrebutted evidence establishing that the Independent Directors reviewed and approved the 2010 Management Agreement and were therefore familiar with its terms.  *See, e.g.*:

- the 2010 Management Agreement at 1 ("Scope of Services") and 2 ("Fee/Expense Reimbursement") (JX082);

- the December 19, 2010 Special Committee meeting minutes discussing and approving the 2010 Management Agreement (JX077 at 2–3);

- Eluz's testimony on the Independent Directors' approval of the 2010 Management Agreement (Tr. at 213:19–216:22); and

- Vaknin's testimony on the approval and interpretation of the 2010 Management Agreement (Tr. 373:20–374:13; 385:15–21; 392:19–394:25; 421:20–422:4; 434:18–23; and 479:23–481:4).

(ECF No. 231 at 8–9). That Agreement provided that Ampal would pay Merhav at the same rate during 2011, subject to an end-of-year adjustment. (Tr. 373:20–374:3; JX082 at 2, 4).

The jury was also given substantial, unrebutted evidence establishing the Independent Directors' knowledge of the 2011 Merhav payments, the timing of those payments, and the exact amount of those payments. *See, e.g.*:

- Eluz's testimony on the Independent Directors' knowledge of the timing and amount of the management fees paid to Merhav in 2011 (Tr. at 224:5–11 230:6–21; 286:20–287:17);

- Eluz's testimony on the disclosure of the timing and amount of the management fees paid to Merhav in 2011 in public filings reviewed and approved by the Independent Directors (Tr. 254:25–255:21; 238:19–239:18; 240:17–21; 252:3–21; 286:20–287:17; 292:1–293:7; 296:8–298:7);

- Eluz's testimony on the disclosure of the timing and amount of the management fees paid to Merhav in 2011 in presentations sent or made to the Independent Directors (Tr. 290:9–291:2; 289:7–291:3);

- Eluz's testimony on the Independent Directors' review and approval of public filings and the quarterly meetings in which those filings were presented and discussed (Tr. 220:8–20; 238:19–239:18);

- Vaknin's testimony on the Independent Directors' knowledge of the timing and amount of the management fees paid to Merhav in 2011 (Tr. 370:2–15; 385:15–21; 523:11–524:22);

- Vaknin's testimony on the disclosure of the timing and amount of the management fees paid to Merhav in 2011 in public filings reviewed and approved by the Independent Directors (Tr. 380:2–381:14; 403:23–18);

- Vaknin's testimony on the disclosure of the timing and amount of the management fees paid to Merhav in 2011 in presentations sent to the Independent Directors (Tr. 376:8–378:7);

- Firon's testimony on the disclosure of the timing and amount of the management fees paid to Merhav in 2011 in public filings reviewed and approved by the Independent Directors (Tr. 615:3–615:21).

(ECF No. 231 at 9).

The jury was also given copies of Ampal's public SEC filings, all of which were shown to have been reviewed and approved by the Independent Directors and all of which disclosed the 2011 Merhav payments, the timing of those payments, and the exact amount of those payments. *See* JX099 (Ampal's Form 10-Q dated November 14, 2011) at 3–4, 13, 19–20; JX104 (Ampal's Form 10-Q dated May 16, 2011) at 3, 11, 17; JX105 (Ampal's Form 10-Q dated August 4, 2011) at 3–4, 12, 18, 20; and JX 116 (Ampal's Form 10-K for Year End 2011 dated March 30, 2012, along with Exhibit 10ii to the 10-K) at 36, Note 20(a).  (ECF No. 231 at 10).

Further, the jury also was presented with unrebutted evidence establishing the Independent Directors' knowledge of the reason for the existence and amount of the Merhav payments and the services provided by Merhav to Ampal in 2011 in exchange for those payments.  *See, e.g.*:

- Eluz testified about the Independent Directors' knowledge of the services provided by Merhav in 2011 (Tr. at 247:8–249:23; 248:4–23);

- Vaknin testified about the services provided by Merhav in 2011 (Tr. 370:13–372:6; 373:6–19; 489:8–16); and

- Vaknin testified about how the Independent Directors knew about the services provided by Merhav in 2011 (Tr. 414:22–416:2; 488:5–491:3).

(ECF No. 231 at 11–12).

31

Lastly, the jury was presented with unrebutted testimony establishing the Independent

Directors' knowledge that Merhav's direct and indirect expenses in 2011 exceeded its expenses in

2010. *See, e.g.*:

- Vaknin testified about Merhav's services and expenses being greater in 2011 than in 2010 (Tr. 422:5–14; 422:15–425:8; 489:8–15); and

- Firon testified about confirming that Merhav's services and expenses were greater in 2011 than in 2010 (Tr. 586:20–589:4; 591:11–592:14; 593:12–24; 610:10–23; 751:11–756:13).

(ECF No. 231 at 12–13).

Eluz also presented unrebutted testimony that Merhav spent more time and had more

people working on Ampal's business in 2011 than it did in 2010 and that the Independent Directors

were keenly aware of this. (Tr. 422:15–22). Vaknin testified that he believed that had a year-end

reconciliation of Merhav's 2011 expenses been done "[Ampal] would have paid more money to

Merhav due to the complexity of this 2011 year, but we didn't do it. At that time we were doing

more of the cutting expenses and therefore we went to this plan of cutting expenses. That's it."

(Tr. 422:5–14). Accordingly, the Independent Directors opted to continue making payments at the

2010 level.

The Trustee failed to rebut much, if any, of this evidence during trial, yet now asks the

Court to set aside the verdict because the Special Committee members were not informed of or

provided with a specific accounting of Merhav's direct and undirect expenses in 2011 attributable

to management services provided by Merhav to Ampal. (*See* ECF No. 224-1 at 1). But, as

discussed below, there was no legal impediment to Ampal's decisionmakers concluding that its

interest would not be well served by effecting the year-end reconciliation called for under the 2010

Management Agreement. Abundant trial evidence shows that Ampal's Board made this decision

knowingly and with complete awareness of the facts it considered material to its decision to approve or ratify the 2011 Payments to Merhav at the 2010 level.

In sum, the Trustee is not entitled to relief under Rule 50(b) because he failed either to (i) move under Rule 50(a) before the case was submitted to the jury, or (ii) demonstrate that manifest injustice would result if judgment as a matter of law is not granted in his favor.  But even if the Trustee's Rule 50(b) Motion was not procedurally barred, viewing the evidence in the light most favorable to Eluz, the Court would deny the Trustee's Motion for judgment as a matter of law, both because Eluz's ratification defense is amply supported by the evidence, and because even if that were not so additional viable issues remain, including whether Eluz breached any duty; whether, if she did, any damages were caused; and whether Ampal failed to mitigate any such damages, which it easily could have done by seeking information and demanding a billing adjustment when confronted with the 2011 10-K and its disclosure of Ampal's payments to Merhav.

### III.

### THE TRUSTEE'S MOTION FOR A NEW
### TRIAL PURSUANT TO RULE 59(a)

The Trustee moves for a new trial pursuant to Rule 59(a).  The Trustee claims that he is entitled to a new trial because the jury instructions and the verdict sheet on ratification were erroneous and prejudicial or, alternatively, because the verdict is against the weight of the evidence.  (ECF No. 224-1 at 14).  The Court disagrees, holds that the Trustee is not entitled to a new trial on ratification, and therefore denies the Trustee's Motion.

#### A.  Legal Standard

After a jury trial, Rule 59(a)(1)(A) gives a court discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."

*Fosamax*, 742 F. Supp. 2d at 477.  When ruling on a Rule 59 motion, the court "is free to weigh the evidence . . . and need not view it in the light most favorable to the verdict winner."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  The motion may be granted "even when there is evidence to support the jury's verdict, so long as the court 'determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice.'"  *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) (quoting *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005)).

"In order for the Court 'to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence.'"  *Mugavero v. Arms Acres, Inc.*, 680 F.Supp.2d 544, 558 (S.D.N.Y. 2010) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)).

The Rule 59(a) standard is "less stringent" than the standard for granting judgment as a matter of law under Rule 50 "in two significant respects: (1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'"  *Manley*, 337 F.3d at 244–45 (quoting *DLC Mgmt.*, 163 F.3d at 133–34).

Rule 59 motions can also be based on asserted errors in the jury charge.  "A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law."  *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696 (2d Cir. 1993).  "In determining whether a jury instruction was erroneous, the Court must ask 'whether considered as a whole, the instruction [] adequately communicated the essential ideas to the jury.'"  *Cammeby's*, 152 F. Supp. 3d at 163 (alteration in original) (quoting *United States v. Schultz*, 333

34

F.3d 393, 413–14 (2d Cir. 2003). "Analysis of a judge's answer to a jury question follows the

same reasoning utilized by a reviewing court to consider jury instructions provided by the trial

judge." *Urena v. Lape*, 373 F. Supp. 2d 449, 458 (S.D.N.Y. 2005).

### B. The Trustee's Arguments

The Trustee argues that the Court "failed to adequately inform the jury of the law, failed to

adequately cover the issue so that the jury could intelligently determine the question of ratification,

and the Court's failure to provide a further instruction regarding Merhav's 2011 Expenses (over

[the Trustee's] objection) was error and warrant[s] a new trial." (ECF No. 224-1 at 15). He makes

a number of arguments for why the Court's instruction on ratification was improper, including that

the "instruction should, as set forth in prevailing case law, make reference to the 'transaction' as

opposed to a portion of the transactions (*i.e.* which here was the 2011 Payments)," and that the

instruction made "no reference to Merhav's direct or indirect expenses or costs at all, let alone as

relevant or 'material facts' that the Special Committee needed full knowledge of to ratify the 2011

payments." (*Id*. at 16, 18).

The Trustee also argues that he is entitled to a new trial because the verdict sheet on the

common law of ratification erroneously permitted the jury to find that the Special Committee

ratified the 2011 payments to Merhav. (*Id*. at 2). Specifically, the Trustee complains that because

the verdict sheet lacked "any direction as to what 'full knowledge' meant in the context of this

transaction, the jury clearly erred when it answered question 5 in the affirmative." (ECF No. 224-

1 at 4).

Alternatively, the Trustee argues that he is entitled to a new trial because the jury's verdict

was against the weight of the evidence because "the evidence at trial is unequivocal and undisputed

that the Special Committee lacked knowledge regarding Merhav's 2011 Expenses, which were facts material to the determination of Merhav's compensation in 2011." (*Id*. at 25–26).

## C.  Eluz's Arguments

In opposition, Eluz argues that the Trustee fails to meet his "heavy burden" under Rule 59(a) of establishing that the jury's verdict was seriously erroneous or a miscarriage of justice. (ECF No. 231 at 2–3).  Eluz asserts that the Court correctly charged the jury on ratification "based on well-settled Second Circuit authority."  (ECF No. 231 at 25).  She argues that the Court correctly provided the jury with an "all-encompassing instruction that would allow the jury to consider whatever facts it deemed material to [the 2011 Merhav] payments."  (*Id*. at 16).

Eluz contends that the Trustee agreed to, and therefore waived any objection with respect to, the language in Interrogatory No. 5 – a specifically focused question on the "full knowledge" requirement.  (*Id*. at 17–18).  She further maintains that verdict sheets are not to be considered in a vacuum, but rather in conjunction with the jury instructions, (*id*. at 18–19), and that in this case the verdict sheet properly guided the jury in its deliberations leading to a legally sound verdict, (*id*. at 17).  Lastly, Eluz contends that a verdict sheet is not required to be completed in a particular order or in its entirety where the jury reaches unanimity on a complete defense to liability.  (*Id*. at 19–20).

## D.  The Verdict Was Not Against the Weight of Evidence

For the reasons discussed above in Section II.E, the Court holds that Eluz presented substantial evidence supporting a reasonable conclusion that the Independent Directors ratified the 2011 Payments to Merhav.  Among other things, Ampal's 2011 10-Qs and its 10-K dated March 31, 2012 for the year 2011 disclosed the existence and amount of Ampal's payments to Merhav; Eluz, Vaknin, and Firon all testified they knew Merhav's level of services to Ampal increased in

2011 from the prior year; and Vaknin testified that "we" (in context referring to Ampal's decisionmakers) believed that a more detailed accounting would have increased the amount Ampal owed Merhav, and so, in the interest of "cutting expenses," Ampal "didn't do" a detailed accounting. (Tr. 422:5–22). Accordingly, the Court declines to grant the Trustee's Motion on this ground, as the verdict was not against the weight of the evidence presented at trial. *See supra* Section II.E., *Mugavero*, 680 F. Supp. 2d at 558.

### E. The Court Properly Instructed the Jury On the Law of Ratification

The Court's charge and verdict sheet concerning ratification are set forth at pages 15 to 16 of this decision. The charge is supported by and consistent with applicable case law. *See* cases cited *supra* Section II.A.3.

#### 1. "Full Knowledge of Material Facts"

The Trustee nevertheless contends that "[t]he Court's instruction and the Court's answers to the jury's questions failed to adequately inform the jury of the law, failed to adequately cover the issue so that the jury could intelligently determine the question of ratification, and the Court's failure to provide a further instruction regarding Merhav's 2011 Expenses (over [the Trustee's] objection) was error and warrant a new trial. (ECF No. 224-1 at 15). The Court rejects the Trustee's argument that the Court failed to adequately inform the jury as to the law of ratification. The ratification instruction given – which is quoted in full at page 15 of this decision – accurately characterizes governing law as established by Second Circuit precedent, U.S. District Court decisions from this state, and New York State caselaw, including cases that the Trustee himself cites. *See* cases cited *supra* Section II.A.3; ECF No. 224-1 at 7–10.

In fact, the Trustee identifies no misstatement of governing law in the charge on ratification. Rather, as he did at trial, the Trustee argues that the Court was obliged to more

granularly tell the jury that certain specific information that the Trustee focuses on—namely, a quantification of Merhav's services to Ampal in 2010—was a necessary element of whatever could constitute "full knowledge" by Ampal's Independent Directors or Board of "material facts" for purposes of the jury's ratification analysis. (ECF No. 224-1 at 2–3). Thus, at trial, upon receipt of the proposed ratification instruction from the Court, the Trustee asked the Court to add the following sentence: "Plaintiff contends that the Special Committee could not have ratified the transaction because it lacked full knowledge of all material facts, such as Merhav's direct and indirect expenses incurred in allegedly providing services to Ampal in 2011." (ECF No. 224-1 at 16). This request was not backed by caselaw deeming such specificity to be required in a charge. Nor does the Trustee's Motion cite any such law. (*See, e.g.*, ECF No. 224-1 at 23).

The Court therefore adheres to its ruling at trial rejecting the addition of the proposed sentence, which it found and still finds "a contention-restating sentence that's suggestively put and not necessary, (Tr. 937:17–18), and an improper "anchoring restatement of [the Trustee's] position that's too suggestive and unnecessary to properly charge the jury as to the law in this place within the charge." (Tr. 937:13–938:5). The Court understood the Trustee's intention to argue that a quantification was a necessary component of facts that would be "material" for Ampal's ratification analysis, and understood that Eluz contended it was not; thus, in the Court's view, the existing charge appropriately allowed each side to present their contentions in an appropriately explained legal framework which was "already encompassed in the charge language we have." (Tr. 938:1–5). Quite simply, the Trustee's proposed ratification instruction would improperly have told the jury that it was bound as a matter of law to accept a core contention of the Trustee on a hotly disputed fact (and therefore a question to be resolved by the jury), *i.e.,* whether information that Ampal's Independent Directors knowingly chose not to examine and considered immaterial

to their decision-making nevertheless was required for the Independent Directors to "ratify" the 2011 payments to Merhav of which they were well aware and had approved, even where they had consciously decided not to conduct the type of accounting the Trustee insists on due to their concern that the result would be markedly higher expenses for Merhav.  Again, the Trustee provides no law and the Court has identified none requiring such specificity and suggestiveness in an instruction about the law of ratification.  *Cf. Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 888 (2d Cir. 1972) ("For the determination of whether information is material or, alternatively stated, of which such information would have affected the actions of a 'reasonable man' the jury is the appropriate body").

Finally, the conduct of the trial and the parties' summations confirms the correctness and workability of the charge as given.  The Court accurately instructed the jury as to the law of ratification generally, tracking relevant caselaw, and explicitly informed counsel that it was allowing the parties to argue in summation what each party considered "material" with respect to the 2011 Payments.  And that is exactly what the parties did in their respective summations.  (*See* Tr. 1138:6–1139:16; 1143:10–19; 1145:8–17 (Eluz); 1174:3–12 (Trustee)).  Thus, the jury heard heated debate about whether a detailed accounting was or was not required for Ampal to have ratified the disputed payments, and the jury's verdict and verdict sheet demonstrate that the jury concluded an informed ratification occurred.

### 2.  "Transaction" v. "2011 Payments"

The Trustee's other challenge to the charge at trial was and may still be that "[w]ith respect to ratification . . . the instruction should, as set forth in prevailing case law, make reference to the 'transaction' as opposed to a portion of the transaction (*i.e.* which here was the 2011 Payments), and that full knowledge of material facts regarding the transaction must include reference to

Merhav's 2011 Expenses." (ECF No. 224-1 at pp. 16-17). The Court understood the Trustee to

propose (i) putting dismissed prior-year claims before the jury by referring to a "transaction" that

involved a multi-year course of dealing; and (ii) requiring an overly rigid and prescriptive

articulation of what information was "material" for the Independent Directors. The Court therefore

responded to the Trustee's argument stating:

> . . . by adding your appropriate language that there needs to be awareness of the []
> material facts relating to something, fill in the blank, noun to follow, the charge
> instructs that whatever is relevant to what occurred is fair game to be considered
> and must have been taken into account in the ratification.
>
> And I think that because of the prior rulings and procedural history of the
> case, including that claims for relief arising from 2010 events are dismissed, I think
> we need to focus the noun on 2011 payments, so I think it needs to be 2011
> payments here.
>
> What your argument is is that [] prior events are relevant to the
> appropriateness of those payments, but you are able to do that in light of the
> material-facts charge here and instruction here. That's where I come out.

(Tr. 935:2–17). The Court's conclusion was consistent with the position of Eluz's counsel who

opposed the inclusion of the Trustee's proposed language on the ground that "[t]he propriety of

the transaction, at least with respect to the 2010 agreement, is not at issue here and that would be

confusing [to the jury]." (Tr. 936:2–4). That position is correct because, in August 2020, this

Court (by then-presiding Judge Bernstein) granted summary judgment in Eluz's favor dismissing

the First Claim, which alleged that Eluz breached her fiduciary duty to Ampal "in connection with

Ampal's entry into an agreement in 2010 to pay and the payment of certain management fees to

Merhav . . . ." (ECF No. 120 at 2). Indeed, the Court had already proposed an instruction to avoid

any such juror confusion and, without objection by either party, ultimately instructed the jury as

to:

40

**Events occurring before 2011**

During the course of the trial, you were presented with evidence concerning certain matters that occurred [in] 2011, which is the year of the payments that plaintiff Spizz's lawsuit claims were improper. Evidence from earlier periods may include agreements that were entered into before 2011, payments made by Ampal to Merhav in 2009 and 2010, and other pre-2011 events. You may consider evidence of events from before 2011 that you consider relevant to plaintiff Spizz's claims about the 2011 payments, but you should not attempt to determine whether those pre-2011 events were improper in any way, nor may you find defendant Eluz either liable or not liable based on any opinion you may form as to whether those pre-2011 events were or were not proper.

(Tr. 1216:22–1217:10).

Thus, the Court determined that it would "overrule the [Trustee's] objection, which is specifically as to whether the wording should be material facts relating to the transaction or relating to the 2011 payments. I am going to adopt 2011 payments as the proper focus of this trial. That's my ruling." (Tr. 936:11–15).

The Trustee's request that the Court instruct the jury to consider an ill-defined "transaction" as a whole against the backdrop of the parties' multi-year course of dealing, as opposed to the 2011 payments, would have contradicted the Court's prior rulings by asking the jury to evaluate a legal conclusion already drawn by the Court in dismissing the First Claim, and would ignore the Court's instruction with respect to events occurring before 2011. The Court, therefore, properly rejected the Trustee's attempt to relitigate an issue already decided by the Court. *See, generally, Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 277–281 (S.D.N.Y. 2010) (court refused to instruct jury on law of specific performance as requested by plaintiff on the ground that it would contradict the court's prior rulings on that issue).

## F. The Verdict Sheet

The Court rejects the Trustee's complaint that the Court assertedly provided the jury with "a legally deficient Jury Verdict Sheet." (ECF No. 224-1 at 2).

41

"The formulation of special verdict questions rests in the sound discretion of the trial judge," *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 141 (2d Cir. 2007), and will warrant reversal only if the questions mislead or confuse the jury, or inaccurately frame the issues to be resolved, *Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008). In making this assessment, a court must read challenged questions "in conjunction with the judge's charge to the jury." *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 96 (2d Cir. 1998) (internal quotation marks and citation omitted).

Question 5 on the verdict sheet asked the jury: "Did Defendant Eluz prove by a preponderance of the evidence that, at any time after 2011, a Board committee with authority to approve related party transactions had full knowledge of all material facts pertaining to the 2011 Payments?" (ECF No. 222). The Trustee contends that question 5 was misleading because it "failed to identify to the jury what full knowledge meant, and the jury instructions . . . omitted any explanation as to what specifically was meant by the 'full knowledge of all material facts language.'" (ECF No. 224-1 at 21). "[A]t a minimum," the Trustee argues, the verdict sheet should have "included a separate stand-alone interrogatory for the jury to resolve whether the Special Committee had to have knowledge of Merhav's expenses in 2011 to have full knowledge of all material facts." (ECF No. 224-1 at 23).

The Court disagrees; the Trustee's contention echoes its demand for a needlessly and misleadingly slanted definition of "material" information and full knowledge, which fails for reasons discussed in this Decision's prior section. Moreover, the jury in this case was given a verdict sheet that included questions keyed to specific claims and defenses as explained in the jury instructions. *See supra* Section I.C.1. Although question 5 does not detail what full knowledge meant, the jury instructions operate "in conjunction with" the verdict sheet, *Shah*, 148 F.3d at 96,

and explain that "[f]ull knowledge exists where the party claimed to have ratified an otherwise unauthorized act was aware that the payments took place, the material facts relating to the 2011 payments, and the amount of the transaction." (Tr. 1227:8–12). The Court also instructed the jury as follows:

### Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts. You determine the weight of the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the witness testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

\*\*\*

As to the facts, ladies and gentlemen, you are the exclusive judges. You are to perform the duty of finding the facts without bias or prejudice to any party.

(Tr. 1192:19–1193:1; 1194:3–5).

This message was not only delivered orally to the jurors, but they were allowed to take a copy of the instructions with them into the jury room. Because of these instructions as well as the "strong presumption that the jury in reaching its verdict complied with [the court's] instructions," *Bingham v. Zolt*, 66 F.3d 553, 563 (2d Cir. 1995), the Court cannot conclude that verdict sheet was either misleading or incomplete by failing to define the specific phrase "full knowledge" in the manner the Trustee self-servingly requested. *See Woods v. Oneida Cnty.*, 575 Fed. Appx. 11, 12–13 (2d Cir. 2014) (holding that the court's failure to use a specific phrase requested by the plaintiff in the special verdict sheet, when viewed "in the full context of the jury instructions," did not constitute plain or fundamental error warranting a new trial). Viewed in the full context of the jury instructions, the omission from the verdict sheet was not "[a]n error that 'deprive[d] the jury of adequate legal guidance to reach a rational decision' on [the] case's fundamental issue." *Rasanen v. Doe*, 723 F.3d 325, 334–35 (2d Cir. 2013) (citation omitted). Rather, the verdict sheet,

43

together with the instructions, correctly charged the jury as to the governing law and asked questions that were well-designed to ensure that the jury's verdict was informed by findings of fact going to the required legal elements of Eluz's ratification defense.

Accordingly, the Trustee's motion for a new trial based on asserted error in the verdict sheet is denied.

### G. Post-Verdict Meeting With Jurors

After accepting the verdict, the Court explained to the jury that:

> It is my practice to go to the jury room to see if the jurors have any questions about the process or wish to share anything about their experience. I am particularly eager to give you a chance to let me know of anything the court can do to make jury service as convenient and unburdensome, as well as rewarding, as possible. To the extent I am legally permitted, I can answer your questions. You do not have to stay for this. I will be in the jury room only briefly, possibly just for a minute or two. I will not discuss my own views, if any, of the evidence or the strength or weaknesses of any parties' case, and I don't want to hear from you in particular about any specifics of your deliberations. That is really something that's intended to remain among jurors.

(Tr. 1286:17–1287:4).

The Court discharged the jurors and they returned to the jury room. The Court offered counsel the opportunity to speak with the jurors:

> What I'd like to do, having told the jury I'd be happy to go see them, is do so, so that they're not just sitting around, to the extent they're waiting. So what I want to do, unless anyone tells me I can't, is first memorialize that in discussing this on the record earlier with counsel, we agreed I was going to do it with at least one member of each trial team so that there's not any *ex parte* communicating or information known solely to me. You're welcome to join me.

(Tr. 1291:23–1292:5). Counsel for each party and the Court jointly met with the jury to discuss the trial. (*See* ECF No. 224-1 at 3).

According to the Trustee's counsel, a member of the jury, in response to a general question posed by Eluz's counsel, told the parties that the jury deliberated over Merhav's direct and indirect

expenses for 2011 and wanted to know what those expenses actually were. (ECF No. 224-1 at 3; ECF No. 224-3 Ex. C at ¶ 8 (Declaration of Darryl R. Graham dated July 21, 2022)). The Trustee argues that this exchange supports his argument that the Court's ratification instruction was legally deficient because it did not explain what "full knowledge" meant in the context of the case. (ECF No. 224-1 at 3–4). The Court disagrees; if anything, the reported juror comment suggests that the jury understood the governing law and closely considered the parties' respective contentions regarding ratification.

Thus, even setting aside that Mr. Graham's statements about a juror's post-verdict off-the-record remarks are hearsay by definition, *see Fed. R. Evid*. 801(c), this exchange does not call the verdict into question. Rather, juror curiosity about Merhav's expenses in no way reflects juror confusion, nor does it undermine the jury's reported unanimous conclusion that the challenged payments were ratified with full knowledge of material facts. Moreover, even if this were not so, "allegations that a jury was confused by certain legal principles in a case do not warrant further inquiry." *United States v. Aiyer*, 433 F. Supp. 3d 468, 474 (S.D.N.Y. 2020). "Those matters pertain to the jurors' mental processes and should not become the subject of inquiry absent extraordinary circumstances . . . ." *Id*. (citing *Yeager v. United States*, 557 U.S. 110, 122 (2009) ("Courts properly avoid such explorations into the jury's sovereign space[.]")); *Tatum v. Jackson*, 668 F. Supp. 2d 584, 594–95 (S.D.N.Y. 2009) (refusing to overturn a verdict on the basis of alleged juror confusion). Further, "[i]t is well established that, absent evidence of extraneous prejudicial information or outside influence, post-trial jury inquires may not be used to impeach a verdict." *Campbell v. City of New York*, No. 99–Civ.–5129, 2003 WL 660847, at *1 (S.D.N.Y. Feb. 27, 2003). Thus, post-verdict discussions with the jury do not warrant discarding the verdict.

**H. Trustee's Assertion of an Impermissible Compromise Verdict**

The Trustee argues unpersuasively (and without legal support) that the jury's verdict

reflects an impermissible compromise requiring a new trial:

> the verdict clearly represents an impermissible compromise by the jury with respect
> to [Eluz's] ratification defense as no other interrogatory, other than interrogatories
> 5 and 6 in the Jury Verdict Sheet, was answered unanimously.   Further,
> interrogatory 5, which asks whether the Special Committee members had 'full
> knowledge of all material facts pertaining to the 2011 Payments' is deficient as
> neither the interrogatory itself nor the jury instructions provided the jury with an
> adequate description of what 'full knowledge of all material facts' meant in the
> context of this case.   There can be no other explanation for the jury finding that
> there was a proper ratification by the Special Committee members of Merhav's
> 2011 compensation when such a finding is unsupported by the record.

(ECF No. 224-1 at 4–5).

"In order for a [] court to grant a new trial on jury compromise grounds, 'the record itself

viewed in its entirety must clearly demonstrate the compromise character of the verdict.'" *Lindsey*

*v. Butler*, No. 11-cv-9102, 2022 WL 17849009, at *7 (S.D.N.Y. Dec. 22, 2022) (quoting *In re*

*Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011)).   "[T]he inference of

compromise stems from inconsistency between the verdict and the facts adduced at trial." *Ajax*

*Hardware Mfg. Corp. v. Indus. Plants Corp.*, 569 F.2d 181, 184 (2d Cir. 1977) (internal quotation

marks and citations omitted); *Vichare v. AMBAC Inc.*, 106 F.3d 457, 463 (2d Cir. 1996)

("Traditionally, in order to constitute an impermissible compromise the verdict must, at least, be

inconsistent with the facts adduced at trial").   In other words, the record must show that the jury

"reach[ed] agreement by means other than a conscientious examination of the evidence." *Maher*

*v. Isthmian Steamship Co.*, 253 F.2d 414, 416–17.   "A charge of 'compromise verdict' requires

more than a 'reprise' of the argument that the verdict was unsupported by the weight of the

evidence." *Abel v. Town Sports Int'l LLC*, No. 09 Civ. 10388, 2012 WL 6720919, at *9 (S.D.N.Y.

Dec. 18, 2012) (citation omitted).   Yet that is exactly what the Trustee presents here.

The Court emphatically disagrees with the contention that the jury arrived at a compromise verdict in this case.  The jury's verdict is logical and strongly supported by record evidence. "[B]ecause the jury's verdict draws support from the evidence introduced at trial, it cannot be set aside on the unwarranted premise that it was an impermissible compromise."  *Gerber v. Comput. Assocs. Int'l, Inc.*, 303 F.3d 126, 138 (2d Cir. 2002) (citation omitted).  The Court finds no grounds for granting a new trial on this basis.

## CONCLUSION

For the reasons stated above, the Trustee's motion for judgment as a matter of law pursuant to Rule 50(b) is DENIED.  The Trustee's motion for a new trial pursuant to Rule 59 is DENIED. A separate order is not required.

**SO ORDERED.**

Dated:  New York, New York
       January 27, 2023                       *s/ David S. Jones*
                                       _____
                                       HONORABLE DAVID S. JONES
                                       UNITED STATES BANKRUPTCY JUDGE